## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| ORION REFINING CORPORATION, | ) | |
| | ) | Case No. 03-11483 (MFW) |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| MICHAEL G. SYRACUSE d/b/a | ) | |
| INTERSTATE SUPPLY COMPANY, | ) | Adv. Pro. No. 03-53939 |
| and TEXAS ICO, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 06-cv-536 (***) |
| v. | ) | |
| | ) | Re: Adv. D.I. 77, 78, 1522 |
| ORION REFINING CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

---

## OPENING BRIEF ON BEHALF OF APPELLANTS/PLAINTIFFS, MICHAEL G. SYRACUSE d/b/a INTERSTATE SUPPLY COMPANY, and TEXAS ICO, INC., ON APPEAL FROM CHAPTER 11, CA NO. 03-11483 (MFW), AP NO. 06-00051, ADV. PROC. NO. 03-53939

Andrew C. Wilson (#01162)
Thomas R. Blum (#03170)
Susan M. Caruso (#27195)
Simon, Peragine, Smith & Redfearn, LLP
New Orleans, Louisiana 70163-3000
Telephone: (504) 569-2030

Edward S. Rapier, Jr. (#17896)
2160 8th Street, Suite A
Mandeville, LA 70471
(504) 831-3393

Michael R. Lastowski, Esq.
Christopher M. Winter, Esq
Duane Morris LLP
1100 N. Market Street
Wilimington, DE 19801-1246
(302)657-4951

*Counsel for Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO, Inc.*

February 26, 2007

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..................................................................................ii

NATURE AND STAGE OF THE PROCEEDING..............................................1

A.  Procedural Posture of the Adversary Proceedings............................................1
B.  The Merits of the Adversary Proceedings........................................................4

SUMMARY OF ARGUMENT .............................................................................7

1.     The Court applied the wrong elements of Louisiana law............................8
2.     The Court's suspensive condition simply doesn't exist. ...........................9
3.     The Debtor's fault fulfilled any "suspensive condition,"
       even if one had existed. ...........................................................................9
4.     Retroactivity and/or retrospective effects are not at issue.......................10
5.     The Court's construction of the Contract leads to "absurd consequences.".............10

STATEMENT OF FACTS ....................................................................................11

One Man's Trash is Another Man's Treasure....................................................11
The Contract.........................................................................................................12
The Debtor's Interference ...................................................................................13
The Bankruptcy....................................................................................................14
The First Opinion.................................................................................................14
The Post-Judgment Motion..................................................................................17
The Second Opinion .............................................................................................18

ARGUMENT..........................................................................................................19
        Introduction
        Standard of Review ....................................................................................19
            1.   The Court applied the wrong elements of Louisiana Civil law. ....................19
                 A. Sales under the Civil Code.....................................................19
                 B. Sales of a Lump......................................................................23
            2.   There is no suspensive condition ..................................................27
            3.   The Debtor's fault fulfilled Syracuse's obligations under the
                 Contract even if there were suspensive conditions. ....................30
            4.   Retroactivity and/or retrospective effects are not at issue. .............35
            5.   The Court's construction of the Contract leads to "absurd
                 consequences.".........................................................................38

CONCLUSION.......................................................................................................40

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Becnel v. Alexander*, 00-1304 (La. App. 5th Cir. 03/28/01), 783 So.2d 540........................ 39

*Biggs v. Prewitt*, 95-0315, 669 So.2nd 441 (La. App. 1Cir. 10/06/95)
(internal citations omitted)............................................................................................... 20

*Campesi v. Margaret Plantation*, 417, So.2d 1265 (La. App. 1st Cir. 1982),
writ denied, 422 So.2d 163 (La. 1982) ............................................................................38

*Christina Investment Corp. v. Gulf Ice Company*, 55 So.2d 685 (La.App. 1Cir. 1951)........ 23

*Covington v. Ace Transportation Co., Inc.* 36,507
(La. App.2nd Cir. 10/23/02), 830 So.2d 495 ....................................................... 39

*Cox v. Dept. of Highways*, 209 So.2d 9, 11 (La. 1968). .....................................................31

*Davis v. Laster*, 138 So.2d 558 (La. 1962). ......................................................................39

*Doucet v. Huffine Roofing & Construction Co.*, 2002-1049
(La. App. 5th Cir. 02/25/03), 841 So.2d 916 ......................................................................38

*E.B. Ludwig Steel Corporation v. C.J. Waddell Contractors, Inc.*,
534 So.2d 1364 (La. App. 5th Cir. 1988) ............................................................................33

*Electric Neon Clock Company v. Cooper*, 83 So.2d 678 (La. App. 1Cir. 1955)...................22

*Energy Development Corp. v. St. Martin*, 128 F. Supp. 2d 368 (E.D. La. 2000) .................37

*Evangeline Refining Company, Inc.*, 37 B.R. 450 (Bankr. W.D. La. 1984 ..........................25, 26

*Gaubert v. Toyota Motor Sales USA, Inc.*, 99-2569 (La. App. 1st Cir. 11/03/00),
770 So.2d 879 ............................................................................................................. 38, 39

*Givens v. Southern Farm Bureau Casualty Ins. Co.*, 197 So.2d 380
(La. App. 2Cir. 1967) (writ refused) 250 La. 902, 199 So.2d 1916 (La. 1967) ...................22

*Hampton v. Hampton, Inc.* 713 So.2d 1185 (La. Ct. App. 1998) .......................................27

*Harrington v. Oliver*, 459 So.2d 111 (La. App. 2d Cir. 1984) .............................................32

*Hunt v. Suares*, 9 La. 434 (La. 1836) .............................................................29

*In re: Bryson Properties, XVIII*, 961 F.2d 496 (4th Cir. 1992) ............................19

*In re Jatty*, 31 B.R. 46 (Bankr. W.D. La. 1983) ..............................................20

*In re: Perma Pacific Properties*, 983 F.2d 964 (1992)........................................ 19

*In re Squyres*, 172 B.R. 592 (Bankr. C.D. Ill. 1994) ...........................................36

*In re Succession of Dunhan*, 468 So.2d 888 (La. 1981) .......................................21

*IP Timberlands Operating Co., Ltd. v. Denmiss Corp*, 93-1637
(La. App. 1st Cir. 5/23/95), 657 So.2d 282 ....................................................... 38

*Jefferson Parish School Board v. Rowley, Co*, 350 So.2d 187 (La. App. 4Cir. 1977)..........28, 29

*Lafleur v. Hollier Floor Covering, Inc.* 00 00969 (La. App. 3rd Cir. 12/6/00),
774 So.2d 359 ............................................................................................38

*McLain v. Cuccia*, 259 So.2d 337 (La. App. 4th Cir. 1972).................................. 39

*Marcann Outdoor, Inc. v. Hargrove*, 140 So.2d 815 (La. App. 3rd Cir. 1962) ...................39

*Matter of Sanders*, 969 F.2d 591 (7th Cir. 1992) ............................................36

*Matter of Village Rathskeller, Inc.*, 147 BR 665 (Bankr. S.D.N.Y. 1992). ........................36

*Mobile Machinery & Supply Co., Inc. v. York Oil Field Salvage Co., Inc*, 171 So.
872 La. App. 1Cir. 1937................................................................................24, 25, 28

*Morelock v. Morgan & Bird Gravel Company*, 141 So. 378 (La. 1931)..............................23

*Orazio v. Henderson*, 01-0028 (La. App. 3rd Cir. 07/11/01),790 So.2d 754 ........................39

*Orion Ref. Corp. v. Dep't of Revenue*, 2005 W.L. 994575 (Bankr. M.D. La. 4/27/05) ........37

*Payne v. Lyons Cypress Lumber Company*, 7 Teiss. 325, 1910 W.L. 1479,
7 Orleans App. 325 (La. App. Orleans 1910) ........................................................32

*Peleteri v. Caspian Group, Inc.*, 2002-2141 (La. App. 4 Cir. 1/2/03),
851 So.2d 1230 ............................................................................................30

*Pendleton v. McFarlane*, 63 So.2d (La. 1953) ...................................................39

*Penick & Ford, Inc. v. Waguespack & Haydel*, 86 So. 605 (La. 1920)..................................33

*Perlow v. Perlow*, 128 B.R. 412 (E.D. M.C. 1991) ...............................................19

*Peterson v. Schimek*, 98-1712 (La. 03/02/99), 729 So.2d 1024 ...........................................38

*Peyton Place, Condominium Association v. Guastella*, 95-396
(La. App. 5th Cir. 01/17/96), 668 So.2d 1174 ...........................................38

*Remington Rand v. Boliew*, 131 So.2d 835 (La. App. 2Cir. 1961)......................................22

*Roy O. Martin Lumber Company v. Sinclair*, 56 So.2d 240 (La. 1951) .............................22, 23

*S.F. Bowser Company, Inc. v. Wambsgans*, Orleans NO 7552,
2 PELT. 450, 1919 WL 1442 (La. App. Orleans 1919)......................................27, 28

*Schexnayder v. Capital Riverside Acres*, 129 So. 139, 143 (La. 1930). ...............................27

*Singer Company v. Willis*, 435 F. Supp. 1188, n. 3 (W.D. La. 1977)
(applying Louisiana law in a contract issue).........................................20

*Standard Chevrolet Company v. Federal Hardware Implement Mutuals*,
178 So. 642 (La. App. 2Cir. 1937) .........................................23

*Standard Oil Co. of Louisiana v. Allison*, 200 So. 273 (La. 1941)........................................35

*States Masonry, Inc. v. J. A. Jones Construction Company*, 507 So.2d 198 (La. 1987) .......27

*Succession of Welsh*, 111 La. 801 35 So. 913 (1904) ...........................................26

*TR Drilling Co., Inc. Howard*, 463 So.2d 923 (La. App. 2nd Cir. 1985) .............................39

*Tauzin v. Claitor*, 417 So.2d 1304 (La. App. 1st 1982), writ denied,
422 So.2d (La. 1982) .........................................38

*Thomas v. Phillip Werlein, Ltd.*, 158 So. 635 (La. 1935) .........................................23

*Tilley v. Lowery*, 511 So.2d 1245 (La. Ct. App. 1987)..........................................27

*Umholtz v. Brady*, 169 B.R. 569 (E.D. N.C. 1993) ...............................................19

*Ventre v. Pacific Indemnity*, 419 So.2d 969 (La. App. 3Cir. 1982)......................................21, 30

## STATUTES

Louisiana Civil Code art. 1772………………………………………………………10, 31, 35, 37

Louisiana Civil Code art. 1775 ........................................................................35

Louisiana Civil Code art. 1901 and 1905 ........................................................38

Louisiana Civil Code art. 1909 ........................................................................25

Louisiana Civil Code art. 1919 ........................................................................25

Louisiana Civil Code art. 1956 ........................................................................20

Louisiana Civil Code art. 1967 (1984) .........................................................8, 20

Louisiana Civil Code art. 2046. ...................................................................30, 38

Louisiana Civil Code art. 2047. ........................................................................30

Louisiana Civil Code art. 2053. ........................................................................37

Louisiana Civil Code art. 2276 ........................................................................38

Louisiana Civil Code art. 2439 (1998) ............................................................22

Louisiana Civil. Code art. 2456 (1998). ..........................................................20

Louisiana Civil Code art. 2458………………………………………………………23, 25, 26

Louisiana Civil Code art. 2459 ........................................................................25

Louisiana Civil Code art. 2467 ........................................................................25

LSA-C.C. 2474. ...............................................................................................39

## RULES

§541 of the Bankruptcy Cod ............................................................................2

Rule 7054(a)......................................................................................... 6

Federal Rules of Bankruptcy Procedure, Rule 8013.............................................19

## **MISCELLANEOUS**

James E. Archibald, *Pledges of voluntary contributions to the United Nations by member states; establishing and enforcing legal obligations, 36 Geo. Wash. Int.'l L. Rev. 317 (2004)(internal quotations omitted)* ..................................7

*Litvinoff*, Obligations§39-52 (1975) ....................................................................................26

## NATURE AND STAGE OF THE PROCEEDING

### A. Procedural Posture of the Adversary Proceeding

In May 2002, proceedings were commenced in the 29th JDC for the Parish of St. Charles, Louisiana, in which Michael G. Syracuse d/b/a Interstate Supply Company and Texas ICO, Inc. (collectively, "Syracuse") filed a claim against Orion Refining Corporation, the owner of a refinery in NORCO, Louisiana.  Syracuse alleged that Orion Refinery Corporation had sold certain "Surplus Materials" to Syracuse, some of which Syracuse sold to third-parties and some of which Syracuse had sold back to the refinery, but that the refinery officials would not allow Syracuse access to the remainder.  Orion Refinery Corporation answered denying liability and sought arbitration to which the parties eventually agreed.  The parties then spent considerable time arranging the format for the arbitration.

One year later, on May 13, 2003, Orion Refining Corporation ("Orion" or the Debtor") abruptly filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware.  This unexpected filing by Orion stayed the State proceedings in Louisiana.

Shortly thereafter, Orion filed a motion (D.I. 24) (the "Sale Motion") seeking authority to sell (the "Sale") substantially all of its operating assets, primarily consisting of Orion's refinery located in Norco, Louisiana (the "Refinery") and related assets, to Valero Refining – New Orleans, L.L.C. ("Valero") or another successful bidder.  In response, Syracuse filed an objection (D.I. 268) to the Sale Motion (D.I. 24) because it included the remaining "Surplus Materials", which he had purchased from Orion nearly two years before the bankruptcy proceeding.  Again, Orion had prevented Syracuse from removing most of the Surplus Materials after Syracuse had sold a significant amount to third-parties and even back to Orion.  Meanwhile, the Debtor had

1

sought the approval of the sale on an expedited basis and Syracuse's objection was one of the few presented.

The Debtor's attorneys then drafted a proposed order, which allowed for the sale of Syracuse's Surplus Materials as part of the sale of the entire refinery to Valero, but at the same time substituted a formal escrow fund in the amount of $1,500,000.00 for the remaining Surplus Materials so that if Syracuse established that he had acquired title to the Surplus Materials before the bankruptcy, the escrow fund would be used to satisfy Syracuse's claims in part, as his actual claim was much larger. This is because the amount of the escrow fund was based upon an inventory of only those individual items for which there was a salvage value as opposed to scrap value. Again, it should be noted, that this Order was proposed by the Debtor's attorneys, drafted by the Debtor's attorneys, and agreed to by Syracuse only as a compromise and courtesy to the Debtor and its creditors so as to allow the sale to proceed.

