IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>ORION REFINING CORPORATION,<br><br>      Debtor. | Chapter 11<br><br>Case No. 03-11483 (MFW) |
| MICHAEL G. SYRACUSE d/b/a<br>INTERSTATE SUPPLY COMPANY, and<br>TEXAS ICO, INC.,<br><br>      Plaintiffs/Appellant,<br><br>  v.<br><br>ORION REFINING CORPORATION,<br><br>      Defendant/Appellee. | Adv. Proc. No. 03-53939 (MFW)<br><br>C.A. No. 06-536 (UNA) |

**ANSWERING BRIEF OF APPELLEE CYPRESS ASSOCIATES, LLC,
AS THE ORC DISTRIBUTION TRUST REPRESENTATIVE**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Richard D. Allen (#469)
Gregory W. Werkheiser (# 3553)
Thomas W. Briggs, Jr. (#4076)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

 Attorneys for the ORC Distribution Trust
 Representative

March 28, 2007

## TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF CITATIONS | iii |
| STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION | 1 |
| ISSUES PRESENTED AND STANDARD OF APPELLATE REVIEW | 2 |
| STATEMENT OF THE CASE | 3 |
| A. Factual Background | 3 |
| B. Proceedings And Disposition Below | 5 |
| C. This Appeal | 12 |
| SUMMARY OF ARGUMENT | 14 |
| ARGUMENT | 18 |
| I. THE BANKRUPTCY COURT CORRECTLY HELD THAT THE EXISTENCE OF AN UNFULFILLED SUSPENSIVE CONDITION PRECLUDED SYRACUSE FROM ACQUIRING OWNERSHIP OF THE SURPLUS MATERIALS. | 18 |
| A. The Bankruptcy Court Correctly Found The Agreement To Contain A Suspensive Condition | 18 |
| B. A Suspensive Condition May Apply To A Sale Of Movables | 20 |
| C. Any Alleged Interference By Orion Is Irrelevant And Did Not Allow Syracuse To Acquire Ownership Of The Surplus Goods Before The Petition Date | 22 |
| D. Whether Or Not The Agreement Was A "Sale In A Lump" Is Irrelevant | 27 |
| E. The Bankruptcy Court's Decision Does Not Lead To Absurd Consequences | 28 |
| II. NO TRANSFER OF OWNERSHIP OCCURRED UPON EXECUTION OF THE AGREEMENT BECAUSE IT WAS NOT A CONTRACT OF SALE | 30 |
| A. If The Agreement Can Be Categorized Under The Louisiana Civil Code, Its Predominant Character Is As A Contract To Provide Services Under Which No Transfer Of Ownership Occurred. | 30 |
| B. Because The Agreement Did Not Provide For Payment In | |

ii.

TABLE OF CONTENTS (continued)

Page

"Current Money," It Was An Innominate Contract And No
Transfer Of Ownership Occurred.                                    36

CONCLUSION                                                          39

<u>TABLE OF CITATIONS</u>

Cases                                                                                          <u>Page(s)</u>

<u>Acadiana Health Club, Inc. v. Herbert</u>,
    469 So.2d 1186 (La. App. 3d Cir. 1985)......................................................... 32, 34

<u>Alonzo and CPA Construction Company v. Chifici</u>,
    526 So.2d 237 (La. App. 5th Cir. 1988)............................................................ 33

<u>American Flint Glass Workers Union v. Anchor Resolution Corp. (In re Anchor</u>
    <u>Resolution Corp.)</u>,
    197 F.3d 76 (3d Cir. 1999)..................................................................................2

<u>Austin's of Monroe, Inc. v. Brown</u>,
    474 So. 2d 1383 (La. App. 2d Cir. 1985)...................................................... 31, 33

<u>Azubuko v. Royal</u>,
    443 F.3d 302 (3d Cir. 2006)............................................................................. 30

<u>Barber Asphalt Paving Co. v. St. Louis Cypress Co.</u>,
    46 So. 193 (1908) ........................................................................................ 22, 29

<u>Bass v. Fillion (In re Fillion)</u>,
    181 F.3d 859 (7th Cir. 1999)............................................................................ 23

<u>Boyle v. King County</u>,
    282 P.2d 261 (Wash. 1955)..........................................................................34-35

<u>Burtch v. Ganz (In re Mushroom Transp. Co., Inc.)</u>,
    382 F.3d 325 (3d Cir. 2004)..............................................................................2

<u>Canal Motors, Inc. v. Campbell</u>,
    269 So. 2d 847 (La. App. 4th Cir. 1972)........................................................ 20

<u>Cities Serv. Co. v. Ocean Drilling and Explor. Co. (In re Incident Aboard the D/B Ocean</u>
    <u>King)</u>,
    758 F.2d 1063 (5th Cir. 1985), <u>mandate recalled and amended on other grounds by</u>,
    877 F.2d 322 (1989) ........................................................................................ 20

<u>City of New York v. New York Disposal Corp.</u>,
    166 N.Y.S. 963 (N.Y. Sup. Ct. 1917).............................................................. 35

<u>Commodity Cred. Corp. v. Marlow (In re Julien Co.)</u>,
    117 B.R. 910 (Bankr. W.D. Tenn. 1990) ........................................................ 23

<u>Continental Nut Co. v. Louisiana Pecan Shelling Co.</u>,
    316 So. 2d 490 (La. App. 2d Cir. 1975)........................................................... 29

<u>Cox v. Louisiana</u>,
    209 So. 2d 9 (La. 1968) ................................................................................... 22

Douglas v. Murphy,
   51 So. 2d 310 (La. 1950)..................................................................25-27

E.B. Ludwig Steel Corp. v. C.J. Waddell Contractors, Inc.,
   534 So. 2d 1364 (La. App. 5th Cir. 1988)..........................................22

Energy Dev't Corp. v. St. Martin,
   128 F. Supp. 2d 368 (E.D. La. 2000)..................................................26

Evans v. Graves Pontiac-Buick-GMC Truck, Inc.,
   576 So. 2d 1025 (La. App. 1st Cir. 1991)............................................20

Fields v. Thompson Printing Co., Inc.,
   363 F.3d 259 (3d Cir.2004)................................................................2

Gulf Rice Milling, Inc. v. Sonnier,
   930 So. 2d 256 (La. App. 3d Cir. 2006)..............................................23

Harrington v. Oliver,
   459 So. 2d 111 (La. App. 2d Cir. 1984)..............................................22

Hearsey v. Craig,
   53 So. 17 (La. 1910)..........................................................................37

In re Olympia Holding Corp.,
   129 B.R. 679 (Bankr. M.D. Fla. 1991)................................................23

In re Robotic Vision Sys., Inc.,
   322 B.R. 502 (Bankr. D.N.H. 2005)....................................................23

In re Squyres,
   172 B.R. 592 (Bankr. C.D. Ill. 1994)..................................................27

Jefferson Parish School Bd. V. Rowley Co.,
   350 So. 2d 187 (La. App. 4th Cir. 1977)........................................Passim

Kohler v. Huth Constr. Co.,
   123 So. 588 (La. 1929)......................................................................23

KSLA-TV, Inc. v. Radio Corp. of Amer.,
   501 F. Supp. 891 (W.D. La. 1980)......................................................33

Laborers' Int'l Union v. Foster Wheeler Corp.,
   26 F.3d 375 (3d Cir. 1994)................................................................30

Little, Brown and Co. v. American Paper Recycling Corp.,
   824 F. Supp. 11 (D. Mass. 1993)........................................................35

Ober v. Williams,
   35 So. 2d 219 (La. 1948)..................................................................24-25

Orion Ref. Corp. v. Louisiana (In re Orion Ref. Corp.), Adv. Pro. No. 03-1119, 2005 WL
    994575 (Bankr. M.D. La. April 27, 2005), aff'd, C.A. No. 05-878-A (M.D. La. Sept.
    16, 2005), aff'd, No. 05-30919 (5th Cir. July 17, 2006)......................................................26

Payne v. Lyons Cypress Lumber Co.,
    7 Teiss. 325 (La. App. Orleans Parish 1910) ......................................................22

Penick & Ford, Ltd. v. Waguespack & Haydel,
    86 So. 605 (La. 1920) ............................................................................................23

Poree v. Elite Elev. Svcs., Inc.,
    665 So. 2d 133 (La. App. 4th Cir. 1995)...............................................................33

Price v. Huey Childs Builder, Inc.,
    426 So.2d 398 (La. App. 2d Cir. 1983 ..................................................................33

S.F. Bowser Co., Inc. v. Wambsgans, Orleans No. 7552 (La. App. Orleans Parish 1919)...........19

Smith v. Arcadian Corp.,
    657 So.2d 464 (La. App. 3d Cir. 1995)................................................................31

Spillers v. Collier,
    434 So. 2d 504 (La. App. 2d Cir. 1983).................................................................20

Standard Oil Co. of La. v. Allison,
    200 So. 273 (La. 1941) ....................................................................................26-27

Swope v. Columbian Chem. Co.,
    281 F.3d 185 (5th Cir. 2002)................................................................................31

Thielman v. Gahlman,
    44 So. 123 (La. 1907) ...........................................................................................37

Ventre v. Pacific Indemnity Co.,
    419 So. 2d 969 (La. App. 3d Cir. 1982).................................................................21

Wampler v. Wampler,
    118 So. 2d 423 (La. 1960)................................................................................22, 24

## STATUTES

11 U.S.C. § 363(f)(4) ...........................................................................................................23

11 U.S.C. § 541...........................................................................................................2, 8, 23

28 U.S.C. § 157(b)(2)(A), (B) and (O)...................................................................................1

28 U.S.C. § 158(a)(1).............................................................................................................1

28 U.S.C. § 1334(b) ..............................................................................................................1

La. Civ. Code art. 1772 .................................................................................................. 24

La. Civ. Code art. 1772, cmt. (c) ................................................................................... 24

La. Civ. Code art. 1775 ................................................................................... 10, 12, 23, 26

La. Civ. Code art. 1914 .................................................................................................. 37

La. Civ. Code art. 1914 cmt. (b) .................................................................................... 37

La. Civ. Code art. 1916 .................................................................................................. 37

La. Civ. Code art. 2041 .................................................................................................. 24

La. Civ. Code art. 2439 ............................................................................................... 36-37

La. Civ. Code art. 2456 ................................................................................................ 9, 37

La. Civ. Code art. 2458 ........................................................................................ 16, 23, 27-28

La. Civ. Code art. 2458, cmt. (c) ................................................................................... 28

La. Civ. Code art. 2464 ............................................................................................... 36-37

La. Civ. Code art. 2464 cmt. (c) ................................................................................. 36-37

La. Civ. Code art. 2464 cmt. (b) .................................................................................... 36

La. Civ. Code art. 2474 .................................................................................................. 29

La. Civ. Code art. 2756 ............................................................................................... 31-32

La. Civ. Code art. 2757 .................................................................................................. 31

**OTHER AUTHORITIES**

5 Louisiana Civil Law Treatise (2d ed. 2001) .......................................................... 31

2 Saúl Litvinoff, Obligations § 157 ......................................................................... 31

Huey L. Golden, Comment, The Conditional Sale In Louisiana Jurisprudence: Anatomy
    Of A Synecdoche, 54 La. L. Rev. 359, 362 (1993) .............................................. 21

Levasseur, "The Work of the Louisiana Appellate Courts for the 1977-78 Term –Sales,"
    39 La. L. Rev. 705, 712-13 (1979) ...................................................................... 33

## STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION

The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") had jurisdiction over the proceedings from which this appeal arises pursuant to 28 U.S.C. § 1334(b). Such proceedings are core matters pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1). The order (Bankr. D.I. 76)[1] at issue in this appeal granted partial summary judgment to appellee, the ORC Representative (as defined herein), and dismissed Count I of the Complaint of appellant Syracuse (as defined herein), which had sought declaratory relief recognizing Syracuse as the owner of certain Surplus Materials (as defined herein). Thereafter, pursuant to the ORC Representative's motion, the Bankruptcy Court directed entry of a final order as to Count I and made an express determination "that there is no just reason for delay," with specific factual findings in support thereof.