Based on these events, the Court entered an Order (D.I. 336) (the "Sale Order") on June 26, 2003, consummated on July 1, 2003, approving the sale to Valero and granting related relief, which included certain stipulations resolving Syracuse's Sale Objection. Syracuse's Sale Objection was memorialized in ¶ 57 (a) of the Sale Order as follows:

> Pending *final adjudication of [Syracuse's]* asserted ownership interest in the Surplus Materials, the Debtor shall establish an escrow account (the "escrow account") funded with $1,500,000.00 in cash from the proceeds of the Sale of the Purchased assets to the purchaser ("the escrow amount"). In the event of a determination by a *final order* of this Court or another court of competent jurisdiction that: (i) [Syracuse] owned some or all of the Surplus Materials at the time of the Sale and some or all of the Surplus Materials did not become property of the Debtor's bankruptcy estate pursuant to §541 of the Bankruptcy Code upon the commencement of the Debtor's bankruptcy case; and (ii) that some or all of the Surplus Materials were transferred to the Purchaser pursuant to the terms of this Order, [Syracuse's] ownership Interest in such Surplus Materials shall be deemed attached to the escrow Amount in an amount to be determined by the Court. *The Debtor shall not transfer or*

*encumber the escrow Account pending such adjudication*.  Further, upon such adjudication, the Debtor shall *promptly deliver* to [Syracuse] any amounts in the Escrow Account to which it is entitled.  [Syracuse] and the Debtor agree to seek a prompt determination of the Syracuse Adversary Proceedings.  (Sale Order ¶ 57(a)).  (emphasis added)

Paragraph 57 (a) clearly requires a "final adjudication" and a "final order" before any action may be taken with regard to the escrow.  Indeed, ¶57 indicates that "the Debtor shall not transfer or encumber the escrow account pending such adjudication."  Consequently, the Debtor was and is not allowed to do anything with the escrow until such time there is a "final adjudication."  This is the plain language of the ¶57 drafted by the Debtor's own attorneys.

Subsequently, on or about September 13, 2003, Syracuse filed a proof of claim (Claim No. 269), asserting a secured claim against Orion in the amount of $2,330,894.35,[1] which included both the inventoried items as well as additional scrap items.  Syracuse had also filed the instant adversary proceeding on June 19, 2003. (D.I. 1)

On July 2, 2004, the Court entered an Order (D.I. 1361) (the "Confirmation Order") confirming the Amended Plan of Liquidation of Orion Refining Corporation, dated May 12, 2004 (D.I. 1242) (the "Plan").  Also, on July 2, 2004 (the "Effective Date"), the Plan became effective, the Debtor was dissolved, the ORC Distribution Trust was established and Cypress Associates, LLC was appointed as the trustee of the ORC Distribution Trust (the "ORC Representative").  Since the Effective Date, the ORC Representative has administered the ORC Distribution Trust, including, without limitation, conducting this and certain other litigation to which the Debtor was formerly a party.

Despite the plain language of ¶ 57, the Debtor ignored its obligation to establish an escrow account.  As a result, Syracuse filed an objection (D.I. 1318) to the confirmation of Orion's Plan

---

[1]     Syracuse later filed a request for allowance of an administrative expense (D.I. 1400) in the same amount.

on June 18, 2004 which resulted in ¶51 of the Confirmation Order, (again, drafted by the Debtor's own attorneys) which required the Debtor to "execute a third-party escrow agreement." When the Debtor proposed unnecessary, onerous conditions upon Syracuse, an impasse occurred, and the Debtor then moved to transfer the funds at issue into the Court's registry account by formal motion. (D.I. 1390)  After further negotiations between the parties and the involvement of the Court, a new Order was presented and executed on or about December 6, 2004 authorizing and directing the ORC representative to transfer the Orion funds into the Court's registry account (D.I. 1522).  According to the Debtor, the funds remain in the registry of the Court at the present time.

## B.  The Merits of the Adversary Proceedings

Syracuse was required by the elements of ¶57 of the Sale Order to establish that: (1) Syracuse held title to the Surplus Materials at the time of the sale, (2) the Surplus Materials were present at the refining on July 1, 2003, the date of the sale; and, (3) the value of the Surplus Materials was $1,500,000.00 or more.  Initially, Syracuse filed a motion for partial summary judgment on the issue of whether the Surplus Materials were present at the refinery at the time of the sale to Valero.  This was a necessary factual foundation for the title issue.  Syracuse had to file the motion only because the Debtor had denied basic Requests for Admission on this issue, forcing unnecessary discovery for Syracuse.  Eventually, the Debtor capitulated and this Motion was granted pursuant to Court Order. (D.I. 76).

Meanwhile, the parties had filed cross-motions for partial summary judgment on the issue of title as of the date of the sale to Valero. ("ADV. D.I. 37, 38, 47, 48, 60 & 63).  After oral argument on September 14, 2004, the motions were taken under advisement by the Court, the Honorable Charles G. Case, presiding.  The matter was then transferred internally within the

4

Court on April 25, 2005 (D.I. 70), and then reassigned to the Honorable Mary F. Walrath on June 15, 2005. (D.I. 72), who chose not to hear oral argument.  On April 17, 2006, the Court issued its Memorandum Opinion (ADV. D.I. 77) (the "Opinion") and related Order (ADV. D.I. 78) (the "PSJ Order") denying Syracuse's Motion for Partial Summary Judgment on title to the Surplus Materials and granting the ORC Representative's cross-motion for partial summary judgment on the same issue of title.  In the PSJ Order, the Court directed that the "proceeds of the sale held in escrow shall be released to the Debtor."

On April 27, 2006, Syracuse filed a Motion to Alter, Amend and/or Reconsider Judgment and/or for New Trial (ADV. D.I. 81) as regards both the Opinion and the PSJ Order and related relief; a memorandum of law in support thereof (ADV. D.I. 84), (as amended, ADV. D.I. 86); an emergency motion for stay of enforcement of the PSJ Order (ADV. D.I. 82); and, a motion for an emergency hearing on the Reconsideration Stay Motion (ADV. D.I. 83).  On May 11, 2006, the ORC representative filed an objection to the reconsideration stay motion (ADV. D.I. 90) and its brief in opposition to reconsideration  (ADV. D.I. 91).  Syracuse then filed a reply in support of reconsideration on May 18, 2006 (ADV. D.I. 92).

Argument was held on the Motion related to the stay as to the release of the escrow funds on June 6, 2006.  At the time of the hearing, Syracuse's counsel made it clear that if the Court were to distribute the escrow pending Syracuse's pursuit of further relief en route to a final adjudication on appeal, the best that Syracuse could hope for would be a Pyrrhic victory, as even if Syracuse did prevail eventually on the merits, there would be no funds to satisfy his claim, and Syracuse would have nothing, which would result in irreparable harm.  Tr. p. 5   In addition, Syracuse's counsel pointed out that the plain language of ¶57 clearly referred to a "true final adjudication through the final appeal."  Tr. p. 6

5

In response, the Court acknowledged that it "didn't focus on the final adjudication language of the Sale Order" and raised the question that if that "if that's what the parties agree to, don't I need to comply with that?" *Id.* Therefore, the Court ruled in favor of Syracuse, finding that the stay should remain in effect. As the Court stated:

> Okay. Well, I think I am convinced that given the final language in the Order, I think that it's not appropriate, wasn't appropriate for me to have directed the disbursal of the escrow funds until any adjudication is final since there's a pending motion for reconsideration, I think I'll either grant the stay or at least modify my order not to direct disbursal of the moneys until there's final adjudication. (Tr. p. 16).

The Court also noted that "there would be irreparable harm because the stipulation gave them the escrow, and anything less than that I think would be irreparable harm." Tr. p. 17  On that basis, the Court rescinded its original Order of dispersal of the escrow and granted the stay.

Thereafter, the Motion to Alter, Amend and/or Reconsider Judgment and/or for New Trial was argued on June 28, 2006 (See D.I. 105).  The Motion was then taken under consideration and on August 8, 2006, the Court denied the Motion.  (D.I. 108, 109)  On August 17, 2006, Syracuse filed a Notice of Appeal from the Court's Opinion and Order (D.I. 112).  Subsequently, the Debtor filed a motion pursuant to Rule 7054(a) for Express Determination That There is No Just Reason for Delay (D.I. 116), and a second Motion seeking an Order declaring the Court's Judgment final and seeking a release of the escrow funds. (D.I. 114, 115, 116, 117)  The Court granted the former and denied the latter. (D.I. 125)  The appeal was perfected on September 5, 2006 (D.I. 121), and the record designated by the parties. (D.I. 119,122).  Notice of Completion of Mediation was filed on December 14, 2006. (USDC D.I. 6)

This adversary proceeding is now before the Court solely on the basis of Syracuse's appeal. The case is presently unassigned and is to be assigned to the Judge who fills the vacancy of the

Honorable Kent A. Jordan who was elevated to the United States Court of Appeals for the Third Circuit. (USDC D.I. 7).

## SUMMARY OF ARGUMENT

What happened below in this matter is not an atypical result of what happens when the Louisiana Civil Code meets the common law. All of the precepts, concepts and principles from Louisiana law originate from the French Napoleonic Code, forty years of Spanish civil law and the influences of Roman law, and render the Louisiana Civil Code and Louisiana law in general, unique from the other forty-nine States. One of the cardinal rules of analysis under Louisiana law is that English common law may not be incorporated into Louisiana law absent a specific codal provision to that effect. In other words, the Louisiana Civil Code controls. Indeed, the two systems function as reciprocals of one another: the common law's inductive reasoning system requires the derivation of "general principles or rules of law from precedent...extracting an applicable rule, which is then applied to a particular case."[2]  In contrast, the deductive reasoning process of the civil law involves the application of "general code provisions to the facts of the case to reach a specific solution."[3] Here, the Court used neither system.

Syracuse submits that the wrong result occurred below for five major legal reasons which primarily resulted from the Court's attempt to apply and then reconcile common law concepts in a civil law context. Additional errors resulted from the Court's attempt to read non-existent contractual provisions into the parties' contract, further compounded by the Court's reliance upon non-existent facts or events, and, the Court's insertion of *new* theories each time Syracuse

---

[2]    James E. Archibald, *Pledges of voluntary contributions to the United Nations by member states; establishing and enforcing legal obligations, 36 Geo. Wash. Int.'l L. Rev. 317, 332 (2004)(internal quotations omitted).*

[3]    Id.

refuted the theories presented by the Court as adopted by the Debtor.  The resulting Opinion as supplemented by the Second Opinion contains the following five major errors:

**1.  The Court applied the wrong elements of Louisiana law.**

The specific codal Article 2458 from the Louisiana Civil Code associated with sales "in a lump" as well as the jurisprudence interpreting same should have dictated the outcome of this matter.  Since there was a specific codal Article governing the fact situation, and since there are cases "on all fours" on this issue, under Louisiana Civil law, the Court should have granted Syracuse's motion on title.  The Court simply never addressed this codal article and instead found a common law "conditional sale," although not labeling its conclusion as such, and then inserted a "suspensive condition" into the parties' agreement which is nowhere to be found in the written document governing the terms and conditions of the parties.

The Court apparently concluded that until such time as Syracuse had furnished *all* of the consideration (or "cause" under the civil law)[4] for the Surplus Materials he purchased from the Debtor, he could not take title.  From the Court's standpoint, this consideration took the form of both Syracuse's payment of $100,000.00 under the Contract, which he paid, as well as his obligation to remove the Surplus Materials and clean-up the property thereafter.  While the common law recognizes such a "conditional sale" by which the seller retains title until all of the consideration has been furnished, Louisiana civil law does not recognize the concept and instead finds title has passed upon an agreement between the seller and the buyer as to the price and the object.  Thus, the Court's construction of the Contract simply could not happen under Louisiana law.

---

[4]  See, La. Civ. Code art. 1967 (1984).

8

2.    **The Court's suspensive condition simply doesn't exist.**

The Court concluded that Syracuse's "performance of his clean up services was a suspensive condition to his obtaining title to the Surplus Materials in the designated areas."[5]    This was a welcome surprise to the Debtor as this was nowhere set forth in the Contract governing the terms and conditions of the parties' agreement nor was there any testimony beyond the "four corners" of the Contract of any intent by the parties along those lines.    Indeed, the practice and conduct of the parties belied such an interpretation since Syracuse clearly took title as of the time of the agreement and sold over $700,000.00 worth of Surplus Materials with the Debtor's full knowledge and permission, some of which was sold "as is, where is" on location, in the refinery, without moving or delivering many such items outside of the refinery.    In fact, some of the items were sold directly back to the Debtor without ever moving them from their location.    Thus, the so-called "suspensive condition" was simply never "suspended": title to the Surplus Materials had clearly passed.    Moreover, Syracuse could not clean the entire seventeen subject areas of the refinery until most of the large items were sold and/or removed from each area so as to allow for access.    Consequently, the "suspensive condition" was not only legally but factually non-existent or impossible.

3.    **The Debtor's fault fulfilled any "suspensive condition," even if one had existed.**

The uncontroverted testimony of the Debtor's former employee shows that the Debtor's supervisory personnel deliberately interfered with Syracuse's attempts to remove the "Surplus Materials."    Under Article 1772 of the Louisiana Civil Code, any obligation or "suspensive condition," if one ever existed, would have been fulfilled or satisfied when Syracuse's

---

[5]    Opinion at p. 7.

9

performance under the Contract was no longer possible. This occurred when the Debtor locked Syracuse out on or about March 31, 2002, well over a year before the Debtor filed its bankruptcy Petition and/or the sale to the third-party Valero, took place in July 2003. Consequently, there is absolutely no basis in fact or law for the Court to have found the existence or legal effect of any "suspensive condition."