---

[1] References to the record are as follows: (a) if to the Bankruptcy Court docket in the main case, Case No. 03-11483 (MFW), "Bankr. D.I. ____"; (b) if to the Bankruptcy Court docket in the adversary proceeding, Adv. Pro. No. 03-53939 (MFW), "Adv. D.I. ____"; and (c) if to the docket for the appeal in this Court, "Dist. D.I. ____". References to the Appendix to Appellee's Answering Brief, filed contemporaneously herewith, are as follows: "A____".

<u>ISSUES PRESENTED AND STANDARD OF APPELLATE REVIEW</u>

The issues presented in this appeal are the following:

1.     Did the Bankruptcy Court correctly conclude that ownership of the Surplus Materials remained with Orion (as defined below) as of the commencement of its bankruptcy case, and that the Surplus Materials therefore became part of Orion's bankruptcy estate created pursuant to 11 U.S.C. § 541(a)?

2.     Whether the Bankruptcy Court's decision was also correct and should be affirmed on the alternative basis that the Agreement (as defined below) between Syracuse and Orion was not a contract of sale and therefore ownership of the Surplus Materials never transferred?

Because this appeal involves a grant of summary judgment, a purely legal determination, a *de novo* standard of review is applied. <u>See</u>, <u>e.g.</u>, <u>American Flint Glass Workers Union v. Anchor Resolution Corp. (In re Anchor Resolution Corp.)</u>, 197 F.3d 76, 80 (3d Cir. 1999).  "Summary judgment is appropriate where the moving party can demonstrate 'that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" <u>Burtch v. Ganz (In re Mushroom Transp. Co., Inc.)</u>, 382 F.3d 325, 335 (3d Cir. 2004) (quoting Fed. R. Civ. P. 56(c)).  The evidence is viewed in the light most favorable to the non-movant, "draw[ing] all reasonable inferences in favor of the non-moving party." <u>Fields v. Thompson Printing Co., Inc.</u>, 363 F.3d 259, 265 (3d Cir.2004).

STATEMENT OF THE CASE

A.    Factual Background

1.    The Agreement

In the early spring of 2001, Orion Refining Corporation ("Orion" or the "Debtor") entered into a contract (the "Agreement") (A000058-A000099) with Michael G. Syracuse, d/b/a Interstate Supply Company and Texas ICO (collectively, "Syracuse"), to remove certain surplus industrial materials (collectively, the "Surplus Materials") which had lain unused on the grounds of Orion's refinery in Norco, Louisiana (the "Refinery") for, in some cases, as much as twenty years, and to clean certain areas of the Refinery.  (Collins Dep. at 106; Squires Dep. at 10).[2]  The items to be removed included pipes, valves, fittings, heat exchangers, tanks and other vessels.

Syracuse repeatedly characterizes the Agreement as a contract of sale (Op. Br. at 19-23),[3] which ignores the plain language of the Agreement, including the following provisions:

- Syracuse (or Interstate Supply) was defined as the "Contractor" (not as a purchaser) and agreed to furnish "surplus material reclamation and clean-up services" to Orion.  (Agreement at 1).

- Syracuse specifically represented that he was in the material reclamation and clean-up services business (id.) and agreed to complete the work under the Agreement "with due diligence, in a good, workmanlike manner, using skilled, competent and experienced workmen and supervisors."  (Id. at § II.A).

- The Agreement specified the areas of the Refinery that were to be cleaned on a map incorporated as Exhibit E to the contract, and Syracuse agreed "to remove surplus materials as identified by Orion" in material disposal orders.  (Id. at § II.A).

---

[2]    The above references are to excerpted portions of the deposition of Leslie Collins, dated August 5, 2004 (hereinafter, "Collins Dep.") (A000100-A000103) and the deposition of Warren Squires, dated July 9, 2004 (hereinafter, "Squires Dep.") (A000104-A000117).

[3]    The above reference is to the Opening Brief On Behalf Of Appellants/Plaintiffs, Michael G. Syracuse d/b/a Interstate Supply Company, And Texas ICO, Inc., On Appeal From Chapter 11, CA NO. 03-11483 (MFW), AP NO. 06-00051, ADV. PROC. NO. 03-53939, dated February 26, 2007 (Dist. D.I. 11) (hereinafter, "Opening Brief" or "Op. Br.").

- Completion of the designated areas was defined by the Agreement as: "graded and able to cut grass without obstruction." (Id.).

- The Agreement specifically stated: "All areas shall be cleaned and turned back over to Owner before project is considered complete." (Id. at § IV.A).

Thus, the Agreement on its face is primarily one for services.[4]

The economic terms of the Agreement also completely undermine Syracuse's assertion that it was a contract of sale. Syracuse relies on the fact that he paid $100,000 to Orion in four installments to support his theory that the Agreement was a contract of sale. (Agreement at § IV. A.). However, Syracuse's own repeated contention that the Surplus Materials have a value in excess of $2.3 million show that the principal consideration Orion was to receive consisted of his services, as the Bankruptcy Court noted.[5] (PSJ Op. at 7). Plainly, the Agreement was not a contract of sale.

2.    The Alleged "Interference"

Syracuse asserts that interference by Orion prevented him from completing his work. The assertion on its face makes little sense because there is no reason Orion would interfere with work it wanted to have and contracted to have performed. Moreover, the evidence plainly establishes that Syracuse simply lacked the manpower and capabilities to handle all of the work required under the Agreement. (Squires Dep. at 32). For instance, although many of the designated areas occupied large portions of the Refinery grounds and contained numerous large

---

[4]    These contractual provisions belie Syracuse's contention– entirely without record support – that his offer to purchase the Surplus Materials for $100,000 was distinct from his offer to clean-up the areas from which the Surplus Materials would be removed. (Op. Br. 12). For that allegation to have even a kernel of truth to it, Syracuse would have to persuade this Court that Syracuse was gratuitously offering to clean-up the Refinery (thereby finding clear error in the Bankruptcy Court's contrary conclusion).

[5]    On or about September 13, 2003, Syracuse filed a proof of claim (Claim No. 269) asserting a secured claim against Orion in the amount of $2,330,894.35 and later filed a request for allowance of an administrative expense (Bankr. D.I. 1400) in the same amount. (Op. Br. at 3; see also id. at 9 (asserting "Syracuse . . . sold over $700,000 worth of Surplus Materials . . . ."), and 14 (asserting an appraisal "valued some of the remaining Surplus Materials at $1,591,150").

vessels and other materials, Syracuse rarely had more than 4 or 5 people, including his son and wife, to perform the required work.  (Id. at 32-33).  In addition, many of the larger materials needed to be cut into smaller pieces before they could be removed, and Syracuse lacked the capabilities to perform this work on his own.[6] (Id. at 33-34).

        Two facts plainly refute the claim of interference.  First, Orion agreed to a specific clean-up schedule proposed by Syracuse, under which Syracuse would have access to multiple areas at a time, and he agreed to complete his work in those areas before moving on to other areas. (Squires Dep. at 28-29).  Second, when it became evident that Syracuse would be unable to abide by the schedule he had proposed and complete his obligations by March 31, 2002, as required by the Agreement (Agreement at §III.A), Orion offered to extend the Agreement. (Squires Dep. at 78).  Syracuse, however, did not accept that offer and failed to complete the Agreement, leaving numerous areas remaining to be cleaned, and leaving in those areas all of the vessels and other materials that he now claims to own. (Collins Dep. at 128).  In any event, the Bankruptcy Court found that there were genuine issues of disputed fact as to Syracuse's claim of interference. (PSJ Op. at 9).

        B.        Proceedings And Disposition Below

            1.        The Bankruptcy Case

        On May 13, 2003, Orion filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in the Bankruptcy Court.

---

[6]        To the extent that Syracuse complains that Orion controlled his access to certain areas of the Refinery, that was plainly permitted by the Agreement, which provides:

            The CONTRACTOR shall not permit his employees, vendors, visitors, labor representatives, salesmen, agents, or subcontractors to enter any area other than the Work areas from time to time designated by the OWNER.

        (Agreement Ex. A, § 31).

Shortly thereafter, Orion filed a motion (Bankr. D.I. 24) (the "Sale Motion") seeking authority to sell (the "Sale") substantially all of its operating assets, primarily consisting of the Refinery and related assets, to Valero or another successful bidder.  Syracuse filed an objection to the Sale Motion (Bankr. D.I. 268) (the "Sale Objection"), alleging that the Surplus Materials, which were to be included in the Sale, were his property.  On June 26, 2003, the Bankruptcy Court entered an Order (Bankr. D.I. 336) (the "Sale Order") approving the Sale to Valero and granting related relief, which included certain stipulations resolving the Sale Objection.  Thereafter, the Sale was consummated on July 1, 2003.

On July 2, 2004, the Bankruptcy Court entered an Order (D.I. 1361) (the "Confirmation Order") confirming the Amended Plan of Liquidation of Orion Refining Corporation, dated May 12, 2004 (Bankr. D.I. 1242) (the "Plan").  Also, on July 2, 2004 (the "Effective Date"), the Plan became effective, the Debtor was dissolved, the ORC Distribution Trust was established and Cypress Associates, LLC was appointed as the trustee of the ORC Distribution Trust (the "ORC Representative").  Since the Effective Date, the ORC Representative has administered the ORC Distribution Trust, including, without limitation, conducting this and certain other litigation to which the Debtor was formerly a party.

2.    The Adversary Proceeding

On June 19, 2003, Syracuse commenced the adversary proceeding from which this appeal arises, Adv. Pro. No. 03-53939 (the "Adversary Proceeding"), by the filing of a complaint (Adv. D.I. 1) (the "Complaint") against Orion.  Syracuse sought in Count I of his eight count Complaint declarations that he was the owner of the Surplus Materials and that the Surplus Materials were not property of Orion's bankruptcy estate.  Other counts of the Complaint attempted to plead claims not directed related to ownership of the Surplus Materials.