### 4.    Retroactivity and/or retrospective effects are not at issue.

The Court repeatedly erred in construing Syracuse's contentions as an effort to seek a retroactive recognition and/or a reversion of title back from the bankruptcy estate to Syracuse. In reality, Syracuse's contention was and is that Syracuse acquired title as soon as the agreement as to price and the object (i.e., the Surplus Materials) was reached. Further, any civil law obligations under the Contract were deliberately frustrated by the actions and "fault" of the Debtor and were thus fulfilled under Louisiana Civil Code art. 1772. This would have occurred, at the latest, by March of 2002, well over a year before the Debtor filed for bankruptcy, creating the Debtor's bankruptcy Estate. Thus no rights of the Debtor, the bankruptcy estate or a third-party could have been affected, which was the concern of the Court.

### 5.    The Court's construction of the Contract leads to "absurd consequences."

The Court's construction of the Contract was that title to any of the Surplus Materials could not pass to Syracuse unless the Surplus Materials left the refinery. But then the Debtor purchased items back from Syracuse while the items remained in or near their original location within the refinery. Syracuse also repeatedly sold items to third-parties both *in situ* and by transportation offsite. Ignoring these facts, the Court ruled that Syracuse could only take title to items if he cleaned the area where they were located "concomitantly." But there was no testimony or evidence that this procedure ever occurred or that this was the understanding of the

10

parties. To the contrary, Syracuse clearly took title to many of the Surplus Materials without such "concomitant" action. The Court was also never able to reconcile why Syracuse would pay $100,000.00 solely for the privilege of cleaning up the refinery, or why the terms "buyer," "seller," "sold," and "warranty" were present within the Contract if the sole or even the main purpose of the Contract was for the Debtor to clean the refinery. In reality, the only reason why Syracuse was not able to remove his Surplus Materials was that the Debtor's representatives prevented him from doing so, and even attempted to force him to clean-up areas not among the seventeen designated areas within the Contract.

Even if the import of this Contract was not immediately apparent or was ambiguous, the Contract which was drafted by the Debtor's representatives should have been construed against the Debtor and the Court should not have gone beyond the Contract's "four corners" to interpret the Contract and determine the intent of the parties from their actions. Such an inquiry would have resulted in the inevitable conclusion that title had passed to Syracuse immediately upon the parties' agreement as to the price and object under the Louisiana Civil Code; that the parties permitted numerous sales to proceed based upon this understanding, including sales to both the Debtor and third-parties; and, that the Debtor's unjustifiable concern that Syracuse would not complete the clean-up or simply petty jealously, resulted in the Debtor's representatives initiating "Self-help," preventing Syracuse from cleaning up the subject areas of the refinery. No other construction is possible.

## STATEMENT OF FACTS

### One Man's Trash is Another Man's Treasure

In early 2001, Syracuse received word that the Debtor wished to sell certain surplus equipment, materials and scrap materials ("the Surplus Materials") located in specific areas

around the Debtor's refinery located in St. Charles Parish, Norco, Louisiana. While these Surplus Materials held little value for the Debtor, because of decades in the salvage business Syracuse knew the Surplus Materials could be sold for substantial value. Thereafter, Syracuse toured the Debtor's refinery facility on several occasions to examine the Surplus Materials which had been set aside and marked for sale.[6] Syracuse then tendered a written offer to the Debtor to purchase the Surplus Materials for $100,000. He also offered to clean-up the areas from which the Surplus Materials would be removed.

### The Contract

The Debtor accepted Syracuse's offer and in response the Debtor prepared Contract No. 0019549 ("the Contract") dated April 24, 2001.[7] The Contract was executed by the Debtor on April 26, 1991 and by Syracuse on May 1, 1991. The Contract states that Syracuse was to pay $100,000 for the Surplus Materials.[8] The Surplus Materials, which he was purchasing, were those items aside from permanent or fixed assets,[9] located in "all designated areas as shown on drawing No. 004-003-1-272" which was Exhibit "E" to the Contract.[10] There were seventeen (17) areas in total. The Surplus Materials to be sold had been set aside in those areas, photographed and labeled.[11]

After removal of the Surplus Materials, Syracuse was to clean the same designated areas to "completion" which was defined as "graded and able to cut grass without obstruction."[12] Obviously, he could not cut grass with enormous tanks, valves and other Surplus Materials still

---

[6]  Deposition of Stanley Favalora, former Orion employee, at pp. 12-13 (Exhibit 2).
[7]  Deposition of Stanley Favalora, former Orion employee, at pp. 12-13 (Exhibit 2).
[8]  Contract at p. 3, IV, "Pricing".
[9]  Contract at p.2, Section II, "Scope of Work (A)"
[10]  Contract at p. I, Section II, "Scope of Work(A)".
[11]  Deposition of Stanley Favalora, former Orion employee, at pp. 12-13 (Exhibit 2).
[12]  Contract at p.2, Section II, "Scope of Work (A)".

in place.  Significantly, there was and is nothing in the Debtor's contract that required Syracuse to clean-up the entire property *before* title would pass or before he could move any of the sold items offsite, or, which permitted the Debtor to bar Syracuse from removing the Surplus Materials from the seventeen different areas.  To the contrary, the contract allowed Syracuse to enter any of the seventeen areas and then cordon them off so as to restrict access to Syracuse alone.[13]  There was also nothing that required Syracuse to clean all areas either before or "concomitantly" with the sale of the Surplus Materials, as the Court would later conclude. Indeed, Syracuse immediately began selling items to third parties without any objections by the Debtor.  Syracuse was even selling the materials back to the Debtor.

### The Debtor's Interference

Syracuse's progress began to slow down, however, when the Debtor's representatives began to arbitrarily impede and prevent Syracuse's access to the seventeen designated areas in direct contravention of the specific terms of the Contract.  They even forced him to clean areas outside of the seventeen designated areas by barring his access to his Surplus Materials.  Nevertheless, despite the interference throughout the Spring of 2001, Syracuse continued in his efforts to remove the Surplus Materials he had purchased.  Syracuse also cleaned up some of the areas from which the Surplus Materials were removed to the satisfaction of the Debtor.  Yet, the Debtor's actions prevented Syracuse from being able to remove *all* of Syracuse's Surplus Materials.[14]  Eventually the Debtor's interference culminated in the Debtor's final act when the Debtor actually locked Syracuse out of the refinery in March of 2002.[15]

---

[13]  Contract at p. 2, Section II, "Scope of Work (A)".
[14]  Affidavit of Arthur J. "A.J." Kahoe (Exhibit 1); Deposition of Stanley Favalora at pp. 19, 20-25. 33 and 52; Deposition of Leslie Collins at pp. 45-46, 56, 69, 70, 75-77, 89, 113, 145 and 153.
[15]  Id.

Just before that time however, Syracuse had an appraisal of some of the Surplus Materials performed by Mark Israel of Rosen Systems, Inc.[16]    This appraisal valued some of the remaining Surplus Materials at $1,591,150.00.  It should be noted that, this amount was not known by Syracuse or the Debtor prior to the lock-out and there was no connection or correlation between the value of the Surplus Materials or the value of cleaning the property.  It should also be noted that removal of the Surplus Materials themselves was part of the contemplated clean-up.

### The Bankruptcy

Once Syracuse was locked out, Syracuse was not able to clean up further nor was he able to get access to his Surplus Materials.  As a result, Syracuse was forced to file a claim in State court against the Debtor in May 2002.  After stalling based upon an agreement to arbitrate, the Debtor eventually declared bankruptcy one year later in May 2003. The primary purpose of the bankruptcy proceeding was for the Debtor's well-planned sale of the entire refinery to Valero.

By July 2004, Cross-Motions for Summary Judgment were eventually filed  by the parties related to whether Syracuse had obtained title to the Surplus Materials from the Debtor, not whether "title to the Surplus Materials passed to the 'purchaser' (Valero),"[17] as the Court would eventually rule.

### The First Opinion

On April 17, 2006, the Court issued its Memorandum Opinion[18] granting the Debtor's Motion and denying Syracuse's Motion.  In the Opinion, the Court applied selected provisions of Louisiana law, few of which had been raised by the parties.  First, the Court held that

---

[16]  Attached to Original Complaint, D.I.1.

[17]  Opinion at 1.

[18]  Adv. D.I. 77.

14

Syracuse could never have acquired title to any of the Surplus Materials until such time as Syracuse had cleaned up *all* seventeen areas of the refinery which were the subject of the Contract.[19]  In reaching this conclusion, the Court did not explain how Syracuse sold a significant number of Surplus Materials to third-parties and even back to the Debtor, with no objection from the Debtor, despite the fact that the subject areas had not been cleaned up.  The Court's Opinion also did not address the practical aspect of the situation: that the areas could obviously not be cleaned until the Surplus Materials were removed.  Finally, the Opinion did not address the fact that many of these Surplus Materials were sold "as is/where is" and were not removed by Syracuse or any third-party until after the sales were perfected with no objection from the Debtor and with specific oversight by the Debtor's Representatives.

Compounding the obvious flaws in logic inherent in the Court's analysis was the Court's legal conclusion that cleaning up the entire property was a "suspensive condition" which prevented the passage of title to Syracuse.  In reaching this legal conclusion, the Court failed to address the fact that the condition was not "suspended" since title had passed as evidenced by resales, and, the fact that *there was no wording whatsoever* in the Contract as to a "suspensive condition" of any kind which would prevent the passage of title.  Nor did the Court address those provisions of Louisiana law, particularly the Louisiana Civil Code, which require express language setting out a "suspensive condition" for such to be recognized.  More importantly, the Court failed to address the specific codal articles applicable to sales of this type, particularly article 2458 of the Louisiana Civil Code, addressing sales "in a lump" as was the case here.  In effect, what the Court had actually found, although not using the label, was that the Contract constituted a common law "conditional sale" whereby a seller retains title

---

[19]  Opinion, pp. 5-8.

until certain conditions are fulfilled by the buyer. This is a concept which is simply not recognized under the Louisiana Civil Code. What the Court had seized upon was an alleged partial failure of "consideration," in common law terms, since Syracuse had not completed the clean-up. This is not a barrier to a sale in Louisiana.

The Court's Opinion next addressed the concept of the "seller's fault" which Syracuse had raised since the Debtor's representatives had prevented Syracuse from cleaning up the property. This is a defense to an alleged failure of performance or an obligation specifically recognized under Louisiana Civil Code art. 1772. The Opinion specifically recognizes the existence of that codal article, and in addition noted that under Louisiana Civil Code art. 1775, the effect of such interference by the seller is "retroactive to the inception of the obligation, i.e. from March 31, 2002 back to May 2001."[20]

To circumvent this problem, the Court raised an issue that had never been raised by either of the parties: that because title to the refinery passed from the Debtor to the bankruptcy estate upon the filing of the bankruptcy proceeding, and because the refinery had been sold to Valero, a third-party, title could not retroactively transfer from Valero, an innocent third-party, back to Syracuse. What the Court did not address was the fact that title was already vested in Syracuse as of the day of the sale and at the latest, assuming a suspensive condition existed, on the day he was locked out of the refinery in March 2002, over one year before the bankruptcy proceeding had been filed. Thus, there could be no issue of retroactivity or retrospective application if the Debtor had interfered with Syracuse's fulfillment of the Contract. It should

---

[20]  Opinion at p. 9.

also be noted that the Opinion at the same time indicated that there was a genuine issue of fact "over whether the Debtor interfered with Syracuse's performance of the Agreement." [21]

## The Post-Judgment Motion

From this adverse decision, Syracuse filed a Motion to Alter, Amend and/or Reconsider the Judgment and/or for New Trial on April 27, 2006.[22] In that Motion Syracuse pointed out the factual flaws inherent in the Opinion, the fact that the Opinion did not address the actual, applicable law, and, that the Opinion applied the common law concept of a conditional sale while at the same time inserting numerous legal theories which the Debtor had never raised, but which allowed the Debtor to prevail. Eventually, oral argument was held before the Court on June 28, 2006.

At that time, the Court raised yet another new "selective waiver" issue, apparently to address the inexplicable scenario by which Syracuse supposedly did not have title to the Surplus Materials, but was still selling the Surplus Materials to third-parties and back to the Debtor with the Debtor's approval and without removing them first. The Court suggested that perhaps there was a "selective waiver" by the Debtor of the "suspensive condition."[23]

At that point in time, the Court had not only inserted a "non-existent Suspensive Condition," into the Contract, the Court was then attempting to address the fact that the parties' actions belied such a "suspensive condition" by suggesting that some sought of "selective waiver" had occurred. This is despite the fact that, like the "suspensive condition," there was absolutely no evidence of any "selective waiver" in any of the testimony, any of the documents in the record, or even in the contentions of the Debtor.

---

[21] Opinion at p. 9.
[22] D.I. 81.
[23] Transcript, p. ___ (6/28/06).

## The Second Opinion

On August 8, 2006, the Court issued its second opinion denying Syracuse's Motion.[24]  By that point in time, the Debtor had adopted the Court-created theories, including the newest waiver theory, as its own.  The Court accepted the Debtor's retrospective justification for the new "selected waiver" theory indicating that the Contract's language allowed for "selective waiver."[25]  Next, the Court addressed the language in the original Opinion which stated that, "Syracuse could not establish his title to the Surplus Materials over the interests of Valero," ruling on the retroactivity or retrospective issue.  The Second Opinion indicates that despite the clear language of the first Opinion, what the Court actually meant was that title passed to the "Debtor's Bankruptcy Estate,"[26] not Valero.  There was no explanation given for these completely contrasting rulings.

The Second Opinion then goes on to side-step the obvious fact that if the Debtor's interference in Syracuse's performance had resulted in Syracuse's acquisition of title, (this assuming the non-existent "suspensive condition" existed), the filing of the bankruptcy proceeding somehow did not improve the position of the bankruptcy estate, which was allowed to acquire title to the Surplus Materials, an interest which the Debtor would not have had under the applicable Louisiana law, as Syracuse would have acquired title in March 2002, effective to the original date of the sale one year before, and two years before the bankruptcy was even filed.  Finally, the Second Opinion suggests that the "suspensive condition" must have been implied, apparently because it obviously was not present in the Contract.[27]  From

---

[24]  D.I. 109 (the "Second Opinion").
[25]  Second Opinion at pp. 17-18.
[26]  Second Opinion, pp. 13-14.
[27]  Second Opinion at p. 9.

these adverse rulings incorporated in both the Opinion and the Second Opinion, Syracuse now appeals to the District Court.