Between July 16, 2004 and September 10, 2004, Syracuse and Orion filed and briefed respective cross-motions for summary judgment on the issue of whether the Surplus

Materials were part of Orion's bankruptcy estate (Adv. D.I. 37, 38, 47, 48, 60 & 63).[7]  Oral

argument was held on the summary judgment motions on September 14, 2004, and the motions

were taken under advisement by the Bankruptcy Court.[8] (A000083-A000104).

On April 17, 2006, the Bankruptcy Court issued its Memorandum Opinion (Adv.

D.I. 77) (the "PSJ Opinion" or "PSJ Op.") (A000023-A000034) and related Order (Adv. D.I. 78)

(the "PSJ Order") (A000035-A000037).[9]  The PSJ Opinion and PSJ Order denied Syracuse's

motion for partial summary judgment on title to the Surplus Materials and granted the ORC

Representative's cross-motion for partial summary judgment on the same issue.

On April 27, 2006, Syracuse filed a motion (Adv. D.I. 81) for reconsideration of

the PSJ Order and related relief, together with a memorandum of law in support thereof (Adv.

D.I. 84, and, as amended, Adv. D.I. 86) (collectively, the "Reargument Motion").  On May 11,

2006, the ORC Representative filed its brief in opposition to the Reargument Motion (Adv. D.I.

91).[10]  Syracuse filed a reply in support of his Reargument Motion on May 18, 2006 (Adv. D.I.

92).  Oral argument was held on June 28, 2006 (Bankr. D.I. 1797).  At oral argument (A000261-

A000316), Syracuse requested and obtained the opportunity to submit limited supplemental

---

[7]    As reflected on the Adversary Proceeding docket (A000004-A000022), the parties conducted significant discovery prior to the filing of the cross-motions for summary judgment.

[8]    On August 4, 2004, the ORC Representative filed a motion *in limine* to preclude Syracuse's expert testimony and evidence, and a memorandum of law in support thereof (Adv. D.I. 43, 44 & 45), which remain pending before the Bankruptcy Court. Additionally, on September 1, 2004, Syracuse filed a second motion for partial summary judgment and a brief in support thereof (Adv. D.I. 50 & 51) seeking a summary determination as to the presence of the Surplus Materials at the Refinery on July 1, 2003. On July 20, 2005, the Court entered a stipulated order (Adv. D.I. 76) resolving that motion.

[9]    Syracuse complains that Chief Judge Walrath "chose not to hear oral argument." (Op. Br. at 5).  However, neither party sought oral argument before Judge Walrath.  Moreover, the Bankruptcy Court, per the Honorable Charles G. Case, II, heard oral argument on September 14, 2004, shortly after briefing was completed on the summary judgment motions (D.I. 1486).  The transcript of this oral argument was available to Judge Walrath.

[10]    At Syracuse's request, on June 9, 2006, the Bankruptcy Court entered an order (Adv. D.I. 99) staying the effectiveness of the PSJ Order insofar as it directed the immediate release of the Orion Funds (as defined below) to the ORC Distribution Trust.

briefing in support of his position (A000292 & A000314-A000315), and further briefs were thereafter submitted by the parties. (Adv. D.I. 106 & 107).

On August 8, 2006, the Bankruptcy Court issued its Memorandum Opinion (Adv. D.I. 108) (the "Reconsideration Opinion" or "Recon. Op.") (A000038-A000055) and Order (Adv. D.I. 109) (the "Reconsideration Order") (A000056-A000057) denying Syracuse's Reargument Motion.

3.    Related Proceedings Before The Bankruptcy
       Court Concerning The Funds At Issue

For nearly four years the ORC Representative, and Orion before it, have set aside, reserved and/or escrowed $1,500,000 (together with all interest thereon, the "Orion Funds") pending the outcome of the dispute over Syracuse's asserted ownership interest in the Surplus Materials.  The parties memorialized their understanding with respect to the Orion Funds in paragraph 57(a) of the Sale Order (hereinafter, "Paragraph 57(a)"), which, in relevant part, provides:

> Pending final adjudication of [Syracuse's] asserted ownership interest in the Surplus Materials, the Debtor shall establish an escrow account (the "Escrow Account") funded with $1,500,000.00 in cash from the proceeds of the Sale of the Purchased Assets to the Purchaser (the "Escrow Amount").  In the event of a determination by a final order of this Court or another court of competent jurisdiction that: *(i) [Syracuse] owned some or all of the Surplus Materials at the time of the Sale and some or all of the Surplus Materials did not become property of the Debtor's bankruptcy estate pursuant to section 541 of the Bankruptcy Code upon the commencement of the Debtor's bankruptcy case; and (ii) that some or all of the Surplus Materials were transferred to the Purchaser pursuant to the terms of this Order, then [Syracuse's] ownership Interest in such Surplus Materials shall be deemed to have attached to the Escrow Amount in an amount to be determined by the Court.* . . .

(Sale Order ¶ 57(a) (emphasis added)).[11]

On December 6, 2004, in partial resolution of ongoing disputes between the parties concerning the manner in which the Orion Funds should be escrowed/reserved, the Bankruptcy Court entered an order (Bankr. D.I. 1522) (the "Registry Order") authorizing and directing the ORC Representative to transfer the Orion Funds into the Bankruptcy Court's registry account. In accordance with the Registry Order, the ORC Representative remitted $1,500,000 to the Clerk of Court to be deposited in the Bankruptcy Court's registry account, where they remain.[12]

4.    The Bankruptcy Court's PSJ Opinion And
Reconsideration Opinion

In the PSJ Opinion, the Bankruptcy Court noted that "Syracuse argues that the Agreement was a contract of sale" and that "the Debtor argues that the Agreement was for services," but assumed without deciding that the Agreement was a contract of sale. (PSJ Op. at 5). The Bankruptcy Court then acknowledged the general proposition under the Louisiana Civil Code that "title to an object normally passes to the purchaser when the parties reach an agreement as to the thing and the price, even though no delivery has occurred." (Id. at 6 (citing La. Civ. Code art. 2456)). The Bankruptcy Court, however, recognized the existence of "[n]umerous exceptions to this general rule . . ." (Id.), including that "[w]hen a contract of sale also requires the performance of a service, the performance of that service is a suspensive condition that is required to be fulfilled before title can pass under the contract of sale." (Id. (citing Jefferson Parish School Bd. V. Rowley Co., 350 So. 2d 187, 192-93 (La. App. 4th Cir. 1977)).

---

[11]    Although not relevant to this appeal, Syracuse's characterization of Paragraph 57(a) as a "courtesy to the Debtor" (Op. Br. at 2) is not accurate. The order was the product of contentious negotiations between the parties.

[12]    Syracuse devotes a substantial portion of his Opening Brief (See, e.g., Op. Br. at 2-4 & 5-7) to attacking Orion and the ORC Representative on matters related to the Orion Funds. As such collateral matters are not at issue in this appeal, the ORC Representative will not burden this Court with an extended response to Syracuse's baseless attacks.

Based on undisputed facts in the record, the Bankruptcy Court concluded "that Syracuse's performance of his clean-up services was a suspensive condition to his obtaining title to the surplus materials in the designated areas." (PSJ Op. at 7).  The Bankruptcy Court reasoned as follows:

> In this case, Syracuse states that he paid the Debtor $100,000 to purchase the surplus materials in the designated areas of the Debtor's former Norco facility.  The Agreement, however, also required him to remove the materials and clean those areas.  The fact that Syracuse claims the value of the remaining items at the Norco facility is $1,591,000 is evidence of the value the Debtor placed on his clean up services.
>
> . . . . Until Syracuse removed an item from a designated area and cleaned that area, title to that item did not pass from the Debtor to Syracuse.

(Id.).

With respect to Syracuse's contention that the Debtor's alleged interference with his performance precluded it from enforcing any such suspensive condition against him, the Bankruptcy Court reasoned that this factual dispute was immaterial because "under Louisiana law, even if the suspensive condition is regarded as fulfilled because of the Debtor's interference with the performance of the Agreement, Syracuse's title would not revert back to the inception of the Agreement and the rights of intervening parties would be protected." (PSJ Op. at 10-11 (citing La. Civ. Code art. 1775)).  Accordingly, because the bankruptcy estate obtained an interest in the Surplus Materials "before the suspensive condition could be regarded as fulfilled," the Bankruptcy Court concluded that Syracuse could not subsequently establish title to the Surplus Materials. (Id. at 11).

As discussed, Syracuse moved for reargument, that motion was fully brief and Syracuse then requested and obtained yet another opportunity to brief issues that he omitted from his brief in support of his Reargument Motion.  The Bankruptcy Court specifically rejected Syracuse's contention that the Bankruptcy Court had misapprehended the issue before it, writing that it "did in fact address and decide the very issue the parties identified: did title to the property

pass to Syracuse before the Debtor filed its bankruptcy petition."[13] (Recon. Op. at 5).    The

Bankruptcy Court also considered and rejected Syracuse's misconstruction of the PSJ Opinion as

requiring Syracuse to clean all designated areas before title to any Surplus Materials could pass.

Judge Walrath confirmed that her PSJ Opinion had clearly identified removal of Surplus

Materials from designated areas as a predicate to the passage of title. (Recon. Op. at 11 (citing

PSJ Op. at 7)).

        In addition, the Bankruptcy Court carefully examined and rejected each of the

following purported errors identified by Syracuse: (a) reading the Agreement to contain a

suspensive condition (Recon. Op. at 7); (b) applying a suspensive condition to a sale of movables

(*i.e.,* personal property) (id. at 7-9); (c) implying a suspensive condition from the overall

Agreement when the words "suspensive condition" did not appear in it (id. at 9-11); (d) not

accepting Syracuse's argument that he was legally deemed to have obtained title to the Surplus

Materials before the Debtor's bankruptcy filing based on the debtor's alleged bad acts (id. at 11-

13); (e) allegedly holding that Valero's acquisition of the Surplus Materials in the Sale cut off

Syracuse's ownership interest (id. at 13-14); (f) allowing the Debtor to improperly improve its

position by not giving effect to Syracuse's retroactive claim of title in the Surplus Materials (id. at

14-16); and (g) not finding a general waiver by the Debtor of the suspensive condition by

allowing Syracuse to sell some of the Surplus Materials without first removing them from the

Refinery property and by buying certain of the Surplus Materials back from Syracuse (id. at 17-

18).

        In summary, the Court carefully considered and rejected each of the complaints

and challenges to the PSJ Opinion contained in the Syracuse's Reargument Motion.  In doing so,

---

[13]    Despite the Bankruptcy Court's ruling, Syracuse baldly continues to mischaracterize the
        PSJ Opinion as erroneously framing the issue as whether title passed to Valero. (Op. Br.
        at 14 & 36).    As discussed above, this self-serving characterization is not an accurate
        portrayal of what transpired before the Bankruptcy Court.

the Bankruptcy Court noted that Syracuse "fail[ed] to distinguish the law on which the Court relied" and "ignore[d] the cases referenced by the Court in its [PSJ] Opinion and the effect of article 1775...." (Recon. Op. at 10-12). The Bankruptcy Court reaffirmed that its conclusions were "well-founded in Louisiana Law." (Recon. Op. at 11).