## ARGUMENT

### Standard of Review

Under the applicable standard of review, the lower-court's decision should be reversed in its entirety.  Pursuant to Rule 8013 of the Bankruptcy Rules, on appeal, the District Court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.[28]  In an appeal from bankruptcy proceedings, the District Court sits as an appellate court and applies the same standard of review as those governing an appellate review in other cases.[29]  In general, an appeal from a bankruptcy court only involves two standards of review: (1) as to findings of fact, a district court must proceed under a clearly erroneous standard of review;[30] and, (2) as to conclusions of law, a *de novo* standard of review is appropriate.[31]  Under this standard, both the lower Court's factual findings and conclusions of law should be reversed. Syracuse's contentions are set forth in greater detail below based upon five (5) separate premises.

### 1.  The Court applied the wrong elements of Louisiana Civil law.

#### A.  Sales Under the Civil Code

As to sales in general, under the Louisiana Civil Code, Article 2439 provides that a "sale is a contract whereby a person transfers ownership of a thing to another for a price and money."[32] The article continues, stipulating that the simple requirements for the perfection of a sale are

---

[28]  Federal Rules of Bankruptcy Procedure, Rule 8013.
[29]  *In re: Perma Pacific Properties*, 983 F.2d 964, 966 (1992).
[30]  *In re: Bryson Properties, XVIII,* 961 F.2d 496, 499 (4th Cir. 1992).
[31]  *Umholtz v. Brady*, 169 B.R. 569, 572 (E.D. N.C. 1993); *Perlow v. Perlow*, 128 B.R. 412, 414 (E.D. M.C. 1991).
[32]  La. Civ. Code art. 2439 (1998).

"the thing, the price, and consent of the parties."[33]  The code essentially requires a "meeting of the minds of the parties as to the object to be sold and the price."[34]  Without agreement on these two basic elements, although there may be some form of contract, "there is no sale."[35]  Here, obviously the objects were designated as the Surplus Materials were labeled, photographed and set aside, and, the $100,000.00 price was agreed.  Thus, the requirements for a sale were met.  Syracuse also agreed to cleanup afterwards as part of the arrangement.  The latter was of no moment, however, as title would still pass even if the consideration[36] was incomplete, i.e., the cleanup were not complete, as the sale had been perfected already under Louisiana law.  This is because Louisiana law on sales is also very specific as to title or ownership.

More specifically, Louisiana Civil Code Article 2456 states that: "[o]wnership is transferred between the parties as soon as there is an agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid."[37]  As such, the contract of sale becomes perfected when the agreement is signed and when there is a clear identification of the items exchanged and the price.[38]  Once an agreement reflects the specific items to be bought and the specific price to be paid, the sale is complete.[39]  The buyer "becomes bound to pay the purchase price," and the seller is "divested of ownership."[40]

---

[33] *Id.*
[34] *Biggs v. Prewitt*, 95-0315, 669 So.2nd 441, 443 (La. App. 1Cir. 10/06/95) (internal citations omitted).
[35] *Singer Company v. Willis,* 435 F.Supp. 1188, 1190, n. 3 (W.D. La. 1977) (applying Louisiana law in a contract issue).
[36] "Cause" under the civil law is a rough equivalent.  See, Louisiana Civil Code art. 1967.
[37] La. Civ. Code art. 2456 (1998).
[38] *In re Jatty,* 31 B.R. 46, 48 (Bankr. W.D. La. 1983).
[39] *Id.*
[40] *Id.*

Of particular importance is the fact that the Louisiana Civil Code simply does not recognize the common law conditional sale of movables[41] where title could sometimes remain with the vendor, as such a concept is considered "legally impossible" in Louisiana.[42] Thus, the transfer of ownership occurred here when the Contract was signed as to all of the Surplus Materials in the seventeen designated areas and title to all of them then transferred to Syracuse. The only things not sold in those areas, as the Contract states, were "any permanent or fixed assets," but, "the Surplus Materials," became the property of Syracuse when the agreement was reached.

Consequently, under Louisiana law, the Debtor could not retain title to the Surplus Materials once the agreement was reached. This is not to say the Debtor would not have had remedies in damages or for specific performance had Syracuse not fulfilled his end of the bargain, i.e., not paid the purchase price or had, of his own volition, not cleaned up after removing or selling the Surplus Materials.

In situations such as this where a seller claims that the seller has retained title and thus that a particular transaction was never perfected, the Louisiana courts ignore such an interpretation absent specific language in the Contract, and recognize the sale. For example in, *Ventre v. Pacific Indemnity,*[43] an owner of an airplane entered into an agreement of sale with another pilot. The agreement provided that the other pilot would purchase a one half interest in the airplane on an installment basis. Thus, there was an agreement as to the object and the price. Subsequently, the other pilot gave the owner a check for $165.00, this representing the first installment payment on their agreement, but the check was returned "NSF." The owner barred

---

[41] Under the Louisiana Code "movables" include "things, whether animate or inanimate, that normally move or can be moved from one place to another" such as the Surplus Materials.
[42] *In re Succession of Dunham,* 468 So.2d 888, 897 (La. 1981).
[43] 419 So.2d 969 (La. App. 3Cir. 1982).

21

the other pilot from using the plane, but the other pilot gained access to the plane and crashed it by accident, resulting in a total loss.

The owner's insurer denied coverage since the other pilot was not a named pilot. The owner claimed that the other pilot was not a part-owner of the plane and that his unauthorized use of the plane constituted theft and he filed suit for coverage. The trial court found no coverage stating:

> The testimony shows that (the owner) and (the other pilot) entered into an agreement to jointly purchase the aircraft. This agreement was in the form of a conditional sale-(the owner) purchased the plane in his own name and (the other pilot) then was to pay for his one-half interest in the aircraft on an installment basis....In the common law, this agreement has the effect of maintaining title in the conditional vendor until the conditions of sale are fulfilled. However, in Louisiana, the effects following from that particular contract are those of the completed sale and title passes to the vendee at that time and cannot be rescinded bilaterally.[44]

The Court of Appeal agreed:

> We agree with the trial court that the sale of the one-half interest in the plane from (the owner) to (the other pilot) was complete. Even though Louisiana courts have consistently refused to recognize the common law "conditional sale," they have repeatedly held that where all essential elements and conditions for absolute sale are present in a contract between parties, the effects flowing legally from that particular contract follow whether the parties foresaw and intended them or not, and though they may refer to their contract as a conditional sale.[45]

This decision does not exist in isolation, as wherever a seller under Louisiana law attempts to retain title in accordance with a typical common law conditional sale, the courts recognize a sale but always hold that title passes to the buyer.[46] Again, this is not to say that in such a

---

[44] 419 So.2d at 970 citing, *Givens v. Southern Farm Bureau Casualty Ins. Co.,* 197 So.2d 380 (La.App. 1967).

[45] L.S.A.-C.C. art. 2439; *Givens v. Southern Farm Bureau Casualty Ins. Co.,* 197 So.2d 380 (La. App. 2Cir. 1967) (writ refused) 250 La. 902, 199 So.2d 1916 (La. 1967).

[46] *See, e.g., Givens, surpa; Remington Rand v. Boliew,* 131 So.2d 835 (La. App. 2Cir. 1961); *Electric Neon Clock Company v. Cooper,* 83 So.2d 678 (La. App. 1Cir. 1955); *Roy O. Martin Lumber*

situation the seller has no rights or remedies.  Although title passes to the buyer, the seller still has a remedy under Louisiana law to enforce a vendor's lien or to sue for dissolution of the sale.[47]  Consequently, where there has been an agreement as to the object and the price, but there is an alleged partial failure of consideration for whatever reasons, the sale is still perfected, and title passes to the buyer at the time of the agreement.

Although the Court in the instant matter does not explicitly state that this was a common law conditional sale, the Court readily acknowledged that the agreement was signed; the objects were identified in the seventeen different areas; that a price was agreed; that Syracuse paid the agreed price of $100,000.00, that Syracuse was removing Surplus Materials and cleaning up areas; but, that he did not complete the clean-up for whatever reason.  Consequently, all that is at issue is an alleged partial failure of consideration which, as will be shown further below, was the result of deliberate actions or "fault" of the Debtor as seller.  Accordingly, title passed and the Court erred in denying Syracuse's motion and granting the Debtor's motion.  The Court also erred by applying the wrong codal articles, as this was a sale "in a lump."

### B.  Sales in a Lump

Sales of this type are covered by a specific provision of the Louisiana Civil Code related to sales of movables "in a lump."  This article states in relevant part:

> Art. 2458.  Sale by Weight, tale or measure; lump sales.
>
> When things, such as goods or produce, are sold in a lump, ownership is transferred between the parties upon their consent, even though the things are not yet weighed, counted, or measured.

---

*Company v. Sinclair*, 56 So.2d 240 (La. 1951); *Christina Investment Corp. v. Gulf Ice Company*, 55 So.2d 685 (La.App. 1Cir. 1951); *Standard Chevrolet Company v. Federal Hardware Implement Mutuals*, 178 So. 642 (La. App. 2Cir. 1937).

[47] *See, e.g., Thomas v. Phillip Werlein, Ltd.*, 158 So. 635 (La. 1935); *Christina Investment Corp., supra.*; *Morelock v. Morgan & Bird Gravel Company*, 141 So. 378 (La. 1931).

23

Although, the Trial Court simply ignored this codal article, there can be no question that this article governs this fact situation, which involves a "sale and removal" agreement just as in the instant matter. The Surplus Materials were specifically labeled, photographed and set aside in seventeen different areas of the refinery as the Debtor's former employee, Stanley Favalora confirmed.[48] That this is the applicable codal provision is best illustrated by the holding in, *Mobile Machinery & Supply Co., Inc. v. York Oil Field Salvage Co., Inc,*[49] another "sale and removal" situtation. There, a dispute arose between a seller and buyer related to the sale of 60,000 feet of used or surplus one-inch pipe remaining at a defunct lumber site. In that matter, representatives of the buyer, a salvage company much like Syracuse, had traveled to the seller's lumber company, which had gone out of business, to purchase whatever pipe was located in specific areas of the lumber yard, specifically several dry kilns, owned by the lumber company. As was the case with Syracuse, the buyer's representatives estimated the amount of pipe in multiple dry kiln areas and offered to purchase the pipe in a lump for $1,000.00. The sale was to be for "all of the pipe in these dry kilns 'as is, where is' without reference to quantity or measurement",[50] similar to the situation here, where the buyer also agreed to remain responsible for all costs of removing and shipping the pipe. The buyer's representatives then issued a check to the seller with a notation on the back of the check: "$50.00 paid on three dry kilns, about 60,000 feet of one degrees pipe. Bal. Due $950.00."[51] The Court held that:

---

[48]  Deposition of Stanley Favalora, pp. 15-19.
[49]  171 So. 872 (La. App. 1Cir. 1937).
[50]  171 So. at 873.
[51]  Id.

> The sale was completed on this occasion, and the Defendant was to dismantle, load, and ship the pipe at its own expense. In accordance with Article 2459, C.C. the sale was complete.[52]

When the buyer's representatives returned to the seller's lumber company to remove the pipe, only 43,266 feet remained, as some of the pipe and one of the kilns had been removed. As a result, the buyers sought compensation or a refund for the amount of pipe which was not delivered or, in effect, a reduction of the purchase price. The Trial Court had held in favor of the purchaser; however, the Court of Appeal ruled against the purchaser, finding that since *title had passed to the purchaser* on the date that buyer tendered the check to the seller, risk of loss also passed to the purchaser. As the Court stated:

> **The sale of the pipe was in a lump** and no weighing, counting, or measuring was contemplated in order to complete the sale or fix the price. The sale of the pipe is controlled by Article 2459 (now 2458) of the Civil Code, wherein it is provided that, 'if, on the contrary, the goods, produce or other objects have been sold in a lump, the sale is perfect, though these objects may not have been weighed, counted or measured.' It follows from this, and in accordance with Article 2467 and Article 1909 of the Civil Code, that the pipe was at the risk of the Defendant from the date of the sale. Delivery was made on the date of the sale, as the Defendant was present and accepted the pipe and agreed to have it dismantled and shipped. In accordance with Civil Code art. 1919, the contract being completed, the Defendant owed the price which was paid.[53]

The holding in *Mobile* Machinery does not exist in isolation. To the contrary, *In re: Evangeline Refining Company, Inc.*,[54] a matter involving another bankrupt refinery and a sale of goods left there, is likewise particularly illustrative. There, an oil company purchased fuel from an energy resource company. The fuel was shipped to the facility of the seller's subsidiary, the eventual Debtor. The fuel was commingled with a lesser amount of fuel belonging to the Debtor. A creditor obtained a writ of seizure and sale of the Debtor's facility

---

[52] Id.
[53] 171 So. 874.
[54] 37 B.R. 450 (Bankr. W.D. La. 1984).

and took possession of the Debtor's physical assets, including the oil company's fuel.  In response, the Debtor filed a Chapter 11 proceeding.

The Trial Court granted summary judgment in favor of the oil company purchaser, because the oil company and the energy resource company had completed a contract of sale, title had passed, and the oil was therefore not subject to seizure by the creditor.  The Court reasoned that, "once the thing is identified, segregated from the mass, and designated as a specific thing being sold, then the sale is perfected and ownership passes to the buyer."[55]  The Court went on to find that there had been "sufficient identification" of the fuel sold to the purchaser.[56]  Of particular importance was the fact that the Court also noted that the Debtor had taken action showing that it considered the fuel to belong to the purchaser.[57]  Finally, the Court noted that it was not necessary for any delivery to take place.  All that was need was the agreement on the object and the price, or, as the Court stated, "the sale is perfected". . . as soon as there exists an agreement for the object and the price thereof, although the object has not been delivered, nor the price paid."[58]

Likewise, the Surplus Materials were specifically set aside, and a price was agreed. Thus, there was an agreement between Syracuse and the Debtor on both object and price and a "sale in a lump" took place pursuant to Article 2458.  Further, as in *Evangeline,* the Debtor's actions in purchasing materials back from Syracuse, which had never moved from their spot in their refinery, clearly indicated an intention that title be passed without any further adieu.