C.    This Appeal

On August 17, 2006, Syracuse filed a purported notice of appeal from the PSJ Opinion, the PSJ Order, the Reconsideration Opinion and the Reconsideration Order (Adv. D.I. 112) (the "Purported Notice of Appeal"). To expedite the resolution of this litigation through appellate review, the ORC Representative thereafter filed a motion (Adv. D.I. 116) (the "Certification Motion") requesting that the PSJ Order be certified as a final judgment under Rule 54(b) of the Federal Rules of Civil Procedure and that the Bankruptcy Court determine there was no just reason for delaying appellate review of the PSJ Order. By Order, dated September 20, 2006 (Adv. D.I. 125) (the "Appeal Certification Order"), the Bankruptcy Court, *inter alia,* granted the Certification Motion and made specific findings in support of the conclusion that the PSJ Opinion and PSJ Order constituted a final order and judgment as to Count I of the Complaint and that there was no just reason for delay.[14]

This appeal was docketed in this Court on August 31, 2006, and initially assigned to Judge Jordan. Syracuse filed his designation of the record and statement of issues on appeal, which also was docketed in this Court on August 31, 2006 (Dist. D.I. 2). The ORC Representative filed its counter-designations of the record on September 8, 2006 (Dist. D.I. 4).

---

[14]    Syracuse did not oppose the Certification Motion and has not challenged the Appeal Certification Order.

Thereafter, the parties unsuccessfully attempted to mediate this appeal through the Court's mandatory mediation program (Dist. D.I. 6).[15]

Syracuse filed his Opening Brief on February 26, 2007. This is the answering brief of the ORC Representative.

---

[15]     Following the elevation of Judge Jordan to the United States Court of Appeals for the Third Circuit, this appeal was reassigned to the vacant judicial position. Magistrate Judge Mary Pat Thynge then so ordered a stipulated briefing schedule tendered by the parties at her direction (Dist. D.I. 8 & 9).

## SUMMARY OF ARGUMENT

Syracuse proceeds from the premise that the Bankruptcy Court must have erred in ruling against him because, despite being a court that operates within a comprehensive code-based system of law (*i.e.,* the Bankruptcy Code) on a daily basis, it was not competent to understand and apply the Louisiana Civil Code to the facts before it. (Op. Br. at 7 ("What happened below in this matter is not an atypical result of what happens when the Louisiana Civil Code meets the common law."). Syracuse then asserts that "the wrong result occurred below for five major legal reasons which primarily resulted from the [Bankruptcy] Court's attempt to apply and then reconcile common law concepts in a civil law context" and that "[a]dditional errors resulted from the Court's reliance upon non-existent facts or events, and, the Court's insertion of *new* theories each time Syracuse refuted the theories presented by the Court as adopted by the Debtor." (Id. at 7-8).

According to Syracuse, the purported "five major errors" by the Bankruptcy Court consist of the following (Op. Br. at 8-11): (1) the Bankruptcy Court's alleged treatment of the Agreement as a common law "conditional sale" and refusal to treat the Agreement as a "sale in a lump"; (2) the Bankruptcy Court's reading of the Agreement to make Orion's commitment to sell the Surplus Materials to Syracuse subject to a suspensive condition that Syracuse perform the services required of him under the Agreement; (3) the Bankruptcy Court's refusal to accept Syracuse's position that Orion's alleged fault excused Syracuse from performing services under the Agreement; (4) the Bankruptcy Court's rejection of Syracuse's assertion that, notwithstanding that Orion has never been adjudicated to have prevented Syracuse's performance of the Agreement, any suspensive condition should have been deemed satisfied as of a date prior to the commencement of Orion's bankruptcy case; and (5) and the Bankruptcy Court's construction of the Agreement in a manner that leads to "absurd consequences" because the Bankruptcy Court

did not read supposedly ambiguous aspects of the Agreement in Syracuse's favor.  These challenges to the PSJ Opinion and the PSJ Order have no basis in law or fact.

Part I of this brief explains why the Bankruptcy Court correctly found there to be an unfulfilled suspensive condition in the Agreement that prevented the completion of the sale of the remaining Surplus Materials to Syracuse and resulted in the Debtor retaining its ownership interest in the Surplus Materials when its bankruptcy estate came into existence.[16]  As discussed in Sub-Part I.A. below, the Bankruptcy Court correctly read the Agreement and applied the undisputed facts to conclude that the removal and clean-up services to be provided by Syracuse were a central component of the Agreement and a necessary condition to the enforceability of the Agreement and Orion's attendant obligation to transfer title to the Surplus Materials.  Both the terms of the Agreement, which extensively described the "surplus material reclamation and clean-up services" to be provided by Syracuse, and the value that Syracuse himself necessarily placed on the reclamation and clean-up services, which far surpassed the $100,000 he alleges he paid for the Surplus Materials, establish the critical importance to such services under the Agreement.

As discussed in Sub-Part I.B. below, Syracuse is simply wrong as a matter of Louisiana law when he argues that a contract to sell movables subject to a suspensive condition cannot exist under Louisiana law and then characterizes the Agreement as a conditional sale under which title could not be retained by Orion.  Not only the Louisiana appeals court decision of <u>Jefferson Parish Sch. Bd. v. Rowley Co., Inc.</u>, 350 So. 2d 187, 192-93 (La. App. 4th Cir. 1977), the principal case relied on by the Bankruptcy Court, but a host of other cases decided under Louisiana law, establish a long tradition under the Louisiana Civil Code of recognizing

---

[16]    Rather than track the structure of Syracuse's Opening Brief, which is arbitrarily organized and disjointed in its discussion of the relevant issues, this Answering Brief attempts to present the ORC Representative's analysis of the relevant issues in a cohesive and coherent manner.  To assist the Court in relating this discussion to the arguments contained in Syracuse's Opening Brief, wherever feasible, page references to the Opening Brief are included.

suspensive conditions in sales of movables.   A "conditional sale," in contrast, has a well established and limited meaning as a contract where a seller sells a thing subject to an attempted retention of title until all installment payments are made by the buyer.  This Agreement cannot be confused with a sale on credit under a retention of title.

Sub-Part I.C. responds to Syracuse's contention that Orion's alleged interference with his performance under the Agreement precludes Orion's reliance on the existence of a suspensive condition.   Assuming that Orion was at fault for Syracuse's failure to render the services required under the Agreement, such interference is irrelevant because Louisiana Law and the Bankruptcy Code would not vest him with an interest superior to that acquired by Orion's bankruptcy estate upon the commencement of its bankruptcy case.

Sub-Part I.D., in turn, disposes of Syracuse's argument concerning a so-called "sale in a lump" under Article 2458 of the Louisiana Civil Code.   Whether the Agreement contemplated a sale in a lump is legally insignificant to whether there was an unsatisfied suspensive condition in the Agreement that prevented the passage of title to Syracuse.  The only consequence of a contract constituting a sale in a lump is to eliminate the requirement that things be weighed, counted or measured as a prerequisite to a sale under Louisiana law.

Sub-Part I.E dismisses the several arguments that Syracuse offers as purportedly demonstrating absurd consequences resulting from the PSJ Opinion.  In reality, these are simply additional complaints about the Bankruptcy Court's reading and application of the Agreement's terms.  First, Syracuse mistakenly attempts to invoke a rule of construction under Louisiana Law that has no application outside of the context of construing warranty language in sale agreements. Second, Syracuse resorts to mischaracterizing the terms of the Agreement and the PSJ Opinion to manufacture a conflict between the parties' conduct and Bankruptcy Court's holding that simply does not exist.

As explained in Part II, this Court may also affirm the PSJ Order for an additional and entirely independent reason – the Agreement on its face was not a contract of sale

under Louisiana law.  No ownership, therefore, could transfer under the Agreement, except to the extent that Syracuse actually completed performance of the Agreement in accordance with its terms.

Sub-Part II.A. considers the Louisiana Civil Code's treatment of contracts containing sale and service components.  Applying Louisiana law principles of categorization, which require a contract to be characterized by its predominate obligations, it is clear that the Agreement was predominantly one for services.  Accordingly, no sale occurred.

Sub-Part II.B., in turn, examines relevant provisions of the Louisiana Civil Code upon which Syracuse must rely to establish that the Agreement was a contract of sale and that title passed to him.  It is evident from, among other things, the express language of Articles 2439 and 2464 of the Louisiana Civil Code and the accompanying comments that when a thing is to be transferred predominantly for services to be rendered, the contract cannot be categorized as a sale.  Rather, if it does not qualify as a contract for services, it is an innominate (*i.e.,* unclassified) contract under Louisiana law and the sale-specific Articles governing passage of title, upon which Syracuse must rely to prevail, have no application to the Agreement.

<u>ARGUMENT</u>

I.    THE BANKRUPTCY COURT CORRECTLY HELD THAT THE EXISTENCE OF AN UNFULFILLED SUSPENSIVE CONDITION PRECLUDED SYRACUSE FROM ACQUIRING OWNERSHIP OF THE SURPLUS MATERIALS.

A.    The Bankruptcy Court Correctly Found The Agreement To Contain A Suspensive Condition

Ignoring central provisions of the Agreement that obligate Syracuse to clean designated areas and remove the surplus materials, Syracuse contends "there was no 'suspensive condition' any where [sic] in the Contract" and that the Bankruptcy Court "simply created a 'suspensive condition' which did not exist." (Op. Br. 27). However, the Louisiana Civil Code and the case law construing it, together with the unambiguous terms of the Agreement, amply support the conclusion reached by the Bankruptcy Court.

As the Bankruptcy Court noted, the Louisiana Civil Code defines a suspensive condition "as a conditional obligation that 'may not be enforced until the uncertain event occurs.'" (PSJ Op. at 6 (quoting La. Civ. Code art. 1767)). <u>Jefferson Parish Sch. Bd. v. Rowley Co., Inc.</u>, 350 So. 2d 187, 192-93 (La. App. 4th Cir. 1977), on which the Bankruptcy Court principally relied (PSJ Op. at 6-7), shows that, irrespective of whether a contract is characterized as one for services or as a contract to sell, the requirement that services be provided in connection with the transaction constitutes a suspensive condition that will preclude the passage of title until such services have been supplied. The conclusion that this Agreement gave rise to a suspensive condition is inescapable given the holding in the <u>Jefferson Parish</u> case. There, the appellate court found a suspensive condition to exist even though installation of the equipment accounted for just 3.7% of the total cost. <u>Id.</u>, at 189 & 191. In comparison, the services to be provided by Syracuse represented the bulk of the consideration to be provided under the Agreement. (PSJ Op. at 7 ("The fact that Syracuse claims the value of the remaining items at the Norco facility is $1,591,000 is evidence of the value the Debtor placed on his clean-up services")).