---

[55] *Evangeline Refining Company, Inc.,* 37 B.R. at 450, citing, Succession of Welsh, 111 La. 801 35 So. 913 (1904); *Litvinoff*, Obligations§39-52 (1975).
[56] *Id.*
[57] *Id.*
[58] *Id.*citing La. Civ. Code art. 2458.

Consequently, the sale of the Surplus Materials was perfected, title passed to Syracuse and Syracuse's motion should have been granted.

**2.    There was no suspensive condition.**

A thorough review of the Contract reveals that there was no "suspensive condition" any where in the Contract. The Court simply created a "suspensive condition" which did not exist. This was both a clear error of fact and an erroneous conclusion of law as Louisiana courts do not readily imply a suspensive condition.

Under long standing principles of Louisiana law, courts do not construe provisions in a contract as suspensive conditions unless the express contract language compels such a construction.[59]    Indeed, the Supreme Court of Louisiana has consistently explained that contractual provisions must be construed, whenever possible, *not* to be suspensive conditions.[60] Since this is the law in Louisiana, it is not appropriate for a court to divine a suspensive condition in a contract that contains no language – express or otherwise – creating one.   If Louisiana law will not lightly infer a suspensive condition, it assuredly will not tolerate importing or creating one wholesale as here.

Yet, this does not mean that a putative suspensive condition will not be raised as a defense. For example, in, *S.F. Bowser Company, Inc. v. Wambsgans*,[61] the Plaintiff had sold a gasoline tank and equipment to the Defendant, the owner of a property which contained a service station.   The Defendant sought to void the sale because no installation had taken place and therefore there was no sale.   In other words, the Defendant sought to treat the installation as a

---

[59]   Hampton v. Hampton, Inc. 713 So.2d 1185, 1190 (La. Ct. App. 1998); Tilley v. Lowery, 511 So.2d 1245, 1247 (La. Ct. App. 1987).
[60]   States Masonry, Inc. v. J. A. Jones Construction Company, 507 So.2d 198, 201 (La. 1987); Schexnayder v. Capital Riverside Acres, 129 So. 139, 143 (La. 1930).
[61]   Orleans NO 7552, 2 PELT. 450, 1919 WL 1442 (La. App. Orleans 1919).

27

suspensive condition.   But the Plaintiffs stood ready to perform the installation, just as Syracuse was ready to remove his Surplus Materials and then clean up had he been permitted to do so.  The Court in *Wambsgans* therefore concluded that the sale had been perfected by the agreement on the price and the object and that there was no suspensive condition.  Likewise, there was no suspensive condition here.

It appears that the lower Court reached its conclusions by "mixing apples and oranges," as so often happens when the civil law meets the common law.  In this situation, the Court relied primarily on the holding in *Jefferson Parish School Bd v. Rowley Co.* [62]  In that matter, a school board advertised for public bidding on a school renovation project for the purchase *and* installation of tables, cabinets and other equipment for a science laboratory.  The materials were destroyed by fire before they were installed.  Unlike the vague terms and conditions of the Contract in the instant matter drafted by the Debtor, specific terms and conditions governed that arrangement.  Many of those clearly indicated that risks of loss remained with the seller until the installation was complete.

Insofar as the question of passage of the title is concerned, the *Rowley* court noted that this was a very specific type of contract which the court chose to "characterize" as a "furnish and install contract" which the Court felt could be either a construction contract or a contract of sale.[63]  This was not a "sale and removal" Contract as in *Mobile Machinery*.  The Court then explored the issue of whether in some situations involving these special types of contracts, "installing" can be "so trifling . . .  as not to suspend the sale."[64]   The Court concluded that regardless of how it was characterized the terms of the contract indicated that the parties

---

[62]   350 So.2d 187, 192-93 (La. App. 4 Cir. 1977) (cited in original opinion at p.6).
[63]   350 So,2d at 192.
[64]   350 So.2d at 192.

intended for title and ownership to remain with the contractor until installation.   In other words, installation was critical to the buyer.  *Id.*

In contrast, in the instant matter, the Court undertook no analysis as to the costs involved in "cleaning up."   Certainly in selling the Surplus Materials, Syracuse's testimony and that of other witnesses in the case clearly indicates that the items were being removed either by Syracuse or by third-party purchasers as the sales occurred.   At times, the Debtor was purchasing the items from Syracuse and the Debtor, kept or placed them where the Debtor wished.   In terms of cleaning up, this was trifling.   The Contract simply states:

> Completion of areas is defined as:
>
> [G]raded and able to cut grass without obstruction.   At completion of cleaning designated areas, Owner will inspect and approve that work is complete and acceptable.   Contractor is to supply all equipment that is necessary to remove all materials and trash.[65]

As removal of the Surplus Materials was inherent in Syracuse's ongoing sales to third-parties and to the Debtor, the only relevant issue under the *Rowley* analysis[66] should have been whether picking up trash and picking up trash was "trifling."   The Court never even undertook such an analysis.

Another important point is that in *Rowley*, there was a disastrous event: the equipment to be installed was destroyed before title could pass.   In complete contrast, Syracuse purchased the items, and was reselling them to third-parties and back to the Debtor.   The process was ongoing and certainly evidenced the fact that title had passed.   No condition was "suspended" as the resales were in progress when Syracuse was locked out.

---

[65]   Contract, ¶ 2, SCOPE OF WORK, (A).
[66]   Citing, *Hunt v. Suares*, 9 La. 434 (La. 1836).

29

The Court's analysis here should have followed that in *Venteri, supra,*[67] which involved the purchase of the plane shortly before it crashed. In that matter, after failing to establish a common law conditional sale, since Louisiana law doesn't recognize same, the seller attempted to characterize the arrangement as a sale subject to a suspensive condition, i.e., that the other pilot had failed to qualify for insurance coverage, and that therefore title did not pass. The court disagreed:

> We view this condition as resolutory rather than suspensive, such that the failure to comply with the engagements by one of the parties, does not dissolve the contract of right, but rather provides the means, which consists of a suit for dissolution or a demand for specific performance.[68]

Consequently, in this matter, the Debtor, as seller, had plenty of other remedies available, but "self-help" by locking Syracuse out of the refinery was not one of them since Louisiana does not favor self-help.[69] Regardless, this was simply not a sale subject to a suspensive condition as the sale had already taken place as of the date of the agreement between Syracuse and the Debtor, and resales were ongoing as was the process of removing the resold Surplus Materials from the Debtor's refinery. The lower court's construction of the Contract was based upon clearly erroneously findings of fact and clear errors of law in its insertion of a non-existent suspensive condition in the Contract.

### 3.    The Debtor's fault fulfilled Syracuse's obligations under the contract, even if there were suspensive conditions.

The fact witnesses made it clear what actually happened, and that there was no "suspensive condition." Simply put, the Debtor's representatives arbitrarily decided that they didn't like

---

[67] 419 So.2d 969.
[68] 410 So.2d at 971, citing LSA-C.C. arts. 2046 and 2047.
[69] *Peleteri v. Caspian Group, Inc.*, 2002-2141 (La. App. 4 Cir. 1/2/03), 851 So.2d 1230, 1236-7.

Syracuse selling so many items and making money.[70]  In fact, the Debtor's former employee, Leslie Collins, recalled that soon after Syracuse purchased the Surplus Materials, the Debtor began to interfere with Syracuse's efforts to remove the Surplus Materials from the refinery because the Debtor's employees did not want the Syracuse "cherry picking" the best items for sale.[71]  In fact, he testified that the Debtor's former supervisors, Walter Landry and Warren Squires, told Syracuse "to quit cherry-picking, to stay in the Auction Yard and clean it up and then they would let him go to another place."[72]  Eventually, Mr. Collins was informed by the Debtor's representatives that Syracuse was not to be allowed back into the refinery because his contract had ended.[73]

Under applicable Louisiana law, the Debtor's interference or "fault" fulfilled Syracuse's obligation, and title passed to Syracuse.  As the Louisiana Civil Code states in relevant part:

> Art. 1772. Fault of a Party.
>
> A condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment.

The rule of law is stated succinctly as follows:

> Where the promise makes performance impossible, it is unimaginable that any civilized system of law would allow the promisee' to recover damages for the promisors' failure to perform under the contract.  It is a long established principle of law that he who prevents a thing may not avail himself of the non-performance he has occasioned.  The principle is founded upon the premise that one should not be able to take advantage of his own wrongful act.[74]

---

[70]  Deposition of Stanley Favalora, pp. 10-11 (Exhibit 2).
[71]  Deposition of Leslie Collins, pp. 70-72 (Exhibit 3).
[72]  Deposition of Leslie Collins, p. 71 (Exhibit 3).
[73]  Deposition of Leslie Collins, pp. 84-88 (Exhibit 3).
[74]  *Cox v. Dept. of Highways*, 209 So.2d 9, 11 (La. 1968).

Another Louisiana Court has described such an inequitable situation as follows:

> Defendant cannot avoid the burden of a contract when its own conduct prevented Plaintiff from carrying out his part of the undertaking, and when the latter was ready and willing to discharge his obligations.[75]

Here, the Debtor drafted a contract, executed the contract with the Plaintiffs, and then attempted to add additional tasks, duties and obligations beyond the contract for the Plaintiffs to fulfill through coercion. Specifically, as the testimony of former Orion employees, Warren Squires,[76] Stanley Favalora[77] and Leslie Collins,[78] and Michael Syracuse,[79] as well as the Affidavit of former Orion employee, A. J. Kahoe, all unequivocally demonstrated, the Debtor repeatedly barred the Plaintiffs from working in those areas where Plaintiffs wished to work, thus impeding the Plaintiffs' performance to a point where the Debtor eventually locked the Plaintiffs out of the refinery.

The jurisprudence is clear that such "fault" fulfills the obligor's performance. For instance, it has been held that where a contractor was locked out of houses he was to renovate by the owner, this was not to be construed as a breach of the contract by the contractor.[80]    Stated another way, where an obligee interferes with a contractor's performance to the point where the contractor is unable to complete his performance

---

[75] *Payne v. Lyons Cypress Lumber Company*, 7 Teiss. 325, 1910 W.L. 1479, 7 Orleans App. 325 (La. App. Orleans 1910).

[76] Deposition of Warren Squires, pp. 17, 18, 26,27, 28, 92 and 93.

[77] Deposition of Stanley Favalora, pp. 19, 20, 21, 23, 24, 33 and 52.,

[78] Deposition of Leslie Collins, pp. 45, 46, 56, 69, 70, 75-77, 89, 113, 145 and 153.

[79] Deposition of Michael Syracuse, Vol. I, pp. 201-202; Vol. II, pp. 206-207.

[80] *Harrington v. Oliver*, 459 So.2d 111, 113 (La. App. 2d Cir. 1984).

within a certain time frame, the delays are attributed to the obligee and do not impair the rights of the contractor.[81]

There is no question that the Debtor's representative(s) deliberately and arbitrarily interfered with Syracuse's performance on the contract because, by their own admission, they did not want Syracuse, as Mr. Collins revealed, "cherry-picking" the most valuable items for immediate resale without cleaning up the refinery first. Their motivation was apparently petty jealousy.[82]  Since the Debtor had drafted the contract of sale, the Debtor had every opportunity to put language to prevent "cherry-picking" in the contract, but the Debtor did not do so.  Moreover, a contract of sale is construed against the seller anyway,[83] and given the absence of such an anti- "cherry-picking" term, the contract of sale here should be construed completely against the Debtor. Even if the Debtor's representative(s) had some type of logical motivation such as to ensure that the property was cleaned up fully, neither the Debtor nor its representative(s) had the right to arbitrarily and unilaterally change the conditions of the contract, nor could the Debtor prevent the fulfillment of the contract through the Debtor's deliberate actions.  The jurisprudence makes this clear.

Nor can a seller attempt to assert a time deadline in a contract where the seller has caused a delay.  For instance, in a case closely analogous situation to the instant matter, *Penick & Ford, Ltd. V. Waguespack & Haydel*,[84] a sale not in a "lump" but "by measure," the Court held that the seller who acted wrongfully as here could not assert a

---

[81]  *E.B. Ludwig Steel Corporation v. C.J. Waddell Contractors, Inc.*, 534 So.2d 1364, 1367 (La. App. 5th Cir. 1988)
[82]  Deposition of Leslie Collins, p. 124
[83]  LSA C.C. 2474.
[84]  86 So. 605 (La. 1920).

33

deadline in the contract against the buyer. In that matter, a buyer sought to purchase a plantation's entire crop of black strap molasses which the buyer had to remove by October 1, 1915. The buyer received six tank cars of molasses and was ready to pay for the remainder, but the seller, in the meantime, had diverted and sold the remainder of the molasses to other third parties before the deadline, thus preventing the buyer from taking possession of the remainder of the crop before the deadline.

After quoting from a series of applicable codal articles from the Louisiana Civil Code, the Louisiana Supreme Court concluded that, "this, it would seem to us was a sale, which, under the law, vested the ownership of the molasses in the purchaser, and in which a definite method of determining the exact quantity was fixed by the parties."[85]   The Court also noted that, although the exact quantity of black strap molasses that would be made from the crop of 1914-15 on the plantation was not known, this "did not prevent the sale being perfect. There was a seller, a purchaser, a thing, a price, and the consent of the parties is plainly expressed."[86]

But the seller argued that the buyer had no claim since the buyer had to remove all of the molasses by October 1, 1915. The Court would not allow the seller to take advantage of such a time constraint because the seller "had committed an act of breach of contract by selling and delivering a large quantity of the crop of 1914-15 to other persons, thus making it impossible to carry out its own obligations under the contract."[87]   Thus the seller was barred from asserting the time deadline due to its wrongful conduct.

---

[85]   86 So. 606.
[86]   86 So. 607.
[87]   86 So. 608.

34

Accordingly, where, as here, the seller has taken action which prevents the fulfillment of obligations under the contract, the Louisiana Civil Code and the Louisiana Courts interpreting same do not allow a party to benefit from the party's own wrongful actions. Syracuse's performance was perfected as of March, 2002, long before the bankruptcy.