Remarkably, while Syracuse continues to challenge the Bankruptcy Court's conclusion, he gives only cursory attention to the <u>Jefferson Parish</u> decision on which it is based. Syracuse's principal attempt to address this decision is to make the general allegation (without pinpoint citation to the opinion) that "[u]nlike the vague terms and conditions of the Contract in the instant matter drafted by the Debtor, specific terms and conditions governed that arrangement" and that "[m]any of those clearly indicated that the risks of loss remained with the seller until the installation was complete." (Op. Br. at 28).    Aside from some references to standard risk allocation, safety and proof of insurance terms in connection with evaluating the contractor's bid (but which the court ignored in finding there to be a suspensive condition) review of the <u>Jefferson Parish</u> opinion reveals no support whatsoever for Syracuse's argument.[17]    <u>See Jefferson Parish</u>, 350 So. 2d at 190-91.

Syracuse also cites <u>S.F. Bowser Co., Inc. v. Wambsgans</u>, Orleans No. 7552 (La. App. Orleans Parish 1919), and argues that it somehow shows there was no suspensive condition. (Op. Br. at 27-28).    However, the issue of whether the contract could contain a suspensive condition figured in no way in the court's cursory analysis.    In any event, even assuming the court engaged in some tacit analysis concerning the unclaimed suspensive condition, the facts make clear that the defendant waived the benefit of any possible suspensive condition that required installation through his misrepresentations that induced the plaintiff not to install the gas pump that had previously been delivered to him. <u>Id.</u> at *2-*3.

The suspensive condition identified by the Bankruptcy Court is apparent on the face of the Agreement.    Syracuse agreed to furnish "surplus material reclamation and clean-up services" to Orion. (Agreement 1).    Syracuse specifically represented that he was in the material reclamation and clean-up services business and agreed to complete the work under the contract

---

[17]    Syracuse also suggests that the fact that the items at issue in <u>Jefferson Parish</u> were lost in a fire some distinguishes the opinion (Op. Br. at 29), but provides no explanation how that fact is legally significant.

"with due diligence, in a good, workmanlike manner, using skilled, competent and experienced workman and supervisors." (Id. at § II.A).  Syracuse agreed "to remove surplus materials as identified by Orion" in material disposal orders (Id.).  And the contract specified that "all areas shall be cleaned and turned back over to owner before project is considered complete." (Id. at § IV.A).  Syracuse entirely ignores these provisions of the Agreement.  The assertion of Syracuse that the Bankruptcy Court erred in finding a suspensive condition is baseless.[18]

> B.    A Suspensive Condition May Apply To A Sale Of Movables

Syracuse also asserts that the concept of a suspensive condition is inapplicable in a sale of movables under Louisiana law. (Op. Br. at 19-23).  That assertion is likewise refuted by the Jefferson Parish decision, which involved a sale of movables (i.e., cabinets, tables and similar items) subject to the suspensive condition that a service would be provided (i.e., the installation of such items in the buyer's building).  Jefferson Parish, 350 So. 2d at 191-92.  Moreover, nonmonetary suspensive conditions have been upheld repeatedly by Louisiana courts in contracts to sell movables. See, e.g., Evans v. Graves Pontiac-Buick-GMC Truck, Inc., 576 So. 2d 1025 (La. App. 1st Cir. 1991) (recognizing suspensive condition of finance company's approval of financing arrangement as predicate to sale of truck); Spillers v. Collier, 434 So. 2d 504 (La. App. 2d Cir. 1983) (enforcing suspensive condition in connection with sale of dog); Canal Motors, Inc. v. Campbell, 269 So. 2d 847 (La. App. 4th Cir. 1972) (holding prerequisite of approval of loan to

---

[18]    Syracuse also appears to argue that the specific words "suspensive condition" must appear in the Agreement to find such a condition. (Op. Br. at 27).  That assertion is refuted by Jefferson Parish, in which the words "suspensive condition" nowhere appear in the contract.  Consistent therewith, Louisiana courts have been loath to impose the requirement that magic words be used for contract provisions to be effective. See, e.g., Cities Serv. Co. v. Ocean Drilling and Explor. Co. (In re Incident Aboard the D/B Ocean King), 758 F.2d 1063, 1067 (5th Cir. 1985) (collecting Louisiana cases), mandate recalled and amended on other grounds by, 877 F.2d 322 (1989).

be a suspensive condition necessary for agreement to sell car to ripen into an enforceable contract).

In arguing that the Bankruptcy Court "applied the wrong elements of Louisiana Civil law" (Op. Br. at 19), Syracuse essentially asserts that the Bankruptcy Court held the Agreement to be a conditional sale and that such sales are not recognized under Louisiana law. The cases Syracuse has relied upon, however, stand only for the unremarkable proposition that Louisiana law does not recognize conditional sales pending payment of the monetary purchase price. The same is true of Syracuse's latest offering, Ventre v. Pacific Indemnity Co., 419 So. 2d 969 (La. App. 3d Cir. 1982). Ventre simply holds that title in an installment sale of a one-half interest in an airplane could not be retained by the seller even though the putative buyer failed to make even a single payment. Id. at 969.

Indeed, the term "conditional sale" has a well established and limited meaning in Louisiana law as "a contract in which 'the purchaser pays the seller in installments, and, although he receives possession and the right to use the thing at the moment when he enters into the agreement with the seller, the seller retains title to the thing until the final payment is made.'" Huey L. Golden, Comment, The Conditional Sale In Louisiana Jurisprudence: Anatomy Of A Synecdoche, 54 La. L. Rev. 359, 362 (1993) (quoting Saúl Litvinoff, Sale and lease in the Louisiana Jurisprudence 111 (2d rev. ed. 1986)). Louisiana law recognizes a clear distinction between a suspensive condition and a conditional sale, which has nothing to do with whether the transaction involves movables:

> The reason why a sale under a suspensive condition does not transfer the ownership is that it is not a sale. If it was a sale, it would transfer the ownership, because a sale is a transfer of ownership, and it is nothing else. The expression "to sell" and the expression "to transfer property for a price in money," are convertible; and, as a consequence, it is no more possible to sell without transferring ownership that it is possible to sell without selling, or to transfer ownership without transferring ownership, or to do any other thing without doing it. When a sale is made under a suspensive condition, there is no sale until the condition

has been fulfilled.  There is merely a contract that there shall be a
sale when the condition is fulfilled.

<u>Barber Asphalt Paving Co. v. St. Louis Cypress Co.</u>, 46 So. 193, 197 (1908).  The Agreement
was not a conditional sale and, as the Bankruptcy Court correctly determined, contained a
suspensive condition, satisfaction of which is a predicate to any transfer of title.

C. Any Alleged Interference By Orion Is Irrelevant And
Did Not Allow Syracuse To Acquire Ownership Of
<u>The Surplus Goods Before The Petition Date</u>

Syracuse devotes a number of pages to discussing Orion's purported fault in
preventing Syracuse's performance under the Agreement. (Op. Br. 9-10, 30-35).  As a threshold
matter, the Bankruptcy Court correctly found that a genuine issue of fact exists as to whether
Orion interfered with Syracuse's performance under the Agreement.  Syracuse does not show
otherwise. (<u>Compare</u> Op. Br. 30-35, <u>with</u> PSJ Op., at 8-11).

Syracuse argues that such interference caused title to vest in Syracuse but fails to
address in any real way the Bankruptcy Court's conclusion to the contrary.  As the Bankruptcy
Court observed, Louisiana Civil Code Articles 1772 and 1775 and their respective comments
expressly recognize and protect the intervening rights of third parties against the retrospective
effect of a satisfaction or deemed satisfaction (on whatever basis) of a suspensive condition. (PSJ
Op. at 9-10).  As the Bankruptcy Court also noted, the Louisiana Supreme Court has conclusively
disposed of this argument in holding: "'There is nothing in the language of the Article which
lends support to the contention that, when the suspensive conditions are performed, title to the
property contracted for vests retrospectively in the grantee to the date the engagement was
contracted.'" (PSJ Op. at 10 (quoting <u>Wampler v. Wampler</u>, 118 So. 2d 423, 426 (La. 1960))).

The cases cited and relied upon by Syracuse do not support any claim of error by
the Bankruptcy Court and are readily distinguishable.  <u>Harrington v. Oliver</u>, 459 So. 2d 111, 113
(La. App. 2d Cir. 1984), <u>E.B. Ludwig Steel Corp. v. C.J. Waddell Contractors, Inc.</u>, 534 So. 2d
1364, 1367 (La. App. 5th Cir. 1988), <u>Cox v. Louisiana</u>, 209 So. 2d 9, 11 (La. 1968), and <u>Payne v.</u>

Lyons Cypress Lumber Co., 7 Teiss. 325 (La. App. Orleans Parish 1910), stand only for the

limited proposition that a contract party who has interfered with his contractor's performance

may not then charge the contractor with breach of the contract if he is unable to complete

performance by the date specified in the agreement.  And, Syracuse's own description of Penick

& Ford, Ltd. v. Waguespack & Haydel, 86 So. 605 (La. 1920), makes clear that it dealt only with

whether a seller could erect as a defense to the buyer's breach claim the buyer's failure to act by

the contract's deadline when the seller's acts made the buyer's performance impossible.[19]  Those

cases are fully consistent with the Bankruptcy Court's conclusion that, if Syracuse proves

interference, he would have a claim for damages (PSJ Op. at 11), but nothing more.

Syracuse next takes issue with the Bankruptcy Court's ruling that the creation of

the Debtor's bankruptcy estate under section 541 of the Bankruptcy Code cut off any ability on

his part to obtain retroactive recognition of any deemed satisfaction of the Agreement's

suspensive condition.[20]  (Op. Br. at 35-36).  Syracuse, however, fails to address the express

limitation on the retroactive effects of fulfillment of a suspensive condition contained in Article

1775 of the Louisiana Civil Code, on which the Bankruptcy Court expressly relied.  Article 1775

provides, in relevant part: "[F]ulfillment of the condition does not impair the right acquired by

third persons while the condition was pending." La. Civ. Code art. 1775.  Further, although

---

[19]     Penick also has been severely limited and criticized in Louisiana case law as inconsistent
        prior precedent and with Article 2458 of the Louisiana Civil Code. See, e.g., Kohler v.
        Huth Constr. Co., 123 So. 588, 589 (La. 1929); Gulf Rice Milling, Inc. v. Sonnier, 930
        So. 2d 256, 260-61 (La. App. 3d Cir. 2006).

[20]     Syracuse inaccurately persists in accusing the Bankruptcy Court of improperly framing
        the issue in its PSJ Opinion as whether the Sale to Valero extinguished Syracuse's title.
        (Op. Br. at 36).  Nevertheless, even assuming the Bankruptcy Court had so-ruled, the
        result would have been correct and would provide an additional basis to affirm the PSJ
        Order.  Under section 363(f)(4) of the Bankruptcy Code, the Bankruptcy Court was
        empowered to sell the Surplus Materials free and clear of interests "in bona fide dispute".
        11 U.S.C. § 363(f)(4).  Such interests include ownership interests that are in bona fide
        dispute.  See, e.g., Bass v. Fillion (In re Fillion), 181 F.3d 859, 862 (7th Cir. 1999); In re
        Robotic Vision Sys., Inc., 322 B.R. 502, 507 (Bankr. D.N.H. 2005); In re Olympia
        Holding Corp., 129 B.R. 679, 681 (Bankr. M.D. Fla. 1991); Commodity Cred. Corp. v.
        Marlow (In re Julien Co.), 117 B.R. 910, 919 (Bankr. W.D. Tenn. 1990).