### 4.    Retroactivity and/or retrospective effects are not at issue.

The Court's opinion suggests that if there were a suspensive condition and Syracuse's performance under the contract was prevented such that Syracuse's obligation was fulfilled under La.C.C. art. 1772, title could not retroactively vest with Syracuse for several reasons. First, the Court indicated that even under La. C.C. art. 1775, until such time as a legal determination has been made that Syracuse's performance or obligation had been fulfilled as of March 31, 2002 when he was locked out of the refinery, title could not pass. Further, the Court suggested that title could pass only when that judicial determination was made and that it would pass at that time.

There is no indication that the jurisprudence would support this interpretation insofar as movables are concerned; indeed the jurisprudence suggests otherwise.

Indeed, in *Standard Oil Co. of Louisiana v. Allison*[88] the Louisiana Supreme Court held that if a party prevents other parties from performing on an obligation that is considered a suspensive condition, the condition is considered fulfilled, title transfers, and the parties' rights are "crystallized."[89]

---

[88]    200 So. 273 (La 1941).
[89]    200 So. at 279.

Consequently, there would appear to be no authority for the contention that a legal determination had to be made before title could pass to Syracuse on March 31, 2002. Indeed, it appears that the rule is to the contrary.

The Court also raised the issue of whether title can retroactively vest in the purchaser when the property has been tendered to a third party. The stipulation reached between the parties prior to the sale of the entire refinery to Valero indicated that the parties were preserving the *status quo.* Thus, the sale of the entire refinery to Valero, including the Surplus Materials, was subject to the stipulation between the parties and would obviate any consideration of the effect of the sale to Valero. But once this flaw in the Court's analysis was brought to the attention of the Court on reconsideration, the Court revised the issue to whether title could retroactively vest in Syracuse when the Debtor's assets were transferred to the bankruptcy estate by the filing of the bankruptcy proceedings. Again, Syracuse denies that the Debtor had title to the Surplus Materials at that time as title should have passed to Syracuse upon the execution or perfection of the sale of the Surplus Materials to Syracuse and certainly at the latest as of March 31, 2002, when Syracuse was locked out. But even if this were still an issue, the proposed construction would allow the Debtor to improve its position and achieve greater rights by the filing of the bankruptcy Petition and the creation of the bankruptcy estate. Such an improvement of the Debtor's position is not permitted under bankruptcy law:

> (T)he Debtor's interests in an asset or his rights against others are not expanded by the filing of a bankruptcy proceeding.[90]

Accordingly, there is no basis for allowing the Debtor to improve his position under these circumstances.

---

[90] In re Squyres, 172 B.R. 592, 594 (BANKR.. C.D. Ill. 1994), *citing,* Matter of Sanders 969 F.2d 591 (7th Cir. 1992) and, Matter of Village Rathskeller, Inc., 147 BR 665 (BANKR.. S.D.N.Y. 1992).

The Court also mentioned two cases in its Opinion related to the retroactivity issue. In the first, *Orion Ref. Corp. v. Dep't of Revenue*,[91] the suspensive condition associated with the transfer of certain tax credits had not been fulfilled under circumstances that were entirely within the control of the obligor. This is the complete opposite situation to that involving Syracuse where the obligee prevented Syracuse's performance as obligor which therefore resulted in the fulfillment of the condition pursuant to art. 1772. In the second case referred to by the Court in the original Opinion, *Energy Development Corp. v. St. Martin*,[92] that court addressed numerous issues associated with ***immovables*** and mineral rights, including issues associated with the Louisiana Mineral Code, the public records doctrine, and public policy considerations, none of which are at issue in the instant matter which only involves ***movables***, not ***immovables***, an important distinction under the civil law. Indeed, several of the cases cited by the Court and by the Debtor all relate to immovables governed by an entirely different body of law than movables.

Nevertheless, the *St. Martin* matter cited by the Court is instructive in one respect. That Court cites La. Civ. Code art. 2053 which governs "ambiguous or doubtful" contractual terms as are involved here that contain no express provisions related to the passage of title or suspensive conditions. The Court in *St. Martin* indicates that:

> Civ. Code art. 2053 provided the framework for interpretation in the case where a contractual provision is perceived as doubtful and states: A doubtful provision must be interpreted in the light of the nature of the contract, equity, usages, ***the conduct of the parties before and after the formation of the contract,*** and of other contracts of a like nature between the same parties.[93]

Likewise, the conduct of the parties in this matter should control the interpretation of the contract since Syracuse readily sold Surplus Materials to third parties and to the Debtor after he

---

[91] (In re: Orion Ref. Corp 2005 W.L. 994575 (BANKR.. M.D. LA 4/27/05)
[92] 128 F.Supp. 2d. 368, 381 (E.D. La. 2000).
[93] 128 F.2d at 380 (emphasis added).

37

purchased them. The construction now being placed on the contract by the Court and Debtor only after the fact is totally divorced from the terms and conditions contemplated by the parties, or the actual terms and conditions of the contract; and certainly as evidenced by the conduct of the parties. Moreover, since there are no "third parties" being affected by a construction of the contract that would allow for retrospective or retroactive effect, as shown above, this should not even be a consideration.

### 5. The Court's construction of the Contract leads to "absurd consequences."

Under the Louisiana Civil Code, the courts are bound to give legal effect to all written contracts according to the true intent of the parties and this intent is to be determined by the words of the contract when these are clear, explicit and lead to no absurd consequences.[94] The meaning and intent of the parties to the written contract in such cases must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence.[95] In other words, when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.[96] Moreover, when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and, thus, summary judgment is appropriate.[97]

---

[94] La. Civ. Code Art. 1901 and 1905; *IP Timberlands Operating Co., Ltd. V. Denmiss Corp*, 93-1637 (La. App. 1st Cir. 5/23/95), 657 So.2d 282, 294; *Campesi v. Margaret Plantation*, 417, So.2d 1265 (La. App. 1st Cir. 1982), writ denied, 422 So.2d 163 (La. 1982).

[95] La. Civ. Code Art. 2276; *IP Timberlands Operating Co., Ltd.* 657 So.2d at 294; *Tauzin v. Claitor*, 417 So.2d 1304 (La. App. 1st 1982), writ denied, 422 So.2d 423 (La. 1982).

[96] La. Civ. Code Art. 2046.

[97] *Peyton Place, Condominium Association v. Guastella*, 95-396 (La. App. 5th Cir. 01/17/96), 668 So.2d 1174; *Lafleur v. Hollier Floor Covering, Inc.* 00 00969 (La. App. 3rd Cir. 12/6/00), 774 so.2d 359; *Peterson v. Schimek*, 98-1712 (La. 03/02/99), 729 So.2d 1024; *Doucet v. Huffine Roofing & Construction Co.*, 2002-1049 (La. App. 5th Cir. 02/25/03), 841 So.2d 916; *Gaubert v. Toyota Motor*

Syracuse contends that the contract is unambiguous as there is no wording which contains any "suspensive condition" as the Court has held, nor is there a "reversion" of title provision as the Debtor has suggested. To the extent these concepts have been added to the contract by the ambiguous terms of the contract by either the Debtor or the Court, they create if not compound ambiguity. Any such ambiguity must be construed against the seller:

### Art. 2474. Construction of Ambiguity Respecting Obligations of Seller.

The seller must clearly express the extent of his obligations arising from the contract, and any obscurity or ambiguity in that expression must be interpreted against seller.[98]

The jurisprudence interpreting that article likewise states that, "the seller is bound to explain himself clearly respecting the extent of his obligations: any obscure or ambiguous clause is construed against him.[99]

It should also be noted that, if there were any ambiguity, the actions of the parties can be used to confirm the meaning of an ambiguous contract.[100]   Here, the actions of the Debtor in buying back the surplus items sold to Syracuse and in allowing Syracuse to sell to third-parties clearly establish that title had transferred to Syracuse. Accordingly, whether the Contract is unambiguous or ambiguous, the Debtor loses.

---

*Sales USA, Inc.*, 99-2569 (La. App. 1st Cir. 11/03/00), 770 so.2d 879; *Becnel v. Alexander*, 00-1304 (La. App. 5th Cir. 03/28/01), 783 So.2d 540; *Orazio v. Henderson*, 01-0028 (La. App. 3rd Cir. 07/11/01),790 so.2d 754; *Covington v. Ace Transportation Co., Inc.* 36,507 (La. App.2nd Cir. 10/23/02), 830 So.2d 495.

[98]   Art. 2474 (1995).

[99]   *McLain v. Cuccia*, 259 So.2d 337, 339 (La. App. 4th Cir. 1972).

[100]   La. Civ. Code Art. 1956; *TR Drilling Co., Inc. Howard*, 463 So.2d 923, 928 (La. App. 2nd Cir. 1985); *Pendleton v. McFarlane*, 63 So.2d1 (La. 1953); *Marcann Outdoor, Inc. V. Hargrove*, 140 So.2d 815 (La. App. 3rd Cir. 1962); *Davis v. Laster*, 138 So.2d 558 (La. 1962).

CONCLUSION

In sum, the decision below resulted in a grossly inequitable result. There were no contractual provisions to support the Court's conditions and the actions of the parties belied the Court's interpretation. The decision below should be reversed, Syracuse's motion should be granted and the Debtor's motion denied.

DUANE MORRIS LLP

*Michael R. Lastowski*

Michael R. Lastowski (DE I.D. 3892)
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail:  mlastowski@duanemorris.com

Andrew C. Wilson (#01162)
Thomas R. Blum (#03170)
Susan M. Caruso (#27195)
Simon, Peragine, Smith & Redfearn, L.L.P.
1100 Poydras Street, 30th Floor
New Orleans, Louisiana 70163-3000
Telephone: (504) 569-2030
E-mail: andreww@spsr-law.com

Edward S. Rapier, Jr. (#17896)
2160 8th Street, Suite A
Mandeville, LA 70471
Telephone: (985)626-1011
Facsimile: (905)674-9082
E-mail: erapier@charter.net

COUNSEL FOR:
MICHAEL G. SYRACUSE D/B/A
INTERSTATE SUPPLY COMPANY, AND
TEXAS ICO, INC.

February 26, 2007

# Unpublished Opinions

Westlaw.

Not Reported in B.R.                                                                                    Page 1

Not Reported in B.R., 2005 WL 994575 (Bankr.M.D.La.)

**(Cite as: 2005 WL 994575 (Bankr.M.D.La.))**

**H**
Only the Westlaw citation is currently available.

United States Bankruptcy Court,
M.D. Louisiana.
In re: ORION REFINING CORPORATION Debtor
ORION REFINING CORPORATION Plaintiff
v.
DEPARTMENT OF REVENUE, State of
Louisiana, By and Through Cynthia Bridges, In
Her Capacity as Secretary Defendant
**No. 03-11483, ADV. 03-1119.**

April 27, 2005.
David Matthew Kerth, Baton Rouge, LA, Elizabeth
J. Futrell, and Matthew Thomas Brown, Jones,
Walker, Waechter, Poitevent, Carrere & Denegre,
New Orleans, LA, for Plaintiff.

Barry Kelly and Emily W. Toler, Baton Rouge,
LA, for Defendant.

MEMORANDUM OPINION

DODD, Bankruptcy J.

*1 Plaintiff Orion Refining Corporation ("Orion")
[FN1] seeks summary judgment on its complaint for
a declaration that it owns Louisiana state tax rebates
totaling $3,331,342. The tax rebates were payable
under enterprise zone contracts [FN2] 940070 and
940071, which Orion acquired from TransAmerican
Refining Corporation ("TARC") in December 1998.
Orion also sought damages equal to the amount of
the rebates from defendant Louisiana Department of
Revenue ("LDR"). [FN3]

> FN1. Orion Refining Corporation filed
> chapter 11 in the United States Bankruptcy
> Court for the District of Delaware on May
> 13, 2003. Pursuant to Orion's plan of
> reorganization, ORC Distribution Trust

succeeded to the debtor's claims. Cypress
Associates, L.L.C., is the representative of
the distribution trust. Despite these
changes, this opinion refers to the plaintiff
as Orion for the sake of simplicity.

FN2. The Louisiana Enterprise Zone Act,
La. R.S. 51:1781 *et seq.,* was intended to
stimulate growth of private business in
geographic areas of the state that are
economically depressed and in need of
business expansion. La. R.S. 51:1782. The
Department of Economic Development
administers the enterprise zone programs
of incentives and inducements. La. R.S.
51:1786. The Enterprise Zone Act allows
the Board of Commerce and Industry, after
consultation with the Departments of
Economic Development and Revenue, to
enter into enterprise zone contracts, which
can provide for sales and use tax rebates
and other tax credits. La. R.S. 51:1787. In
particular, section 1787(A)(1) allows the
contracts to provide for sales and use tax
rebates for purchases of materials used in
the construction of, or addition or
improvement to, the housing of a business
and the machinery and equipment used in
the business.

FN3. In its May 28, 2004 Memorandum
Opinion, the Court concluded that LDR
had waived its sovereign immunity
pursuant to 11 U.S.C. § 106(b) by filing
proofs of claim in Orion's bankruptcy.
LDR filed proofs of claim in the Orion
case for sales taxes from December 1998
through March 2002, corporate income
taxes for July 2002 and corporate franchise
tax for July 2003.

LDR filed a cross motion for summary judgment
seeking a ruling that TARC had assigned the state

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                  Page 2

Not Reported in B.R., 2005 WL 994575 (Bankr.M.D.La.)

**(Cite as: 2005 WL 994575 (Bankr.M.D.La.))**

tax rebates at issue to LDR in November 1998 to satisfy TARC's corporate income, franchise and sales tax liabilities, and that as a result Orion now has no claim to the rebates. Alternatively, LDR asked for a declaration that Orion is liable to LDR for TARC's unpaid taxes because it is TARC's successor.

The parties contend that no material facts are disputed, and that this matter is ripe for summary judgment.

FACTS

LDR and TARC entered into a November 12, 1998 letter agreement ("Letter Agreement") concerning TARC's application for an extension of time to file corporate income and franchise tax returns due November 16, 1998. The Letter Agreement provided in part that:

1) TARC will file its Corporation Income and Franchise tax extension and estimate of tax due in a timely manner.