Syracuse relies on Article 1772 to argue for a deemed fulfillment of the Agreement's suspensive condition (Op. Br. at 31-32), he simply ignores comment (c) to Article 1772, which qualifies the rights obtained upon the deemed fulfillment of a suspensive condition as follows: "[T]he party not at fault may have to content himself with damages rather than specific performance if the latter has become impossible because of the nonfulfillment of the condition." La. Civ. Code art. 1772, cmt. (c).

Syracuse also has ignored Wampler v. Wampler, 118 So. 2d 423 (La. 1960), and Ober v. Williams, 35 So. 2d 219 (La. 1948), two decisions of the Louisiana Supreme Court cited by the Bankruptcy Court.  As Bankruptcy Court stated in quoting Wampler, 118 So. 2d at 426, there is simply "nothing in the language of the Article which lends support to the contention that, when the suspensive conditions are performed, title to the property contracted for vests retrospectively in the grantee to the date the engagement was contracted." (PSJ Op. at 10) (internal quotations omitted).

Ober similarly supports the Bankruptcy Court's conclusion that title could not vest in Syracuse retroactively to a date prior to the commencement of Orion's bankruptcy case. At issue in Ober was whether a mineral reservation of the grantor contained in a deed was extinguished by prescription of ten year non-use. Ober, 35 So. 2d. 220.  Citing Article 2041 of the Louisiana Civil Code (the predecessor to Article 1775), the plaintiff argued (as does Syracuse here) that, upon satisfaction of the suspensive conditions in the contract to sell the property, ownership was deemed to have transferred retroactively to the date of contracting and on that date the prescriptive period began to run. Id.  The Louisiana Supreme Court described the position advanced by the plaintiff as one "many times made" and subject to "consistent rejection . . . in a long line of authorities." Id. at 221-22 (collecting cases).  As the court explained, Article 2041 could not vest ownership retroactively:

> Article 2041 of the Civil Code . . . did not have the magic effect of vesting ownership in White retrospectively.  That article, which is found in that part of the Code dealing with conditional

> contracts, declares that, when the condition has been complied
> with, it has a retrospective effect to the day the engagement was
> contracted.  This merely means that the rights of the obligor,
> upon compliance, revert to the date of the contract but it offers
> no foundation for an argument that, in cases involving contracts
> to sell and purchase immovable property conditioned upon the
> happening of an event or the doing of certain things, the
> ownership is transferred retrospectively by the performance of
> the condition.  On the contrary, ***compliance with the condition
> only renders the contract executory; makes the reciprocal
> promises absolute and establishes the rights and liabilities of
> the parties as of the date of the agreement.***

Id. at 223 (emphasis added).  A finding of interference by Orion leading to satisfaction of a

suspensive condition would confer on Syracuse, at most, a damages remedy against Orion, but

would not vest title.

The Louisiana Supreme Court's decision in Douglas v. Murphy, 51 So. 2d 310

(La. 1950), is also instructive on this point.  There, the plaintiff sued to recover damages for

timber cut and removed from property.  Id. at 311.  The plaintiff's predecessor in interest had

contracted to acquire the property under an agreement containing certain suspensive conditions,

but the plaintiff had been forced to, among other things, commence several lawsuits before she

ultimately succeeded in obtaining a judgment recognizing her ownership interest in the property.

Id. at 311-13.  In dispute was whether the defendants (strangers to the original contract to sell the

property to the plaintiff's predecessor) had acquired superior rights to the timber by means of

acquisitive prescription (a concept in Louisiana law akin to adverse possession), the outcome of

which depended on whether title passed to the plaintiff before or after she obtained a judgment

recognizing her title to the property.  Id. at 313.  The Louisiana Supreme Court held that

ownership of the property only passed when the plaintiff obtained a judgment recognizing her

ownership interest in the property, and not retrospectively:

> It is true that the rights between contracting parties relate back to
> the date of an agreement as in the case of an agreement to sell.
> ***This is a fiction of law but it does not have the effect of vesting
> ownership in the party who had agreed to purchase.***  It merely
> means that the rights of the parties, upon compliance, revert to
> the date of the contract.  The compliance with the conditions

> only renders the contract executory and establishes the rights and
> liabilities of the parties as of the date of the agreement.

Id. at 314 (emphasis added).

As the Bankruptcy Court concluded in the PSJ Opinion, "[w]hen the Debtor filed its bankruptcy case, the estate obtained an interest in the surplus materials," which "occurred before the suspensive condition could be regarded as fulfilled." (PSJ Op. at 11 (citing 11 U.S.C. § 541(a)(1)); See also (Recon. Op. at 11-13). That event rendered it impossible for Syracuse to now establish title to the surplus materials as against Orion's bankruptcy estate and consigns him to an action for damages only. This conclusion is fully supported by Louisiana law and the Bankruptcy Code.[21]

On appeal, Syracuse offers just one case, Standard Oil Co. of La. v. Allison, 200 So. 273 (La. 1941), to support his assertion that the Bankruptcy Court incorrectly applied Article 1775. Unlike this case, Standard Oil involved a two party dispute between the Board of Commissioners of Caddo Levee and its transferees of certain property over whether the conveyance included mineral rights appurtenant to such property. Id. at 274. At issue was whether the transferees acquired good title to the property before or after the enactment of an amendment to the Louisiana Constitution that excluded mineral rights from such property grants. Id. at 277. The court found that, where the agents of the state had wrongfully refused to perform

---

[21] Syracuse also attempts to distinguish two additional cases cited by the Bankruptcy Court –Orion Ref. Corp. v. Louisiana (In re Orion Ref. Corp.), Adv. Pro. No. 03-1119, 2005 WL 994575 (Bankr. M.D. La. April 27, 2005), aff'd, C.A. No. 05-878-A (M.D. La. Sept. 16, 2005), aff'd, No. 05-30919 (5th Cir. July 17, 2006) and Energy Dev't Corp. v. St. Martin, 128 F. Supp. 2d 368 (E.D. La. 2000), aff'd, 296 F.3d 356 (5th Cir. 2002) – but fails to address the relevant point. Both the Orion court and the St. Martin court expressly relied upon Article 1775 in declining to give retroactive effect to the satisfaction of suspensive conditions for the purpose of determining the passage of title. See Orion, 2005 WL 994575, at *3; St. Martin, 128 F. Supp. 2d at 381. Article 1775 is an article of general application situated in Book III ("Of the Different Modes of Acquiring the Ownership of Things"), Title III ("Obligations in General"), Chapter 3 ("Kinds of Obligations") of the Louisiana Civil Code. These courts simply gave the Article its natural reading and recognized the limitations on retroactive effects with respect to the enforcement of title against third parties expressly incorporated therein.

their ministerial tasks of executing the instruments of conveyance, the transferees had a sufficient interest in the property to forestall the retroactive application of the constitutional amendment to their claims. Id. at 278-79. Accordingly, the decision was not predicated on a finding that the transferees, in fact, had acquired good title enforceable as against third parties.[22] Rather, the case stands only for the narrow and unremarkable proposition that a new law which comes into effect during the period while the condition is pending does not regulate the obligation.[23]

In sum, the Bankruptcy Court's conclusion that, even if Orion had interfered with Syracuse, title to the surplus materials would not vest retrospectively in Syracuse is fully supported by Louisiana law and the Bankruptcy Code.[24] The arguments of Syracuse to the contrary are unsupported and baseless.

D.     Whether Or Not The Agreement Was A "Sale In A Lump" Is Irrelevant

Repeating an argument he made to the Bankruptcy Court, Syracuse cites Article 2458 of the Louisiana Civil Code and says that the Agreement gave rise to a "sale in a lump." (Op. Br. at 23-27). Syracuse, however, does not explain how that has any bearing on the

---

[22]     The inapplicability of this decision to disputes involving the effectiveness of title as against third parties was recognized by the Douglas court, which stated of the Standard Oil decision and another case: "What was said in both of those cases applied solely to the rights between the parties." Douglas, 51 So. 2d at 313.

[23]     Syracuse also complains that by declining to enforce a transfer of ownership to him the Bankruptcy Court was unfairly allowing "the Debtor to improve its position and achieve greater rights by the filing of the bankruptcy petition and the creation of the bankruptcy estate." (Op. Br. at 36, citing In re Squyres, 172 B.R. 592, 594 (Bankr. C.D. Ill. 1994)). The Bankruptcy Court correctly rejected this contention, explaining that "there is no provision in the Bankruptcy Code or Louisiana law that establishes Syracuse's rights in the Surplus Materials are superior to the title acquired by the Debtor's estate on the filing of the petition." (Recon. Op. 14-16).

[24]     Syracuse also asserts: "[S]ince there are no 'third parties' being affected by a construction of the contract that would allow for retrospective or retroactive effect, as shown above, this should not even be a consideration." (Op. Br. at 38). This statement, which has no record support, plainly ignores the impact of Syracuse's attempt to diminish the estate on the thousand or more parties who were Orion's creditors at the outset of its bankruptcy case.

correctness of the Bankruptcy Court's judgment. The Bankruptcy Court's analysis did not depend on whether the Agreement was for a sale in a lump, was for another type of sale or was not for a sale at all because the Bankruptcy Court found that, even if it assumed that all elements of a sale to be present, it was subject to an unfulfilled suspensive condition.

The only real effect of Article 2458 is to eliminate the requirement where there is a lump price that things be weighed, counted or measured as a prerequisite to a sale under Louisiana Law. See La. Civ. Code art. 2458 ("When things, such as goods or produce, are sold in a lump ownership is transferred between the parties upon their consent, even though the things are not yet weighed, counted or measured."); see also La. Civ. Code art. 2458, cmt. (c) ("Under this Article, when things are sold in a lump, any required weighing, counting, or measuring is conducted only for the purpose of ascertaining whether the seller performed in full.").  Syracuse has cited no article of the Louisiana Civil Code, case law or other authority that would lead to the conclusion that such lump sales are in any way inconsistent with the operation of a suspensive condition in this Agreement.

In any event, even assuming that Article 2458 might somehow be relevant, Syracuse's characterization of the Agreement as effecting a "sale in a lump" is at odds with the very facts that Syracuse contends to exist.  According to Syracuse: "The Surplus Materials were specifically labeled, photographed and set aside in seventeen different areas of the refinery . . . ." (Op. Br. at 24).  If Syracuse's version of the facts is accepted, then this was not a "sale in a lump," as the surplus materials had been specifically catalogued and identified at the time the agreement was signed.