2) *TARC does hereby authorize and instruct the Department of Revenue to apply all refunds due it under its sales tax and enterprise zone audits presently in progress up to the amount of the Corporation Income and Franchise tax determined to be due.*

3) The Department of Revenue will accept the Corporation Income and Franchise tax extension without funds being deposited.

4) The Department of Revenue will apply refunds due TARC as determined by the audits presently being conducted by the Department. TARC will not be subject to penalties or interest unless the funds available from refund request are not sufficient to satisfy TARC's Corporation Income and Franchise tax estimated liability. In that event, interest and penalties will be due only on the amount of the shortage.

(Emphasis added.) The November 12, 1998 Letter Agreement contains no language authorizing LDR to apply the enterprise zone rebates to offset TARC's *sales* tax liability.

Though TARC had included an estimate of its corporate income and franchise taxes in its November 16, 1998 application for extension to the

returns, TARC did not actually file its corporate income tax return for 1997 and corporate franchise tax return for 1998 [FN4] until June 11, 1999.

> FN4. The Louisiana Department of Revenue combines a corporation's income tax and franchise tax returns for two different years in a single document, form CIFT-620.

The event that complicated matters, and led to this dispute, was TARC's subsequent transfer of assets, including the enterprise zone credits, through a series of transactions that culminated in Orion's ownership of the assets. Specifically, on or about December 15, 1998, TARC and TCR Holding Corporation ("TCR") entered into a transaction through which TCR acquired "all of TARC's rights, title and interest in, to and under the Assets and Properties of TARC ... as the same shall exist on the Closing Date...." [FN5] On the same date, in a separate transaction, Transcontinental Refining Corporation ("Transcontinental"--which later changed its name to Orion) acquired the same rights to the assets of TCR. [FN6]

> FN5. Article 1, Asset and Transfer Agreement between TARC and TCR, Exhibit 1 to Orion's Motion for Summary Judgment.

> FN6. Article 1, Asset and Transfer Agreement between TCR and Transcontinental, Exhibit 2 to Orion's Motion for Summary Judgment.

**\*2** Schedule H to the Asset Transfer Agreement between TARC and TCR specifically states that TARC's enterprise zone contracts numbered 890099, 940069, 940070, 940071 and 940072 were being assumed by TCR. TCR in turn transferred the contracts to Transcontinental (later known as Orion). Neither Asset Transfer Agreement contained provisions suggesting that either TCR or Transcontinental (later, Orion) had voluntarily assumed any of TARC's tax liabilities. [FN7]

> FN7. In fact, paragraph 2.10 of the Asset

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Transfer Agreement between TARC and TCR states that "TARC ... has filed (or will file) all tax returns required to be filed by applicable law on or prior to Closing Date.... TARC has paid (and as to Tax Returns not filed as of the date hereof, will pay) all Taxes that are due, or claimed or asserted by any taxing authority to be due for the periods covered by the Tax Returns or (ii) has duly provided reserves adequate to pay all Taxes...." Paragraph 5.01 of the Agreement defines "Tax" to include state income, franchise, sales and use taxes. Furthermore, at paragraph 4.03 of the Agreement, TARC indemnified TCR after the closing date against any claims "arising out of or relating to all Taxes imposed on TARC...." The Asset Transfer Agreement between TCR and Transcontinental (later, Orion) contains an identical indemnification of Transcontinental by TCR in paragraph 3.03.

On January 11, 1999, Orion applied to the Louisiana Board of Commerce and Industry for approval of TARC's transfer of the specified enterprise zone contracts to Orion. The board approved Orion's application on February 24, 1999 and notified Orion of the approval in a March 11, 1999 letter to Orion's tax consultant. A copy of the board's letter also was sent to LDR, which received it the next day, March 12, 1999.

On April 20, 1999, TARC filed a chapter 11 case in the United States Bankruptcy Court for the District of Delaware. [FN8] One week later, on April 27, 1999 LDR notified TARC that an audit revealed that TARC was entitled to an enterprise zone rebate of $3,047,392.45. Although LDR had been notified previously of TARC's transfer of the enterprise zone contracts to Orion, an LDR revenue audit reviewer sent TARC the rebate check on June 11, 1999. TARC's senior tax accountant returned the check with a cover letter to the LDR revenue audit manager asking LDR to apply the rebates to TARC's tax liabilities, including its sales tax liabilities.

FN8. The case was later transferred to the United States Bankruptcy Court for the Southern District of Texas.

LDR apparently did not comply with TARC's request before the chapter 11 was filed, because the department's proofs of claim in the TARC reorganization sought payment of unpaid sales, corporate franchise and hazardous waste taxes for the period from 1995 through 1999. [FN9]

FN9. TARC objected to LDR's proofs of claim. However, the Court in its May 28, 2004 Memorandum Opinion noted that the record of TARC's bankruptcy case does not indicate that the objection was ever fully adjudicated.

Another tax rebate under contract 940070, in the amount of $406,313.04 and for the tax period from March 1998 through August 1998, apparently was allowable as of October 5, 1999, as evidenced by a letter on that date from a TARC tax accountant to an LDR sales tax section employee. However, neither party offered any proof that LDR had issued TARC a check for that amount.

Finally, on February 2, 2001, LDR sent TARC yet another rebate check (on contract 940070) for $149,363.49. Orion eventually received that check.

These facts indicate that despite LDR's assertions to the contrary, the enterprise zone rebates had not been applied to reduce or eliminate TARC's tax liabilities as of the November 12, 1998 Letter Agreement, or at any time thereafter.

ANALYSIS

LDR argues that the Letter Agreement assigned TARC's enterprise zone rebates to LDR in payment for the corporate and franchise taxes due *before* TARC transferred the enterprise zone contracts to Orion on December 15, 1998. As a result, LDR reasons that the rebates do not belong to Orion because they were used to offset TARC's tax liabilities. The LDR is incorrect for several reasons.

I. *No Evidence Demonstrates that TARC Assigned*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

Not Reported in B.R., 2005 WL 994575 (Bankr.M.D.La.)

**(Cite as: 2005 WL 994575 (Bankr.M.D.La.))**

*the Rebates to LDR.*

*3 Nothing in the Letter Agreement suggests that either TARC or LDR intended that the agreement act as assignment of the tax rebates to LDR. Additionally, even if the Court were to construe the Letter Agreement as an assignment, LDR offered no evidence to suggest that the department or TARC followed the procedures for transferring rebates, which are set out in article VII of the enterprise zone contracts. [FN10]

> FN10. *See e.g.,* May 7, 1996 Enterprise Zone Contract No. 940071, between the State of Louisiana Office of Commerce and Industry and TARC, Exhibit 3 to Orion's Motion for Summary Judgment. Article VII of the contract states, in part, that "in the event the Contractee should sell, or otherwise dispose of the business covered by this Contract, the purchaser of the said business may, within ninety (90) days of the date of such sale, apply to the Board for a transfer of this Contract and *any unused tax credits.*" (Emphasis added.) In contrast, the board specifically approved TARC's transfer of the contracts to Orion.

II. *Conditions for the Set off of the Obligations were not Fulfilled before TARC Transferred the Enterprise Zone Contracts to Orion.*

Second, Louisiana law recognizes that obligations may be conditional. Pursuant to Louisiana Civil Code article 1767, an obligation is conditional if it depends on an uncertain event. If the obligation cannot be enforced until the event occurs, the condition is suspensive. *Id.* Although fulfillment of the condition can have retroactive effect, fulfillment of the condition "does not impair the right acquired by third persons while the condition was pending." La. Civ.Code art. 1775.

The Letter Agreement contains two suspensive conditions. Specifically, the offset of the rebates against the tax liabilities of TARC was conditioned upon (1) LDR's determination of the rebates

pursuant to audits *and* (2) TARC's determination of its corporate and franchise tax liability. Neither of these determinations took place before December 15, 1998, the date on which TARC transferred the enterprise zone contracts--and thus the rebates--to Orion. Therefore, under Civil Code article 1775, the fulfillment of the suspensive conditions in the Letter Agreement did not affect the right to the rebates Orion had acquired before the date of the tax and rebate determinations. *See Energy Development Corp. v. St. Martin,* 128 F.Supp.2d 368, 381 (E.D.La.2000) (a conditional future obligation in a conveyance of mineral rights did not preclude subsequent conveyance of contiguous mineral servitude unburdened by the conditional obligation).

III. *No Offset Took Place before the Transfer of the Enterprise Zone Contracts.*

The third reason that LDR's argument fails is that the obligations of the parties (i.e., Orion's liability for taxes and LDR's liability for the Enterprise Zone Credits) were not offset. Compensation--the Civil Law analog of set off--takes place by operation of law "when two persons owe each other sums of money ... and those sums are *liquidated and presently due.*" La. Civil Code art. 1893 (emphasis added). Liquidation of claims is a prerequisite for compensation. *ITT Residential Capital Corp. v. Cheuk,* 656 So.2d 747, 751 (La.App. 5th Cir.1995) (citation omitted); *West v. West,* 438 So.2d 706, 708 (La.App. 2d Cir.1983).

Neither TARC's tax liabilities nor the enterprise zone credit rebates were liquidated before the date of the Asset Transfer Agreements. TARC's tax liabilities were not liquidated until June 11, 1999, the date TARC actually filed its returns. [FN11] Moreover, the enterprise zone rebates were not liquidated until LDR had completed its audit of TARC, the Secretary of Revenue received notice of the rebate amount from the audit review division and approved it on or about April 27, 1999. Accordingly, the rebates owed to TARC and the tax liabilities owed to LDR were not compensated, or set off, by operation of law before the contracts and rebates were transferred to Orion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                    Page 5

Not Reported in B.R., 2005 WL 994575 (Bankr.M.D.La.)

(Cite as: 2005 WL 994575 (Bankr.M.D.La.))

FN11. TARC had received an extension through June 15, 1999 to file its returns.

*4 Even where compensation does not occur as a mater of law (for example, when one of the debts is unliquidated or is not presently due), compensation nevertheless may occur if the parties agree to remove the obstacle to compensation. La. Civil Code art.1901; *Keene v. Reggie,* 701 So.2d 720, 725 (La.App. 3d Cir.1997). However, LDR offered no evidence to suggest that it had an agreement with TARC to forego the requirement that both the rebates and the tax liabilities be liquidated before LDR could apply the rebates to reduce TARC's tax obligation.

The November 12, 1998 Letter Agreement did not result in an offset of TARC's rebates against its tax liabilities for two other reasons. First, Louisiana Civil Code article 1900 provides that "an obligor who has consented to an assignment of the credit by the obligee to a third party may not claim against the latter any compensation that otherwise he could have claimed against the former." LDR received notice in March 1999 that the Board of Commerce had approved TARC's assignment of its enterprise zone contracts (and, therefore, the rebates) to Orion. Accordingly, given its failure to challenge or object to the assignment, LDR now cannot claim against Orion the compensation between the rebates and the tax liabilities that it could have claimed against TARC. *See In re MMR Holding Corp.,* 199 B.R. 611, 614-15 (M.D.La.1996) (obligor on debt assigned by chapter 11 debtor to third party was not entitled to use compensation theory to offset against assignee funds that obligor advanced to debtor, where obligor had notice of assignment of the debt when the obligor's claim against the debtor became determinable).

Next, under Louisiana law, "a debt to the State for taxes cannot be compensated." *State v. Weaver,* 55 So.2d 279, 280 (La.App. 2d Cir.1951) (recognizing as settled the proposition that, because taxes are not debts in the "ordinary definition of the term but contributions by the citizens for the support of their government, they are not subject to ... compensation.")

The most obvious problem with LDR's argument that TARC's tax liability was offset against the rebates before the transfer to Orion is the undisputed evidence that LDR filed proofs of claim in TARC's bankruptcy. After LDR sent TARC the rebate check in June 1999, LDR filed three proofs of claim in the TARC reorganization. Those claims sought payment of much of the same tax debt that LDR argues it was entitled to set off based on the November 12, 1998 Letter Agreement. Accordingly, as of the date the claims were filed, LDR apparently still regarded TARC as liable for the sales and franchise taxes. If the Letter Agreement assigned the rebates to LDR in payment of the taxes due in November 1998, as the department argues, LDR would have had absolutely no ground for filing proofs of claim in the TARC bankruptcy. The evidence underscores that compensation did not take place--by operation of law or otherwise--before the enterprise zone credits were transferred to Orion in December 1998.

IV. *Orion is Not Liable for Taxes as TARC's Successor.*

*5 Finally, LDR argues in the alternative that Orion is TARC's successor, and therefore is liable for TARC's tax debt.

As a matter of Louisiana law, in the absence of an agreement to assume liabilities, an entity purchasing another entity's assets is liable as the transferor's successor only in limited circumstances. *See Industrial Sales & Service, Inc. v. Security Plumbing, Inc.,* 666 So.2d 1165 (La.App. 5th Cir.1995); *Leblanc v. Adams,* 510 So.2d 678 (La.App. 4th Cir.1987). Successor liability will be imposed only when the party demanding it proves that a transaction in which one entity acquires assets from another was undertaken to defraud the seller's creditors, or when the facts demonstrate that the entity buying the assets was merely a continuation of the entity selling the assets, or when the purchase of all the stock of one corporation from the stockholders of another corporation creates a merger of the two corporations. *Industrial Sales,* 666 So.2d at 1166-67; *Leblanc,* 510 So.2d at 682-3; *Travis-Edwards, Inc. v. Texas-Edwards, Inc.,* 299

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 2005 WL 994575 (Bankr.M.D.La.)

**(Cite as: 2005 WL 994575 (Bankr.M.D.La.))**

So.2d 389, 392-3 (La.App. 2d Cir.1974).

LDR has not proven facts necessary to establish Orion's liability as TARC's successor. The department's argument that some individuals served as officers of both TARC and Orion during the transitional period after the asset transfers alone is not sufficient to impose successor liability on Orion. Glenn Berkman, TARC's tax director, testified in his deposition that the transactions between TARC and TCR, and then TCR and Transcontinental (later, Orion) were not stock sales, but only asset transfers. Moreover, TARC and Orion maintained separate corporate identities both before and after the asset transfer, as evidenced by TARC's bankruptcy filing in April 1999. LDR also has not demonstrated that the asset transfers were undertaken to defraud TARC's creditors. Accordingly, LDR has not met its burden of proving that Orion is liable as TARC's successor. *See Leblanc, supra,* 510 So.2d at 682.