E.    The Bankruptcy Court's Decision Does Not Lead To
      Absurd Consequences

Grouped under the "Absurd Consequences" heading, Syracuse rehashes certain of his arguments challenging the Bankruptcy Court's construction of the Agreement. (Op. Br. at 10-11, 38-39).  First, apparently assuming that the only way the Bankruptcy Court could find a

suspensive condition in the Agreement would be for it to first determine that the Agreement was ambiguous (which is contrary to the record), Syracuse invokes a rule of construction under Louisiana law to argue that any such ambiguities should have been construed against Orion to preclude the operation of such a suspensive condition. (Op. Br. at 38-39). Article 2474, however, upon which Syracuse relies, has no application here.[25] Article 2474, by its express terms, presupposes a contract of sale, which this Agreement is not if it was subject to a suspensive condition. <u>See</u> <u>Barber Asphalt</u>, 46 So. At 197 ("The reason why a sale under a suspensive condition does not transfer the ownership is that it is not a sale."). Additionally, Article 2474 "is limited to provisions in an agreement relating to warranty and is not a general rule for interpretation of contractual obligations." <u>Continental Nut Co. v. Louisiana Pecan Shelling Co.</u>, 316 So. 2d 490, 495-96 (La. App. 2d Cir. 1975).

Second, Syracuse suggests that the parties' conduct is somehow inconsistent with the Bankruptcy Court's conclusions because Orion bought back certain surplus items from Syracuse and allowed Syracuse to sell certain surplus items to third parties. But such conduct is entirely consistent with the Bankruptcy Court's conclusion that "[u]ntil Syracuse removed an item from a designated area and cleaned that item, title to that item did not pass from the Debtor to Syracuse." (PSJ Op. at 7). Because the Bankruptcy Court found that the suspensive condition applied on an area by area basis, it follows that Syracuse was permitted to resell certain surplus items within a given area even if the suspensive condition had not be satisfied as to other surplus items located in other areas. In any event, the Agreement expressly provides that Orion's waiver of any "term, provision, or condition" of the Agreement "shall not constitute a precedent or bind either party to a waiver of any succeeding breach of the same or any other terms, provision, or condition" of the Agreement. (Agreement, Exhibit A, General Contract Provisions, Item 18). The

---

[25]     <u>See</u> La. Civ. Code art. 2474 ("The *seller* must clearly express the extent of his obligations arising from the contract, and any obscurity or ambiguity in that expression must be interpreted against *seller*.") (emphasis added).

Bankruptcy Court therefore correctly found that, even if there had been a waiver of the suspensive condition as to certain items of surplus material, it did not constitute a waiver of the suspensive condition generally.[26] (Recon. Op. at 17-18).

> II.    NO TRANSFER OF OWNERSHIP OCCURRED UPON EXECUTION OF THE AGREEMENT BECAUSE IT WAS NOT A CONTRACT OF SALE

A threshold defect in Syracuse's arguments both below and on appeal is his claim that the Agreement was a contract of sale. This question was fully briefed below, but the Bankruptcy Court found it unnecessary to rule on this question because, even if the Agreement had the elements of a sale, it contained a suspensive condition that prevented the transfer of title. However, because the Agreement was not one for sale, this Court should affirm the Bankruptcy Court for this independent reason. See, e.g., Azubuko v. Royal, 443 F.3d 302, 303 (3d Cir. 2006) ("We may affirm the District Court on any ground supported by the record.").

> A.    If The Agreement Can Be Categorized Under The Louisiana Civil Code, Its Predominant Character Is As A Contract To Provide Services Under Which No Transfer Of Ownership Occurred.

A transfer of ownership to Syracuse only after specific material was identified and removed from the Refinery is consistent with the Agreement having been an executory contract for services, rather than a contract of sale. The Louisiana Civil Code draws distinctions among different categories of contracts, including as between contracts for sale and contracts for

---

[26]    Moreover, Syracuse has failed to preserve any argument for appeal that Orion waived the benefit of any suspensive condition because he has not developed that argument in his Opening Brief. See Laborers' Int'l Union v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court.").

services.[27]  Under the Louisiana Civil Code, a contract to work, or for services, is defined as: "To build by a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price." La. Civ. Code art. 2756.  In addition, "[a] person who undertakes to make a work, may agree, either to furnish his work and industry alone, or to furnish also the materials necessary for such a work." La. Civ. Code art. 2757.

Syracuse has never disputed that title did not pass to him if the Agreement was a contract for services rather than a contract of sale.  When a contract contains mixed consideration the inquiry required by this dichotomy, as framed by the Louisiana courts, seeks to determine the "primary and fundamental obligation" of a contract. Smith v. Arcadian Corp., 657 So.2d 464, 468 (La. App. 3d Cir. 1995); see also, e.g., Austin's of Monroe, Inc. v. Brown, 474 So. 2d 1383, 1388 (La. App. 2d Cir. 1985) ("[T]he contract as a whole must be characterized by its predominate or fundamental obligation.").  This concept is echoed and developed in commentary on the Louisiana Civil Code. See, e.g., 2 Saúl Litvinoff, Obligations § 157, at 288, in 7 Louisiana Civil

---

[27]     The Fifth Circuit Court of Appeals has neatly summarized the Louisiana Civil Code's treatment and categorization of contracts as follows:

> The Louisiana Civil Code defines an obligation as "a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee." [quoting La. Civ. Code art. 1756]  That performance "may consist of giving, doing, or not doing something." [quoting id.] "The obligation to give is one whereby the obligor binds himself to transfer to the oblige the ownership of a thing or to grant him some other real right in a thing." [quoting Saúl Litvinoff, Obligations, § 1.4, at 7 (5 Louisiana Civil Law Treatise (2d ed. 2001)]  "The obligation to do is one whereby the obligor binds himself to carry out or execute an act, or a series of acts, other than transferring a real right, such as making or manufacturing something or rendering a service." [quoting id. § 1.4, at 8]  The distinction between the obligation to give, e.g., sales, and the obligation to do, e.g., building constructions, is material to the judicial determination of questions involving transfer of ownership, risk of loss, prescription, and remedies.

Swope v. Columbian Chem. Co., 281 F.3d 185, 202 (5th Cir. 2002).

Law Treatise (1975) ("When different obligations are intimately connected . . . one of them must be recognized as fundamental and if it is one to do, for instance, the whole contract will be treated as giving rise to an obligation of that kind.").

Both the terms of the Agreement and Louisiana jurisprudence demonstrate that the essential purpose of the Agreement was the provision of services. The unambiguous terms of the Agreement refer to the provision of a particular service rather than a sale. The language of the Agreement manifests an intent that the purpose of the Agreement is to provide reclamation and clean-up services to Orion. The "Whereas" clause of the Agreement states, in pertinent part, "Contractor [Syracuse] is in the business of providing surplus material reclamation and clean-up services and Contractor agrees to furnish such services to Owner [Orion]." (Agreement 1) Moreover, Section II.A specifically identifies the scope of work under the Agreement as the removal of Surplus Materials and the cleaning of certain designated areas. (Id. at § II.A.) Indeed, with the exception of Sections VII.5, VII.6 and X.A, Orion and Syracuse are consistently referred to as "Owner" and "Contractor" respectively. The Agreement also has General Provisions (id at Ex. A), Security Procedures and Regulations (id. at Ex. B) and Safety Guidelines and Requirements (id. at Ex. C), which make sense only in a services contract. At no point does the Agreement state that the purpose of the Agreement was to effect a sale of the Surplus Materials.

Louisiana courts have identified several factors as indicative of whether a contract is one for a sale or services, each of which demonstrates that the contract between Orion and Syracuse was one for services.[28] In Acadiana Health Club, Inc. v. Herbert, 469 So.2d 1186, 1189 (La. App. 3d Cir. 1985), the court noted:

---

[28]    The large majority of these cases arise in the construction context, which is fertile ground for sale versus services contract categorization disputes. However, nothing in Article 2756 limits its applicability to construction contracts. Both contracts "[t]o build by a plot" (*i.e.,* construction contracts) and contracts "to work by the job" (*i.e.,* general services contracts) are within its scope.

> There are three major factors in determining whether a contract is a contract of sale or a contract to build or work by the job. First, in a contract to build, the "purchaser" has some control over the specifications of the object. Second, the negotiations in a contract to build take place before the object is constructed. Lastly, and most importantly, a building contract contemplates not only that the builder will furnish the materials, but that he will also furnish his skill and labor in order to build the desired object.

Further, Louisiana courts look to whether the labor or materials "constitute the principal value of the contract."[29] Alonzo and CPA Construction Company v. Chifici, 526 So.2d 237, 241 (La. App. 5th Cir. 1988) (quoting Price v. Huey Childs Builder, Inc., 426 So.2d 398 (La. App. 2d Cir. 1983)).

Each of these factors indicates that the Agreement between Orion and Syracuse was a contract for services rather than a contract for sale. First, under the terms of the Agreement, Syracuse was responsible for supplying all necessary equipment, manpower and fees to complete the contract. (Agreement, at § II.A.) Indeed, if Syracuse's contentions below are accepted, the Agreement gave him a measure of control over his work, in that "the Debtor retained no right to direct how Syracuse would proceed in the removal of the Surplus Materials . .

---

[29]    Particular emphasis is placed on the predominant source of value in the contract. As one commentator has explained, "[o]n several occasions, the Louisiana courts have followed this approach of weighing the economics of the situation and have ruled that the contract was a sale or a hiring of industry whenever they were satisfied that the 'primary obligation' was one to give and the 'accessory obligation' was one to do or vice versa." Levasseur, "The Work of the Louisiana Appellate Courts for the 1977-78 Term –Sales," 39 La. L. Rev. 705, 712-13 (1979); see also, e.g., KSLA-TV, Inc. v. Radio Corp. of Amer., 501 F. Supp. 891, 894 (W.D. La. 1980) (noting that cost to design, build and install radio tower was far more than a "trifling value" and rejecting contention that it should be deemed a sale), aff'd, 693 F.2d 544 (5th Cir. 1982); Poree v. Elite Elev. Svcs., Inc., 665 So. 2d 133, 135 (La. App. 4th Cir. 1995) ("[A] court considers the economics of the situation to determine if the primary obligation is to give (sale contract) or to do (construction contract)."); Austin's of Monroe, 474 So. 2d at 1388 (stressing that software design, installation and training services accounted for just 1/5th of the total cost of a contract for operating register system).

. . ."[30]  Second, the negotiation of the Agreement occurred before Syracuse fully began work at the

Refinery.  Third, and importantly, the Agreement provided that "[a]ll Work or services rendered

or performed by Contractor shall be done with due diligence, in a good, workmanlike manner,

using skilled, competent and experienced workmen and supervisors."  (Agreement, at § II.A.)  In

other words, the Agreement contemplated not only that certain materials would be removed from

the Refinery by Syracuse, but that in doing so and in cleaning the designated areas, Syracuse

would furnish his skill and labor.  See Acadiana Health Club, 469 So.2d at 1189.  While the

Agreement required a $100,000 payment by Syracuse to Orion made in installments, that was

unquestionably only part of the consideration Syracuse agreed to provide; the principal

consideration was removal of material and cleaning of areas over a one year period.