At the hearing on LDR's motion for summary judgment, counsel for the department also urged for the first time that Orion is liable for TARC's taxes pursuant to La. R.S. 47:308. [FN12] LDR never asserted this theory of recovery in any of its earlier filings in the case, or at the hearing on Orion's motion for summary judgment. Counsel for Orion declined the opportunity to submit additional briefs on this issue, although the applicability of the statute on the facts is far from clear.

> FN12. La. R.S. 47:308 states, in relevant part, that a "if any dealer liable for any tax levied [under La. R.S. 47:301 *et seq.*] sells his business or stock of goods or quits the business, he shall make a final tax return and payment within fifteen days of selling or quitting the business. His successor ..., if any shall withhold sufficient of the purchase money to cover the amount of such taxes ... due and unpaid until such time as the former owner shall produce a receipt from the secretary showing that they have been paid, or a certificate stating that no taxes ... are due. If the purchaser of a business or stock of goods fails to

withhold purchase money as above provided, he shall be personally liable for the payment of the taxes ... accrued and unpaid...."

Section 308 of title 47 applies when a "dealer" as defined in the statute "sells his business or stock of goods or quits the business," and fails to pay taxes due. The liability for the taxes may then fall upon the purchaser of the business or stock of goods. Assuming (without finding) that TARC is a dealer under La. R.S. 47:308, LDR still has not demonstrated that a termination or transfer of TARC's business took place and triggered the provisions of R.S. 47:308.

*6 TARC did not sell its business to Orion. No sale of any equity interests took place. TARC only transferred assets to TCR Holding Corporation, which later transferred the assets to Orion. The assets transferred to TCR and then to Orion were fixed assets, leases, contracts and accounts--not a "stock of goods" within the common understanding of that phrase. [FN13] Further, TARC did not quit its business at the time of the Asset Transfer Agreements. In fact, TARC filed a chapter 11 bankruptcy case in April 1999, which arguably indicates that its business continued to operate then, several months after the Asset Transfer Agreement. LDR has offered no evidence by way of depositions, affidavits or other materials to dispute these facts.

> FN13. The Louisiana Supreme Court, in an old, but oft-quoted, opinion addressing statutory construction and the general and specific meaning of words, defined a "stock of goods" as meaning "articles of movable property which are being held for sale" by a merchant *State v. Fontenot,* 112 La. 628, 36 So. 630, 639-40 (La.1904).

Finally, R.S. 47:308 imposes liability for unpaid taxes only on the "purchaser" of the business or stock of goods from the dealer. In this case, Orion did not purchase any assets from TARC, but rather from TCR. Arguably, if any entity were liable under the statute for TARC's taxes, it would be TCR.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nothing in the statute or cases construing it suggests that a subsequent transferee of the initial transferee is liable for the transferor's tax debt.

LDR has not shown that R.S. 47:308 applies on the facts of this case.

## CONCLUSIONS

There are no genuine issues of material fact regarding the claims of either Motion for Summary Judgment. As a matter of law:

1) TARC did not assign the enterprise zone rebates to LDR pursuant to the November 12, 1998 Letter Agreement.

2) Suspensive conditions in the Letter Agreement were not fulfilled before TARC transferred the enterprise zone contracts to Orion. Thus, the application of rebates LDR owed TARC to satisfy TARC's outstanding tax liabilities did not occur before the assets were transferred to Orion.

3) Compensation did not take place between TARC's tax debt to LDR, and the enterprise zone rebates LDR owed to TARC, before TARC transferred the enterprise zone contracts (and the corresponding right to the rebates) to Orion.

4) LDR has no claim against Orion for the TARC tax liabilities because there is no proof that Orion specifically assumed those liabilities in the asset transfer. Moreover, LDR did not prove facts supporting the imposition of successor liability against Orion under either Louisiana jurisprudence or La. R.S. 47:308.

Accordingly, LDR's motion for summary judgment will be denied and Orion's motion for summary judgment will be granted. Orion is entitled to judgment declaring that enterprise zone rebates in the amounts of $3,074,392.45 (due under contract number 940071) and $406,313.04 (due under contract number 940070), less the rebate in the amount of $149,363 that was previously sent to Orion by LDR, belong to Orion and that amount is owed to Orion by LDR.

Orion also seeks interest on the rebate amounts owed pursuant to Louisiana Civil Code art.2000. [FN14] However, La. R.S. 51:1787(A)(1), the Enterprise Zone Act provision authorizing the

rebate of sales and use taxes, specifically states that "[t]he amount rebated shall in no case be greater than the total of the actual amount of the sales and use taxes paid." Orion is entitled to no greater rights under the enterprise zone contracts than TARC. Therefore, Orion is not entitled to interest on the amount of the rebates awarded to it.

> FN14. Louisiana Civil Code art.2000 provides that "[w]hen the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due ... at the rate of legal interest as fixed by R.S. 9:3500."

Not Reported in B.R., 2005 WL 994575 (Bankr.M.D.La.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2 Pelt. 450

Orleans No. 7552, 2 Pelt. 450, 1919 WL 1442 (La.App.Orleans)

**(Cite as: 1919 WL 1442 (La.App.Orleans))**

Court of Appeal of Louisiana, Parish of Orleans.
S. F. BOWSER COMPANY, INC.
v.
GEORGE WAMBSGANS
No. 7552.

1919.

(Appeal from Civil District Court, Division "B",
No. 125,095)

SYLLABUS

*1 "The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid."

R. C. C. 2456, and authorities quoted.

"The sale may be made purely and simply, or under a condition either suspensive or resolutive. The object of the sale may also be two or more alternative things."
  R. C. C. 2457, and authorities.

"The price of the sale must be certain, that is to say, fixed and determined by the parties."
  R. C. C. 2464, and authorities.

OPINION

West Headnotes

Sales ☞1(1)
343k1(1) Most Cited Cases
The object of the sale may be two or more alternative things. LSA-C.C. art. 2457 and authorities.

Sales ☞19
343k19 Most Cited Cases

The price of a sale must be certain, that is to say, fixed and determined by the parties. LSA-C.C. art. 2464 and authorities.

Sales ☞85(1)
343k85(1) Most Cited Cases
The sale may be made purely and simply, or under a condition either suspensive or resolutive.

Sales ☞202(1)
343k202(1) Most Cited Cases
The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller as soon as there exists an agreement for the object and for the price thereof, although the price has not been paid. LSA-C.C. art. 2456 and authorities quoted.

Sales ☞201(1)
343k201(1) Most Cited Cases
The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller as soon as there exists an agreement for the object and for the price thereof, although the object has not been delivered. LSA-C.C. art. 2456 and authorities quoted.
Max Dinkelspiel, Judge.

*2 Plaintiff sues defendant under a contract of sale of a gasolene tank and equipment, the agreed price being $394.50, of which the defendant paid the sum of $39.45. Plaintiff alleges that it has fulfilled all the obligations imposed by law upon it under said contract, and shipped and delivered to the defendant the said tank and equipment, and stood ready and still stands ready and willing to install same, as agreed, and has tendered and herewith tenders the installation thereof; that notwithstanding this, defendant has declined to accept said tank and equipment, or to receive the installation thereof, or to pay for same, in accordance with the terms of said contract and said notes; that defendant failed to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 Pelt. 450

Orleans No. 7552, 2 Pelt. 450, 1919 WL 1442 (La.App.Orleans)

**(Cite as: 1919 WL 1442 (La.App.Orleans))**

pay the installment which became due on February 3, 1918, and has paid no other installments than the $39.45 credited to him. Plaintiff also claims interest at 6% per annum, and 10% attorneys' fees on the amount of the balance and interest thereon, and prays for judgment in accordance therewith.

The defendant first set up no legal right or cause of action; that the document sued on does not serve for the basis of a judgment against him; and, answering subsequently, he denied the legal construction placed upon the contract. He admits paying to plaintiff $39.45, but avers that said payment is to be governed by the express terms and conditions of the contract; avers that the contract forming the basis of the suit does not evidence a sale between the parties; that under its express provisions no title was to pass; no delivery was ever made or contemplated, except under certain conditions contained in said contract, and the said contract contemplated an installation of a certain gasolene machine or pump by the plaintiff, and evidences an obligation to do or not to do, and for the violation of which either party would be entitled to such damages only as were fixed by the written contract; that there was a certain clause inserted in said contract which reserved the right of ownership in plaintiff to reclaim the gasolene machine without due process of law, and to forfeit as liquidated damages such payments as may have been made. He denies that any delivery, real or contemplated, was ever made; denies that plaintiff is entitled to the remedy of specific performance under the contract, or under the subsequent transaction and convention.

Defendant, further answering, says that he sold out his place of business, which fact was well known to the agent of plaintiff, and it was agreed that the gasolene machine would not be installed, but that the agent would do his utmost to dispose of said machine, and denies that any effort was ever made by plaintiff or his agent to install said outfit at any time after its arrival. Therefore he prays for judgment.

The contract in question is in writing and, amongst other clauses, we find this:
  "Terms: In consideration of the shipment of the

above listed goods, the undersigned agrees to pay S. F. Bowser Company, Inc. the above named amount, $394.50, same being price of said goods, as follows: Cash with order $39.45, and the balance of $355.05 payable as evidenced by promissory notes with interest attached thereto, which said note is given as evidence of said indebtedness and not in payment thereof."

*3 This agreement was signed by plaintiff's agent and the defendant, and notes given in accordance with the terms of said contract.

From the evidence filed in this case we find that plaintiff's agent, Edward P. Dolan, testified as follows:
  "Q: You took this particular order?
  A: Yes, sir.
  Q: Do you know whether or not the goods called for in this order were shipped and delivered to the defendant?
  A: Yes. They were at his place. That is the place he had on St. Claude Avenue.
  Q: Are they in his possession at the present time?
  A: Yes, they are. When the goods arrived there was some question about Mr. Wambsgans selling out and he asked me to hold off the installation, and he asked me to make a request of the City Council for the right to install it on the sidewalk, and the council granted a special permit to Mr. Wambsgans to install.
  Q: I understand that this is one of those gasolene filling stations that sets on the sidewalk; is that correct?
  A: Yes; and they had a permit passed through the council to allow him to do that.
  Q And you say that the installation was withheld at his request?
  A Yes. He said that he was banking on selling out to a number of parties, and he asked me to hold off. I said 'All right; we are ready, as soon as you are.'
  Q: Were you ready to install the apparatus at any time?
  A: Yes, sir.
  Q: And the machine is in his possession?
  A: Yes, sir.
  Q: The agreement or contract has not been

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 Pelt. 450

Orleans No. 7552, 2 Pelt. 450, 1919 WL 1442 (La.App.Orleans)

**(Cite as: 1919 WL 1442 (La.App.Orleans))**

cancelled, in any way?
A: No. sir.

By the Court:
Q: Has he ever called upon you to install that apparatus according to the contract?
A: No, sir. He sold the business out.
Q: Have any further payments been made beyond the $39.45 which was paid cash?
A: No, sir."

The defendant, Wambsgans, and his wife both testified in this case, and, in accordance with their testimony, we are satisfied that the facts sworn to by Mr. Dolan are absolutely true and without contradiction, and, without going into the details of the testimony - for which there is no necessity - we consider that the plaintiff has fully made out its case.

The law on this subject is to be found in our Civil Code. Article 2456 provides:
"Sale Complete when Agreement to Buy and Sell Perfect. The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid." (Quoting numerous authorities).

Again, we find in Article 2457 of the Civil Code, in speaking of sales:
"The sale may be made purely and simply, or under a condition either suspensive or resolutive. The object of the sale may also be two or more alternative things." (Authorities).

*4 Article 2464 C.C. provides:
"The price of the sale must be certain, that is to say, fixed and determined by the parties." (Authorities).

The learned counsel for the defendant in this case refers to the case of *Hypolite Larousini v. Philip Werlein*, 48 An., 13. Quoting from the syllabus:
"No cause of action - If there was a contract as alleged, plaintiff had no cause of action to compel the defendant to sign a deed of lease and

accompanying notes."

This cause does not in any manner come under the facts and obligations in this case, and therefore, does not apply.

The other case cited by counsel is in the 49th Annual, at page 656, - *Mirandona v. Nicholas Burg*. The syllabus in that case reads:
"The specific performance of a contract will not be ordered, when compensation can be made in damages. Nor will it be decreed when the contract requires the doing of an act solely within the volition of the obligor, such as the signing of a lease or the appointing of an arbitrator or the exercise of an option to purchase property."

We consider that there is no applicability between the case at bar and the cases cited. The law is unambiguous and plain. The consideration in this case, acknowledged both by the act of sale and the notes in question, is the voluntary act of the defendant, for which he is bound in morals and in law.

Judgment affirmed.

Orleans No. 7552, 2 Pelt. 450, 1919 WL 1442 (La.App.Orleans)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES BANKRUPCTY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| ORION REFINING CORPORATION, | ) | Case No. 03-11483 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| MICHAEL G. SYRACUSE d/b/a | ) | |
| INTERSTATE SUPPLY COMPANY, | ) | Adv. Pro. No. 03-53939 |
| and TEXAS ICO, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Re: Adv. D.I. 77, 78, 1522 |
| ORION REFINING CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

I, Michael R. Lastowski, certify that I am not less than 18 years of age, and that service

of a copy of the attached OPENING BRIEF ON BEHALF OF APPELLANTS/PLAINTIFFS,

MICHAEL G. SYRACUSE d/b/a INTERSTATE SUPPLY COMPANY, and TEXAS ICO,

INC. was made on February 26, 2007 by hand-delivery upon the following attorney:

Thomas W. Briggs, Esquire            David L. Buchbinder, Esquire
Morris Nichols Arsht & Tunnell       Office of the U.S. Trustee
1201 North Market Street             J. Caleb Boggs Federal Building, Suite 2207
Wilmington, DE 19801                 Wilmington, DE 19801

Dated:  February 26, 2007            Michael R. Lastowski (DE I.D. 3892)

41