The predominate or fundamental obligation focus employed under Louisiana law

to distinguish between contracts "to do" or "to give" has an analog well embedded in the

jurisprudence of courts outside of Louisiana, which also rely on it to ascertain whether contracts

constitute sales for a variety of reasons.  Persuasive factually apposite cases from outside of

Louisiana include the following, where the courts had little difficulty concluding that the

contracts before them were not sales:

- Boyle v. King County, 282 P.2d 261 (Wash. 1955).  The plaintiff contracted with the defendant to remove all edible garbage which accumulated at a sanatorium operated by the defendant.  Id. at 429.  The plaintiff paid an up front fee, which the court characterized as a "bond for faithful performance," and paid a monthly fee to the defendant.  Id. at 429 & 433.  In consideration for his services, the plaintiff was entitled to retain the edible garbage he removed from the defendant's premises and to feed it to the hogs on his farm.  Id. at 429.  After a large number of plaintiff's hogs died, allegedly poisoned by chemical that they ingested through the edible garbage obtained from the defendant, plaintiff sued.  Id. at 429.  In dismissing the plaintiff's action which was predicated, in part, on the existence of certain warranty claims, the court concluded the arrangement was in the nature of a "service contract" to which no warranties applied.  Id. at 433.  The court noted, in particular, that

---

[30]     See Brief On Behalf Of Plaintiffs, Michael G. Syracuse, d/b/a Interstate Supply Company, Texas ICO, Inc., In support Of Plaintiffs' Motion For Partial Summary Judgment On The Issue Of Title, at 4 (Adv. D.I. 38).

"[t]here appears to be no relation between the $40 per month paid for the privilege of removing the garbage and the value of the garbage, the amount of which would vary from month to month." <u>Id.</u>

- <u>Little, Brown and Co. v. American Paper Recycling Corp.</u>, 824 F. Supp. 11 (D. Mass. 1993). The defendant obligated itself to make comparatively small payments and to recycle the plaintiff-publisher's surplus books in consideration of its ability retain and resell recyclable paper from the books for a profit. In return for the right to retain the usable paper contained in the books, the defendant provided its removal services and committed to pay the publisher $10.00 per ton on the recycled paper, presumably retaining any excess as profit for itself. <u>Id.</u> at 13. Through a series of events certain of the books were not destroyed, but instead were resold as books. <u>Id.</u> at 14. When the publisher sued, defendant argued that it was not liable because the contract had actually been a sale. <u>Id.</u> Considering the contract as a whole, the court rejected this position, characterizing the contract as one for services. <u>Id.</u> at 16.

- <u>City of New York v. New York Disposal Corp.</u>, 166 N.Y.S. 963 (N.Y. Sup. Ct. 1917). In this case, the city entered into an agreement with defendant disposal company to remove and dispose of all garbage collected within several of the city's boroughs. <u>Id.</u> at 964. The contract provided that the city would deliver the garbage to several designated locations to be retrieved by the defendant for removal and disposal per its terms. <u>Id.</u> at 964-65. In addition to its obligation to remove and dispose of the garbage, the defendant expressly agreed to make periodic payments to the city "as consideration for the privilege to perform the work" under the contract. <u>Id.</u> at 965. When the defendant stopped making payments under the contract, the city sued. <u>Id.</u> at 965. In response, defendant attempted to characterize the contract as one for sale of the garbage. <u>Id.</u> at 966. The court rejected this argument, describing it as "absolutely without force." <u>Id.</u> The court reasoned that the contract was actually "one for services, for which the defendant was to be compensated through the profits from the garbage which the plaintiff agreed to deliver and which the defendant agreed to dispose of." <u>Id.</u>

As the foregoing cases illustrate, when the structure and economic terms of a contract indicate that the principal focus of the contract is the provision of services, it will be so characterized, both by Louisiana and other courts. As discussed above, the structure of the Agreement between Syracuse and Orion leaves no doubt that the services component of the Agreement predominates far beyond any other aspect of the Agreement. Indeed, the simple economics of the Agreement – the absurdity that Orion would accept only $100,000 in cash for Surplus Materials that Syracuse contends had a value at the time of more than $2.3 million – admit of no other result.

Because the Agreement was not a contract of sale, but rather an executory contract for services, title to the surplus material did not transfer to Syracuse upon execution of the Agreement.  Title to specific material only passed as to those materials once Syracuse performed the services required under the Agreement, including the clean up and removal of the Surplus Materials.

> B.     Because The Agreement Did Not Provide For Payment In "Current Money," It Was An Innominate Contract And No Transfer Of Ownership Occurred.

The Court need not affirmatively find that the Agreement was a contract for services under the Louisiana Civil Code.  It is enough to defeat Syracuse's claim that the Agreement was *not* a contract of sale under the Louisiana Civil Code.  That conclusion is indisputable from the plain language of the Louisiana Civil Code.

Under Louisiana law, "a sale is a contract whereby a person transfers ownership of a thing to another for price *and money*." La. Civ. Code art. 2439 (emphasis added).  Article 2464 provides, in relevant part, that "[t]he price must be fixed by the parties in a sum either certain or determinable through a method agreed by them" and that "[t]here is no sale unless the parties intended that a price be paid."[31] La. Civ. Code art. 2464.  Comment (c) to Article 2464 confirms that for the contract to be a sale, the price must contemplate the payment of money, stating: "Under this Article, the transfer of a thing in return *for services to be rendered*, or an obligation of support, is not a sale but an innominate contract." La. Civ. Code art. 2464 cmt. (c)

---

[31]     While the reference to "money" remains in Article 2439, Article 2464 was amended by the Acts 1993, No. 841, § 1, effective January 1, 1995, to eliminate the words "sum of money".  This revision is, in part, explained by its drafters as having been made to "facilitate the conclusion that a contract is still a sale when, in return for the transfer of a thing, a party gives a sum of money plus another thing, *and the former is larger than the value of the latter*." La. Civ. Code art. 2464 cmt. (b) (emphasis added) (citing 10 Planiol et Ripert, Traité pratique de droit civil français 29 (1932)).  This comment reinforces the conclusion that when the fundamental obligation contained in the contract is in the nature of a service, it should not be categorized and treated as a contract of sale.

(emphasis added) (citing <u>Thielman v. Gahlman</u>, 44 So. 123 (La. 1907), and <u>Hearsey v. Craig</u>, 53 So. 17 (La. 1910)).

While "[n]ominate contracts are those given a special designation such as *sale,* lease, loan, or insurance[,] . . . innominate contracts are those with no special designations."[32] La. Civ. Code art. 1914 (emphasis added).  Only "[n]ominate contracts are subject to the special rules of the respective titles when those rules modify, complement, or depart from the rules of this title."[33] La. Civ. Code art. 1916.  By negative implication from Article 1916, innominate contracts are not subject to such special rules.  Accordingly, if this Agreement is an innominate contract, Article 2456, the sole statutory authority relied on by Syracuse in contending that ownership of the Surplus Materials transferred from Orion upon execution of the Agreement, is entirely without application here.

The plain language of Article 2439 and Article 2464, including Comment (c) thereto, admit no doubt that a contract such as this one – where the predominant cause (*i.e.,* consideration) to be furnished by Syracuse was his removal, clean-up and remediation services – is not a contract of sale.  Indeed, both <u>Thielman v. Gahlman</u>, 44 So. 123 (La. 1907), and <u>Hearsey v. Craig</u>, 53 So. 17 (La. 1910), the two decisions cited by the Civil Code drafters to support their statements in Comment (c) of Article 2464, are factually apposite in their central elements to this case.  Both decisions involved testamentary transfers of property made in exchange for value consisting predominantly or exclusively of services to be rendered (*i.e.,* lifetime care and later

---

[32]     For the avoidance of doubt, Comment (b) explains that "[a]ll of the contracts that are given special names and special treatment in Book III, Titles VI-XX of the Civil Code are nominate contracts." La. Civ. Code art. 1914 cmt. (b).  Thus, sale contracts, which are addressed in Book III, Title VII of the Civil Code, are undoubtedly nominate contracts.  Comment (c) states further as to innominate contracts: "All contracts that are neither given a special designation nor subjected to special regulation but which nevertheless result from the exercise of the parties' contractual freedom are innominate contracts." Id. at cmt. (c).

[33]     The Title referred to in Article 1916 is Book III, Title IV, captioned "Conventional Obligations or Contracts."  Title IV contains code provisions of general application to obligations and contracts.

burial of the decedent).  Similarly, in this case, the large majority of the value that was to be provided by Syracuse for the Surplus Materials consisted of his services.  That much cannot reasonably be disputed by Syracuse since he has consistently maintained that the value of the Surplus Materials to him was more than $2.3 million and made payment in cash and credit of just $100,000.

<u>CONCLUSION</u>

For all of the foregoing reasons, the ORC Representative respectfully submits that (i) the Bankruptcy Court's PSJ Opinion and PSJ Order should be affirmed in their entirety, (ii) costs should be taxed against Syracuse pursuant to Federal Rule of Bankruptcy Procedure 8014 and (iii) the ORC Representative should be granted such other and further relief as this Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 /s/ Gregory W. Werkheiser
Richard D. Allen (#469)
Gregory W. Werkheiser (#3553)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200

Counsel for Cypress Associates, LLC,
as ORC Distribution Trust Representative

March 28, 2007

759215.10

## <u>CERTIFICATE OF SERVICE</u>

I, Gregory W. Werkheiser, certify that I am not less than 18 years of age, and that service of the **Answering Brief Of Appellee Cypress Associates, LLC, As ORC Distribution Trust Representative** and **Appendix To Appellee's Answering Brief** was caused to be made on March 28, 2007 upon those parties identified on the attached service in the manner indicated.

Under penalty of perjury, I declare that the foregoing is true and correct.


Dated:  March 28, 2007                     /s/ Gregory W. Werkheiser
                                          Gregory W. Werkheiser (No. 3553)

## SERVICE LIST

**BY HAND**

Michael R. Lastowski, Esquire
DUANE MORRIS LLP
1100 Market Street, Suite 1200
Wilmington, DE  19801-1246

David L. Buchbinder, Esquire
Office of the United States Trustee
J. Caleb Boggs Federal Building
Suite 2207
Wilmington, DE  19801

Jeremy W. Ryan, Esquire
Saul Ewing LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE  19801

**BY FIRST CLASS MAIL**

Andrew C. Wilson, Esquire
Thomas R. Blum, Esquire
Susan M. Caruso, Esquire
Simon, Peragine, Smith & Redfearn, L.L.P.
1100 Poydras Street, 30th Floor
New Orleans, LA 70163-3000

Edward S. Rapier, Jr., Esquire
2160 8th Street, Suite A
Mandeville, Louisiana  70471

Michael D. Warner, Esquire
Warner Stevens, LLP
301 Commerce Street
Suite 1700
Fort Worth, TX  76102

779762