IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>ORION REFINING CORPORATION,<br><br>        Debtor. | Chapter 11<br><br>Case No. 03-11483 (MFW) |
| MICHAEL G. SYRACUSE d/b/a<br>INTERSTATE SUPPLY COMPANY, and<br>TEXAS ICO, INC.,<br><br>        Plaintiffs/Appellant,<br><br>     v.<br><br>ORION REFINING CORPORATION,<br><br>        Defendant/Appellee. | Adv. Proc. No. 03-53939 (MFW)<br><br>C.A. No. 06-536 (UNA) |

## APPENDIX TO APPELLEE'S ANSWERING BRIEF

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Richard D. Allen (#469)
Gregory W. Werkheiser (# 3553)
Thomas W. Briggs, Jr. (#4076)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
    Attorneys for the ORC Distribution
    Trust Representative

March 28, 2007

# TABLE OF CONTENTS

**Document**                                                    **Page(s)**

Michael G. Syracuse d/b/a Interstate Supply Company, And
Texas ICO, Inc., v. Orion Refining Corporation, Civil Action
No. 06-536 (UNA) (D. Del.)

    Docket Sheet                                         A000001-A000003


Michael G. Syracuse d/b/a Interstate Supply Company, And
Texas ICO, Inc., v. Orion Refining Corporation, Adv. Pro. No.
03-53939 (MFW) (Bankr. D. Del.)

    Docket Sheet                                         A000004-A000022

    Memorandum Opinion, dated April 17, 2006 (Entered      A000023-A000034
    4/17/2006, Adv. D.I. 77)

    Order, dated April 17, 2006 (Entered 4/17/2006, Adv. D.I.  A000035-A000037
    78)

    Memorandum Opinion, dated August 8, 2006 (Entered     A000038-A000055
    8/8/2006, Adv. D.I. 108)

    Order, dated August 8, 2006 (Entered 8/8/2006, Adv. D.I.  A000056-A000057
    109)

    Agreement dated as of April 21, 2001 by and between    A000058-A000099
    Orion Refining Corporation and Interstate Supply

    Deposition of Leslie Collins, taken August 5, 2005, pp.   A000100-A000103
    105-08, 117-20, 125-28

    Deposition of Warren Squires, taken July 9, 2004, pp. 6-  A000104-A000117
    13, 18-21, 26-41, 54-69, 74-81


In re Orion Refining Corporation, Case No. 03-13272 (MFW)
(Bankr. D. Del.)

    Transcript of Hearing, dated September 14, 2004        A000118-A000260

    Transcript of Hearing, dated June 28, 2006            A000261-A000316



# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:06-cv-00536-***

IN RE: Orion Refining Corporation
Assigned to: Vacant Judgeship
Case in other court: USBK/DE, 03-11483
                  USBK/DE, AP 06-00051
                  USBK/DE, Adv 03-53939
Cause: 28:0158 Bankruptcy Appeal from Judgment/Order

Date Filed: 08/31/2006
Jury Demand: None
Nature of Suit: 422 Bankruptcy Appeal (801)
Jurisdiction: Federal Question

**Debtor**

**Orion Refining Corp.**

**Appellant**

**Michael G. Syracuse**
*doing business as*
Interstate Supply Company
*doing business as*
Texas Ico Inc.

represented by **Michael R. Lastowski**
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801
(302) 657-4900
Email: mlastowski@duanemorris.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Cypress Associates, LLC as ORC Distribution Trust Representative**

**Appellee**

**Orion Refining Corporation**

represented by **Thomas W. Briggs, Jr.**
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
Email: tbriggs@mnat.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appellee**

**Cypress Associates LLC**
*as the trustee of the ORC Distribution*

represented by **Thomas W. Briggs, Jr.**
(See above for address)

A000001

*Trust*                                    *LEAD ATTORNEY*
                                           *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/31/2006 | 1 | Notice of APPEAL FROM BANKRUPTCY COURT appealing the Order entered on 4/17/06 & 8/8/06 by Judge Mary F. Walrath in Bankruptcy case number 03-11483. Fee Status Paid.- filed by Michael G. Syracuse. (Attachments: # 1 BK order being appealed# 2 BK opinion being appealed# 3 Bk order being appealed# 4 BK opinion being appealed)(els, ) Additional attachment(s) added on 8/31/2006 Bankruptcy transmittal (els, ). (Entered: 08/31/2006) |
| 08/31/2006 | 2 | DESIGNATED RECORD and STATEMENT OF ISSUES on Appeal filed by Michael G. Syracuse (els, ) (Entered: 08/31/2006) |
| 08/31/2006 |  | DESIGNATED RECORD on Appeal is available electronically from the docket sheet on file in the Bankruptcy Court in case number 03-11483. (els, ) (Entered: 08/31/2006) |
| 08/31/2006 | 3 | NOTICE of Docketing Bankruptcy Appeal. (els, ) (Entered: 08/31/2006) |
| 09/06/2006 |  | Case assigned to Judge Kent A. Jordan. Please include the initials of the Judge (KAJ) after the case number on all documents filed. (bkb, ) (Entered: 09/06/2006) |
| 09/08/2006 | 4 | COUNTER-DESIGNATION OF RECORD on Appeal filed by Cypress Associates LLC (mwm, ) (Entered: 09/08/2006) |
| 09/08/2006 |  | DESIGNATED RECORD on Appeal is available electronically from the docket sheet on file in the Bankruptcy Court in case number 03-11483. (mwm, ) (Entered: 09/08/2006) |
| 10/03/2006 | 5 | NOTICE of Entry of Judgment Pursuant to Federal Rule of Bankruptcy Procedure 7054(a) by ORC Distribution Trust Representative (Attachments: # 1 Exhibit A# 2 Certificate of Service)(Briggs, Thomas) (Entered: 10/03/2006) |
| 12/14/2006 | 6 | Letter to Judge Jordan from Brian A. Sullivan dated 12/14/06 regarding Notice of Completion of Mediation. (Attachments: # 1 Mediator's Certificate of Completion)(rwc) (Entered: 12/14/2006) |
| 12/15/2006 | 7 | [1:06-cv-536-***]: Please note that, in accordance with the attached standing order, this case has been designated as one to be assigned to the judge who fills the vacancy left by the elevation of Judge Kent A. Jordan to the United States Court of Appeals for the Third Circuit. Please include ***, in place of the Judge's initials, after the case number on all documents filed. (ntl) (Entered: 12/15/2006) |
| 01/03/2007 | 8 | ORDER Setting Deadlines: Notice of Compliance deadline set for 1/16/2007 for parties to submit a briefing schedule. Signed by Judge Mary Pat Thynge on 1/3/07. (rwc) (Entered: 01/04/2007) |

A000002

| 01/17/2007 | 9 | STIPULATION Stipulation and Order Establishing Appellate Briefing Schedule by Cypress Associates, LLC as ORC Distribution Trust Representative, Cypress Associates LLC. (Attachments: # 1 Proposed Stipulation and Order)(Werkheiser, Gregory) (Entered: 01/17/2007) |
| --- | --- | --- |
| 01/17/2007 | 10 | NOTICE of Service of Stipulation and Order Establishing Appellate Briefing Schedule by Cypress Associates, LLC as ORC Distribution Trust Representative re 9 Stipulation (Werkheiser, Gregory) (Entered: 01/17/2007) |
| 01/18/2007 |  | SO ORDERED - re 9 Stipulation setting briefing - Appellant Brief due by 2/26/2007. Appellee Brief due by 3/28/2007. Appellant Reply Brief due by 4/17/2007. Signed by Judge Mary Pat Thynge on 1/18/07. (rwc) (Entered: 01/18/2007) |
| 02/26/2007 | 11 | OPENING BRIEF in Support - *Opening Brief On Behalf Of Appellants/Plaintiffs, Michael G. Syracuse d/b/a Interstate Supply Company, And Texas ICO, Inc., On Appeal From Chapter 11, CA NO. 03-11483 (MFW), AP NO. 06-00051, ADV. PROC. NO. 03-53939* filed by Michael G. Syracuse.Answering Brief/Response due date per Local Rules is 3/15/2007. (Attachments: # 1 Unpublished Opinions# 2 Certificate of Service)(Lastowski, Michael) (Entered: 02/26/2007) |
| 03/01/2007 | 12 | REQUEST for Oral Argument by Michael G. Syracuse. (Attachments: # 1 Certificate of Service)(Lastowski, Michael) (Entered: 03/01/2007) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 03/27/2007 11:08:32 | | | |
| **PACER Login:** | mn0009 | **Client Code:** |  |
| **Description:** | Docket Report | **Search Criteria:** | 1:06-cv-00536- Start date: 1/1/1970 End date: 3/27/2007 |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

A000003

**B**

**APPEAL**

# U.S. Bankruptcy Court
## District of Delaware (Delaware)
### Adversary Proceeding #: 03-53939-MFW

*Assigned to:* Mary F. Walrath
*Related BK Case:* 03-11483
*Related BK Title:* Orion Refining Corporation
*Related BK Chapter:* 11
*Demand:*
*Nature[s] of Suit:* 456 Declaratory Judgment

*Date Filed:* 06/19/03

**Plaintiff**
-----------------------

**Michael G. Syracuse,** *Michael G.
Syracuse d/b/a Interstate Supply
Company, and Texas Ico, Inc.*

represented by **Christopher Martin Winter**
Duane Morris LLP
1100 N. Market Street
Suite 1200
Wilmington, DE 19801-1246
302-657-4951
Fax : 302-657-4901
Email: cmwinter@duanemorris.com

**Michael R. Lastowski**
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801-1246
302-657-4900
Fax : 302-657-4901
Email: mlastowski@duanemorris.com
*LEAD ATTORNEY*

**Richard W. Riley**
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801
302-657-4900
Fax : 302-657-4901
Email: rwriley@duanemorris.com

*dba*
**Interstate Supply Company**

*dba*
**Texas Ico, Inc.**

A000004

Michael G. Syracuse d/b/a Interstate          represented by **Michael R. Lastowski**
Supply Company, and Texas ICO, Inc.                          (See above for address)

V.

**Defendant**
------------------------

**Orion Refining Corporation**                represented by **Thomas W. Briggs**
P.O. Box 537                                                 Morris Nichols Arsht & Tunnell
14902 River Road                                             1201 N. Market Street
Norco, LA 70079                                              Wilmington, DE 19801
Tax id: 76-0584376                                           302-658-9200
                                                             Fax : 302-658-3989
                                                             Email: tbriggs@mnat.com

**Cypress Associates, LLC, as ORC**           represented by **Gregory W. Werkheiser**
**Distribution Trust Representative**                        Morris, Nichols, Arsht & Tunnell
Morris, Nichols, Arsht & Tunnell                             1201 N. Market St., P.O. Box 1347
1201 N. Market St.                                           Wilmington, DE 19899
P.O. Box 1347                                                usa
Wilmington, DE 19899-1347                                    302 658-9200
302-658-9200                                                 Fax : 302-658-3989
                                                             Email: gwerkheiser@mnat.com

                                                             **Thomas W. Briggs**
                                                             (See above for address)

**Counter-Claimant**
------------------------

**Orion Refining Corporation**                represented by
P.O. Box 537
14902 River Road                                             **Thomas W. Briggs**
Norco, LA 70079                                              (See above for address)
Tax id: 76-0584376

V.

**Counter-Defendant**
------------------------

**Michael G. Syracuse,** *Michael G.*
*Syracuse d/b/a Interstate Supply*
*Company, and Texas Ico, Inc.*

**Counter-Claimant**
------------------------

**Michael G. Syracuse,** *Michael G.*        represented by **Michael R. Lastowski**
*Syracuse d/b/a Interstate Supply*                          (See above for address)
*Company, and Texas Ico, Inc.*

V.

A000005

**Counter-Defendant**

------------------------

**Orion Refining Corporation**
P.O. Box 537
14902 River Road
Norco, LA 70079
Tax id: 76-0584376

| Filing Date | # | Docket Text |
|---|---|---|
| 06/19/2003 | 1 | Complaint by Michael G. Syracuse against Orion Refining Corporation. Receipt Number 066772, Fee Amount $150 Nature of Suit: 456 (Declaratory Judgment). (Attachments: # 1 Exhibit A# 2 Exhibit # 3 Exhibit C# 4 Exhibit D) (Lastowski, Michael) Modified on 6/20/2003 (MNH, ). (Entered: 06/19/2003) |
| 08/21/2003 | 2 | Summons and Notice of Pretrial Conference (related document 1 ) Pretrial Conference set for 10/9/2003 at 10:30 AM at US Bankruptcy Court, 824 Market St., 6th Fl., Courtroom #1, Wilmington, Delaware. (Attachments: # 1 Certificate of Service) (Lastowski, Michael) (Entered: 08/21/2003) |
| 09/22/2003 | 3 | Answer to Complaint , *Affirmative Defenses and* (related document(s) 1 ), Counterclaim by Orion Refining Corporation against Michael G. Syracuse *d/b/a Interstate Supply Company, and Texas ICO, Inc.* Filed by Orion Refining Corporation (Attachments: # 1 Certificate of Service)(Briggs, Thomas) (Entered: 09/22/2003) |
| 11/14/2003 | 4 | Motion for Preliminary Injunction - *Application of Plaintiff, Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO for Preliminary Injunction and Motion for Order of Civil Contempt* Filed by Michael G. Syracuse. Hearing scheduled for 12/11/2003 at 11:00 AM at US District Court, 844 King St., Wilmington, Delaware. Objections due by 12/3/2003. (Attachments: # 1 Exhibit A# 2 Notice # 3 Proposed Form of Order # 4 Certificate of Service w/ Service List) (Lastowski, Michael) (Entered: 11/14/2003) |
| 11/14/2003 | 5 | Memorandum of Law - *Memorandum of Legal Points and Authorities in Support of Application of Plaintiff Michael G. Syracuse d/b/a Interstate Supply Company and Texaco ICO, Inc. for Preliminary Injunction and Motion for Order of Civil Contempt* (related document (s)4 ) Filed by Michael G. Syracuse (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit B-1# 4 Exhibit B-2) (Lastowski, Michael) (Entered: 11/14/2003) |
| 11/26/2003 | 6 | Answer to Complaint with Counterclaim --*Answer on behalf of Michael G Syracuse D/B/A Interstate Supply Company, and Texas* |

A000006

| | | |
|---|---|---|
| | | *ICO, Inc., to Debtors Counter Claims*, Counterclaim by Michael G. Syracuse against Orion Refining Corporation Filed by Michael G. Syracuse (Attachments: # 1 Certificate of Service)(Lastowski, Michael) (Entered: 11/26/2003) |
| 11/26/2003 | 7 | Motion for Leave to File Reply */Motion for Leave to File Michael G. Syracuse D/B/A Interstate Supply Company, Texas ICO, Inc.'s Amended Complaint for Declaratory Judgment as well as for Damages and Injunctive Relief and Administrative Complaint* Filed by Michael G. Syracuse. (Attachments: # 1 Exhibit A# 2 Proposed Form of Order # 3 Certificate of Service) (Riley, Richard) (Entered: 11/26/2003) |
| 12/01/2003 | 8 | Notice of Service - *Notice of Filing of Exhibit "C" to Memorandum of Legal Points and Authorities in Support of Application of Plaintiff Michael G. Syracuse d/b/a Interstate Supply Company and Texaco ICO, Inc. for Preliminary Injunction and Motion for Order of Civil Contempt* (related document(s)4, 5) Filed by Michael G. Syracuse (related document(s)4, 5 (Attac hments: # 1 Exhibit "C"# 2 Certificate of Service)(Lastowski, Michael) (Entered: 12/01/2003) |
| 12/03/2003 | 9 | Objection to *Preliminary Objection of Valero Energy Corporation, Valero Refinery Corporation and Valero Refining - New Orleans, L.L.C. and Motion to Extend Time to File Response in Opposition to Plaintiffs' Application for Preliminary Injunction and Motion for Order of Civil Contempt* (related document(s)4 ) Filed by Valero Energy Corporation (Crowther, Curtis) (Entered: 12/03/2003) |
| 12/03/2003 | 10 | Objection to -- *DEFENDANTS OBJECTION TO APPLICATION OF MICHAEL G. SYRACUSE d/b/a INTERSTATE SUPPLY COMPANY AND TEXACO ICO, INC. AND MOTION FOR ORDER OF CIVIL CONTEMPT* -- (related document(s)4 ) Filed by Orion Refining Corporation (Attachments: # 1 Certificate of Service) (Briggs, Thomas) (Entered: 12/03/2003) |
| 12/03/2003 | 11 | Affidavit/Declaration of Service -- *Affidavit of Eric E. Bluth* -- (related document(s)10 ) Filed by Orion Refining Corporation (Attachments: # 1 Certificate of Service) (Briggs, Thomas) (Entered: 12/03/2003) |
| 12/03/2003 | 12 | Notice of Deposition *(ORAL) Reference Docket No. 4* Filed by Valero Energy Corporation. (Attachments: # 1 Affidavit of Service) (Crowther, Curtis) (Entered: 12/03/2003) |
| 12/05/2003 | 13 | Response to *Application of Plaintiffs for Preliminary Injunction and Motion for Order of Civil Contempt* (related document(s)4 ) Filed by Valero Energy Corporation (Crowther, Curtis) (Entered: 12/05/2003) |

A000007

| 12/08/2003 | 14 | Affidavit/Declaration of Service *Notice of Filing of Affidavit of Eric E. Bluth (Re: D.I. Nos. 4, 10 and 11)* (related document(s)4, 10, 11 ) Filed by Orion Refining Corporation (Attachments: # 1 Notice) (Briggs, Thomas) (Entered: 12/08/2003) |
|---|---|---|
| 12/10/2003 | 15 | Motion for Protective Order *of Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO, Inc.* Filed by Michael G. Syracuse. Hearing scheduled for 12/11/2003 at 11:00 AM at US Bankruptcy Court, 824 Market St., 6th Floor, Wilmington, DE. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Certificate of Service) (Lastowski, Michael) (Entered: 12/10/2003) |
| 12/10/2003 | 16 | Motion for Preliminary Injunction *of Plaintiff Michael R. Syracuse d/b/a Interstate Supply Company, and Texas ICO, Inc. for a Continuance of the Hearing Scheduled for December 11, 2003 on Plaintiffs' Motion* Filed by Michael G. Syracuse. Hearing scheduled for 12/11/2003 at 11:00 AM at US Bankruptcy Court, 824 Market St., 6th Floor, Wilmington, DE. (Attachments: # 1 Exhibit A# 2 Certificate of Service) (Lastowski, Michael) (Entered: 12/10/2003) |
| 12/10/2003 | 17 | Notice of Withdrawal *of Application of Plaintiff, Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO for Preliminary Injunction and Motion for Order of Civil Contempt* Filed by Michael G. Syracuse. (Attachments: # 1 Certificate of Service)(Lastowski, Michael) (Entered: 12/10/2003) |
| 12/10/2003 | 18 | Response to *Plaintiffs' Motion for Continuance and Notice of Withdrawal of Plaintiffs' Application for Preliminary Injunction and Motion for Order of Civil Contempt* (related document(s)4, 16 ) Filed by Valero Energy Corporation (Attachments: # 1 Certificate of Service Certificate of Service) (Crowther, Curtis) (Entered: 12/10/2003) |
| 02/03/2004 | 19 | Notice of Service *of Defendants First Set of Requests for Production of Documents Directed to Plaintiffs, Defendants First Set of Requests for Admissions and Defendants First Set of Interrogatories Directed to Plaintiffs* Filed by Orion Refining Corporation. (Briggs, Thomas) (Entered: 02/03/2004) |
| 02/27/2004 | 20 | Certification of Counsel Filed by Orion Refining Corporation (Attachments: # 1 Proposed Form of Order Scheduling Order# 2 Certificate of Service) (Briggs, Thomas) (Entered: 02/27/2004) |
| 03/15/2004 | 21 | Notice of Service *of Response To First Request For Production Of Documents To The Debtor, Orion Refining Corporation On Behalf Of Plaintiffs; Response To First Request For Admissions To The Debtor, Orion Refining Corporation By Plaintiffs, Michael G. Syracuse, Interstate Supply Co. And Texas ICO, Inc.; and Response To First Set* |

A000008

|  |  | *Of Interrogatories To The Debtor, Orion Refining Corporation On Behalf Of Plaintiffs, Michael G. Syracuse, Interstate Supply Company And Texas ICO, Inc.* Filed by Orion Refining Corporation. (Briggs, Thomas) (Entered: 03/15/2004) |
|---|---|---|
| 03/25/2004 | 22 | Motion to Appear pro hac vice --*Motion of Michael R. Lastowski for an Order Admitting Andrew C. Wilson Pro Hac Vice Pursuant to District Court Local Rule 83.5* Filed by Michael G. Syracuse. (Lastowski, Michael) (Entered: 03/25/2004) |
| 03/30/2004 | 23 | Scheduling Order (related document(s)20 ) Order Signed on 3/9/2004. (GB, ) (Entered: 03/30/2004) |
| 04/01/2004 | 24 | Motion to Shorten Time *Motion for Order Shortening Notice* Filed by Orion Refining Corporation. Hearing scheduled for 4/6/2004 at 02:00 PM (check with court for location). Objections due by 4/6/2004.. (Attachments: # 1 Certificate of Service) (Werkheiser, Gregory) (Entered: 04/01/2004) |
| 04/01/2004 | 25 | Motion to Extend Time *Motion to Extend Fact Discovery* Filed by Orion Refining Corporation. Hearing scheduled for 4/6/2004 at 02:00 PM (check with court for location). Objections due by 4/6/2004. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Notice # 5 Certificate of Service) (Werkheiser, Gregory) (Entered: 04/01/2004) |
| 04/07/2004 | 26 | Order Extending Fact Discovery. Order Signed on 4/6/2004 (related document(s)25 ). (VAW, ) (Entered: 04/07/2004) |
| 04/27/2004 | 27 | Notice of Deposition *of Michael G. Syracuse, Sr.* Filed by Orion Refining Corporation. (Attachments: # 1 Certificate of Service) (Briggs, Thomas) (Entered: 04/27/2004) |
| 04/27/2004 | 28 | Notice of Deposition *of Michael G. Syracuse, Jr.* Filed by Orion Refining Corporation. (Attachments: # 1 Certificate of Service) (Briggs, Thomas) (Entered: 04/27/2004) |
| 04/27/2004 | 29 | Notice of Deposition *of Mark Israel* Filed by Orion Refining Corporation. (Attachments: # 1 Certificate of Service)(Briggs, Thomas) (Entered: 04/27/2004) |
| 04/29/2004 | 30 | Notice of Deposition -- *(Revised) Notice of Deposition of Mark Israel* -- Filed by Orion Refining Corporation. (Attachments: # 1 Certificate of Service)(Briggs, Thomas) (Entered: 04/29/2004) |
| 04/30/2004 | 31 | Notice of Service *of FIRST AMENDED AND SUPPLEMENTAL RESPONSE TO FIRST SET OF INTERROGATORIES TO THE DEBTOR, ORION REFINING CORPORATION ON BEHALF OF* |

A000009

| | | |
|---|---|---|
| | | *PLAINTIFFS, MICHAEL G. SYRACUSE, INTERSTATE SUPPLY COMPANY AND TEXAS ICO, INC.* (related document(s)21 ) Filed by Orion Refining Corporation (related document(s)21). (Attachments: # 1 Certificate of Service)(Briggs, Thomas) (Entered: 04/30/2004) |
| 05/04/2004 | 32 | Judge Charles G. Case added to case. Involvement of Judge Mary F. Walrath Terminated . (JSJ, ) (Entered: 05/04/2004) |
| 05/05/2004 | 33 | Notice of Deposition *of Warren Squires* Filed by Orion Refining Corporation. (Attachments: # 1 Certificate of Service)(Briggs, Thomas) (Entered: 05/05/2004) |
| 05/05/2004 | 34 | Notice of Deposition -- *Notice of Rule 30(b)(6) Deposition to Valero Refining -- New Orleans LLC* Filed by Orion Refining Corporation. (Attachments: # 1 Exhibit Exhibit A# 2 Exhibit Exhibit B# 3 Certificate of Service)(Briggs, Thomas) (Entered: 05/05/2004) |
| 05/25/2004 | 35 | Subpoena *to Warren Squires.* Filed by Orion Refining Corporation (Attachments: # 1 Affidavit Affidavit of Service) (Briggs, Thomas) (Entered: 05/25/2004) |
| 06/16/2004 | 36 | Motion to Set Hearing -- *Joint Motion of Plaintiffs and Defendant to Adjourn Pretrial Conference and to Convert Pretrial Conference Into a Status Conference* -- (related document(s)23 ) Filed by Orion Refining Corporation (related document(s)23). (Attachments: # 1 Proposed Form of Order) (Briggs, Thomas) (Entered: 06/16/2004) |
| 07/16/2004 | 37 | [DENIED - SEE DOCKET NO. 78] Motion For Summary Judgment - *Motion for Partial Summary Judgment on Behalf of Plaintiffs, Michael G. Syracuse d/b/a Interstate Supply Company and Texas ICO, Inc. on the Issue of Title* Filed by Michael G. Syracuse. (Attachments: # 1 Certificate of Service) (Winter, Christopher) Modified on 4/18/2006 (BMT, ). (Entered: 07/16/2004) |
| 07/16/2004 | 38 | Brief *on Behalf of Plaintiffs, Michael G. Syracuse, d/b/a Interstate Supply Company, Texas ICO, Inc., in Support of Plaintiffs' Motion for Partial Summary Judgment on the Issue of Title* (related document(s) 37 ) Filed by Michael G. Syracuse (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 2 - Part Two# 4 Exhibit 3 - Part One# 5 Exhibit 3 - Part Two# 6 Exhibit 3 - Part Three# 7 Exhibit 3 - Part Four# 8 Exhibit 3 - Part Five# 9 Exhibit 4# 10 Exhibit 5# 11 Exhibit 6# 12 Exhibit 7# 13 Certificate of Service) (Winter, Christopher) (Entered: 07/16/2004) |
| 07/16/2004 | 39 | Brief *on Behalf of Plaintiffs, Michael G. Syracuse, d/b/a Interstate Supply Company, Texas ICO, Inc., in Support of Plaintiffs' Motion for Partial Summary Judgment on the Issue of Title* (related document(s) |

A000010

| | | |
|---|---|---|
| | | 37 ) Filed by Michael G. Syracuse (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 2 - Part Two# 4 Exhibit 3 - Part One# 5 Exhibit 3 - Part Two# 6 Exhibit 3 - Part Three# 7 Exhibit 3 - Part Four# 8 Exhibit 3 - Part Five# 9 Exhibit 4# 10 Exhibit 5# 11 Exhibit 6# 12 Exhibit 7# 13 Certificate of Service) (Winter, Christopher) (Entered: 07/16/2004) |
| 07/29/2004 | 40 | Notice of Service of Discovery *Notice of Depositions of Stanley Favalora and Leslie Collins* Filed by Michael G. Syracuse. (Lastowski, Michael) (Entered: 07/29/2004) |
| 08/02/2004 | 41 | Order Granting Motion for Admission pro hac vice of Andrew C. Wilson, Esquire. (Related Doc # 22) Order Signed on 7/29/2004. (BJM) (Entered: 08/02/2004) |
| 08/04/2004 | 42 | Order Reassigning Adversary Proceedings to the Honorable Paul B. Lindsey. Order Signed on 8/3/04. (LCN, ) (Entered: 08/04/2004) |
| 08/04/2004 | | Judge Paul B. Lindsey added to case. Involvement of Judge Charles G. Case Terminated . (LCN, ) (Entered: 08/04/2004) |
| 08/04/2004 | 43 | Motion to Allow -- *Motion in Limine to Preclude Expert Testimony and Evidence* -- Filed by Orion Refining Corporation. (Attachments: # 1 Notice Notice of Motion# 2 Proposed Form of Order # 3 Certificate of Service) (Briggs, Thomas) (Entered: 08/04/2004) |
| 08/04/2004 | 44 | Brief -- *Defendants Opening Brief in Support of Its Motion in Limine to Preclude Expert Testimony and Evidence* -- (related document(s) 43 ) Filed by Orion Refining Corporation (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2# 3 Certificate of Service) (Briggs, Thomas) (Entered: 08/04/2004) |
| 08/04/2004 | 45 | Appendix (related document(s)43, 44 ) Filed by Orion Refining Corporation (Attachments: # 1 Exhibit Tab A, Exhibits B to D# 2 Exhibit Appendix Tabs B to G# 3 Exhibit Appendix Tabs H to O# 4 Certificate of Service) (Briggs, Thomas) (Entered: 08/04/2004) |
| 08/23/2004 | 46 | Order Reassigning Case (to the Honorable Charles G. Case, II). Order signed on 8/18/2004. (VAW, ) (Entered: 08/23/2004) |
| 08/23/2004 | | Judge Charles G. Case, II added to case. Involvement of Judge Paul B. Lindsey terminated. (related document 46) (VAW, ) (Entered: 08/23/2004) |
| 08/23/2004 | 47 | MOTION FOR PARTIAL SUMMARY JUDGMENT Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative. (Attachments: # 1 Certificate of Service) (Briggs, |

A000011

| | | |
|---|---|---|
| | | Thomas) Modified on 8/24/2004 (SDA, ). (Entered: 08/23/2004) |
| 08/23/2004 | 48 | Brief *DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT* (related document(s)47 ) Filed by CYPRESS DISTRIBUTION ASSOCIATES, LLC, as ORC Distribution Trust Representative (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Certificate of Service) (Briggs, Thomas) (Entered: 08/23/2004) |
| 08/27/2004 | 49 | Brief *Plaintiff's Opening Brief in Opposition to Defendant's Motion in Limine to Preclude Expert Testimony and Evidence* (related document (s)43 ) Filed by Michael G. Syracuse (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Declaration 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9# 10 Exhibit 10# 11 Exhibit 11# 12 Exhibit 12# 13 Exhibit 13# 14 Exhibit 14# 15 Exhibit 15# 16 Exhibit 16# 17 Exhibit 17# 18 Certificate of Service) (Lastowski, Michael) (Entered: 08/27/2004) |
| 09/01/2004 | 50 | Motion For Summary Judgment *Motion for Partial Summary Judgment* Filed by Michael G. Syracuse. (Attachments: # 1 Certificate of Service) (Lastowski, Michael) (Entered: 09/01/2004) |
| 09/01/2004 | 51 | Brief *in Support of Plaintiffs' Motion for Partial Summary Judgment on the Issue of the Presence of the Surplus Materials at the Refinery on July 1, 2003* (related document(s)50 ) Filed by Michael G. Syracuse (Attachments: # 1 Certificate of Service) (Lastowski, Michael) (Entered: 09/01/2004) |
| 09/01/2004 | 52 | Motion to Shorten Time *Motion for Partial Summary Judgment on the Issue of Presence of the Surplus Materials at the Refinery on July 1, 2003 50 51* (related document(s)50 ) Filed by Michael G. Syracuse. Hearing scheduled for 9/14/2004 at 09:30 AM (check with court for location). Objections due by 9/10/2004.. (Attachments: # 1 Certificate of Service) (Lastowski, Michael) (Entered: 09/01/2004) |
| 09/02/2004 | 53 | Notice of Service of Discovery *Supplemental Responses to Defendant's, Orion Refining Corporation, First Set of Interrogatories to the Plaintiffs, Michael G. Syracuse, Interstate Supply Co. and Texas ICO, Inc; and Orion Refing Corporation on Behalf of Plaintiffs; and Supplemental Reponses to Defendant's, Orion Refining Coporation, First Request for Production of Documents to Plaintiffs, Michael G. Syracuse, Interstate Supply Co. and Texas ICO, Inc.* Filed by Michael G. Syracuse. (Riley, Richard) (Entered: 09/02/2004) |
| 09/02/2004 | 54 | Motion to Compel *Motion on Behalf of Plaintiffs to Compel Alternatively to exclude Certain Evidence of the Debtor* Filed by Michael G. Syracuse. Hearing scheduled for 9/14/2004 at 09:30 AM |

A000012

| | | |
|---|---|---|
| | | (check with court for location). Objections due by 9/10/2004. (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit # 10 Declaration # 11 Declaration # 12 Exhibit # 13 Attachment # 14 Attachment # 15 Certificate of Service # 16 Attachment) (Lastowski, Michael) (Entered: 09/02/2004) |
| 09/02/2004 | 55 | Motion to Determine *Motion on Behalf of Plaintitts Michael G Syracuse d/b/a Interestate Supply Company and Texas ICO, Inc to Determine Sufficiency of the Reply of the Debtor to Reequiest for Admissions* Filed by Michael G. Syracuse. (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Proposed Form of Order # 9 Certificate of Service # 10 Attachment # 11 Attachment) (Lastowski, Michael) (Entered: 09/02/2004) |
| 09/02/2004 | 56 | Motion to Shorten Time *Motion for Order Shortening Notice* (related document(s)54, 55 ) Filed by Michael G. Syracuse. Hearing scheduled for 9/14/2004 at 09:30 AM (check with court for location). Objections due by 9/10/2004.. (Lastowski, Michael) (Entered: 09/02/2004) |
| 09/08/2004 | 57 | Order Granting Motion to Shorten Notice On Plaintiff's Motion To Determine The Sufficiency Of The Reply Of The Debtor To Request For Admissions And Plaintiff's Motion To Compel, Alternatively To Exclude Certain Evidence. (Related Doc # 56) Signed on 9/7/2004. (JMP, ) (Entered: 09/08/2004) |
| 09/08/2004 | 58 | Order Granting Motion to Shorten Notice For The Motion for Partial Summary Judgment on the Issue of Presence of the Surplus Materials at the Refinery on July 1, 2003 (Related Doc # 52) Signed on 9/7/2004. (JMP, ) (Entered: 09/08/2004) |
| 09/08/2004 | 59 | Brief *Defendant's Reply Brief In Support Of Its Motion In Limine to Preclude Expert Testimony And Evidence* (related document(s)43 ) Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative (Attachments: # 1 Exhibit A# 2 Certificate of Service) (Briggs, Thomas) (Entered: 09/08/2004) |
| 09/08/2004 | 60 | Brief - *Plaintiffs' Answering Brief in Opposition to Defendant's Cross-Motion for Partial Summary Judgment on the Issue of Title* Filed by Michael G. Syracuse (Attachments: # 1 List of Exhibits# 2 Exhibit 1# 3 Exhibit 2# 4 Exhibit 3# 5 Exhibit 4# 6 Exhibit 5# 7 Exhibit 6# 8 Certificate of Service) (Lastowski, Michael) (Entered: 09/08/2004) |
| 09/10/2004 | 61 | Notice of Completion of Briefing *(Re: D.I. 43)* Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative. |

A000013

| | | (Attachments: # 1 Certificate of Service)(Briggs, Thomas) (Entered: 09/10/2004) |
|---|---|---|
| 09/10/2004 | 62 | Notice of Service of Discovery *(Amended Response To First Request For Admissions To The Debtor, Orion Refining Corporation By Plaintiffs, Michael G. Syracuse, Interstate Supply Co. And Texas ICO, Inc.)* Filed by Orion Refining Corporation. (Briggs, Thomas) (Entered: 09/10/2004) |
| 09/10/2004 | 63 | Brief *Orion Refining Corporation's Reply Brief In Support Of Its Motion For Partial Summary Judgment* (related document(s)47 ) Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative (Attachments: # 1 Certificate of Service) (Briggs, Thomas) (Entered: 09/10/2004) |
| 09/10/2004 | 64 | Answering Brief *Orion Refining Corporation's Answering Brief In Opposition To Plaintiffs' Motion To Compel, Alternatively, To Exclude Certain Evidence Of The Debtor And Motion On Behalf Of Plaintiffs, Michael G. Syracuse D/B/A Interstate Supply Company, And Texas ICO, Inc., To Determine Sufficiency Of The Reply Of The Debtor To Request For Admissions, And Response To Plaintiffs' Motion For Partial Summary Judgment On The Issue Of The Presence Of The Surplus Materials At The Refinery On July 1, 2003* Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Certificate of Service) (Briggs, Thomas) (Entered: 09/10/2004) |
| 10/20/2004 | 65 | Notice of Agenda of Matters Scheduled for Hearing *(Telephonic)* on *October 21, 2004 at 8:00 a.m. Prevailing Arizona Time (10:00 a.m. Prevailing Delaware Time) In Phoenix Arizona.* (Briggs, Thomas) (Entered: 10/20/2004) |
| 10/20/2004 | 66 | Notice of Service *Notice Of Service [Re: D.I. 1500 And 65] (Re: Notice Of Agenda Of Matters Scheduled For Telephonic Hearing On October 21, 2004 At 8:00 A.M. Prevailing Arizona Time (10:00 A.M. Prevailing Delaware Time) In Phoenix Arizona)* (related document(s) 65 ) Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative (related document(s)65). (Attachments: # 1 Service List)(Briggs, Thomas) (Entered: 10/20/2004) |
| 12/22/2004 | 67 | Notice of Service of Discovery *(Supplemental Response To First Set Of Interrogatories To The Debtor, Orion Refining Corporation On Behalf Of Plaintiffs, Michael G. Syracuse, Interstate Supply Co. And Texas ICO, Inc.)* Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative. (Briggs, Thomas) (Entered: 12/22/2004) |

A000014

| | | |
|---|---|---|
| 01/24/2005 | 68 | Certification of Counsel (related document(s)50 ) Filed by Michael G. Syracuse (Attachments: # 1 Proposed Form of Order # 2 Certificate of Service) (Lastowski, Michael) (Entered: 01/24/2005) |
| 01/28/2005 | 69 | Certification of Counsel (related document(s)68 ) Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Certificate of Service) (Briggs, Thomas) (Entered: 01/28/2005) |
| 04/25/2005 | 70 | Order Reassigning Adversary Proceeding to the Honorable Randolph Baxter. Order Signed on 4/22/2005. (BJM) (Entered: 04/25/2005) |
| 04/25/2005 | | Judge Randolph Baxter added to case. Involvement of Judge Charles G. Case Terminated (BJM) (Entered: 04/25/2005) |
| 05/09/2005 | 71 | Notice of Service *Regarding Order Reassigning Case.* (Donilon, Gregory) (Entered: 05/09/2005) |
| 06/15/2005 | 72 | Order Reassigning Adversary Proceedings to the Honorable Mary F. Walrath. Order Signed on 6/15/2005. (LCN, ) (Entered: 06/15/2005) |
| 06/15/2005 | | Judge Mary F. Walrath added to case. Involvement of Judge Randolph Baxter Terminated (LCN, ) (Entered: 06/15/2005) |
| 06/16/2005 | 73 | Notice of Service *of Order Reassigning Case* (related document(s)49, 72 ) (related document(s)49, 72). (Donilon, Gregory) (Entered: 06/16/2005) |
| 07/05/2005 | 74 | Notice of Agenda of Matters Scheduled for Hearing Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative Hearing scheduled for 7/7/2005 at 03:00 PM at US Bankruptcy Court, 824 Market St., 5th Floor, Wilmington, DE... Hearing scheduled for 7/7/2005 at 03:00 PM at US Bankruptcy Court, 824 Market St., 5th Floor, Wilmington, DE. (Werkheiser, Gregory) (Entered: 07/05/2005) |
| 07/05/2005 | 75 | Notice of Service *re Notice of Agenda of Matters Scheduled for Hearing on July 7, 2005 at 3:00 p.m.* Filed by CYPRESS ASSOCIATES, LLC, as ORC Distribution Trust Representative.. (Werkheiser, Gregory) (Entered: 07/05/2005) |
| 07/20/2005 | 76 | Order Regarding Motion For Partial Summary Judgment (related document(s)68, 50 ) Order Signed on 7/15/2005. (DKF, ) (Entered: 07/20/2005) |
| 04/17/2006 | 77 | Memorandum of Opinion Denying Michael G. Syracuse's Motion for Partial Summary Judgment, Granting Orion Refining Corporation's |

A000015

| | | Motion for Partial Summary Judgment, and Dismissing Count I of the Adversary Complaint Filed By Michael G. Syracuse. (related document(s)48, 63, 39, 37, 47, 38 ) (JMP, ) (Entered: 04/17/2006) |
|---|---|---|
| 04/17/2006 | 78 | Order Denying Michael G. Syracuse's Motion for Partial Summary Judgment, Granting Orion Refining Corporation's Motion for Partial Summary Judgment, and Dismissing Count I of the Adversary Complaint Filed By Michael G. Syracuse. (related document(s)77, 37, 47 ) Signed on 4/17/2006. (JMP, ) (Entered: 04/17/2006) |
| 04/17/2006 | 79 | Certificate of Service (related document(s)77, 78 ) Filed by Michael G. Syracuse (Winter, Christopher) (Entered: 04/17/2006) |
| 04/17/2006 | 80 | Notice of Service *Re: Memorandum of Opinion Denying Michael G. Syracuse's Motion for Partial Summary Judgment, Granting Orion Refining Corporation's Motion for Partial Summary Judgment, and Dismissing Count I of the Adversary Complaint Filed By Michael G. Syracuse (D.I. 77) and Order Denying Michael G. Syracuse's Motion for Partial Summary Judgment, Granting Orion Refining Corporation's Motion for Partial Summary Judgment, and Dismissing Count I of the Adversary Complaint Filed By Michael G. Syracuse (D.I. 78)* (related document(s)77, 78 ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (related document(s) 77, 78). (Werkheiser, Gregory) (Entered: 04/17/2006) |
| 04/27/2006 | 81 | [DENIED - SEE DOCKET NO. 109] Motion to Reconsider *Motion to Alter, Amend and/or Reconsider Judgment and/or for New Trial on Behalf of Plaintiff, Michael G. Syracuse d/b/a Interstate Supply Company and Texas ICO, Inc.* Filed by Michael G. Syracuse. (Attachments: # 1 Proposed Form of Order # 2 Certificate of Service) (Lastowski, Michael) Modified on 8/9/2006 (BMT, ). (Entered: 04/27/2006) |
| 04/27/2006 | 82 | Motion To Stay *Plaintiffs' Emergency Motion for a Stay of Judgment Pending Disposition of Plaintiffs' Motion for an Order Amending Judgment, and Motion to Amend Findings* Filed by Michael G. Syracuse. (Attachments: # 1 Proposed Form of Order # 2 Certificate of Service) (Lastowski, Michael) (Entered: 04/27/2006) |
| 04/27/2006 | 83 | Motion to Shorten Time *Motion for Emergency Telephonic Hearing and to Shorten Notice and Approve Form, Manner and Sufficiency of Notice* Filed by Michael G. Syracuse. (Attachments: # 1 Notice # 2 Proposed Form of Order # 3 Certificate of Service) (Lastowski, Michael) (Entered: 04/27/2006) |
| 04/27/2006 | 84 | Memorandum of Law *in Support of Motion to Alter, Amend and/or Reconsider Judgment and/or for New Trial on Behalf of Plaintiff, Michael G. Syracuse d/b/a Interstate Supply Company and Texas* |

A000016

| | | |
|---|---|---|
| | | *ICO, Inc.* (related document(s)<u>81</u> ) Filed by Michael G. Syracuse (Attachments: # <u>1</u> Certificate of Service) (Lastowski, Michael) (Entered: 04/27/2006) |
| 04/28/2006 | <u>85</u> | Order Granting Motion for Emergency Telephonic Hearing and to Shorten Notice and Approve Form, Manner and Sufficiency of Notice. (related document(s)<u>83</u> ) Order Signed on 4/28/2006. (LCN, ) (Entered: 04/28/2006) |
| 05/02/2006 | <u>86</u> | Memorandum of Law *(AMENDED) in Support of Motion to Alter, Amend and/or Reconsider Judgment and/or for New Trial on Behalf of Plaintiff, Michael G. Syracuse d/b/a Interstate Supply Company and Texas ICO, Inc.* (related document(s)<u>81</u> ) Filed by Michael G. Syracuse (Attachments: # <u>1</u> Certificate of Service) (Lastowski, Michael) (Entered: 05/02/2006) |
| 05/03/2006 | <u>87</u> | Stipulation Between Cypress Associates, LLC, as ORC Distribution Trust Representative and *Michael G. Syracuse d/b/a Interstate Supply Company and Texas ICO, Inc..* (related document(s)<u>81</u>, <u>83</u>, <u>82</u>, <u>78</u>, <u>85</u> ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (related document(s)<u>81</u>, <u>83</u>, <u>82</u>, <u>78</u>, <u>85</u>). (Attachments: # <u>1</u> Proposed Form of Order) (Werkheiser, Gregory) (Entered: 05/03/2006) |
| 05/03/2006 | <u>88</u> | Notice of Service (related document(s)<u>81</u>, <u>83</u>, <u>82</u>, <u>78</u>, <u>85</u> ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (related document(s)<u>81</u>, <u>83</u>, <u>82</u>, <u>78</u>, <u>85</u>). (Werkheiser, Gregory) (Entered: 05/03/2006) |
| 05/05/2006 | <u>89</u> | Order (AMENDED) Regarding Stipulation Between Cypress Associates, LLC, as ORC Distribution Trust Representative and Michael G. Syracuse d/b/a Interstate Supply Company and Texas ICO, Inc. (related document(s)<u>87</u>, <u>81</u>, <u>83</u>, <u>78</u>, <u>85</u>, <u>82</u> ) Order Signed on 5/4/2006. (LCN, ) (Entered: 05/05/2006) |
| 05/11/2006 | <u>90</u> | Objection to *Plaintiff's Emergency Motion For A Stay Of Judgment Pending Disposition Of Plaintiffs' Motion For An Order Amending Judgment, And Motion To Amend Findings* (related document(s)<u>77</u>, <u>82</u>, <u>78</u> ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (Attachments: # <u>1</u> Certificate of Service) (Werkheiser, Gregory) (Entered: 05/11/2006) |
| 05/11/2006 | <u>91</u> | Brief *In Opposition To Plaintiff's Motion For Reconsideration And Related Relief Concerning Memorandum Opinion And Order, Dated April 17, 2006* (related document(s)<u>81</u>, <u>77</u>, <u>78</u>, <u>86</u> ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (Attachments: # <u>1</u> Certificate of Service) (Werkheiser, Gregory) (Entered: 05/11/2006) |

A000017

| 05/18/2006 | 92 | Brief *in Reply to Defendants' Opposition to Plaintiffs' Motion for Reconsideration and Related Relief Concerning Memorandum Opinion and Order, Dated April 17, 2006* (related document(s)91 ) Filed by Michael G. Syracuse (Attachments: # 1 Certificate of Service) (Lastowski, Michael) (Entered: 05/18/2006) |
| --- | --- | --- |
| 05/24/2006 | 93 | Request for Oral Argument Filed by Michael G. Syracuse. (Attachments: # 1 Certificate of Service) (Lastowski, Michael) (Entered: 05/24/2006) |
| 05/26/2006 | 94 | Notice of Completion of Briefing *Regarding Plaintiffs' Motion to Alter, Amend and/or Reconsider Judgment and/or for New Trial [D.I. 81]* Filed by Michael G. Syracuse. (Attachments: # 1 Certificate of Service)(Lastowski, Michael) (Entered: 05/26/2006) |
| 06/02/2006 | 95 | Notice of Agenda of Matters Scheduled for Hearing Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative Hearing scheduled for 6/6/2006 at 11:30 AM (check with court for location)... (Werkheiser, Gregory) (Entered: 06/02/2006) |
| 06/06/2006 | 96 | Notice of Service *of Notice of Agenda of Matters Scheduled for Hearing on June 6, 2006 at 11:30 a.m. (Eastern Time)* Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative.. (Werkheiser, Gregory) (Entered: 06/06/2006) |
| 06/06/2006 | 98 | **Minutes of Hearing held on: 06/06/2006** **Subject:** Emergency Motion for a Stay of Judgment. (vCal Hearing ID (23877)). (related document(s) 82) (LMC, ) Additional attachment(s) added on 6/12/2006 (TK, ). (Entered: 06/08/2006) |
| 06/07/2006 | 97 | Certification of Counsel *Regarding Plaintiffs' Emergency Motion for a Stay of Judgment, Pursuant to Fed. R. Civ. P. 62, Pending Disposition of Plaintiffs' Motion, Pursuant to Fed. R. Civ. P. 7059, for an Order Amending Judgment, and Motion to Amend Findings, Pursuant to Fed. R. Civ. P. 52(b)* (related document(s)82, 90 ) Filed by Michael G. Syracuse (Attachments: # 1 Exhibit A# 2 Certificate of Service) (Lastowski, Michael) (Entered: 06/07/2006) |
| 06/09/2006 | 99 | Order Granting Plaintiffs' Emergency Motion for a Stay of Judgment Pending Disposition of Plaintiffs' Motion for an Order Amending Judgment, and Motion to Amend Findings. (Related Doc # 82, 90) Order Signed on 6/8/2006. (LCN, ) Modified on 6/9/2006 to add addititional related docket no. (LCN, ). (Entered: 06/09/2006) |
| 06/14/2006 | 100 | Notice of Hearing Filed by Michael G. Syracuse. Hearing scheduled for 6/28/2006 at 09:30 AM at US Bankruptcy Court, 824 Market St., 5th Floor, Wilmington, DE. (Attachments: # 1 Certificate of Service) |

A000018

| | | (Lastowski, Michael) (Entered: 06/14/2006) |
|---|---|---|
| 06/26/2006 | 101 | Notice of Agenda of Matters Scheduled for Hearing Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative Hearing scheduled for 6/28/2006 at 09:30 AM (check with court for location)... (Werkheiser, Gregory) (Entered: 06/26/2006) |
| 06/27/2006 | 102 | Notice of Service *of Notice of Agenda of Matters Scheduled for Hearing on June 28, 2006 at 9:30 a.m.* Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative.. (Werkheiser, Gregory) (Entered: 06/27/2006) |
| 06/28/2006 | 103 | **Minutes of Hearing held on: 06/28/2006** **Subject:** Oral argument on Motion for Reconsideration. (vCal Hearing ID (25469)). (related document(s) 81) (LMC, ) Additional attachment(s) added on 6/28/2006 (LCN, ). (Entered: 06/28/2006) |
| 07/05/2006 | 104 | Motion to Extend Time *(Unopposed) for Plaintiff's and Defendant's Briefs* Filed by Michael G. Syracuse. (Attachments: # 1 Proposed Form of Order # 2 Certificate of Service) (Lastowski, Michael) (Entered: 07/05/2006) |
| 07/07/2006 | 105 | Order Granting Plaintiff's Unopposed Motion to Extend Time (Related Doc # 104) Order Signed on 7/6/2006. (JSJ, ) (Entered: 07/07/2006) |
| 07/11/2006 | 106 | Supplemental Brief *in Support of Plaintiffs' Motion for Reconsideration and Related Belief Concerning Memorandum Opinioin and Order, Dated April 17, 2006* (related document(s)81 ) Filed by Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO, Inc. (Attachments: # 1 Certificate of Service) (Lastowski, Michael) (Entered: 07/11/2006) |
| 07/21/2006 | 107 | Objection to *Plaintiffs' Motion for Reconsideration* (related document (s)81 ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (Attachments: # 1 Exhibit A - Transcript of June 28, 2006 Motion Hearing) (Briggs, Thomas) (Entered: 07/21/2006) |
| 08/08/2006 | 108 | Memorandum Opinion Denying Michael G. Syracuse's Motion for Reconsideration. (related document(s)81, 91, 92, 86 ) (JAF, ) (Entered: 08/08/2006) |
| 08/08/2006 | 109 | Order Denying Michael G. Syracuse's Motion for Reconsideration. (related document(s)108 ) Signed on 8/8/2006. (JAF, ) (Entered: 08/08/2006) |
| | | |

A000019

| 08/09/2006 | 110 | Notice of Service (related document(s)108, 109 ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (Werkheiser, Gregory) (Entered: 08/09/2006) |
|---|---|---|
| 08/09/2006 | 111 | Certificate of Service (related document(s)108, 109 ) Filed by Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO, Inc. (Lastowski, Michael) (Entered: 08/09/2006) |
| 08/17/2006 | 112 | Notice of Appeal Number (AP-06-51). Fee Amount $255. (related document(s)77, 108, 109, 78 ) Filed by Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO, Inc.. Appellant Designation due by 8/28/2006. (Attachments: # 1 Certificate of Service) (Lastowski, Michael) Modified to add appeal number on 8/18/2006 (BMT, ). (Entered: 08/17/2006) |
| 08/17/2006 | 113 | Receipt of filing fee for Notice of Appeal (Ap)(03-53939-MFW) [appeal,ntcapl] ( 255.00). Receipt Number 2666703, amount $ 255.00. (U.S. Treasury) (Entered: 08/17/2006) |
| 08/17/2006 | 114 | Motion to Allow *DEFENDANTS MOTION FOR RELEASE OF FUNDS HELD IN COURTS REGISTRY ACCOUNT (Re: Adv. D.I. 77, 78, 1522)* Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative. (Attachments: # 1 Exhibit A# 2 Certificate of Service) (Briggs, Thomas) (Entered: 08/17/2006) |
| 08/17/2006 | 115 | Opening Brief In Support of Defendants Motion For Release Of Funds Held In Courts Registry Account (Re: Adv. D.I. 77, 78, 1522) (related document(s)114 ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (Attachments: # 1 Exhibit A - D# 2 Certificate of Service) (Briggs, Thomas) Modified duplicate text on 8/18/2006 (BMT, ). (Entered: 08/17/2006) |
| 08/17/2006 | 116 | Motion to Allow *MOTION PURSUANT TO RULE 7054(a) FOR EXPRESS DIRECTION FOR THE ENTRY OF JUDGMENT AND EXPRESS DETERMINATION THAT THERE IS NO JUST REASON FOR DELAY (re: Adv. D.I. 77, 78)* Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative. (Attachments: # 1 Proposed Form of Order # 2 Certificate of Service) (Briggs, Thomas) (Entered: 08/17/2006) |
| 08/17/2006 | 117 | Opening Brief IN SUPPORT OF CYPRESS ASSOCIATES, LLCS MOTION PURSUANT TO RULE 7054(a) FOR EXPRESS DIRECTION FOR THE ENTRY OF JUDGMENT AND EXPRESS DETERMINATION THAT THERE IS NO JUST REASON FOR DELAY (re: Adv. D.I. 77, 78) (related document(s)116 ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (Attachments: # 1 Exhibit A# 2 Certificate of Service) (Briggs, Thomas) Modified duplicate text on 8/18/2006 (BMT, ). (Entered: |

A000020

| | | 08/17/2006) |
|---|---|---|
| 08/18/2006 | 118 | Clerk's Notice Regarding Filing of Appeal Number (AP-06-51). (related document(s) 112 ) (BMT, ) (Entered: 08/18/2006) |
| 08/28/2006 | 119 | Appellant Designation of Items For Inclusion in Record On Appeal *and Statement of Issues on Appeal* (related document(s)112 ) Filed by Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO, Inc.. (Attachments: # 1 Certificate of Service) (Lastowski, Michael) (Entered: 08/28/2006) |
| 08/31/2006 | 120 | Opening Brief on Behalf of Plaintiffs in Opposition to Cypress Associates, LLC's Motion for Express Direction for the Entry of Judgment and Express Determination That There is No Just Reason for Delay and in Opposition to Defendant's Motion for Release or Funds Held in Court's Registry's Account (related document(s)77, 78 ) Filed by Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO, Inc. (Attachments: # 1 Exhibit A# 2 Certificate of Service) (Lastowski, Michael) Modified duplicate text on 9/1/2006 (BMT, ). (Entered: 08/31/2006) |
| 09/05/2006 | 121 | Notice of Docketing Record on Appeal. [Civil Action #06-536]. [Appeal #BAP-06-51]. Filed by the U.S. District Court. (related document(s)112, 119 ) (BMT, ) (Entered: 09/05/2006) |
| 09/07/2006 | 122 | Appellee Designation of Additional Items for Inclusion in Record of Appeal *Defendant Cypress Associates, LLC's Counter-Designationa* Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative. (Attachments: # 1 Certificate of Service) (Briggs, Thomas) (Entered: 09/07/2006) |
| 09/08/2006 | 123 | Brief *Defendant's Consolidated Reply Brief In Further Support Of (I) Defendant's Motion For Release Of Funds Held In Court's Registry Account And (II) Motion Pursuant To Rule 7054(A) For Express Direction For The Entry Of Judgment And Express Determination That There Is No Just Reason For Delay* (related document(s)117, 114, 120, 115 ) Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative. (Attachments: # 1 Certificate of Service) (Werkheiser, Gregory) (Entered: 09/08/2006) |
| 09/15/2006 | 124 | Notice of Completion of Briefing *[Re: D.I. 114 and D.I. 116]* Filed by Cypress Associates, LLC, as ORC Distribution Trust Representative (Attachments: # 1 Certificate of Service) (Werkheiser, Gregory) (Entered: 09/15/2006) |
| 09/20/2006 | 125 | Order Granting MOTION PURSUANT TO RULE 7054(a) FOR EXPRESS DIRECTION FOR THE ENTRY OF JUDGMENT and dismissing Count I of the Complaint and Denying Motion of the ORC |

A000021

Case 1:06-cv-00536-SLR    Document 14-3    Filed 03/28/2007    Page 20 of 20

Representative for Release of Funds(related document(s)114, 116 )
Order Signed on 9/20/2006. (SDJ, ) (Entered: 09/20/2006)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/27/2007 11:43:10 | | | |
| **PACER Login:** | mn0009 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 03-53939-MFW Fil or Ent: filed From: 1/26/2001 To: 3/27/2007 Doc From: 0 Doc To: 99999999 Term: included Format: HTML |
| **Billable Pages:** | 11 | **Cost:** | 0.88 |

A000022

C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| ORION REFINING CORP., | ) | Case Nos. 03-11483 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MICHAEL G. SYRACUSE d/b/a | ) | |
| INTERSTATE SUPPLY CO., and | ) | |
| TEXAS ICO, INC., | ) | |
| | ) | Adv. Proc. No. 03-53939 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ORION REFINING CORP. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION[1]

Before the Court is the motion for partial summary judgment
filed by Michael G. Syracuse ("Syracuse") seeking a determination
that he has title to certain surplus materials located at the
former facility of Orion Refining Corporation (the "Debtor") in
Norco, Louisiana.  The Debtor filed a cross-motion for partial
summary judgment asserting that title to the surplus materials
passed to the purchaser of its Norco facility, Valero Energy
Corporation and Valero Refining-New Orleans, LLC (collectively
"Valero").  For the reasons stated herein, the Court will deny
Syracuse's motion and grant the Debtor's motion.

---

[1] This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052.

Date Filed 4/17/06

77

A000023

I. BACKGROUND

The Debtor operated a crude oil refinery in Norco, Louisiana. On April 24, 2001, Syracuse and the Debtor entered into an agreement ("the Agreement") whereby Syracuse agreed to clean designated areas and remove surplus materials from the Norco facility. The Agreement is governed by Louisiana law. Section II of the Agreement, entitled "Scope of Work" provides:

> A. Contractor shall furnish all . . . personnel to remove surplus material as identified by Orion . . . and clean all designated areas . . . . Completion of areas is defined as: graded and able to cut grass without obstruction. . . . Work or services rendered or performed by Contractor shall be done with due diligence . . . .

(Compl., Ex. A).

In addition to providing clean-up services, Syracuse was purchasing surplus materials located in the designated areas. In fact, the Debtor was not obligated to pay Syracuse any money for his services; instead, Syracuse paid the Debtor $100,000. Section VII of the Agreement, entitled "Special Conditions," provides:

> WARRANTY AND WARRANTY DISCLAIMER-FOR CONTRACTOR USE ONLY
> Seller warrants only that [it] has good title to the "used" and "as is" surplus material sold hereunder. Buyer understands and agrees that Seller is selling hereunder "used" and "as is" surplus material. . . .

(Id.).

Pursuant to the Agreement, Syracuse removed some surplus materials from the Norco facility which it resold. Under the

-2-

A000024

Agreement, Syracuse had until March 31, 2002, to complete his performance, which was not done. Syracuse blames his failure to meet the deadline on the Debtor's interference with his performance. Syracuse contends that, pursuant to the Agreement with the Debtor, he obtained title to $1,591,000 worth of surplus materials that were still located at the Debtor's facility when it filed its bankruptcy case on March 13, 2003.

Shortly after the bankruptcy filing, the Debtor sold all the assets of the Norco facility to Valero. Syracuse objected to the sale to the extent that it included the surplus material that he claimed he owned. The parties agreed to allow the sale to proceed, subject to the Debtor placing $1.5 million of the sale proceeds in escrow pending a determination of title to the surplus materials.

Briefing on the parties' motions for partial summary judgement is complete and they are ripe for decision.


II.   JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (E), (N), & (O).


III.   DISCUSSION

A.   Standard of Review

Summary judgment is appropriate when the matters presented

-3-

to the Court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; Celotex v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact. Adickes v. S. H. Kress & Co., 398 U.S. 144, 161 (1970). Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion. Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment, but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.". Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. A fact is not "genuinely disputed" unless the factual

-4-

conflict between the parties requires a trial of the case for resolution.  Finley v. Giacobbe, 79 F.3d 1285, 1291 (2d Cir. 1996) ("If there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact, this Court will find summary judgment is improper.").

    B.    Title

    Syracuse argues that the Agreement was a contract of sale. Consequently, he asserts that title to the surplus materials passed to him at the time of execution.  As a result, he contends that the items were not property of the Debtor's bankruptcy estate and could not be sold to Valero.

    The Debtor argues that the Agreement was for services. Consequently, the Debtor contends that it retained title to surplus materials that were not timely removed by Syracuse.

    "The means for distinguishing between contracts of sale and construction agreements have been disputed and have never been very clear."  Bruce V. Schewe, Obligations, 46 La. L. Rev. 595, 609 (1986).  In this case, however, it is not necessary to classify the Agreement between the Debtor and Syracuse as one for services or one of sale, because even if classified as a contract of sale, it was a contract subject to a suspensive condition that - until fulfilled - prevented title to the surplus materials from passing to Syracuse.

-5-

Under the Louisiana law of sales, title to an object normally passes to the purchaser when the parties reach an agreement as to the thing and the price, even though no delivery has occurred. La. Civ. Code art. 2456 ("Ownership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid."). Numerous exceptions to this general rule exist, one of which is a sale subject to a suspensive condition. See Robert L. Theroit, An Examination of the Role of Delivery in the Transfer of Ownership and Risk in Sales under Louisiana Law, 60 Tul. L. Rev. 1035, 1037 (1986) (explaining exceptions to Civil Code article 2456). The Civil Code defines a "suspensive condition" as a conditional obligation that "may not be enforced until the uncertain event occurs." La. Civ. Code art. 1767.

When a contract of sale also requires the performance of a service, the performance of that service is a suspensive condition that is required to be fulfilled before title can pass under the contract of sale. See, e.g., Jefferson Parish School Bd. v. Rowley Co., 350 So. 2d 187, 192-93 (La. App. 4th Cir. 1977) (holding that even though the purchaser took delivery and paid for cabinets which were later destroyed by fire, title did not pass on the date of the contract, payment, or delivery because the contract also required the installation of those

-6-

A000028

cabinets, which was an unfulfilled suspensive condition at the time they were destroyed).

In this case, Syracuse states that he paid the Debtor $100,000 to purchase the surplus materials in the designated areas of the Debtor's former Norco facility. The Agreement, however, also required him to remove the materials and clean those areas. The fact that Syracuse claims the value of the remaining items at the Norco facility is $1,591,000 is evidence of the value the Debtor placed on his clean-up services.

The Court concludes that Syracuse's performance of his clean-up services was a suspensive condition to his obtaining title to the surplus materials in the designated areas. <u>Rowley Co.</u>, 350 So. 2d at 192-93. Until Syracuse removed an item from a designated area and cleaned that area, title to that item did not pass from the Debtor to Syracuse. Consequently, the Court finds that title to the items remaining at the Debtor's facility had not passed to Syracuse at the time of the Debtor's bankruptcy filing.

Syracuse argues that the clean-up services he was to preform could not be a suspensive condition to the sale because "the services of cleaning up <u>after</u> the Surplus Materials were removed could only be performed <u>after</u> the Surplus Materials were removed." (Emphasis in original).

-7-

The Court does not agree. Removal of the surplus materials could not be accomplished unless Syracuse was also concomitantly cleaning up the designated areas. Without the satisfaction of the suspensive condition – the clean up of the designated areas – title to the Surplus Materials could not have passed to him from the Debtor

C.    <u>Seller's Fault</u>

Syracuse argues that, even if the Agreement is deemed to be a sale subject to a suspensive condition, the Debtor is to blame for his failure to satisfy the condition because the Debtor interfered with his performance. In support, Syracuse submitted several deposition transcripts describing the restrictions placed on Syracuse in working in certain areas and the affidavit of the Debtor's former security manager, who stated that Syracuse's crew was "called off areas where they were performing work and redirected to other areas."

The Debtor contests Syracuse's allegation that it interfered with his performance and argues that the Agreement gave the Debtor the right to restrict his access to certain areas. In support, the Debtor submitted the deposition of an employee of the Debtor who testified that he gave Syracuse "the opportunity to cherry pick based on . . . areas[, but] he was not able to give [Syracuse] just free range of the plant."

-8-

A000030

Based on the exhibits attached to the motions for summary judgment, the Court concludes that a genuine issue of fact exists over whether the Debtor interfered with Syracuse's performance of the Agreement.

That factual issue, however, is not material to the legal issue before the Court. Even assuming that the Debtor was to blame for Syracuse's nonfulfillment of the suspensive condition, Syracuse cannot establish his title to the surplus materials over the interests of Valero.

It is true that Louisiana law provides that, if a party is unable to perform a suspensive condition because the other party interfered, the condition will be deemed fulfilled. La. Civ. Code art. 1772 ("A condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment."). Further, the condition will be deemed fulfilled retroactively to the date of the agreement. Id. at art. 1775 (the effect is "retroactive to the inception of the obligation.").

There is an exception, however: "fulfillment of the condition does not impair the right acquired by third persons while the condition was pending." Id. at art. 1775. See also id. at art. 1772, cmt. (c) (explaining that even when a suspensive condition is regarded as fulfilled, "the party not at fault may have to content himself with damages rather than

-9-

A000031

specific performance if the latter has become impossible because

of the nonfulfillment of the condition."); id. at art. 1775, cmt.

(b) (stating that article 1775 protects "the rights of third

persons against retroactive effects of the fulfillment of a

condition.").

The Louisiana Supreme Court has explained that:

[A] conditional contract is retrospective in its
operation as a binding executory contract as of the
date it was made and, when the conditions on which the
contract is dependent are fulfilled, either party
thereto has the right to demand its performance.  There
is nothing in the language of the Article which lends
support to the contention that, when the suspensive
conditions are performed, title to the property
contracted for vests retrospectively in the grantee to
the date the engagement was contracted.

Wampler v. Wampler, 118 So. 2d 423, 426 (La. 1960).  See also

Ober v. Williams, 35 So. 2d 219, 223 (La. 1948) (explaining that

article 1775 does not have the effect of vesting title

retrospectively to the date of the agreement; rather, it merely

means that "the rights of the obligor, upon compliance, revert to

the date of the contract . . . it offers no foundation for an

argument that . . . the ownership is transferred retrospectively

by the performance of the condition.").

Consequently, the Court concludes that under Louisiana law,

even if the suspensive condition is regarded as fulfilled because

of the Debtor's interference with the performance of the

Agreement, Syracuse's title would not revert back to the

inception of the Agreement and the rights of intervening parties

-10-

would be protected.  La. Civ. Code art 1775 ("[F]ulfillment of
the condition does not impair the right acquired by third persons
while the condition was pending.").  See also Orion Ref. Corp. v.
Dep't of Revenue (In re Orion Ref. Corp.), No. 03-11483, 2005 WL
994575 at *3 (Bankr. M.D. La. April 27, 2005) (holding that the
transfer of tax credits by TARC to Orion was effective
notwithstanding a prior letter agreement assigning those tax
credits to the Louisiana Department of Revenue because the letter
agreement had two suspensive conditions that were not fulfilled
at the time TARC transferred the tax credits to Orion); Energy
Development Corp. v. St. Martin, 128 F. Supp. 2d 368, 381 (E.D.
La. 2000) (holding that a conditional future obligation does not
burden property such that it is to be taken out of commerce and
the condition does not deny rights acquired by third parties
while the condition is pending), aff'd, 296 F.3d 356 (5th Cir.
2002).

When the Debtor filed its bankruptcy case, the estate
obtained an interest in the surplus materials.  See 11 U.S.C. §
541(a)(1).  This occurred before the suspensive condition could
be regarded as fulfilled.  Also, the Debtor sold its interest in
the surplus materials to Valero before the suspensive condition
was fulfilled.  Therefore, the Court concludes that Syracuse
cannot now establish title to the surplus materials, but is
relegated to an action for damages only.

-11-

A000033

IV. <u>CONCLUSION</u>

The Court will deny Syracuse's motion for partial summary judgment and grant the Debtor's motion for partial summary judgment on the issue of title. The Court will, therefore, dismiss Count I of Syracuse's adversary complaint, which seeks a declaratory judgment recognizing his right, title, and interest in the surplus materials. In addition, the Court will order the release of the sale proceeds from escrow to the Debtor.

An appropriate order is attached.

By the Court,

Dated: April 17, 2006

Mary F. Walrath
United States Bankruptcy Judge

-12-

A000034

**D**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| ORION REFINING CORP., | ) | Case Nos. 03-11483 (MFW) |
| | ) | |
| Debtor. | ) | |
| ——————————————— | ) | |
| MICHAEL G. SYRACUSE d/b/a | ) | |
| INTERSTATE SUPPLY CO., and | ) | |
| TEXAS ICO, INC., | ) | |
| | ) | Adv. Proc. No. 03-53939 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ORION REFINING CORP. | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

ORDER

AND NOW, this **17th** day of **APRIL, 2006**, upon consideration of the Motion for Partial Summary Judgment filed by Michael G. Syracuse and the Motion for Partial Summary Judgment filed by Orion Refining Corporation, and all responses thereto, it is hereby

**ORDERED** that the Motion for Partial Summary Judgment filed by Michael G. Syracuse is **DENIED**; it is further

Date Filed 4/7/06

A000035

**ORDERED** that the Motion For Partial Summary Judgment filed by Orion Refining Corporation is **GRANTED**; and it is further

**ORDERED** that Count I of the adversary complaint filed by Michael G. Syracuse is **DISMISSED**; and it is further

**ORDERED** that the proceeds of sale held in escrow shall be released to the Debtor.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc: Chris Winter, Esquire[1]

_____

[1] Counsel shall distribute a copy of this Order to all interested parties and file a Certificate of Service with the Court.

A000036

SERVICE LIST

Chris Winter, Esquire
Duane Morris LLP
1100 N. Market Street
Wilmington, DE 19801-1246
Counsel for Michael Syracuse

Andrew C. Wilson, Esquire
Burke & Mayer
20th Floor Energy Center
100 Poydras Street
New Orleans, LA 70163
Counsel for Michael Syracuse

Edward S. Rapier, Jr.,
2160 Eighth Street, Suite A
Mandeville, LA 70471
Counsel for Michael Syracuse

Thomas W. Briggs, Esquire
Morris Nichols Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801
Counsel for Cypress Associates, LLC,
ORC Distribution Trust Representative

**E**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| ORION REFINING CORP., | ) | Case No. 03-11483 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MICHAEL G. SYRACUSE d/b/a | ) | |
| INTERSTATE SUPPLY CO., and | ) | |
| TEXAS ICO, INC., | ) | |
| | ) | Adv. Proc. No. 03-53939 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ORION REFINING CORP. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OPINION[1]

Before the Court is the Motion of Michael G. Syracuse ("Syracuse") for Reconsideration of the Court's April 17, 2006, ruling that he did not have title to certain moveable property (the "Surplus Materials") located at the Norco, Louisiana, facility of Orion Refining Corporation (the "Debtor"), which became property of the Debtor's estate as of the petition date. For the reasons stated herein, the Court will deny the Motion.

I.   BACKGROUND

The factual background of this case is recited in the Court's Memorandum Opinion dated April 17, 2006, and will not be

---

[1]  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

Date Filed  8/8/06

Docket No.  108

A000038

repeated here. Syracuse v. Orion Ref. Corp. (In re Orion Ref. Corp.), 341 B.R. 470 (Bankr. D. Del. 2006). On April 27, 2006, Syracuse filed his Motion for Reconsideration. Oral argument on the Motion was initially heard on June 6, 2006, at which time the Court granted the Motion in part and directed that proceeds from the sale of the Surplus Materials remain in escrow until a final decision on the merits is rendered.[2]  The Court continued the hearing to June 28, 2006, to consider the remainder of the arguments raised by the Motion for Reconsideration. At the oral argument held on that date, the Court granted the parties' request for additional briefing. Post-argument briefs were filed on July 11 and 21, 2006. The matter is now ripe for decision.

---

[2]  At the time of the sale of the Debtor's assets to Valero Energy Corporation and Valero Refining-New Orleans, LLC (collectively "Valero"), the parties had stipulated to the escrow of $1.5 million in sale proceeds related to the Surplus Materials. That Stipulation provided that the funds would not be released until:
> [A] determination by a final order of this Court . . . that (i) [Syracuse] owned some or all of the Surplus Materials at the time of the Sale and some or all of the Surplus Materials did not become property of the Debtor's bankruptcy estate pursuant to section 541 of the Bankruptcy Code upon the commencement of the Debtor's bankruptcy case; . . . then [Syracuse's] ownership Interest in such Surplus Materials shall be deemed to have attached to the Escrow Amount . . . .

(Docket No. 336, ¶ 57, in Case No. 03-11483) (emphasis added).

-2-

II.  <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (E), (N), & (O).

III.  <u>DISCUSSION</u>

A.  <u>Standard of Review</u>

A motion for reconsideration is not specifically addressed in the Federal Rules of Civil Procedure; rather, such motions generally fall within the parameters of Rule 59(e), which allows a party to file a motion to alter or amend a judgment. Fed. R. Bankr. P. 9023; 12 <u>Moore's Federal Practice - Civil</u> § 59.30[2][a] (3d ed. 2005) ("[A] Rule 59(e) motion involves the reconsideration of matters properly encompassed in a decision on the merits.").

A motion for reconsideration is an extraordinary means of relief in which the movant must do more than simply reargue the facts or law of the case. <u>See</u> <u>North River Ins. Co v. Cigna Reinsurance Co.</u>, 52 F.3d 1194, 1218 (3d Cir. 1995) (concluding that motion to alter or amend judgment "must rely on one of three major grounds: '(1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to correct clear error [of law] or prevent manifest injustice'.") (citations omitted); <u>Harsco Corp. v. Zlotnicki</u>, 779 F.2d 906, 908 (3d Cir. 1985) ("The purpose of a motion for

-3-

A000040

reconsideration is to correct manifest errors of law or fact or
to present newly discovered evidence."); <u>Stanziale v. Nachtomi</u>,
No. 01-403, 2004 WL 1812705, at *2-3 (D. Del. Aug. 6, 2004)
(stating that a court may grant a motion for reconsideration "if
it appears that the court has patently misunderstood a party, has
made a decision outside the adversarial issues presented by the
parties, or has made an error not of reasoning, but of
apprehension."); <u>Dentsply Int'l, Inc. v. Kerr Mfg. Co.</u>, 42 F.
Supp. 2d 385, 417 (D. Del. 1999) ("[motions for re-argument]
should be granted sparingly and should not be used to rehash
arguments already briefed or allow a 'never-ending' polemic
between the litigants and the Court").

    B.   <u>Grounds for Reconsideration</u>

In his Motion, Syracuse argues that the Court misapprehended
the issue that the parties submitted to the Court for decision,
that the Court made decisions outside the adversarial issues
presented by the parties, and that the Court made clear errors of
law.

    1.   <u>Misapprehension of the Issue</u>

Syracuse contends that the Court addressed the wrong issue,
as indicated by the Court's statement that title to the Surplus
Materials had passed to the purchaser of the Debtor's Norco
facility, Valero Energy Corporation and Valero Refining-New
Orleans, LLC (collectively "Valero"). Syracuse agrees that

-4-

Valero currently has title to the Surplus Materials, but states that the proper issue was whether Syracuse "owned some or all of the Surplus Materials at the time of the Sale and [whether] some or all of the Surplus Materials did not become property of the Debtor's bankruptcy estate."

Syracuse is incorrect. In the Opinion, the Court correctly identified the issue as follows:

> Syracuse argues that the Agreement was a contract of sale. Consequently, he asserts that title to the surplus materials passed to him at the time of execution. As a result, he contends that the items were not property of the Debtor's bankruptcy estate and could not be sold to Valero.
> The Debtor argues that the Agreement was for services. Consequently, the Debtor contends that it retained title to surplus materials that were not timely removed by Syracuse.

341 B.R. at 473-74. The Court resolved that issue as follows:

> The Court concludes that Syracuse's performance of his clean-up services was a suspensive condition to his obtaining title to the surplus materials in the designated areas. Rowley Co., 350 So. 2d at 192-93. Until Syracuse removed an item from a designated area and cleaned that area, title to that item did not pass from the Debtor to Syracuse. Consequently, the Court finds that title to the items remaining at the Debtor's facility had not passed to Syracuse at the time of the Debtor's bankruptcy filing.

Id. at 474.

Therefore, the Court did not misapprehend the issue presented by the parties, but did in fact address and decide the very issue the parties identified: did title to the property pass to Syracuse before the Debtor filed its bankruptcy petition.

-5-

A000042

2.    Making Decisions Outside the Adversarial
       Issues Presented

In his Motion, Syracuse argues that the Court erred in
determining that his contract with the Debtor was a sale subject
to a suspensive condition inasmuch as the contract did not
contain the term "suspensive condition" and the Debtor had not
raised that classification as a defense. Moreover, Syracuse
contends that neither he nor the Debtor intended a suspensive
condition to apply to the contract, and if there was any
ambiguity, it should have been construed against the Debtor.

Syracuse argued that the parties' contract was one of sale;
the Debtor argued that it was one for services. Id. at 473-74.
Contrary to Syracuse's assertion, the Court did not conclude in
its Opinion that the contract was a sale contract. Instead, the
Court found that it was unnecessary to classify the parties'
contract as one of sale or one for services, "because even if
classified as a contract of sale, it was a contract subject to a
suspensive condition that – until fulfilled – prevented title to
the surplus materials from passing to Syracuse." Id. at 474.

Because the parties' contract is governed by civilian
principles, the classification of the contract is determined by
reference to the Civil Code.[3] In classifying a contract in the

_____

[3] La. Civ. Code art. 1916 ("Nominate contracts are subject
to the special rules of the respective titles when those rules
modify, complement, or depart from the rules of this title
[conventional obligations or contracts].").

-6-

absence of a controlling Civil Code article, "the process is a creative one, since the judge ultimately has the power to accept or reject the analogies, or chose between them." Clarence J. Morrow, Louisiana Blueprint: Civilian Codification and Legal Method for State and Nation, 17 Tul. L. Rev. 351, 553-54 (1943).

No controlling Civil Code title exists that specifically classifies a conventional obligation that calls for both a sale of a moveable and a performance of a service when the sale and the service are both integral to the fulfillment of the object of the contract. Consequently, the Court followed the lead of the Louisiana Fourth Circuit Court of Appeals in Jefferson Parish School Bd. v. Rowley Co., 350 So. 2d 187, 192-93 (La. Ct. App. 1977), which held that when a contract calls for both a sale and an act of performance, the performance is a suspensive condition to the act of sale. 341 B.R. at 474.

Because the parties put at issue what the contract was (one of sale or one for services), it was proper for the Court to determine, after considering Louisiana law, what the effect would be if the contract was a sale contract. Consequently, the Court finds no reason to reconsider its decision on this point.

    3.   Clear Error of Law

        a.   Suspensive Condition to Sale of Movables

Syracuse argues that the Court made a clear error of law because it is a legal impossibility to have a suspensive

-7-

A000044

condition to the sale of a moveable.  This argument is without merit.

It is true that, in principle, Louisiana does not recognize the common law doctrine of conditional sales of moveables. Barber Asphalt Paving Co. v. St. Louis Cypress Co., 46 So. 193, 196 (La. 1908) ("[T]o suppose a sale without a transfer of the property in the thing which forms the object of the sale is simply to suppose an impossibility.").

Nonetheless, Louisiana law does recognize that title to moveables does not always pass at the time of contract.[4]  In particular, Louisiana law recognizes a sale of moveables subject to a suspensive condition – which postpones the transfer of title.  Barber Asphalt Paving, 46 So. at 197 ("The reason why a sale under a suspensive condition does not transfer the ownership is that it is not a sale. . . .  When a sale is made under a suspensive condition, there is no sale until the condition has been fulfilled."); Rowley, 350 So. 2d at 192-93 (holding that the

---

[4]  For example, when goods in stock are sold, title does not pass until the particular items of stock are individualized.  La. Civ. Code art. 2547.  Similarly, when moveables are sold by weight, tale, or measure, ownership does not pass until the seller, with the buyer's consent, weighs, counts, or measures the things.  La. Civ. Code art. 2458.  In Syracuse's post-hearing brief, he suggests that title passes at the execution of a contract despite the existence of a condition that would otherwise postpone the transfer of title.  The case cited by Syracuse for that proposition, however, interpreted a prior version of article 2458.  See Louisiana State Rice Milling Co. v. McCowan, 156 So. 213, 214 (La. 1934).

-8-

sale of uninstalled cabinets - moveables - was subject to a suspensive condition).

Therefore, the Court concludes that there was no clear error of law in its conclusion that, even if the contract was a sale, it was subject to a suspensive condition.

b.    Implied Suspensive Condition

In his post-argument brief, Syracuse argues that the Court's conclusion was erroneous because there is no mention of the term "suspensive condition" in the parties' contract. This is not necessary, however, when that is the effect of the contract's classification under the Civil Code. The contract at issue in Rowley did not contain the term either, yet the Rowley Court concluded that the sale at issue was subject to a suspensive condition. 350 So. 2d at 189-92.

The cases cited by Syracuse are not to the contrary, but merely stand for the unremarkable proposition that courts must look to the contract as a whole to determine if a suspensive condition exists. See Southern States Masonry, Inc. v. J.A. Jones Constr. Co., 507 So. 2d 198, 201-02 (La. 1987) (holding that a "pay when paid" clause in a contract between a general and a subcontractor would not be construed as a suspensive condition when the parties did not contemplate that the subcontractor would be the insurer of the owner's solvency); Schexnayder v. Capital Riverside Acres, Inc., 129 So. 139, 143 (La. 1930) (declining to

-9-

A000046

construe a stipulation to a contract as a condition precedent
when the language of the contract did not compel that result);
Hampton v. Hampton, Inc., 713 So. 2d 1185, 1190-91 (La. Ct. App.
1998) (inferring the existence of a suspensive condition after
reading the contract as a whole); Tilley v. Lowery, 511 So. 2d
1245, 1247 (La. Ct. App. 1987) (holding that an affirmative
predial servitude of use was created by the parties' agreement
and that the identification of its exact location was not a
suspensive condition that delayed the creation of the servitude).

Syracuse also argues that the Court's ruling on this point
is in error because the parties never intended the result reached
by the Court.  This also is not necessary.  See, e.g., Thomas v.
Philip Werlein Ltd., 158 So. 635, 637 (La. 1935) ("Where all the
essential elements and conditions for an absolute sale are
present in a contract between parties, the effects flowing
legally from that particular contract follow, whether the parties
foresaw and intended them or not, and though they may refer to
the contract as an agreement to sell or as a conditional sale.").

In his post-argument brief, Syracuse fails to distinguish
the law on which the Court relied.[5]  Therefore, the Court will
not reconsider its conclusion (that even if the parties' contract
was a sale, it was a sale subject to a suspensive condition)

---

[5] It was on this issue specifically that Syracuse asked
permission to submit a brief.

-10-

because it is well-founded in Louisiana law.

        c.   <u>Removal as Suspensive Condition</u>

In his post-argument brief, Syracuse also argues that in its Opinion the Court found that the suspensive condition to the contract was the requirement that Syracuse clean the designated areas. Syracuse asserts that at oral argument the Court, for the first time, suggested that the suspensive condition was the removal of the equipment.

This is inaccurate. In the Opinion, the Court expressly found that "[t]he Agreement, however, also required [Syracuse] to remove the materials and clean those areas. . . . Until Syracuse removed an item from a designated area and cleaned that area, title to that item did not pass from the Debtor to Syracuse." 341 B.R. at 474.

        d.   <u>Retroactive Fulfillment of Suspensive Condition</u>

Syracuse asserts that the Court also erred by not addressing Syracuse's argument that it was legally deemed to have obtained title to the Surplus Materials before the Debtor's bankruptcy filing based on the Debtor's alleged bad acts. He argues that under Louisiana law his title would be retroactive to the date of the Debtor's bad acts, which was before the Debtor's bankruptcy filing. <u>See</u> La. Civ. Code art. 1772 ("A condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment.").

-11-

In fact, the Court did address this issue in its Opinion and concluded that, as a matter of law, Syracuse could not establish title to the Surplus Materials even if he succeeded in proving that the Debtor interfered with his performance. 341 B.R. at 475-76. That ruling was premised on Louisiana law which protects the intervening rights of third parties. Id. at 475 (stating that article 1775 of the Louisiana Civil Code "protects 'the rights of third persons against retroactive effects of the fulfillment of a condition'.") citing Wampler v. Wampler, 118 So. 2d 423, 426 (La. 1960) ("There is nothing in the language of the Article [dealing with suspensive conditions] which lends support to the contention that, when the suspensive conditions are performed, title to the property contracted for vests retrospectively in the grantee to the date the engagement was contracted.") and Ober v. Williams, 35 So. 2d 219, 223 (La. 1948) (holding that article 1775 does not have the effect of vesting title retrospectively to the date of the agreement).

In his post-argument brief, Syracuse ignores the cases referenced by the Court in its Opinion and the effect of article 1775, while continuing to assert that article 1772 controls. Even the comments to article 1772, however, acknowledge that title may not pass retroactively: "the party not at fault may have to content himself with damages rather than specific performance if the latter has become impossible because of the

-12-

nonfulfillment of the condition." La. Civ. Code art. 1772, cmt. c. That is exactly what the Court determined in its Opinion; Syracuse has at most a claim for damages for breach of contract. 341 B.R. at 476.

> e. <u>Wrong Third Party</u>

In his post-argument brief, Syracuse argues that the Court, in its Opinion, determined that the third party whose rights prevented the retroactive fulfillment of the suspensive condition was Valero. This is erroneous, Syracuse contends, because the parties stipulated that the sale to Valero would not affect their respective claims of title to the Surplus Materials and that their interests would attach to the proceeds of the sale of that property. He asserts that the Court changed its ruling and suggested, for the first time at the oral argument, that the third party was the Debtor's estate.

Syracuse's premise is erroneous. The Court determined in its Opinion that the third party that cut off Syracuse's rights was the Debtor's bankruptcy estate. <u>Id.</u> at 476. The Court concluded that the Debtor's bankruptcy estate acquired property rights in the Surplus Materials pursuant to section 541(a)(1) of the Bankruptcy Code as of the commencement of the case thereby preventing any retroactive fulfillment of the suspensive condition. <u>Id.</u> ("When the Debtor filed its bankruptcy case, the estate obtained an interest in the surplus materials. This

-13-

A000050

occurred before the suspensive condition could be regarded as
fulfilled.").

   f.   Improvement of Position

   In his post-argument brief, Syracuse also argues that the
Debtor's bankruptcy estate cannot receive any better title in the
Surplus Materials than the Debtor had and that, because the
suspensive condition was deemed fulfilled as to the Debtor, it
must be as to the estate as well.  To hold otherwise, argues
Syracuse, would allow the Debtor to improve its position simply
because it filed bankruptcy.  See, e.g., In re Sauvres, 172 B.R.
592, 594 (Bankr. C.D. Ill. 1994) ("[The debtor's interests in an
asset or his rights against others are not expanded by the filing
of a bankruptcy proceeding.").

   The Court disagrees.  The filing of a petition in bankruptcy
creates a new legal entity, the bankruptcy estate.  The estate
succeeds to the debtor's rights in most respects but possesses
property rights and legal attributes in addition to those of the
pre-petition debtor.  For example, property of the estate
includes recoveries for transfers avoidable under chapter 5 of
the Bankruptcy Code.  11 U.S.C. §§ 541(a)(7), 544, 547, 548 &
549.  In particular, the estate has the power to avoid interests
of third parties in property of the debtor that were unperfected
as of the petition date.  Id. at § 544.  Any improvement in
position that the estate may have over the position of the debtor

-14-

A000051

absent a bankruptcy filing does not inure to the benefit of the debtor; it is for the benefit of creditors.  The creation of a bankruptcy estate is to fulfill the purposes of the Bankruptcy Code, which "aims, in the main, to secure equal distribution among creditors." Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co., 126 S. Ct. 2105, 2109 (2006).

Because in this case the bankruptcy estate came into existence and obtained title to the Surplus Materials before Syracuse's rights were adjudicated, Syracuse cannot obtain title to the Surplus Materials under Louisiana law.  Once a person[6] obtains an interest in property, Louisiana law protects that person's rights against the retroactive effects of the fulfillment of a suspensive condition.  La. Civ. Code art. 1775, cmt. (b) (stating that article 1775 protects "the rights of third persons against retroactive effects of the fulfillment of a condition.").

Section 541(d) of the Bankruptcy Code does make property of the estate subject to a constructive trust claim.  This is of no

---

[6] Under Louisiana law, "[t]he right of ownership may exist only in favor of a natural person or a juridical entity." La. Civ. Code art. 479.  The Debtor's estate is a legal entity that can hold property, and the trustee (or debtor in possession) is its representative and has the capacity to sue and be sued on behalf of the estate.  11 U.S.C. §§ 101(15), 323 & 1107(a). Thus, the bankruptcy estate has attributes of a personality and is, therefore, a juridical person under Louisiana law.  La. Civ. Code art. 24 (defining a "juridical person" as an entity to which the law attributes personality . . . .").

-15-

help to Syracuse, however, because constructive trust claims are not recognized under Louisiana law. See, e.g., Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Management), 4 F.3d 1329, 1336 (5th Cir. 1993).

Consequently, there is no provision in the Bankruptcy Code or Louisiana law that establishes Syracuse's rights in the Surplus Materials are superior to the title acquired by the Debtor's estate on the filing of the petition. See Rine & Rine Auctioneers v. Douglas County Bank & Trust Co. (In re Rine & Rine Auctioneers, Inc.), 74 F.3d 854, 858 (8th Cir. 1996) (providing that state law controls questions concerning the nature and extent of a debtor's interest in property, but federal bankruptcy law determines the extent to which that interest is property of the estate).

Thus, while Syracuse may have been able to use article 1772 to obtain title to the Surplus Materials in the absence of the Debtor's bankruptcy filing, once the Surplus Materials became property of the estate, Syracuse lost his right to obtain title to those items. Syracuse merely has a "claim" against the Debtor's estate. See 11 U.S.C. § 101(5) (defining a "claim" to be a "(A) right to payment . . . or (B) right to an equitable remedy for breach of performance . . . .").

-16-

g.   Waiver

Syracuse also argues that the contract cannot be classified as a sale subject to a suspensive condition because Syracuse sold some of the Surplus Materials without ever moving them before the Debtor filed bankruptcy, even selling some of the Surplus Materials back to the Debtor.  These actions, Syracuse contends, demonstrate that title to certain items passed before removal and clean-up services required by the Agreement could be performed.

In its Opinion, the Court stated that "[r]emoval of the surplus materials could not be accomplished unless Syracuse was also concomitantly cleaning up the designated areas.  Without the satisfaction of the suspensive condition – the clean up of the designated areas – title to the Surplus Materials could not have passed from him to the Debtor."  341 B.R. at 475.  The fact that the Debtor may have agreed that Syracuse did not have to remove some of the Surplus Materials that it purchased from him does not invalidate the Court's classification of the Agreement as a sale subject to a suspensive condition.

Syracuse argues, however, that if the Debtor waived the requirement that Syracuse remove some items from the Norco facility, it was a waiver of the suspensive condition itself.  The Defendant responds in its post-argument brief that the parties' contract expressly provides that "[a] waiver . . . of any term, provision, or condition of this contract shall not

-17-

constitute a precedent or bind either party hereto to a waiver of any succeeding breach of the same or any other terms, provision, or condition of this contract."  (Contract, Exh. A, Item 18.) Consequently, the Court concludes that, if the Debtor did waive the suspensive condition as to some of the sales, it did not constitute a waiver of the suspensive condition as to all sales.

IV. <u>CONCLUSION</u>

For the above-stated reasons, the Court will deny Syracuse's motion for reconsideration.

An appropriate order is attached.

By the Court,

Dated: August 8, 2006

Mary F. Walrath
United States Bankruptcy Judge

-18-

A000055

**F**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| ORION REFINING CORP., | ) | Case Nos. 03-11483 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MICHAEL G. SYRACUSE d/b/a | ) | |
| INTERSTATE SUPPLY CO., and | ) | |
| TEXAS ICO, INC., | ) | |
| | ) | Adv. Proc. No. 03-53939 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ORION REFINING CORP. | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

**AND NOW**, this **8th** day of **AUGUST, 2006**, upon consideration of the Motion for Reconsideration filed by Michael G. Syracuse, and the Debtor's response thereto, and after oral argument, it is hereby

**ORDERED** that the Motion for Reconsideration filed by Michael G. Syracuse is **DENIED**.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc: Christopher M. Winter, Esquire[1]

---

[1] Counsel shall serve a copy of this Opinion and Order on all interested parties and file a Certificate of Service with the Court.

Date Filed 8/8/06

Docket No. 109

A000056

SERVICE LIST

Christopher M. Winter, Esquire
Michael R. Lastowski, Esquire
Duane Morris LLP
1100 N. Market Street
Wilmington, DE 19801-1246
Counsel for Michael Syracuse

Andrew C. Wilson, Esquire
Thomas R. Blum, Esquire
Susan M. Caruso
Simon, Peragine, Smith & Redfearn, LLP
1100 Poydras Street, 30th Floor
New Orleans, LA 70163-3000
Counsel for Michael Syracuse

Edward S. Rapier, Jr., Esquire
2160 Eighth Street, Suite A
Mandeville, LA 70471
Counsel for Michael Syracuse

Richard D. Allen, Esquire
Gregory W. Werkheiser, Esquire
Thomas W. Briggs, Jr., Esquire
Morris Nichols Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19801
Counsel for Cypress Associates, LLC,
ORC Distribution Trust Representative

G



CONTRACT NUMBER: O019549

AGREEMENT made as of this 24th day of April, 2001, by and between Orion Refining Corporation, a Delaware corporation ("Owner"), and Interstate Supply ("Contractor").

WITNESSETH

WHEREAS Owner operates a crude oil refinery facility, with administrative offices at 14902 River Road, New Sarpy, Louisiana, 70078, and Contractor is in the business of providing surplus material reclamation and clean-up services and Contractor agrees to furnish such services to Owner;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, it is agreed as follows:

I. **DEFINITIONS.** The terms used in this Agreement shall have the meanings given them in the Orion Refining Corporation General Contract Provisions ("General Conditions"), which are attached as Exhibit A and made a part hereof. The Contract Documents are defined generally in the General Conditions and include the following specifically identified documents:

A. EXHIBIT A - Orion Refining Corporation General Contract Provisions, pages 1-7.

B. EXHIBIT B - Orion Refining Corporation Contractor Security Procedures and Regulations, pages 1-10.

C. EXHIBIT C - Orion Refining Corporation Safety Guidelines and Requirements for Contractors, pages 1-9.

D. EXHIBIT D - Orion Minimum Insurance Requirements, 2 pages

E. EXHIBIT E – Orion Drawing # 004-003-1-272 for use to identify areas of work.

F. EXHIBIT F – Interstate Supplies Rate Sheet for on-site disposal services. (referring to Special Conditions.)

I. **SCOPE OF WORK**

A. Contractor shall furnish all required insurance, supervision, equipment, materials, and qualified personnel to remove surplus materials as identified by Orion approved M.D.O. (material disposal order) and clean all designated areas as shown on drawing # 004-003-1-

O. Box 537                    Norco, Louisiana   70079                    (504) 764-8611

2000                                    Page 1 of 7

A000058



CONTRACT NUMBER: O019549

272. Surplus materials do not include any permanent or fixed assets. All areas are to be secured by either permanently installed chain link fencing (existing) or by orange barricade fencing. Temporary fencing, if needed, will be done at the expense of the Contractor. ONCE AREAS ARE SECURED, THERE WILL BE NO ENTRY ALLOWED OTHER THAN CONTRACTOR. Completion of areas is defined as: graded and able to cut grass without obstruction. At completion of cleaning designated areas, Owner will inspect and approve that work is complete and acceptable. Contractor is to supply all equipment necessary to completely remove all materials and trash. Contractor is responsible for all equipment, man-power, and fees necessary to complete this contract. All Work or services rendered or performed by Contractor shall be done with due diligence, in a good, workmanlike manner, using skilled, competent and experienced workmen and supervisors.

B. Minimum PERSONAL SAFETY EQUIPMENT that must be provided by CONTRACTOR, at no additional cost to Owner, to Contractor's employees working in process areas of Orion's Refinery. All items may not be necessary for every job; but, if necessary, Contractor will furnish any of the following:

| | |
|---|---|
| 1. ANSI approved Hard Hat | 7. Work Gloves |
| 2. Safety Glasses with side shields | 8. Respirator (if required for Work) |
| 3. Mono-goggles | 9. Rubber boots |
| 4. Ear plugs | 10. Rubber gloves |
| 5. Steel toed shoes or boots | 11. Disposable Coveralls |
| 6. Fire retardant clothing (such as NOMEX) | 12. Safety Equipment Bag |

C. EQUIPMENT AND SERVICES TO BE PROVIDED BY ORION REFINING CORP.

1. Parking space
2. Sanitary facilities
3. Potable water
4. Utilities
5. Items referenced in job scope to be supplied by others and not supplied by Contractor

. TERM OF THE AGREEMENT

A. The Work under this Agreement shall commence on April 24, 2001, and shall take approximately 12 months to complete; no later than March 31, 2002.

. Box 537                    Norco, Louisiana  70079                    (504) 764-8611

A000059



CONTRACT NUMBER: O019549

## IV. PRICING

A. Owner shall be paid $100,000.00. The payments will be made as per the schedule shown below:

$25,000.00 at award of contract. Due two weeks after set-up of offices.
$25,000.00 due 30 (thirty) days after first payment
$25,000.00 due 60 (sixty) days after first payment
$25,000.00 due 90 (ninety) days after first payment

All areas shall be cleaned and turned back over to Owner before project is considered complete.

## V. TAX CONSIDERATIONS

A. Contractor's invoice shall include all applicable governmental agency local and state taxes.

## VI. INVOICING

A. All invoices will be submitted by Owner upon notification of Warehouse Superintendent that milestone has been made.

B. Payment shall be made to Orion Refining Corporation within 5 days of receipt of invoice.

## II. SPECIAL CONDITIONS

A. The following special conditions, if any, shall be deemed a part of this Contract and, in the event of conflict, shall be deemed to modify the General Conditions.

   1. All applicable laws are to be followed concerning the disposal of materials.

A000060



CONTRACT NUMBER:  O019549

2.  All sub-contractors are to maintain the same levels of insurance with Orion Refining Corporation named as "Additional insured" with waiver of subrogation. **NO EXCEPTIONS**

3.  The disposal of asbestos, oil, and any other regulated material is the sole responsibility of Contractor to identify for removal and must notify Orion Environmental department before any action can be taken.  Contractor may agree to perform the services to remove materials or advise Owner it does not desire to perform the required activities.  If Contractor does agree to perform the services, such services shall be performed in a lawful, safe, and prudent manner under the terms of this agreement and as specified in the agreed upon request.  This agreement does not obligate Contractor to perform services, but, it does require Contractor to notify Orion before removing any material with contamination or regulated material.  Upon notification of contaminants, Owner and Contractor shall negotiate the cost associated with each specific piece of material and agree to which party is responsible for any payments to perform work before work begins.

4.  A signed dray ticket and scale receipt from Orion will be turned over to Warehouse superintendent for each load of material leaving Orion property.

5.  WARRANTY AND WARRANTY DISCLAIMER—FOR CONTRACTOR USE ONLY
Seller warrants only that is has good title to the "used" and "as is" surplus material sold hereunder. Buyer understands and agrees that Seller is selling hereunder "used" and "as is" surplus material. There are no express warranties other than Seller's warranty of title. No warranty including but not limited to warranties of merchantability or fitness for a particular purpose, shall be implied.

6.  INDEMNITY—FOR CONTRACTOR USE ONLY
Buyer shall indemnify and save harmless Seller, its employees and agents, from and against all claims, liabilities, losses, damages, fines, penalties and expense of every character whatsoever (including but not limited to liability for pollution, environmental damage or restoration, nuisance, bodily injury, sickness and/or disease, including death and loss of or damage to property), which are caused by or arise out of or in connection with "USED" and "AS IS" surplus material, after delivery to Buyer of "used" and "as is" surplus material at Place of Delivery, whether such liability is based on contract, warranty, tort (including negligence and strict liability), statute, or otherwise.

## II. REPRESENTATIVES OF THE PARTIES

A.  Until further written designation by notice given in accordance with this Contract the authorized representatives of the parties are as follows:

    1. Owner's Designated Representative

). Box 537                          Norco, Louisiana  70079                          (504) 764-8611

A000061



CONTRACT NUMBER:  O019549

    a.  **IN PURCHASING** - For all contractual changes

(Only the personnel in Owner's Purchasing/Contracts Department or company executives can authorize a change to this agreement that affects the pricing for items covered by this agreement.)

    1.  A. L. "Tony" Landry      Tel. No. (504) 471-4725
    2.  David Williams          Tel. No. (504) 471-4724

  b.  **IN REFINERY** - For liaison with Contractor's representative at jobsite.

    1.  Walter Landry, or his designated representative.
        Tel. No.  (504) 471-4731

2.  **Contractor's Designated Representatives** - for liaison with Owner's Refinery representative at jobsite.

    a.  Michael Syracuse      Tel No. (877) 365-2883

## IX.  NOTICES

  A.  Notices required to be given under the Contract shall be given in the manner provided for in the General Conditions and

    1.  **if to Contractor, addressed:**

        Interstate Supply
        211 Paul Lane
        Shepard, TX 77371
        Attn: Michael Syracuse

        TELEPHONE      (877) 365-2883
        FACSIMILE       (936) 365-2717

O. Box 537          Norco, Louisiana  70079        (504) 764-8611

2000              Page 5 of 7

A000062



CONTRACT NUMBER: O019549

2.  if to Owner, addressed:

Orion Refining Corporation
Contract Administration Supervisor
P. O. Box 537
Norco, Louisiana 70079

TELEPHONE       (504) 764-8611
FACSIMILE       (504) 764-8835

or to such other addresses as may be specified in a notice so given.

## X. GENERAL CONDITIONS

A.  This Agreement consists of the foregoing terms and conditions ("Commercial Terms"), and the General Contract Provisions in Exhibit A, and Exhibits B through E attached hereto. In the event of any conflict between the Commercial Terms and the General Contract Provisions, the Commercial Terms shall take precedence. Any terms and conditions of Contractor, no matter when received, shall not constitute terms and conditions of this Agreement unless expressly set out in writing as a part of this Agreement, and any terms and conditions of Seller's proposal are objected to by Buyer without need of any further notice of objection.

## XI. ENTIRE AGREEMENT

A.  This contract contains the entire agreement between the parties. There are no understandings, commitments, obligations, or other liabilities between the parties except as expressly set forth herein. This Contract supersedes all prior written or oral agreements of the parties. No modification hereof shall be binding unless in writing and signed by a duly authorized officer of each party.

A000063

## EXHIBIT – A

### Orion Refining Corporation
### General Contract Provisions

#### ITEM 1 – RELATION OF PARTIES

It is the express intention of the parties hereto that, in the performance of this contract and of the Work hereunder, CONTRACTOR'S status shall be that of an independent contractor, and the relation of the parties hereunder shall in no event be construed to be that of principal and agent. CONTRACTOR recognizes and agrees that a statutory employer relationship as provided by La. R. S. 23:1061 (A), as amended by Act 315 of 1997, exists between CONTRACTOR and OWNER with respect to the services or products to be provided under this AGREEMENT, and with CONTRACTOR'S direct employees and its statutory employees; and the Work to be performed hereunder is an integral part of, or is essential to, the ability of the OWNER to generate its own products or services.

#### ITEM 2 – COMPLIANCE WITH LAWS

CONTRACTOR shall observe and abide by, and shall require its subcontractors to observe and abide by, all valid applicable laws, rules, and regulations of the federal and state governments ( and subdivisions or agencies thereof) and policies of OWNER in connection with any and all Work performed hereunder.

#### ITEMS 3 – PERMITS AND LICENSES

It shall be the responsibility of the CONTRACTOR to secure all permits required to mobilize and demobilize all CONTRACTOR furnished equipment.

#### ITEM 4 – PAYMENT LIABILITY

CONTRACTOR shall pay for all labor performed or furnished by it hereunder (including any related employment taxes), for all material furnished by it, and for all other costs incurred in the performance of the Work to be done by CONTRACTOR.

#### ITEM 5 – INDEMNITY AGREEMENT

CONTRACTOR HEREBY AGREES TO INDEMNIFY AND HOLD OWNER HARMLESS FROM AND AGAINST ANY LOSS OR LIABILITY (INCLUDING LEGAL EXPENSES) ARISING OUT OF ANY CLAIM OR CAUSE OF ACTION FOR LOSS OR DAMAGE TO PROPERTY, INCLUDING CONTRACTOR'S PROPERTY, INJURIES TO OR DEATH OF PERSONS INCLUDING CONTRACTOR'S EMPLOYEES, TO THE EXTENT CAUSED BY, RESULTING FROM, GROWING OUT OF, OR INCIDENTAL TO THE WORK PERFORMED UNDER THIS CONTRACT AND SHALL, AT THE OPTION OF THE OWNER, DEFEND OWNER AT CONTRACTOR'S SOLE EXPENSE IN ANY LITIGATION INVOLVING THE SAME, REGARDLESS OF WHETHER SUCH WORK IS PERFORMED BY CONTRACTOR, HIS EMPLOYEES, OR BY HIS SUBCONTRACTOR'S, THEIR EMPLOYEES OR ALL OR EITHER OF THEM.

#### ITEM 6 – PATENT INDEMNIFICATION

Except as OWNER shall deprive CONTRACTOR of freedom of choice or OWNER shall independently elect, CONTRACTOR agrees to indemnify and save OWNER harmless from all claims for alleged patent infringement asserted against OWNER and growing out of the performance of Work by CONTRACTOR under this contract, including the use of tools, implements, or methods employed by CONTRACTOR, and as may arise from the operation by OWNER of the facilities as constructed under this contract, and CONTRACTOR shall defend, at CONTRACTOR'S sole expense, any suit involving OWNER alleging patent infringement by reason of the foregoing causation or any litigation thereof and shall hold OWNER harmless from any loss or liability on account thereof or any judgment entered in any such action.

A000064

EXHIBIT – A

## Orion Refining Corporation
### General Contract Provisions

### ITEM 7 – INSURANCE COVERAGE

CONTRACTOR and all subcontractors shall carry and pay for insurance in amounts and in accordance with conditions set forth in this Agreement. OWNER establishes the insurance limits outlined as minimum limits. OWNER'S requirements are not to be considered as indicative of the ultimate amounts and types of insurance, which CONTRACTOR needs. Neither failure to comply nor full compliance with the insurance provisions of the contract shall limit nor relieve CONTRACTOR from holding OWNER harmless in compliance with ITEM 5, "Indemnity Agreement".

### ITEM 8 – PERFORMANCE BOND

If required by OWNER, CONTRACTOR shall provide a performance bond for the Work in the amount and form requested by OWNER.

### ITEM 9 – AREA LABOR PRACTICES

CONTRACTOR shall not deviate from the area labor practices regarding rates, jurisdictional agreements, working hours, benefits, or bonuses without prior written approval of OWNER. OWNER and CONTRACTOR shall agree on hours in CONTRACTOR'S normal workweek. Any "spot" overtime required (such as completing concrete pours) shall not increase the contract price.

### ITEM 10 – CERTAIN LABOR CHARGES EXCLUDED

If labor charges under this contract are directly reimbursable by OWNER to CONTRACTOR, said labor charges shall not include any remuneration (including back pay and penalties) paid to employees of CONTRACTOR by reason of any order, decision, or adjudication of any federal or state agency or court (including any settlement or compromise thereof) as the result of any violation of any federal or state law, rule or regulation.

### ITEM 11 – SUSPENSION OF WORK

OWNER or CONTRACTOR, with the approval of OWNER, may at any time suspend the Work under this agreement or any part thereof by OWNER giving notice or approval in writing to CONTRACTOR. All Work so suspended shall be resumed by CONTRACTOR within ten (10) days after the time fixed in a written notice of approval from OWNER to CONTRACTOR to resume Work.

CONTRACTOR shall be reimbursed for its costs incurred during the period of suspension for maintaining its field organization and facilities consisting of:

a) Reasonable charges of CONTRACTOR'S field staff necessarily retained during the period of suspension.

b) Reasonable rental charges for construction tools and equipment, which are necessarily idle as a result of suspension, including costs of maintenance thereof.

c) Other reasonable costs incurred by CONTRACTOR attributable to the suspension of Work such as demobilization costs, mobilization costs in connection with start of Work after the period of suspension and costs, if any, occasioned by rehabilitation of Work completed or Work in progress at the time of suspension of Work.

CONTRACTOR shall not be entitled to loss of anticipated profits because of the suspension of Work, but if as a result of such suspension the cost to CONTRACTOR of subsequently performing the Work is increased, an equitable adjustment shall be made in the contract price to compensate CONTRACTOR.

A000065

EXHIBIT – A

## Orion Refining Corporation
### General Contract Provisions

### ITEM 12 – FORCE MAJEURE

Any delays in performance by either party under this contract shall be excused if and to the extent caused by occurrences beyond the control of the parties affected, including but not limited to the decrees of government, acts of God, strikes or other concerted acts of workmen, floods, riots, war, rebellion, and sabotage; but the foregoing shall not give rise to any claims for damages or be considered a waiver by either party of the obligations of this Agreement. Notwithstanding the foregoing delays in performance by either party by reason of strikes or other concerted acts of workmen shall not be excused for a period of more than thirty (30) days.

### ITEM 13 – INFORMATION FURNISHED BY OWNER

CONTRACTOR agrees that information, including any drawings and designs furnished by OWNER to CONTRACTOR is deemed to be and is the personal and confidential property of OWNER, and such information shall not be divulged by CONTRACTOR to another or be used in any way by CONTRACTOR or pursuant to a contract or undertaking with any person except OWNER, provided that the foregoing restrictions do not apply to:

(a)     Information which at the time of its disclosure is, or which thereafter becomes other than by act or omission of CONTRACTOR, part of the public domain;

(b)     Information which the CONTRACTOR can show was in CONTRACTOR'S possession in tangible form at the time of disclosure and was not acquired, directly, or indirectly, from OWNER;

(c )    Information which was received by CONTRACTOR after the time of disclosure by OWNER from a third party who has a lawful right to disclose it to CONTRACTOR and who did not require CONTRACTOR to hold it in confidence.

(d)     Contractor is required by law to disclose information.

### ITEM 14 – INFORMATION FURNISHED BY CONTRACTOR

Other than information subject to written secrecy agreements between the parties, CONTRACTOR warrants that the possession, use, and/or disclosure by OWNER of any information furnished by CONTRACTOR to OWNER shall not violate the proprietary rights of third parties. If, based upon its possession, use, and/or disclosure of such information, OWNER is charged with misuse of proprietary rights of any third party, CONTRACTOR shall defend and hold OWNER harmless from any loss, liabilities, damages or expenses arising from such charges.

### ITEM 15 – REPRODUCTION OF DRAWINGS

OWNER shall have and retain the right to reproduce in whole or in part, for its own use, any and all drawings furnished by or through CONTRACTOR, not withstanding any notations on such drawings.

### ITEM 16 – PHOTOGRAPHS

Photographs of the facilities taken by the CONTRACTOR will be made available to the OWNER. Such photographs shall not be reproduced, duplicated or published by the CONTRACTOR without the prior written consent of the OWNER. Press releases concerning the facilities shall not be made by CONTRACTOR without the prior written consent of the OWNER.

### ITEM 17 – INSPECTION OF FACILITIES

Nothing contained in any agreement between the parties shall restrict OWNER'S right, without recourse by CONTRACTOR, to have or permit access to or make inspection of the facilities.

A000066

EXHIBIT – A

## Orion Refining Corporation
## General Contract Provisions

### ITEM 18 – WAIVER OF RIGHTS

A waiver on the part of OWNER or CONTRACTOR of any term, provision, or condition of this contract shall not constitute a precedent or bind either party hereto to a waiver of any succeeding breach of the same or any other terms, provision, or condition of this contract. Any such waiver must be in writing and delivered to the other party in order to be effective.

### ITEM 19 – PAYMENTS WITHHELD

OWNER may withhold payment in such amounts as may be reasonably necessary to protect OWNER from loss because of failure of CONTRACTOR to perform or meet its obligations under this contract. OWNER may also withhold payment until such time as CONTRACTOR has furnished to OWNER partial and/or full releases of liens from third parties as the OWNER may reasonably require from time to time.

### ITEM 20 – TERMINATION

OWNER shall have the right to terminate this Agreement at any time by written notice to CONTRACTOR. CONTRACTOR shall be entitled to full payment for the Work done hereunder up to the time of such cancellation, including proportional payment of the profit under this contract, providing evidence satisfactory to OWNER is submitted showing that all bills and claims in connection with the Work have been satisfactorily discharged, and providing that 10% of the amount due may be withheld for thirty one (31) days after such termination. Following termination and settlement with CONTRACTOR for Work performed up to date of termination, OWNER, with respect to the Work remaining to be done, shall assume the obligations which CONTRACTOR has made for labor, materials, subcontracts, operating equipment, services, fees, moving costs, rentals, or other items which CONTRACTOR may have therefore in good faith undertaken and incurred in the performance of the contract, and OWNER shall assume ownership and unrestricted use of all CONTRACTOR'S engineering, procurement, accounting, and construction documents and records relating to Work performed and to be performed under the contract. In the event the CONTRACTOR fails to perform the Work on time, or fails to complete the Work by the target date thereafter or fails to perform the Work in a satisfactory manner after having started, or commits any other breach of the contract, OWNER may at any time thereafter, without waiving any other legal remedy, cancel the contract by giving CONTRACTOR written notice to that effect and may take over and complete the Work by whatever method it may deem expedient (e.g., by its own personnel, other contractors or otherwise).

### ITEM 21 – ASSIGNMENT OF CONTRACT

This contract shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto, provided, however, that this contract shall not be assigned or transferred, in whole or in part, by CONTRACTOR, by operation of law or otherwise, unless OWNER'S prior written consent is obtained.

### ITEM 22 – PURCHASING

The selection of suppliers furnishing materials, equipment, or supplies shall be made from a list of vendors mutually agreed upon in advance by OWNER and CONTRACTOR.

### ITEM 23 – LIST OF EMPLOYEES

CONTRACTOR shall furnish OWNER a list of its employees, and shall thereafter advise OWNER promptly of any additions to, or deletions from, such list.

A000067

EXHIBIT – A

Orion Refining Corporation
General Contract Provisions

## ITEM 24 – CHANGES AND EXTRA WORK

OWNER, without invalidating the contract or any bond given thereon, may order extra Work or make changes by altering, adding to, or deducting from the Work, the contract sum being adjusted accordingly. CONTRACTOR will be furnished written instructions on any such changes. If CONTRACTOR claims that any additional instructions involve extra cost under this contract, it shall give OWNER written notice and shall receive written approval from OWNER before proceeding with the Work, except in an emergency endangering life or property.

## ITEM 25 – MATERIAL, EQUIPMENT, AND WORKMANSHIP GUARANTEES

CONTRACTOR warrants that all Work performed under the contract shall be done in a good workmanlike manner. If any Work performed by CONTRACTOR or its subcontractors is found to be defective within twelve (12) months from date of "Final Acceptance" of the Work, CONTRACTOR shall promptly replace or repair such defective workmanship without any cost to OWNER. CONTRACTOR warrants that all material and equipment required to complete the Work under this contact shall be merchantable and fit new material and equipment or, where mutually agreed by the parties, merchantable and fit used material and equipment. If any commodity type materials such as piping, electrical supplies, insulation, structural steel, concrete sheet metal, paint, etc., furnished by CONTRACTOR or his subcontractors are found to be defective by reason of inherent defects or faulty design within twelve (12) months from the date of "Final Acceptance", CONTRACTOR shall replace such materials at direct costs to OWNER. However, CONTRACTOR shall not be obligated to repair or replace any materials becoming defective as a result of ordinary wear, tear, corrosion or erosion, or as a result of operating conditions more severe than those contemplated in the original design.

## ITEM 26 – SUBCONTRACTS

CONTRACTOR may subcontract, subject to OWNER'S written approval, any part of the Work; but subcontracting shall not relieve CONTRACTOR from any of the obligations or liabilities of this contract.

## ITEM 27 – OTHER CONTRACTS

OWNER reserves the right to let other contracts for other Work in connection with the project and to perform such other Work itself, and CONTRACTOR shall coordinate its Work and cooperate with OWNER and any other contractors on the job.

## ITEM 28 – OWNER'S REPRESENTATIVE

OWNER shall designate a representative who shall have authority to act for and on behalf of OWNER in all matters in connection with this contract and the Work performed hereunder. Such representative shall have the right to inspect the Work as it is performed and will endeavor to inform CONTRACTOR immediately if any particulars of the Work inspected do not comply with the detailed specifications, plans safety and OWNER regulations, and contract stipulations. Failure of the OWNER'S representative to inspect or to call to the attention of CONTRACTOR any particulars in which Work does not comply with the detailed specifications, plans, etc., shall in no way relieve CONTRACTOR of its obligations and guarantees under this contract.

## ITEM 29 – CONTRACTOR'S REPRESENTATIVE

CONTRACTOR shall assign to the Work a competent representative who shall be responsible for project supervision and have authority to act for CONTRACTOR. All instructions given CONTRACTOR'S representative by OWNER shall be binding. Instructions will be confirmed in writing upon request. OWNER may request the removal of any employee of CONTRACTOR for incompetence or other good cause. CONTRACTOR shall also appoint a competent resident superintendent who shall be in attendance at the project site during all working hours and who shall have charge of the Work, and the authority to act for the CONTRACTOR. CONTRACTOR shall advise OWNER in writing of the name, address, and telephone number (day and night), of such designated superintendent.

A000068

EXHIBIT – A

## Orion Refining Corporation
## General Contract Provisions

and of any change in such designation. CONTRACTOR'S resident superintendent shall maintain a daily log book to record the construction progress and other significant events relating to the project. OWNER'S Project Manager shall have access to and may periodically review the CONTRACTOR'S daily log book.

## ITEM 30 – PROTECTION OF MATERIALS – HOUSEKEEPING

CONTRACTOR shall use reasonable care to protect all materials, equipment, and Work from deterioration because of weather, damage, theft, etc., at all times prior to the final acceptance of the Work hereunder. CONTRACTOR shall maintain an acceptable standard of housekeeping, taking into consideration that there are certain economic limits of housekeeping that control or govern a construction job, and shall at all times keep the premises in a safe condition and free of the accumulation of waste materials or rubbish caused by its employees, subcontractors, vendors, suppliers or Work.

## ITEM 31 – RESTRICTIONS ON CONTRACTOR'S WORK AREA

The CONTRACTOR shall not permit his employees, vendors, visitors, labor representatives, salesmen, agents, or subcontractors to enter any area other than the Work areas from time to time designated by the OWNER. The CONTRACTOR shall provide instructions to the aforesaid of the boundaries of these areas and shall at all times exercise the degree of control necessary to see that the provisions of this condition are met.

## ITEM 32 – SAFETY AND OWNER REGULATIONS

CONTRACTOR shall abide by all federal and state safety requirements and shall take all reasonable precautions to protect the workmen and the public and shall provide, where reasonable and necessary, barriers, guards, temporary bridges, lights, watchman, etc. All applicable safety rules of the OWNER shall be observed.

CONTRACTOR shall familiarize himself and his employees with the area and/or operating units bordering the jobsite and the hazards that might be encountered in working adjacent to them. CONTRACTOR shall be prepared to cooperate fully with the police, OWNER safety men, fire chief, and OWNER representative when requested to alter its operations during times of emergency or when violating any of their regulations and rules.

## ITEM 33 – INSPECTION AND ACCEPTANCE

OWNER shall have the right to inspect and approve or reject in accordance with the specifications all or any portion of the Work. Failure of the OWNER to inspect or to call to the attention of CONTRACTOR any particulars in which the Work does not comply with the detailed specifications shall in no way relieve CONTRACTOR of the obligations and guarantees under this contract. CONTRACTOR shall correct any defects found and reported to it. Written confirmation will be furnished if requested.

## ITEM 34 – PROJECT COMPLETION DATE

CONTRACTOR shall make every reasonable effort to complete its Work by the given completion date and secure final acceptance from OWNER. CONTRACTOR agrees to abide by the provisions of this document.

## ITEM 35 – FINAL ACCEPTANCE

When CONTRACTOR considers it has met all contractual obligations, including all guarantees required, except for extended material, equipment, and workmanship guarantees, CONTRACTOR shall notify OWNER in writing. OWNER will make an investigation and inspection of all phases of the contract requirements; and, if all such contractual obligations have been met, a letter of acceptance will be issued; but in no case will such acceptance relieve CONTRACTOR of its obligations.

A000069

EXHIBIT – A

## Orion Refining Corporation
### General Contract Provisions

### ITEM 36 – ARBITRATION

All disputes, claims or questions which may arise in connection with CONTRACTOR'S performance and which cannot be settled by negotiations (provided the true construction and meaning of specifications and drawings shall be decided only by OWNER) shall be referred to three (3) disinterested arbitrators, one to be appointed by each of the parties to the contract and the third by the two thus chosen, the decision of any two of whom shall be final and binding. Each of the parties hereto shall pay one-half of the expenses of such arbitration. The arbitration shall be held in Louisiana. This contract shall be interpreted in accordance with the laws of the state of Louisiana.

### ITEM 37 – AUDITS

OWNER may, upon request, audit any and all records of vendor and/or any Subcontractors relating to Work performed hereunder for a period of ten (10) years; Provided however, CONTRACTOR and/or Subcontractor shall have the right to exclude any trade secrets, formulas or processes from such inspection. Any errors or improper payments discovered during the audit process shall be promptly remedied by payment to the injured party. At all times, CONTRACTOR and/or Subcontractor shall have all the obligations and duties and OWNER shall have all of the rights, powers and privileges with respect to maintenance of records and audits thereof set forth in this contract.

### ITEM 38 – CONTRACTOR ACCOUNTING AND TIMEKEEPING

CONTRACTOR shall maintain detailed accounting and timekeeping records during the progress of Work. Contractor working on OWNER's refinery site shall utilize OWNER furnished timekeeping system to assure accurate time sheets are submitted to OWNER.

### ITEM 39 – CONTRACTOR FURNISHED MATERIALS

All materials furnished by CONTRACTOR and/or Subcontractor must meet OWNER's Engineering Specifications and be on OWNER's Approved Manufacturers List (AML). Any deviation from the above must be in writing from the OWNER'S representative.

A000070

EXHIBIT "B"


# ORION REFINING CORPORATION


## Security Procedures and Regulations


For Contractors

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

### TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Identification | 3 |
| 2. | Employee Roster | 3 |
| 3. | Vehicles | 3 |
| 4. | Parking Areas, Gates and Fences | 4 |
| 5. | Visitors | 4 |
| 6. | Terminated - Employees | 4 |
| 7. | Gate Logs | 5 |
| 8. | Material and Equipment Passes | 5 |
| 9. | Contractor Tools and Equipment | 5 |
| 10. | Service Vehicles | 6 |
| 11. | Pass Alterations | 6 |
| 12. | Material and Equipment Deliveries | 6 |
| 13. | Tool and Equipment Marking | 6 |
| 14. | Gate Checks - Vehicles & Personnel | 6-7 |
| 15. | After Hours Security | 7 |
| 16. | Reporting Thefts | 7 |
| 17. | Gate Assignments and Restricted Areas | 7 |
| 18. | Other Restrictions | 7 |
| 19. | Rules of Personal Conduct | 8 |
| 20. | Safety Helmets | 9 |
| 21. | Safety Equipment | 9 |
| 22. | Time Cards | 9 |
| 23. | Meal Policy | 9 |

A000072

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

1. ### IDENTIFICATION

   All Contractor Personnel, their subcontractors and visitors, shall have proper identification as described hereunder. The identification must be shown to the Security Officer upon entering and departing the Refinery or at any other time while on Orion Refining Corporation ("OWNER") property when requested by any OWNER security or staff personnel.

   Orion will provide all Contractor employees with an Orion I.D. badge which will be worn in full view at all times while on the plant site. All badges will be returned to Orion for re-issue upon the completion of the job(s) for which they were issued.

   If a badge is lost on the job site, you must notify Orion Security immediately. If you are unable to find it, a new badge can be purchased. The cost of a new badge is $20.00. If you lose your badge off site, a new badge can be purchased the following workday for $20.00. Your employee will not be allowed to enter the plant site and start work until he/she has been issued a new badge and has clocked in at the turnstiles.

   If a badge is left at home, the employee should be sent home to retrieve it. If a replacement badge is given instead, there will be a $20.00 charge. A $5.00 credit will be given if the other badge is turned in to the guard the next workday. Damaged badges will be replaced at no cost to the Contractor.

   Contractors will be billed $20.00 per badge for lost or misplaced badges. Orion will provide a signed payroll deduction sheet when needed. Contractors will be billed $20.00 per badge for any Contractor employee who leaves their employment and does not return their badge to Orion.

   Badges must be worn in plain view while on OWNER property. Contractors and their subcontractors will assist in enforcing this rule by taking appropriate disciplinary action in cases of non-compliance.

2. ### EMPLOYEE ROSTER

   Contractors and Sub-contractors are required to maintain a current roster of their employees and their badge numbers. All Contractors and Sub-contractors shall submit this roster, no less frequent than weekly, to Security. Contractors will be expected to coordinate this effort for their Sub-contractors to avoid duplication. This roster will be maintained for reference purposes. In most cases, a copy of the weekly Time Sheet complete with Badge Numbers will be sufficient.

3. ### VEHICLES

   All vehicles must be identified as belonging to the Contractor or Sub-contractor by having the Owner Name on the vehicle. A decal, magnetic sign, or similar device may be used. However, in all cases, the Owner Name, insignia and Number shall be legible from a reasonable distance.

   Due to congested traffic conditions, only those Contractor vehicles which are absolutely necessary for the reasonable administration of the project will be given the privilege of entering the Refinery, and these must be approved by the Construction and Engineering Department Heads, and Refinery Manager

A000073

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

Except in rare instances, the use of personal vehicles in the Refinery will be prohibited. To provide, necessary identification, the Security Office, will provide a highly visible magnetic decal or dashboard pass for temporary use while on the Refinery premises. These identification passes must be returned to the issuing Gate upon exit.

4.  PARKING AREAS, GATES AND FENCES

Orion shall designate an area as close to the job site and Contractor's gate as possible for their employees. Parking of privately owned transportation will be at their own risk. Orion will not be liable for any damage to these vehicles. Parking will be conducted in a reasonable manner and as directed by OWNER. Contractor Employees will observe all traffic regulations while on OWNER property.

5.  VISITORS

All persons except material delivery personnel and Contractor's authorized personnel, desiring admittance the Refinery to conduct business with Contractors, will obtain a visitor's pass from the Security Officer at the Contractor's designated gate or Main Gate.

Visitor's vehicles will not be permitted to enter the work site areas except in instances where the use of the vehicle is absolutely necessary. In such instances, the specific approval of an authorized OWNER or Contractor Representative must be obtained and so indicated on the visitor pass.

All visitors will be required to sign the Visitor's Log upon entry.

The entrance of casual visitors to the Contractor areas is strictly prohibited.

Visitor Procedures:

a.  Visitors will request admittance from the Security Officer at the Contractor's Gate or Main Gate. They will be required to give to the Security Officer the following information:

- Name
- Company they represent
- Name of person they wish to see

b.  The Security officer will obtain clearance from the person the visitor wishes to see who in turn will provide the Security Officer with the information specified in paragraph a. above.

c.  In all instances, the visited party will arrange to meet the visitor at the Contractor's Gate and accompany him/her to and from the job site.

d.  Once in he Plant, the visitor will not be permitted to visit other Contractors on site. The visitor will have to repeat the above procedures should they wish to visit another Contractor.

A000074

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

6.  **TERMINATED EMPLOYEES**

   An authorized representative of the Contractor and/or Security Officer must escort all Contractors' employees, who have been discharged or have resigned while on the job, from the Refinery.

7.  **GATE LOGS**

   At each Contractor's Gate, the Security Officer shall maintain a daily log listing the Name, Company/Organization, Visited Party, Time of Entry and Departure of all visitors to the job site.

   The Security, officer shall also maintain a Daily Log listing the Name, Badge Number, Contractor's Name, Time of Entry/Departure of all contractor Employees entering or leaving other than at normal working hours.

   Contractor Timekeeper or Foremen will be responsible for checking Daily Gate Logs for Manpower exceptions (i.e., Late ins - Early departures) to assure time sheets are accurately submitted.

8.  **MATERIAL AND EQUIPMENT PASSES**

   The Material and Equipment Pass shall be made out in duplicate. When the material and/or equipment is transported from one Plant site to another, the original copy of this form will be given to the person transporting the material/equipment. The original copy of this document will be submitted to the Security Guard at the point of re-entrance to the Plant. If the material/equipment is transported off site, the Security Guard will then retain both copies of this pass for record. Security Department shall conduct a daily check of Material and Equipment Passes.

   A Material and Equipment Pass is required each time any tool, material, or piece of equipment leaves the Refinery. These passes must be issued and signed by an authorized OWNER Employee or Security Guard. In exceptional cases, OWNER may authorize prime contractors who hold large contracts to designate specific responsible individuals to issue passes for materials, tools and equipment used on that Contractor's job. All Contractors are strongly encouraged to leave their tools and equipment on the job site for the duration of the job to eliminate the daily need for passes.

9.  **CONTRACTOR'S TOOLS AND EQUIPMENT**

   Some contracts will require the Contractor to furnish his own tools and equipment. Contractors will be asked to keep this to a working minimum. Each contractor entering the Refinery must present to the Security Officer at his assigned entrance gate at the time or initial arrival, a complete inventory of tools and equipment brought on the job site. This inventory will consist or all electric or air powered tools and any other tool with a purchase value of $100 or more. This listing will have a description of each item to include Contractor's markings and serial numbers. If additional tools and equipment are brought on site, a supplemental listing must be provided to the Security Office at the point/time of entry to the Plant. The

A000075

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

initial inventory and all supplemental inventories will be maintained on file by the Security Officer for future use when tools and equipment are removed from the Plant.

Exception to the above rule will be individual Contractor employees who furnish their own tools. These employees will be allowed to enter and leave the job site without a Material and Equipment Pass, however, all tools will be inspected by Security prior to the employee leaving the Plant.

10. SERVICE VEHICLES

Contractor owned as well as outside Equipment Service Vehicles entering the Refinery to repair tools and equipment must present the Security Officer at the time of entry, a complete tool and equipment inventory of the items carried in his truck. Contractors are encouraged to advise their service people of these requirements in advance to preclude unnecessary delay at the gate. In all cases, service vehicles will be inspected and surveyed with Ultraviolet Equipment prior to departing the Refinery.

11. PASS ALTERATIONS

All Material & Equipment Pass forms must be written in ink and must be crossed out below the last item listed. No Contractor is authorized to alter this form. If alterations are necessary, they can only be done by the person issuing the pass and must be signed after each alteration.

12. MATERIAL AND EQUIPMENT DELIVERIES

Deliveries to the job site shall be restricted to scheduled working hours.

Exception to the Rule must have prior approval from an authorized Orion representative who will provide Security with advance notice of after-hours deliveries.

Contractor's acceptance of deliveries late in the day shall be contingent upon their ability to unload the delivery. Trucks and/or trailers may be left at designated areas for unloading the next scheduled workday. It is the contractor's responsibility to advise the common carrier of these requirements and the Gate Number to which deliveries are to be made. Failure to provide this information may result in a considerable loss of time and money.

13. TOOL AND EQUIPMENT MARKING

Contractors and sub-contractors will identify their major company owned tools (unit value of $100 or more) with a distinctive marking, (i.e., color band, stencil, engraving, etc.). This of course is not a restriction. Tools of a lesser value may be marked as deemed appropriate. This does not apply to rental tools which would probably already bear the rental company's marking; however, a listing of all tools by manufacturer, size, type and serial number is advisable to aid in the recovery of lost or misplaced items.

A000076

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

OWNER shall stencil or engrave Owner owned tools and equipment accordingly and use 'Marks-it' for major tool and equipment identification. Contractors are asked not to use this means for their tool marking so that these tools can be identified. To facilitate the identification of tools that have been stolen, misplaced, then found, Contractors are required to provide OWNER Security with written procedures of their tool-marking program.

14. GATE CHECKS OF VEHICLES AND PERSONNEL

At the end of every shift, all vehicles, leaving the plant will be subject to OWNER Security inspection. This will also include:

- Tool containers
- Lunch boxes
- Clothing bundles
- Any and all packages

To facilitate this inspection, all passengers will dismount vehicles when requested and walk through the Contractor Gate before re-boarding the vehicle. If required, the Contractor will provide contractor management personnel at the gate during shift changes to insure compliance by contractor employees.

15. AFTER HOUR SECURITY

OWNER shall arrange for hourly patrols and inspection of Contractor's building, jobsites, and area. The patrolman will make unscheduled, trips through the area to check for open buildings, open tool boxes, equipment left running, fire or other serious hazards and unauthorized personnel in the area. However, beyond contractual liability, OWNER assumes no responsibility for losses occurring in the Contractor's area. The Contractor is required to secure his area as noted below:

a.  Lock up tools, materials, equipment, and building.
b.  Eliminate easy access to inside buildings
c.  Install outside lights if building is in a dark area.
d.  Keep night light on inside buildings.

16. REPORTING THEFTS

In the event of a theft or suspected theft, the Contractor will notify security immediately so that an investigation can be can be conducted at that time. The Contractor will submit an incident report on forms provided by OWNER Security.

17. GATE ASSIGNMENTS AND RESTRICTED AREAS

All Contractor employees will enter and exit the Refinery through designated gates only.

ORC-B (2/15/00)                    Page 7 of 11

A000077

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

Contractor employees shall confine their activities to the job site. If it is necessary to move between work site, movement shall be restricted to those established roadways and walkways. Movement through operating and unit areas, loitering or visiting other Contractor work sites is <u>strictly prohibited</u>.

### 18. OTHER RESTRICTIONS

Cameras, radios and television sets are not allowed on OWNER property.   Contractor employees and/or their visitors found carrying these items will have to surrender them to OWNER Security and may reclaim these items when leaving the Refinery.

The use of camera/photographic equipment on OWNER property is strictly prohibited. Only authorized OWNER personnel will be permitted to use this type of equipment on the premises.

### 19. RULES OF PERSONAL CONDUCT

Employees are reminded that certain rules and regulations are required for orderly, safe and effective operation of any large industrial organization. OWNER has established a policy of rules and regulations governing safety, conduct and responsibilities for their employees as well as Contractor employees. These rules and regulations will be strictly enforced. It is the intention of these regulations to maintain desirable working conditions that are safe and promote cooperation among all employees.

Listed below are representative offenses that can justify disciplinary measures. This list is not intended to identify all causes nor have they been put in order of severity.

- Willful damage or theft or unauthorized use of Orion, Contractor or other employee's personal property, or removing property, records, private data or classified information from Owner premises without permission or giving such information to any unauthorized persons, either orally or in writing.
- Committing any act of violence, fighting or improper or immoral conduct on OWNER'S property. Use of abusive language, threatening or coercing any employee.
- Insubordination to persons with authority to direct, including refusal to identify yourself to any supervisor or other designated Owner representative upon request.
- Gambling or card playing on OWNER'S property.
- Doing personal work during work time on OWNER'S property
- Possession, or use of intoxicating liquors or drugs on OWNER'S property, including vehicles, or being under the influence of intoxicants or drugs during working hours.
- Using Owner phones for personal business.
- Refusal to take medical tests such as a Breathalyzer test for blood alcohol content, to determine the ability to perform the job with competence and safety.

ORC-B (2/15/00)                    Page 8 of 11

A000078

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

Contractor employees shall confine their activities to the job site. If it is necessary to move between work site, movement shall be restricted to those established roadways and walkways. Movement through operating and unit areas, loitering or visiting other Contractor work sites is strictly prohibited.

18. **OTHER RESTRICTIONS**

Cameras, radios and television sets are not allowed on OWNER property. Contractor employees and/or their visitors found carrying these items will have to surrender them to OWNER Security and may reclaim these items when leaving the Refinery.

The use of camera/photographic equipment on OWNER property is strictly prohibited. Only authorized OWNER personnel will be permitted to use this type of equipment on the premises.

19. **RULES OF PERSONAL CONDUCT**

Employees are reminded that certain rules and regulations are required for orderly, safe and effective operation of any large industrial organization. OWNER has established a policy of rules and regulations governing safety, conduct and responsibilities for their employees as well as Contractor employees. These rules and regulations will be strictly enforced. It is the intention of these regulations to maintain desirable working conditions that are safe and promote cooperation among all employees.

Listed below are representative offenses that can justify disciplinary measures. This list is not intended to identify all causes nor have they been put in order of severity.

* Willful damage or theft or unauthorized use of Orion, Contractor or other employee's personal property, or removing property, records, private data or classified information from Owner premises without permission or giving such information to any unauthorized persons, either orally or in writing.
* Committing any act of violence, fighting or improper or immoral conduct on OWNER'S property. Use of abusive language, threatening or coercing any employee.
* Insubordination to persons with authority to direct, including refusal to identify yourself to any supervisor or other designated Owner representative upon request.
* Gambling or card playing on OWNER'S property.
* Doing personal work during work time on OWNER'S property
* Possession, or use of intoxicating liquors or drugs on OWNER'S property, including vehicles, or being under the influence of intoxicants or drugs during working hours.
* Using Owner phones for personal business.
* Refusal to take medical tests such as a Breathalyzer test for blood alcohol content, to determine the ability to perform the job with competence and safety.

A000079

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

* Violating or disregarding safety, security, fire and traffic regulations.

* Smoking in prohibited areas.

* Inefficient performance of assigned duties, neglect of duty or careless use of Owner property.

* Allowing another person to use your identification card or using another employee's card or special pass to enter or leave Owner property, or in any way entering or leaving Owner property without permission or by other than authorized means.

* Possession of firearms, weapons, cameras or sound recording devices on Owner property without specific authorization.

20.  **SAFETY HELMETS**

The following is a list of the color of hard hats that shall be worn by employees when conducting field work at Orion Refining Corporation.

| | | |
|---|---|---|
| Maintenance | ———————— | Green - Maintenance Assist (Shaw) Green |
| Operations | ———————— | White |
| Security | ———————— | White |
| Warehouse | ———————— | Light Blue |
| Safety | ———————— | White with red markings |
| Engineering | ———————— | White |
| Managers | ———————— | White |
| Shaw Constructors | ———————— | Purple |

All other contractors will wear their respective colors, unless it would create a conflict with any of the colors mentioned above.

21.  **SAFETY EQUIPMENT**

The following Safety equipment is required at all times in the plant area:

      a.    Hard Hat
      b.    Safety Glasses with side shields
      c.    Goggles and earplugs will be carried to use in specific areas when required.
      d.    Steel Toe Shoes or Boots.

22.  **TIME - CARDS**

No Contractor Employee(s) shall leave Owner property once they have punched in their Time Card. All parking areas and non-work areas will be considered "Off Owner Property". Anyone found leaving their work area for any reason other than those listed below, will be subject to dismissal:

      a.    End of work shift, after punching out Time Card

A000080

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

b.    When in transit from one work area to another (must be accompanied by Supervisor or have signed pass from Supervisor).

c.    On special assignment for Supervisor or Orion request

23.   <u>MEAL POLICY</u>

During meal breaks, all Contractor and Sub-contractor employees must punch "out" their time cards when leaving Orion property on their specified meal break and upon return, punch "in". Owner Supervisor, who will notify Security in writing, can approve exceptions to this policy.

A000081

# EXHIBIT "B"

## Orion Refining Corporation
### Security Procedures and Regulations

## ORION
### Refining Corporation

### MATERIAL & EQUIPMENT PASS

Date_____ Employee #_____ Vehicle #_____

Items_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Approved
By_____ Company_____

Leaving
Post_____ Time_____ S/O_____

Entering
Post_____ Time_____ S/O_____

A000082

EXHIBIT - C

# Orion Refining Corporation

## Safety Guidelines and Requirements

## For Contractors

A000083

## EXHIBIT - C

### Orion Refining Corporation
### Safety Guidelines and Requirements

The Contractor shall comply with, and shall cause all of his employees to comply with, the Company's rules and regulations on safety and fire prevention at the place of work. All contractor employees must attend a safety orientation meeting, conducted by Orion. Each work crewmember will read and sign the "Safety Rules and Regulations for Contractor and Their Employees" procedures PRIOR to starting work. Each worker will need to review these procedures and re-sign every six-(6) months. Without limiting the foregoing, the Contractor shall comply with the following provisions:

(1)     The Contractor shall abide by all pertinent Federal, State, Local and Company safety regulations and policies. OSHA regulations, including Right-To-Know hazardous substance training, ditch and excavation and requirements and hazardous atmosphere precautions--and the requirements to thoroughly train and equip all employees to recognize and deal safely with such (and other) concerns--are noted particularly. Certain Federal, State, Local and/or Company safety regulations and policies are specifically summarized, but are in no way intended to constitute a complete list of concerns to be provided for by the Contractor.

(2)     Any Contractor having employees working with or around hazardous materials/confined spaces will supply COMPANY with proof of training as per OSHA C.F.R. 29-1910-132/133/134/120 and 1200. Also OSHA C.F.R. 29-1910-146.

(3)     The Contractor shall provide all required materials, equipment, and relevant training in order to meet these and other requirements.

(4)     A work permit is required on all jobs in the plant- Daily/Shift

Jobs involving an ignition source or entry into tank dikes or confined spaces, require an entry and/or hot work permit - Daily/Shift

All hot work will require the Contractor to furnish a fire watch specifically assigned to the project. THE FIRE WATCH WILL ONLY DO THIS WORK. The fire watch will be trained and certified in the use of hand-held fire extinguishers. This certificate will be presented to COMPANY PRIOR to the commencement of work.

The fire watch will need to read and sign the procedures describing "Hot Work Permits and Fire Watch Responsibilities and Duties."

The term "Hot Work" includes the use of explosives, torches, appliances, tools, or equipment producing sparks, flame or ignition. "Hot Work" also includes but is not limited to, the following:

ORC-C (4/1/99)                    Page 2 of 9

A000084

## EXHIBIT - C

a.   Acetylene burning torches
b.   Electric and gas welding equipment
c.   Nelson stud and spot welders
d.   Sandblasting equipment
e.   Open fire (salamanders, heaters, etc.)
f.   Soldering irons
g.   Non-explosion proof electric motor-driven tools or equipment
h.   Electrical heating elements
i.   Wire-brushing (powered or manual)
k.   Blow torches and prestolite outfits
l.   Power-actuated tools

No "Hot Work" shall be done within 50' of any sewer manhole or other area drain unless the permission of COMPANY'S representative is obtained and manhole/drain has been properly covered.

All other work not requiring a hot work permit requires a cold work permit.

Contractors are to provide a minimum of two (2) dry-chemical fire extinguishers for each job - to be located near the job site.

(5)   Specific approval must be obtained from the COMPANY'S representative BEFORE locating and operating a combustion engine on COMPANY property. These engines may be on portable air compressors, welding machines, etc.

COMPANY representative's approval MUST also be obtained BEFORE locating and operating x-ray and nuclear radiant ion-producing equipment.

(6)   Contractors shall have arrangements for emergency medical services for their employees. Emergency phone numbers should be given to plant first aid. Orion medical facilities will be available to Contractors ONLY IN life threatening cases where outside aid is not appropriately available.

Smoking, lighters and matches: smoking is prohibited in the refinery and tank farms except as specifically permitted. "Strike Anywhere" type matches and butane lighters ARE NOT allowed. It is recommended that only lighters made of durable metal with a guard cover over the fuel valve and igniter be used.

(7)   Clothing- Hardhats meeting ANSI 89.1, Class B, requirements shall be worn at all times. Sturdy leather steel toe footwear (no tennis-style shoes) SHALL be worn at all times, except where particular tasks dictate the use of specialized footwear. Exceptions shall be approved by the Company PRIOR to their usage.

A000085

# EXHIBIT - C

Industrial Safety Glasses are to be worn at all times, and as required by OSHA, protective eyewear, face equipment, and/or hearing protection shall be worn whenever appropriate and as appropriate to the particular work being done.

Shirts and long pants shall be worn at all times. SLEEVELESS SHIRTS ARE PROHIBITED. Long sleeved shirts are strongly encouraged. Non-synthetic materials: i.e., wool and cotton, are strongly encouraged for all clothing.

Life jackets are required to be worn while performing any work on COMPANY docks and anywhere involving contained water. (Ponds etc.)

(8)    Tools and Equipment - Air driven or Class I Division I rated electric driven power tools SHALL be used in any area which has, or which by virtue of the activity to be performed may develop, an atmosphere above 10% of the LEL.

Sufficient lengths of hoses SHALL be used so as to locate all engine driven equipment, i.e., pumps and compressors, at a safe distance (to be determined by the Contractor in cooperation with Company's project inspector and the supervisor at each job site) from potential sources of explosive vapors; such as open "hot" piping, recovery systems, or tanks. "Safe distance" shall necessarily imply in area whose atmosphere has NO likelihood of exceeding 10% of the LEL.

Fire extinguishers SHALL be provided and deployed in adequate number, size, type, and manner so as to reasonably guard against the hazards introduced by the work performed within the context of the job-site environment. All fire extinguishers must be in good working condition; maintained, tested, and labeled in accordance with all applicable regulations. The Contractor, SHALL ensure that his employees are specifically and adequately trained in the use of such equipment.

(9)    OSHA Hazard Communication Standard (29 CFR 1910.1200) Contractor employees performing work within company facilities are covered by their employer's hazard communication program.

PRIOR to being awarded any contract, the Contractor SHALL provide to the Company, for each hazardous chemical (as defined by 29 CFR 1910.1200) to be brought onto any Company job site by the Contractor the MSDS and a description of the intended

application and quantity. All containers of chemicals brought onto or used on any Company job site by the Contractor SHALL be clearly labeled by the Contractor with the identity of the contents and appropriate hazard warnings, in accordance with 29 C.F.R. 1910.1200. The Contractor SHALL properly dispose of containers off site as soon as the job is completed.

A000086

# EXHIBIT - C

Light petroleum products including gasoline, naphtha, and similar flammable liquids SHALL NOT be used or stored on COMPANY'S property for ANY purpose without the permission of the COMPANY'S representative.

(10) Training - The Contractor SHALL provide to the Company, PRIOR to being awarded any contract, documentation of his internal employee safety training programs for equipment and tasks pertinent to the job and of his Right-To-Know program for ALL physical and chemical health hazards normally associated with such work. This documentation SHALL include (1) program descriptions and (2) certification that EACH employee he intends to use on the Company's job site has been or will be given appropriate safety training in ALL areas mentioned above, PRIOR to employee doing any work.

No later than on the first day of work, and PRIOR to starting any work, as many as possible of the Contractor employees to be involved on Company property SHALL participate in a safety briefing at the job site by Company personnel. For any Contractor employee not attending that briefing, the Contractor SHALL provide that employee a fully comparable orientation PRIOR to that employee doing any work.

(11) Procedures - When transferring liquids other than potable water through hoses by portable pumps of any type, such operation will be manned at all times so as to guard against environmental damage/safety hazards due to leaks.

Except in a designated fabrication area or shop, or in an area in which the atmosphere has no likelihood of exceeding 10% of LEL, a fire guard –TRAINED and EXPERIENCED in the operation of his equipment SHALL be posted at ALL welding, cutting, and related work.

Consideration MUST be given to concurrent (possibly unrelated) work at same location which might involve open tanks or other potential sources of hazardous atmospheres; additional precautions may be required as deemed appropriate by the Company's project inspector or supervisor.

All procedures MUST reflect adherence to Federal, State, and Company safety regulations and policies.

(12) Accident - Any instance of work-related personal injury or illness, or property damage, shall be promptly attended to, including immediate reporting to the Company's project inspector. The Contractor must furnish a written "Incident Report".

A000087

# EXHIBIT - C

ANY release to the environment of chemicals (or water contaminated with such), including but not limited to the products in the Company's custody and supplies provided or used by the Contract, SHALL require immediate and complete cleanup and reporting to the Company's project inspector. As required by law and/or regulatory agencies, and cleanup will be in accordance with relevant environmental regulations. The Contractor WILL BE responsible for such cleanup of any release he or his subcontractor may cause. Contractors SHALL make themselves aware of the methods and costs of such cleanup.

ALL damage to COMPANY'S equipment, piping, wiring, or other property or equipment that is inadvertently activated MUST be reported to COMPANY immediately. ALL debris, scrap, and oil spills incidental to work MUST be cleaned up each day or at such other times as may be designated by COMPANY representative. Contractor SHALL exercise "good housekeeping" in all areas at all times.

The Contractor SHALL keep the area in which they are working in a safe and secure manner at all times. At job completion, the area will be placed in the same or better condition than before the work began.

Excavations and other openings must be protected with adequate barricades and identified when necessary with electric lights or other devices approved by COMPANY representative.

The Contractor SHALL continuously maintain adequate protection of all works fabricated or constructed by Contractor from damage and shall protect the Company's property, and the property and persons of others, from injury or loss arising in connection with performance of the work. The Contractor SHALL, until final acceptance of his work, make good at his own expense any damage to such works from any source or cause whatever, except such as may be caused solely and directly by agents or employees of the Company.

(13)  Confined Spaces - A confined space is any enclosure NOT intended for continuous occupancy, with known or potential hazards, poor natural ventilation, and with a restricted means of entry and exit. Confined spaces may, therefore, include, but are not limited to: storage tanks, sump tanks, tank trucks, separators, vacuum trailers, rail cars, underground vaults (gate valve boxes), or any open top space of more than four feet in depth (such as pits and excavations); in which an accumulation of toxic contaminants, flammable vapors, physical hazards or any oxygen deficient of enriched atmosphere exists or may develop.

Contractor confined space entry procedures SHALL include in addition to other OSHA requirements the following:

For removal of covers from confined spaces and for work in confined spaces PRIOR to gas-freeing, i.e., less than 10% LEL, nonferrous tools, including hand tools, SHALL be used.

A000088

# EXHIBIT - C

Means of ventilation, including air-driven and/or Class I Division I electric-driven fans shall be used in accordance with current regulations and recommendations in confined space work.

Testing and documentation of confined space atmospheres for the presence and level of explosive vapors, the presence and concentration of toxic vapors (including, as appropriate, hydrocarbons, hydrogen sulfide, ammonia, and benzene), the presence and concentration of Tetra Ethyl Lead (TEL), and the oxygen level SHALL, be in accordance with OSHA requirements.

Contractor SHALL provide the following equipment or equivalent if confined space entry is required: **MSA 260 Combustible Gas and Oxygen Alarm System.**

Dragger sampling pump kit and appropriate detector tubes.

Lead-in-air analyzer kit

Hose-line type (with escape unit) air-supplied respirator or Self-contained Breathing Apparatus (MSA AND NIOSH OMTC- 1 9C or TC-13F approved, respectively)

Contractor SHALL meet all OSHA requirements for descent and retrieval of personnel from Confined Space Entry.

Any other equipment required to perform work within OSHA regulations SHALL be the Contractor responsibility to provide and maintain.

(14)     Parking will be assigned for Contractor's personnel by an authorized representative of COMPANY. The movement of cars and trucks inside diked area is PROHIBITED unless authorized by representative, and permitted with a vehicle entry permit. Contractor's personnel will be allowed only LIMITED ACCESS to the job site through the plant.

(15)     Employees of the Contractor are RESTRICTED to areas where they are performing work. All other building and operating areas are OUT-OF-BOUNDS.

(16)     Contractor SHALL be responsible for the proper conduct of his employees and the enforcement of these Safety Rules and Regulations as they pertain to all such employees who are on the premises of Orion Corporation.

(17)     The work will be done on a straight-time basis between the hours of 0730-1600 Monday through Friday. In the event that work is to be done outside of the above hours, COMPANY personnel MUST approve the work.

A000089

## EXHIBIT - C

(18)    Drug Testing for ALL Orion Corporation Contractors and subcontractors.

Purpose:

To have a uniform requirement on drug testing for all plant workers who are on Company premises regardless of whether they are contractor, or Sub-contractor's employees. These individuals will be required to comply with Orion's drug policy.

a.    All Contractors and Sub-Contractors who will be working at Orion Refining Corporation's plant WILL agree to have their employees tested for drugs. This will be a PREREQUISITE for ALL bids awarded. The Contractor/Sub-Contractor WILL have to sign an agreement to this fact BEFORE a bid is awarded.

b.    All Contractors/Sub-Contractors WILL provide documentation to COMPANY indicating that ALL, their employees working on site have been drug tested within the last six-(6) months.

c.    If these employees have not been tested for drugs, they may then utilize COMPANY'S facilities to provide this service at THEIR COST.

(19)    At Orion we have a CLEAN SHAVE policy.
Mustache and side burns are allowable SO LONG AS they
DO NOT interfere with a positive seal of a respirator facemask

(20)    Utility Hose and Couplings

a.    The RED hose we have been using with crow foot connections WILL be used for compressed air. It can also be used for water.

b.    N-50 BLUE hose with Thor couplings WILL be used for NITROGEN ONLY.

c.    L-81 BLACK hose with ball check couplings WILL be used for BREATHING AIR ONLY

d.    Inferno STEAM HOSE with steam hose fittings WILL be used for STEAM SERVICE ONLY

Hoses and fittings/couplings will only be used as explained above. Anyone switching fittings to use hoses otherwise will be severely reprimanded.

A000090

## EXHIBIT - C

(21) NO ONE WILL CONNECT TO ANY PLANT UTILITY; PLANT AIR; FIREWATER;
NITROGEN; STEAM; ETC., WITHOUT A SPECIFIC WORK PERMIT
AUTHORIZING THE UTILITIES USE.

SAFETY CHECK OUT POLICY

It is the policy of Orion Refining Corporation to maintain a safe, healthful, work environment for
all employees, contractors, and sub-contractors. To that end, the Company will act to eliminate
risks associated with unacceptable construction practices. No contractor, subcontractor, or
employee representative SHALL perform ANY work WITHOUT review of ALL applicable
COMPANY safety policies and procedures.

PRIOR to commencement of ANY construction activity, a safety meeting WILL be held between
contractor representatives and COMPANY personnel to discuss the scope of work to be
performed and all associated safety concern. Following this meeting, the COMPANY safety check
out policy form will be authorized by the general contractor and all participating sub-contractors.
This authorization indicates that ALL safety concerns have been addressed PRIOR to
construction.

Any violation of COMPANY safety policies and procedures may result in delay of construction
activity or termination of the contractual agreement. Any questions or concerns arising during the
construction period should be brought to the attention of the project engineer, safety manager, or
operations management personnel.

A000091

# EXHIBIT D

## MINIMUM INSURANCE REQUIREMENTS
### ORION REFINING CORPORATION

A.  EACH INSURANCE POLICY maintained by CONTRACTOR or approved subcontractor for Work performed under this Agreement, must be endorsed by underwriters naming OWNER as additional insured, and waive underwriters' rights of subrogation against OWNER, its subsidiaries and affiliated companies and their owners, co-owners, and joint ventures, if any, and their employees, officers, and agents.

B.  FAILURE TO SECURE the insurance coverage, or the failure to comply fully with any of the insurance provisions of this Agreement, or the failure to secure such endorsements on the policies as may be necessary to carry out the terms and provisions of this Agreement shall in no way act to relieve CONTRACTOR from the obligations of this Agreement, any provisions hereof to the contrary notwithstanding. In the event that liability for loss or damage is denied by the underwriters, in whole or in part, because of breach of said insurance by CONTRACTOR or for any other reason, or if CONTRACTOR fails to maintain any of the insurance herein required, CONTRACTOR shall hold harmless and indemnify OWNER, its joint interest owners, its subsidiaries and affiliated companies, their agents, employees, directors, officers, servants and insurers against all claims, demands, costs and expenses, including attorney's fees, which would otherwise be covered by said insurance.

C.  TO PROTECT OWNER against liability, loss, or expense arising from damage to property or injury to any person arising out of, in connection with or resulting from the Work provided for hereunder, CONTRACTOR shall, during the progress of the Work, carry, at its own expense on forms and in reliable insurance companies authorized to do business in the state or area in which the Work is to be performed hereunder, with minimum thirty (30) days notice of cancellation to OWNER, the following minimum insurance coverage:

(1)  Workmen's Compensation, U.S. Longshoreman's and Employer's Liability Insurance, in accordance with the statutory requirements of the state in which the Work is to be performed, and endorsed specifically to include the following:

(a)  Employer's Liability, including Occupational Disease coverage subject to a limit of liability of not less than $1,000,000; and
(b)  "Alternate Employer" endorsement.
(c)  "Jones Act", subject to $1,000,000 limit; and
(d)  "IN REM" endorsement.

(2)  Physical Damage insurance for loss of or damage to equipment and machinery used in the performance of the Work, including loss or damage during loading, unloading, and while in transit. Such coverage shall be on an all-risk basis or its equivalent subject to a limit of not less than 90% of the actual cash value at the time of loss

2/11/00

A000092

# EXHIBIT D
## MINIMUM INSURANCE REQUIREMENTS
### ORION REFINING CORPORATION

with any and all deductibles to be assumed by, for the account of, and at CONTRACTOR'S sole risk.

(3) Commercial General Liability insurance, with limits of liability of not less than the following:

(a) Bodily Injury and Property Damage - Any one occurrence, combined single limit $1,000,000; and such insurance shall include the following:
   (i) Premises and Completed Operation's Coverage;
   (ii) Contractual Liability, covering the liabilities assumed under this Agreement;
   (iii) Broad Form Property Damage Coverage;
   (iv) Explosion, collapse and underground hazard coverage;
   (v) Sudden and Accidental pollution coverage;
   (vii) "IN REM" endorsement; and
   If work is performed using any type of water craft,
   (viii) Watercraft Exclusion deleted; and
   If Work requires Contractor's use of a crane,
   (ix) Rigger's liability exclusion deleted

(4) Commercial Automobile insurance, with limits of liability of not less than the following:

(a) Bodily Injury and Property Damage - Any one occurrence, combined single limit $1,000,000. Such coverage shall include owned, hired, and non-owned vehicles.

(5) All Risk Builder's Risk insurance for loss of or damage to tangible property with a limit of $1,000,000 per occurrence.

(6) Umbrella Coverage in an amount which would result in an aggregate amount of coverage provided under each coverage described in (2) through (5) above of not less than $5,000,000.00 per occurrence.

(7) CERTIFICATES OF INSURANCE shall be supplied by CONTRACTOR prior to commencement of Work and shall evidence the naming of OWNER as additional insured as well as the waiver of subrogation in favor of OWNER, the thirty (30) day notice provision, the minimum insurance coverage and a certification that such coverage is primary coverage with all policy deductibles borne solely by CONTRACTOR.

2/11/00

A000093



# INTERSTATE SUPPLY

P.O. Box 1179  •  Shepherd, Texas 77371

**INDUSTRIAL SUPPLIES**

(877)365-2883 TOLL FREE
(936)365-2717 FAX#

TO: ORION REFINING CORPORATION

FROM:   MICHAEL SYRACUSE

# OF PAGES:  7/w cover

PHONE:    (985)764-4725

FAX:     (985-725-1667

ATTENTION:    TONY LANDRY

TONY,

THIS IS INTERSTATE SUPPLY RATE SHEET

EXHIBIT F -RATE SHEET

INTERSTATE SUPPLY

VII. SPECIAL CONDITIONS
     PARAGRAPH 3.

     SUBMITTED TO ORION ON FILE

PIPES  •  VALVES  •  FITTINGS  •  MILL SUPPLY

A000094

## RATES SCHEDULE

### PERSONNEL

JAN. 1, 2001

### HAZARDOUS/ NONHAZARDOUS/ OIL SPILL CLEANUP

| | |
|---|---|
| Project Manager | $400.00 Day |
| Health and Safety Administration | $ 45.00 Hr. |
| Transportation Coordinator | $ 40.00 Hr. |
| Mechanic | $ 28.00 Hr. |
| Supervisor | $ 32.00 Hr. |
| Foreman | $ 26.00 Hr. |
| Equipment Operator | $ 21.50 Hr. |
| Laborer | $ 20.00 Hr. |

A . (4) Hour Minimum Charge on all Labor
Labor is Only Chargable Gate to Gate for Orion Refining
Only.

## EQUIPMENT AND MATERIALS

| | |
|---|---|
| Automobile | $ 55.00 Day |
| Pick - up Truck | $ 55.00 Day |
| 4 - Wheel Drive Truck | $ 60.00 Day |
| Vacuum Truck (Wet Vac) w/Operator | $ 78.00 Hr. |
| 20' "G.U." Gobbler-Skimer Response Vessel | P.O.R |
| 16' John Boat w/25 H.P out Board | $160.00 Day |
| 18' Boom Trailer | $100.00 Day |
| 16' Equipment Trailer | $ 80.00 Day |

Marine Equipment is Furnished with Paddles and Life Jackets for our Employees.

| | |
|---|---|
| Hot Water Unit (High Pressure) | $375.00 Day |
| Trash Pump | $ 80.00 Day |
| Transfer Pump | $100.00 Day |
| 2" S/S Pump | $180.00 Day |
| 2" Air Dia Pump | $ 70.00 Day |
| Barrel Pump | $ 45.00 Day |
| 2" Discharge Hose | $ 15.00 Day Per 20' Length |
| 2" Suction | $ 15.00 Day Per 20' Length |
| 3" Discharge/ Suction Hose | $ 20.00 Day Ea. Per 20' Length |

## HEAVY EQUIPMENT (ON REQUEST)

| | |
|---|---|
| Fork Lift | |
| Cherry Picker | P.O.R. |
| Case 880 C Escavator or Equivalent | P.O.R. |
| Case 580 C Backhoe or Equivalent | P.O.R. |
| Case 1150 C Dozer or Equivalent | P.O.R. |
| Case 450 B Dozer or Equivalent | P.O.R. |
| Case Track hoe or Equivalent | P.O.R. |
| | P.O.R. |

*Mob - Demob Charges will Apply on all Heavy Equipment*

3/4 Air Hose                                         $ 9.00 Day
                                                     Per 50' Section
175 CFM Air Compressor                               $140.00 Day
                                                     Plus Fuel
Pressure Washer                                      $100.00 Day
Steam Cleaner/Pressure Washer(5000PSI)  $250.00 Day
All Containment Boom                                 P.O.R.
Absorbent Pads                                       P.O.R.

## MISCELLANEOUS TOOLS AND SUPPLIES

1/2" Poly Rope                                       $ 70.00 Roll
1/4" Poly Rope                                       $ 45.00 Roll
Rake                                                 $ 12.00 Job
Hoe                                                  $ 10.00 Job
Pitch Fork                                           $ 10.00 Job
Shovel                                               $ 10.00 Job
Squeegies                                            $ 10.00 Job
Cotton Wipes                                         $ 35.00 Bag
Visqueen                                             $ 70.00 Roll
Industrail Weed Eater                                $ 40.00 Day
18" Chain Saw                                        $ 30.00 Day
Sorbant Pads                                         $ 30.00 Bail
Sorbant Boom                                         $120.00 /Bag
                                                     80' in Each Bag
All Other Supplies Not Listed Above.  P.O.R.

A000098

## PROTECTIVE CLOTHING AND ACCESSORIES

| | |
|---|---|
| PPE Level "A" | P.O.R. |
| PPE Level "B" | $250.00 / Occurrence |
| PPE Level "C" | $ 70.00 /Occurrence |
| PPE Level "D" | $ 7.00  A Day / Man |
| | |
| Tyvex Treated Suits with Hoods | $ 10.00 Each |
| PVC Treated Tyvex Suits w/Hoods | $ 15.00 Each |
| Protective Clothing (Chemical Specific) | P.O.R. |
| Acid Suits (2 Piece with Hood) | $ 60.00 Day |
| Acid Suits (Incapsulated) | $140.00 Day |
| Acid Boots | $ 30.00 Ea. Pair (Replacement) |
| | |
| Acid Gloves | $ 6.00 Each Pair |
| Inner Protective or Cotton Gloves | $ 1.50 Each Pair |
| Full Face Respirator | $ 30.00 Day |
| Replacement Cartriges (Single Stage) | $ 5.50 Each |
| Replacement Cartriges (Double Stage) | $ 12.00 Each |
| Self Contained Breathing Air | P.O.R. |
| Cascade Air System | P.O.R. |

All Other Safety Supplies not Listed above P.O.R

A000099

**H**

United States Bankruptcy Court for the District of Delaware
In re: Orion Refining Corporation Debtor Michael G. Syracuse d/b/a Interstate Supply Company and Texas ICO, Inc.

Compressed Transcript and Word Index of:

# LESLIE COLLINS

**Taken August 5, 2004**

LEX *Scribe,* Inc.
4640 S. Carrollton Avenue, Suite 2A-5
New Orleans, Louisiana 70119
Phone (504) 488-8400

A000100

Case 1:06-cv-00536-SLR     Document 4 call™ Filed 03/28/2007     Page 3 of 28

Page 105

1  of it was broke down into different sections.
2  That's where he come up with the 17 different
3  areas. Some of it could have been right
4  next-door to it.
5      Q. It's a little hard to get a sense
6  from just this map, but can you describe how
7  large -- I mean are these large parcels of
8  land, these 17 areas?
9      A. The Auction Yard is, the New Sarpy
10  Yard is, and the North 40 is.
11     Q. And was there a lot of material in
12  these areas?
13     A. In the North 40, in the Auction
14  Yard, in the New Sarpy, yes.
15     Q. Were there some areas in which there
16  was less material?
17     A. Yes.
18     Q. And I understand that there are --
19  were different types of materials that he was
20  to clean, remove. Were the materials broken
21  out by type in the various areas or in each of
22  those areas were there -- were all of the
23  various materials?
24     A. Oh. You could have some of
25  anything. You could have compressors, you

Page 106

1  could have valves, you could have pipes, you
2  could have -- it was like that.
3      Q. So there weren't -- the material
4  wasn't broken out by type?
5      A. No. No, sir.
6      Q. How long -- do you know how long
7  this material had been sitting at the
8  refinery?
9      A. Some of it probably been sitting
10  there 20 years.
11     Q. What type of material do you think
12  might have been sitting there for 20 years?
13     A. You had vessels, you had old
14  compressors, exchangers, some vessels, beams,
15  stuff like that.
16     Q. Do you know what the -- or whether
17  these are the types of -- well, let me
18  rephrase that. Was there other material that
19  was less old?
20     A. Well, some of it was brought there
21  it was probably older than some that we had
22  there but, I mean, it was -- to me it was all
23  scrap. It wasn't safe to use a lot of it.
24     Q. Was there rust on a lot of these
25  materials?

Page 107

1      A. Yes, sir.
2      Q. Were any of these materials in
3  nonworking order?
4      A. Yes.
5      Q. With respect to those types of
6  materials, could they be put back into the
7  operations of the refinery?
8          MR. WILSON:
9              Objection to form.
10         THE WITNESS:
11             I doubt it.
12 BY MR. BRIGGS:
13     Q. What generally is -- and I
14  understand there are all types of different
15  materials ranging from large vessels to small
16  fittings, pipes, et cetera.
17         What would have been involved in the
18  process of moving some of this stuff out? In
19  other words, would you need large cranes or
20  could you do it with like a flatbed truck, did
21  you need a lot of people to do it?
22     A. You had -- you had to have cranes to
23  do it.
24     Q. Did Mr. Syracuse have a crane?
25     A. No.

Page 108

1      Q. Did you -- would you need a lot of
2  people for like lifting or moving various
3  objects?
4      A. Well, you need four people; two on
5  the ground, two on the thing to rig and unrig.
6      Q. But that would involve using a
7  crane?
8      A. Yes.
9      Q. What would be involved in moving the
10  larger vessels and tanks? Could you move
11  those with a crane?
12     A. Yes.
13     Q. If you didn't have a crane, could
14  you cut them into smaller pieces and move them
15  that way?
16     A. Yes.
17     Q. Did Mr. Syracuse have the equipment
18  to cut up any of these vessels?
19         MR. WILSON:
20             Objection to form. Lack of
21         foundation.
22         THE WITNESS:
23             Yeah, he could have cut some of
24         them up.
25 BY MR. BRIGGS:

A000101

Case 1:06-cv-00536-SLR    Document 14-9    Filed 03/28/2007    Page 4 of 5

Page 117

1 hired a contractor to do that.

2    Q. Do you know who that contractor was?

3    A. It was Terry -- I don't recall what
4 the last name is. It was his name. I forget
5 what his last name was.

6    Q. Were you involved directly in the
7 testing of the tanks?

8    A. No, sir.

9    Q. Did -- and that was environmental
10 that did that?

11    A. Yes.

12    Q. Did they communicate to you when the
13 testing was complete?

14    A. Yes.

15    Q. So after they tested a particular
16 vessel, would they tell you whether or not it
17 was clean or needed to be cleaned?

18    A. Yeah. They'd test it before it was
19 cleaned and tested it after it was cleaned,
20 and then they would say it was good to be cut.

21    Q. And as of approximately the fall of
22 2001, do you know were there a number of
23 vessels and tanks that had been cleaned and
24 released to Mr. Syracuse?

25    A. Yes.

Page 118

1    Q. Did Mr. Syracuse ever remove any of
2 those tanks or vessels?

3    A. I think he might have moved a few of
4 them, but in Section 3 he didn't move none of
5 them.

6    Q. And was Section 3 the one with the
7 approximately 40 or so?

8    A. Uh-huh. Right.

9    Q. Do you know of -- as of
10 approximately fall of 2001 were most or all of
11 the tanks and vessels in Section 3 cleaned and
12 released to Mr. Syracuse?

13    A. Yes.

14    Q. All of them?

15    A. Not all of them.

16    Q. Most of them?

17    A. Most of them.

18    Q. Oh. What is a sea-can?

19    A. It's a big container that's got
20 doors on the end of it -- you get them 20-foot
21 long, 40-foot long -- that you stock material
22 in.

23    Q. You store material, the material
24 that he was to clean or --

25    A. Yeah. He could -- anything you want

Page 119

1 to put in there, just to keep it out of the
2 weather.

3    Q. Would you put like equipment or
4 something in there, tools?

5    A. Yes. Yes.

6    Q. Okay. I just wasn't sure.

7    A. I was looking. This right here --
8 let's see. You got another one like this?

9    Q. And I believe you --

10    A. This, that's a sea-can right there.

11    Q. Were the sea-cans -- who did the
12 sea-cans belong to?

13    A. Most of them belonged to Mike.

14    MR. WILSON:

15       Objection to form.

16    THE WITNESS:

17       Most of them belonged to Mike.

18 BY MR. BRIGGS:

19    Q. Did Mr. Syracuse bring them to the
20 refinery?

21    A. No. That was all included in the
22 scrap.

23    Q. As of approximately fall of 2001, do
24 you know if all of the testing was done?

25    MR. WILSON:

Page 120

1       Objection to form.

2    THE WITNESS:

3       Not all of it, no.

4 BY MR. BRIGGS:

5    Q. So there was still some testing --

6    A. Oh, yes.

7    Q. -- that needed to be done? When
8 Mr. Syracuse would show up in the mornings
9 and -- to begin work and safety would come
10 down to issue the work permit, was there any
11 inspection that safety would do of the areas
12 that he wanted to go to work in before they'd
13 issue a work permit?

14    A. Sometimes, yeah.

15    Q. And were you a part of those
16 inspections? Did you go around with --

17    A. Sometimes, yes.

18    Q. And what types of things were -- was
19 safety looking at?

20    A. They was looking to see if they had
21 any PPL in the tanks, if they was open,
22 secured it right and stuff like that with the
23 gun -- with a machine.

24    Q. Were these in the operational areas
25 of the refinery or --

A000102

Page 125

1  A. I don't.
2  Q. In the spring, winter/spring of
3  2002, I believe you had testified earlier that
4  around Christmas of '01 Mr. Syracuse had gone
5  on vacation and stopped working at the
6  refinery. Do you recall a time after that
7  that Mr. Syracuse came back to work?
8  A. Yeah. After the Christmas holidays
9  he came back.
10  Q. Was he coming back on a daily basis?
11  A. Yeah.
12  Q. And was he working at that point?
13  A. Yeah.
14  Q. And was he making progress in, you
15  know, recleaning the areas and removing some
16  material?
17  A. Yes.
18  Q. Do you know for approximately how
19  long after the Christmas holiday Mr. Syracuse
20  continued to work at the refinery?
21  A. Up until his contract run out.
22  Q. Do you know if that was sometime in
23  the spring of 2000 -- do you recall?
24  A. No, sir. I don't.
25  Q. Do you know if there were any

Page 126

1  discussions or were you involved -- let me
2  rephrase that. Were you involved in any
3  discussions with Mr. Syracuse and anyone at
4  Orion concerning extending Mr. Syracuse's
5  contract?
6  A. No, sir. I wasn't involved in it.
7  Q. Do you know if there were any such
8  discussions?
9  A. I had heard that they was -- they
10  offered him a contract, to extend his
11  contract.
12  Q. That Orion had offered to extend
13  Mr. Syracuse's contract?
14  A. Yes.
15  MR. WILSON:
16  Objection to form.
17  THE WITNESS:
18  Yes.
19  BY MR. BRIGGS:
20  Q. Do you know whether or not
21  Mr. Syracuse accepted that offer?
22  A. I don't think so.
23  Q. Do you know if Mr. Syracuse ever
24  proposed extending his contract or proposed a
25  plan for continuing to clean up after the

Page 127

1  expiration of his contract?
2  A. I hadn't heard no one say so.
3  Q. Did Mr. Syracuse ever identify to
4  you that there were certain -- or say to you
5  that there were certain areas in which it was
6  a priority for him to get into?
7  A. No, he didn't never tell me it was a
8  priority to get into. I think what he was
9  trying to do is try to keep enough going that
10  he could keep his job going.
11  Q. What do you mean keep enough going?
12  A. Well, you have to get materials and
13  stuff out to make -- before you can make your
14  payrolls and stuff like that and rent your
15  equipment.
16  Q. Generally at the time that
17  Mr. Syracuse ceased or stopped showing up to
18  work at the refinery, can you just give me a
19  ballpark of generally the amount of work that
20  remained to be done? Was it 50 percent,
21  30 percent, 100 percent?
22  A. It probably -- to be -- you mean
23  that needed to be completed or was completed?
24  Q. Let's say was completed.
25  A. Probably about 40 percent.

Page 128

1  Q. So he had cleaned about 40 percent
2  of the areas?
3  A. Yeah. Between 30 and 40.
4  Q. And would you also say that he had
5  removed about 30 to 40 percent of the
6  materials?
7  A. Yes.
8  Q. Do you know if other than J.W.A.
9  Mr. Syracuse ever had discussions with any
10  other contractors concerning cutting up of
11  vessels?
12  A. No, sir. He's the only one that I
13  can recall.
14  Q. I'm going to hand you what has
15  previously been marked as Orion Exhibit 9 --
16  or 19. Do you recognize that document?
17  A. Yes.
18  Q. Can you tell us what that document
19  is?
20  A. That's the -- I think this is mostly
21  the tanks and stuff that's in Section 3, Alky,
22  the New Sarpy area.
23  Q. And are those tanks that need to be
24  tested?
25  A. Yeah. And be cleaned, yes.

A000103

I

9E0551B
WARREN SQUIRES  JULY 9, 2004

```
              IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE DISTRICT OF DELAWARE

IN RE:                          )
ORION REFINING CORPORATION      )    Chapter 11
           Debtor.              )
_____ )   Case No. 03-1483 (CGC)
                                )
MICHAEL G. SYRACUSE d/b/a        )
INTERSTATE SUPPLY COMPANY        )
and TEXAS ICO, Inc.,             )
                                )
         Plaintiffs,             )
                                )
    vs.                          )   Adv. Proc. No. 03-53030
                                )
ORION REFINING CORPORATION,      )
                                )
         Defendant.              )
_____ )
```

DEPOSITION OF

WARREN SQUIRES

CLINTON, IOWA

JULY 9, 2004

9:28 a.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
330 North Brand Boulevard, Suite 250
Glendale, California  91203
(818) 551-7300

REPORTED BY:  Lucinda Winslow-Haidsiak, CSR, RPR, CRR

FILE NO:  9E0551B

1  getting more conversations about, you know, getting
2  somebody in there and to clean the place up.  Probably,
3  what, 2000, something like that, sometime in 2000.
4      Q.  Approximately, fall of 2000 people began
5  to -- Orion began talking to you about wanting to
6  get --
7      A.  Well, it was probably earlier than that.  We
8  had some internal discussions.
9      Q.  Who did you have those discussions with?
10     A.  My boss, Troy Champeaux, and Tony Landry,
11  Dave Williams.
12     Q.  What did they tell you about wanting to clean
13  up the areas of the refinery?
14     MR. RAPIER:  I'm going to object on the basis
15  of hearsay.
16     Q.  (BY MR. BRIGGS)  You can answer.
17     A.  Okay.  What they told me about the clean-up,
18  about the contractor or the whole process?
19     Q.  Just to put it in context, I believe you said
20  in -- sometime in 2000, your supervisors at Orion, or
21  people at Orion, began expressing to you that they
22  wanted to bring someone in to clean-up certain areas of
23  the refinery.
24     A.  Right.
25     Q.  I just want to get an understanding of the

Page 6

1  conversations that you had with them concerning cleaning
2  up the refinery.
3      A.  Well, I mean we had talked about the type of
4  contractor that, you know, we wanted to come into the
5  refinery and clean it up; you know, whether we wanted to
6  get a scrap metal contractor; did we want to get a
7  general contractor, you know, the type that we've --
8  that does other work in the plant.
9      Also, you know, we had talked about, you
10  know, what materials we had out there, you know.  I
11  mean, it was just a huge facility of junk, and we
12  were -- we had some discussions about the types of
13  materials that we had to get rid of, not anything in any
14  real detail, broad, but other than that, that was the
15  earlier discussions, earlier-stage discussions, I guess,
16  that we had.
17     Q.  Did there come a time when Orion decided what
18  type of contractor it wanted to come in?
19     A.  Yes, yes.  That was -- Tony Landry and Dave
20  Williams had had experience with a Syracuse-type
21  contractor, or I don't even remember the name of the
22  company now but his company.  I had not had -- you know,
23  I have managed general turn-around-project-type
24  contractors, but they had had familiarity with guys like
25  the companies like his so they were leaning towards that

Page 7

1  direction, because they felt like that he had the
2  connections, I guess, to facilitate the moving of the
3  merchandise off of the place, that was the intent, where
4  other contractors that we deal with, they don't have
5  those kind of -- we didn't think they had those kind of
6  connections.
7      Q.  At some point prior to engaging any
8  contractor, did anyone at Orion go through and identify
9  the materials that they wanted to remove or the types of
10  materials that they wanted to remove?
11     A.  To what level of detail?  Did we write down
12  on a piece of paper everything that we had in the plant,
13  to my knowledge, no.
14     Q.  Did you or anyone at Orion identify,
15  generally, the types of materials?
16     A.  Yes, yes.  We had vessels, we had electrical,
17  we had, you know, piping yard.  Yes, we knew and had
18  some feel for what we had there in front of us.
19     Q.  Was this material that was being used in any
20  way by Orion?
21     A.  Not at the time, no.  It was just junk.
22     Q.  How did Orion go about engaging
23  Mr. Syracuse's company, and we can break that down a
24  little bit if you want.
25     MR. RAPIER:  I'm going to object to the form

Page 8

1  of the question.  It presumes he has any knowledge of
2  Orion's engaging and presumes the fact that he has some
3  knowledge of that issue.
4      Q.  (BY MR. BRIGGS)  Well, we can step back.  Do
5  you have an understanding of how --
6      A.  Yes, I read the contract that was written,
7  and I wasn't involved in the contractual negotiations,
8  but I was involved in some of the discussions that were
9  taking place between Orion and Syracuse.
10     Q.  Discussions prior to entering into the
11  contract or after entering into the contract?
12     A.  After.
13     Q.  Do you have any knowledge concerning how
14  either Orion contacted Mr. Syracuse's company or --
15     A.  No, no, I don't know who contacted who.
16     (A brief discussion was held off the record.)
17     Q.  (BY MR. BRIGGS)  I'm going to hand you what
18  has been previously marked as Orion Exhibit 1 and 1A,
19  and if you could just take a second to look over that
20  document, and I will ask you some questions about it,
21  and you can tell me if you are familiar with that
22  document.
23     A.  Man, this stuff is -- it has been a while
24  since I've looked at it.
25     Yes.

Page 9

3 (Pages 6 to 9)

9E0551B

**WARREN SQUIRES   JULY 9, 2004**

1    Q. Can you tell me what this document is?
2    A. This is our formal contract with Syracuse's
3 company.
4    Q. If I could draw your attention to on the
5 first page, Section 2.A, and if you could just read over
6 that first part of that paragraph.
7    A. Uh-huh (affirmative response).
8    Q. Did you have an understanding of what Orion
9 wanted to accomplish with this contract?
10    MR. RAPIER: I'm going to object to the form
11 of the question. The witness has already stated he had
12 no input in the drafting or the negotiations for the
13 contract.
14    Q. (BY MR. BRIGGS) You can answer.
15    A. Yeah, I understood what we wanted.
16    Q. What was that?
17    A. We wanted to have all of the materials —
18 surplus materials removed from the plant, and then after
19 the surplus materials were removed, the area was
20 supposed to have been cleaned up. In other words, there
21 was value materials, there were nonvalue materials.
22 Remove the value materials, clean up the nonvalue
23 materials, which is garbage and, you know, left over
24 wood, stuff like that, crating that stuff was sitting.
25    Q. If I could draw your attention on the second

Page 10

1    A. Yes, it is.
2    Q. Now, this map has certain identifying numbers
3 on here that are circled, and if you look in the lower,
4 right-hand corner, there is one marked as 10 —
5 identified as 10. Are these numbers the — do they
6 correspond to the areas of the refinery that Orion
7 wanted cleaned?
8    A. Yes, it looks — auction yard.
9    (Interruption by phone.)
10    Sorry about that.
11    Q. No problem.
12    On the upper, left-hand side of the map —
13    A. I'm —
14    Q. Take your time. Do you need to go off the
15 record a moment?
16    A. Okay.
17    Q. On the upper, left-hand side of the map,
18 there are 17 areas listed and identified by name, first
19 one being West Plant Tank Farm, the last one being 404.
20 Do these correspond to the areas on the map identified
21 by the circled numbers?
22    A. Yes, they do.
23    Q. When did you first become involved in any
24 discussions with Syracuse or his company concerning the
25 clean-up of the refinery?

Page 12

1 page, Section 3A, it reads, "The work under this
2 agreement shall commence on April 24, 2001, and shall
3 take approximately 12 months to complete, no later than
4 March 31, 2002."
5    Do you know if Orion had anticipated that it
6 would take no longer than a year to clean up the
7 refinery?
8    A. I was under the impression that it would not
9 take more than a year. Now, how this year was
10 determined, I wasn't — I wasn't involved in that, so I
11 didn't — I wasn't part of setting the timeline.
12    Q. Were there — you know, were there more than
13 one areas of the refinery that were to be cleaned, or
14 was it one large area?
15    A. No, there were multiple areas.
16    Q. I will draw your attention back to the first
17 page under Section 2A, refers to a drawing identified as
18 Drawing No. 004-003-1-272?
19    A. Yes.
20    Q. I'm going to hand the witness what has been
21 premarked as Orion Exhibit 2. Can you tell me what that
22 document is?
23    A. It is a plot plan of the plant.
24    Q. Do you know, is that the drawing that is
25 referenced in the contract?

Page 11

1    A. When I was assigned the warehouse, when I
2 took over the warehouse, because Walter Landry was the
3 supervisor over this project, so when I — Walter worked
4 under me. When he was reassigned under me, that's when
5 I got involved.
6    Q. Do you remember approximately when that was?
7    A. Oh, I don't know. I don't recall exactly the
8 date and the time.
9    Q. Do you know if it was, approximately, around
10 when the contract was entered into, or was it six months
11 after that?
12    A. No. It was very shortly after they had —
13 that they went into the contract. It was very shortly
14 after. Exactly what the timing was, I'm not sure.
15    Q. Well, if you look back at Exhibit 1 on
16 Page 7 — at the bottom of the page you can see there
17 are Page 1 of 7, and 6 of 7?
18    A. Yes.
19    Q. Pages — I think it is the — okay.
20 Actually, if you turn to the next page, it has two
21 signatures on it; one being a signature that appears to
22 be RS Rayzor, and the other appears to be Michael
23 Syracuse; and the date under Michael Syracuse's
24 signature is May 1, 2001.
25    Does that refresh your recollection at all of

Page 13

(Pages 10 to 13)

A000106

1      A. We didn't treat Syracuse's company any
2   different than we would have any other company that we
3   have in our plant -- in our facility. You know,
4   these -- the personnel that come into a plant when they
5   are scheduled to work in a certain area, they don't roam
6   all over the refinery. We just can't allow that because
7   of safety, operational issues.
8         So Syracuse was granted access to certain
9   areas because we had other work going on in other areas.
10   We had operational issues that were -- always from
11   day-to-day there were things that we were trying to
12   control, that Alliant and their staff were trying to
13   control. He, and other companies like him, you know, we
14   had to know where they were.
15      Q. With respect to Syracuse's company in
16   particular, in order for them to have access to an area,
17   did Orion have to approve on a daily basis or on any
18   regular basis access to those areas?
19      A. Yes, yes. Yes, that's true. He had to have
20   a work permit.
21      Q. Were the work permits issued on a daily
22   basis, a weekly basis, or otherwise?
23      A. Daily.
24      Q. How were the work permits issued? In other
25   words, were they issued in advance and provided

Page 18

1   to Mr. Syracuse by Orion?
2      A. I don't know. I wasn't involved in that
3   work-permit issue. Assuming that it is like any other
4   work permit, it is daily. Every morning they issue a
5   work permit.
6      Q. Do the contractors, you know, with whom you
7   have knowledge concerning work -- issuing of work
8   permits, would they request in the morning a work
9   permit?
10      A. Yes.
11      Q. Who would they request that work permit from?
12      A. Either operations or a company contact.
13      Q. Do you know -- not just at this point in time
14   but at any point in time, during the course of
15   Mr. Syracuse's work at the refinery, do you have an
16   understanding of the process by which he was issued
17   work permits in particular?
18      A. Vaguely.
19      Q. I'm going to hand you what has been
20   previously marked as Orion Exhibit 2 -- or, I'm sorry,
21   4. If you would, just take a moment to look through
22   that and tell me if you recognize this document.
23      A. Yes, okay.
24      Q. Can you tell me what this document is?
25      A. It was just a list of the areas that -- you

Page 19

1   know, that we had contracted to clean, materials that
2   were expected to be cleaned, and any items there that we
3   didn't want to be removed.
4      Q. Who put together this list? Who drafted this
5   list?
6      A. This was put together by Walter Landry.
7      Q. Do you know, was this shared with
8   Mr. Syracuse at any point?
9      A. Yes, it was.
10      Q. Do you know, did Mr. Syracuse have any input
11   into developing this list?
12      A. I don't know that.
13      Q. If you look under the -- well, the first
14   column has numbers, and then the second column seems
15   to -- it has entries that vary from the names -- what
16   appear to be the names of certain areas to at the very
17   top it just identifies welding machines and selected
18   equipment.
19         Do you know was this column intended to
20   identify the areas to be cleaned?
21      A. Yes, because, if you notice, on the
22   right-hand side of the page, it actually gives the
23   location of where these things were at:  material
24   located at Auction Yard, NS Warehouse, West Plant, and
25   East Plant Laydown Yard. So, in other words, we had

Page 20

1   some welding machines in the plant that were located in
2   these varies areas.
3      Q. Under Column 3, third column in from the
4   left, it seems to identify the -- what was to be removed
5   or how much was to be removed, and the first entry under
6   No. 1 is, "Remove all purchased material," and does that
7   refer just to the welding machines and selected
8   equipment?
9      A. Yes.
10      Q. Just moving down a line, other entries say,
11   "Remove all material." Does that mean that Mr. Syracuse
12   was to remove all of the --
13      A. Material in that yard --
14      Q. Okay.
15      A. -- in that location.
16      Q. And, then, moving over to the sixth column
17   where it says "duration" --
18      A. Uh-huh (affirmative response).
19      Q. -- now the first entry -- the first one is
20   the only one with an entry. It says, "Five days." Was
21   that -- do you know if that was the amount of time it
22   took Mr. Syracuse to clean, or if that was the amount of
23   time it was anticipated to take him to clean?
24      A. I don't know that.
25      Q. The very next column over says, "Percent,"

Page 21

(Pages 18 to 21)

## WARREN SQUIRES  JULY 9, 2004

1    Q. At this point in time, were you having any
2  meetings with Mr. Syracuse to discuss the status of his
3  work at the refinery?
4    A. By May I was involved with Syracuse, yes. We
5  were having meetings. I didn't have meetings with him
6  every week.
7    Q. How often did you meet with Mr. Syracuse?
8    A. On an as-need basis.
9    Q. Would you call these meetings, or would
10  Mr. Syracuse call them, or somebody else?
11    A. The first as-need meeting that we had, I
12  called it. There were times that he called me on the
13  phone and had conversations with me. He didn't
14  necessarily call a meeting, you know, he would just call
15  me on the phone.
16    Q. When he called you on the phone, was it just
17  to discuss the status of his work, or was it to discuss
18  where he was going to be working next, or anything else?
19    A. You know, just problem areas that he felt was
20  a problem for him.
21    Q. What were some of the problems that he
22  expressed to you in, approximately, May of 2001?
23    A. "There were other areas in the plant that I
24  need to work," and, you know, "I've" — he gave me a
25  scenario about his company's financial needs; and so we

Page 26

1  that was extracted from here. I'm kind of getting
2  ahead, and I don't know if you even have that paperwork.
3    Q. Yes, we will get to that.
4    A. Okay. Do you want me to continue?
5    Q. Actually, you can finish your answer.
6    A. Okay.. After that meeting, okay, we — I,
7  personally, okay, granted Mike more lenient access to
8  some of the other locations. So, in other words, I gave
9  him the opportunity to cherry pick, based on — based on
10  areas — I was not able to give him just free reign of
11  the plant. We restricted him to more than just one
12  location.
13    We were allowing him in more than one, and he
14  chose those locations, and a schedule that we put
15  together reflected that. He actually signed it. I
16  don't know where that — I don't know whatever happened
17  to that one, but there was a schedule that he and I both
18  signed.
19    Q. I'm going to hand you what has been
20  previously marked as Orion Exhibit 11, and,
21  unfortunately, I do not have a color copy of that. I
22  believe it was — there were certain colors in there —
23  blue, red, black — at the time.
24    A. Yes.
25    Q. But is that the schedule you are referring

Page 28

1  had conversations about him telling me that, you know,
2  he has to be able to pay his employees, and, you know,
3  "I need to" — "I need to move in some of these other
4  areas. Can't keep operating this way," you know, that
5  kind of stuff, so.
6    Q. Do you know why or did he express to you why
7  he needed to move into other areas in order to pay his
8  employees?
9    A. He wanted to cherry pick the material.
10  That's what we kind of — meaning myself and the staff
11  that were working with me — for me — we sensed that he
12  wanted to just take out the — just remove the valued
13  materials, not the nonvalued materials.
14    Q. Did Orion have a view as to whether or not
15  Orion would allow him to go into different areas and
16  remove value materials?
17    A. At first, we were very restrictive to keeping
18  him focused to where he was going to remove all valued
19  and nonvalued before we would allow him to move to
20  another location.
21    I had a meeting with Syracuse, Walter Landry,
22  and myself in Mike Syracuse's office, and we laid out a
23  schedule. This is the schedule. I don't know — it
24  looks like it has been folded up and copied, but there
25  was a schedule that was done that was an Excel schedule

Page 27

1  to?
2    A. Yes, it is. Now, he signed this schedule.
3  It doesn't show it here, but — this copy doesn't show
4  his signature on it, but he actually signed — he and I
5  signed it in his office.
6    Q. Who put together this schedule, initially?
7    A. Mike Syracuse, Walter Landry, and myself.
8  Mike — and Mike, understanding that we could not give
9  him free access to the whole plant, knew that he would
10  be restricted to a couple of areas, two or three areas
11  at a time. We were giving more leniency within those
12  two or three areas, and as soon as he finished one, he
13  would open up another one so that way he would always
14  have more than one area that he could move into.
15    Q. Did Mr. Syracuse choose the various areas
16  into which he would have access to at one time?
17    A. He chose the areas. He was the driver on
18  choosing those areas.
19    Q. Does this schedule, which is Orion
20  Exhibit 11, does this reflect the schedule that you had
21  agreed upon with Mr. Syracuse?
22    A. As far as my knowledge, yes, it looks like it
23  is the schedule.
24    Q. If you look at the very top, it has what
25  appear to be dates, months and then days underneath, and

Page 29

(Pages 26 to 29)

9E0551B
## WARREN SQUIRES  JULY 9, 2004

above those it has numbers ranging from 5 to 255 at the very end.

Do those denote -- do you know if those numbers at the top correspond to the number of days that it was anticipated Mr. Syracuse would be working in any particular area?

MR. RAPIER:  I'm going to object to the form of the question, leading.

A. Actually, I don't understand the question.

Q. (BY MR. BRIGGS) That's fine. Let me back up.

In the center of the page, there are various -- what are on my copy -- black lines?

A. Yeah. That is representative of the time duration that he is going to be working in those areas.

Q. Does the beginning of the line to the left, do you know what that --

A. That's the start date, that's his start date.

Q. Just taking as an example, I believe it is No. 3, East Plant Triangle -- it is a little hard to read on my copy, may be 13 -- at the very top or under the East Plant Triangle, there are various categories of what appear to be materials; the first one being pipe, underneath that vessels, scrap, construction material, and clean-up.

Page 30

1    A. Absolutely, in his office.
2    Q. The very top right there is an entry that
3  reads, "As of 6-18-01." Do you know if this was -- if
4  these entries were made as of that date?
5    A. Yes.
6    Q. Now, some of the entries appear to predate or
7  work appears to have begun before June 18, 2001. Do you
8  know, was Mr. Syracuse doing work in any of these areas
9  at that time?
10    A. He was supposed to be.  He was supposed to be
11  working in those areas.
12    Q. Do you know if he was working in those areas?
13    A. I don't know.
14    Q. As of, approximately, June -- middle of June,
15  2001, do you know what the status of the overall
16  progress of Mr. Syracuse's work was in terms of cleaning
17  up the various areas of the refinery?
18    A. He was having a problem.  When I got
19  involved, he was -- his staffing levels were not
20  appropriate.
21    Q. What do you mean by that?
22    A. I mean, he only had he and his family and a
23  couple of other people, so you can't clean up, you know
24  a thousand something -- a couple of thousand acres of
25  materials with just 18-wheeler loads full with minimal

Page 32

1    Do you know what those entries correspond to?
2    A. That's representative of -- that's the time
3  duration that it is going to take -- that Mike agreed
4  that he would perform that removal of that type of
5  material.
6    Q. So just as an example, taking the first entry
7  under East Plant Triangle, which is pipe, the black
8  line, on my copy, begins, approximately, June 10th or
9  between June 10th and June 17th.  Does that mean that
10  that was the date that Mr. Syracuse was to begin working
11  on cleaning up the pipe in the East Plant Triangle area?
12    A. Yes, that's what it means.
13    Q. The line then extends out through July,
14  approximately, 22nd, it looks like.  Does that
15  correspond to the number or the amount of time it was
16  anticipated that it would take Mr. Syracuse to clean the
17  pipe out of the East Plant Triangle area?
18    A. That's true, yes.
19    Q. Do you know who determined the amount of
20  time -- anticipated amount of time it would take to
21  clean out that pipe?
22    A. Yes, Mike Syracuse.
23    Q. So is it your understanding that all of these
24  entries reflecting anticipated duration of particular
25  projects was determined by Mr. Syracuse?

Page 31

1  folks.  You know, it takes -- it was a big job.  It is a
2  huge job.  Okay?
3    It is probably as large of a job as any other
4  major work that we do in the plant.  You know, it was --
5  just due to sheer magnitude, it was a sizable job, and
6  he didn't appear to be staffing appropriately.  So we
7  were constantly having conversations with him about the
8  staffing levels, you know, "Mike, you are not going to
9  get done with five people," you know.
10    Q. Do you know, did Mr. Syracuse have any
11  subcontractors or other contractors working for him?
12    A. Yes, he did.
13    Q. Do you know who those were?
14    A. J&S was supplying him -- started off
15  supplying him labor, and he had another subcontractor
16  that we knew, or that eventually we knew that this
17  gentleman was coming in to cut up the vessels, and that
18  was -- what's the name of that company?  Oh, I can't
19  even think of it now.
20    Q. If I say J&W does that refresh your
21  recollection?
22    A. J&W, yeah.
23    Q. Do you know, did Mr. Syracuse's company have
24  the ability to cut up any of the material that was in
25  the refinery?

Page 33

9 (Pages 30 to 33)

A000109

9E0551B

WARREN SQUIRES  JULY 9, 2004

1      MR. RAPIER: I'm going to object. It calls
2  for speculation.
3          Q. (BY MR. BRIGGS) You can answer.
4      A. No, no. He didn't have the expertise to do
5  that.
6          Q. To --
7      A. Just cut scrap, no.
8          Q. Do you know if that was why Mr. Syracuse
9  brought in J&W?
10         MR. RAPIER: I'm going to object. It calls
11 for speculation and opinion. He has no way of knowing
12 what -- why Mr. Syracuse would have hired any
13 contractor. He has no knowledge of Mr. Syracuse's
14 thought process.
15         Q. (BY MR. BRIGGS) You can answer.
16     A. He brought in J&W because he didn't have the
17 expertise.
18         Q. Okay.
19     A. He hired the expertise.
20         Q. Do you know, was this schedule updated
21 periodically?
22     A. Yes, it was.
23         Q. How was it determined, or who determined the
24 updates that would be entered?
25     A. Between Walter, Mike Syracuse, and Leslie

Page 34

1      MR. BRIGGS: Let the record reflect that
2  Mr. Squires was pointing to Orion Exhibit 11.
3      A. (CONTINUING) Yeah, this was -- Orion
4  Exhibit 11 was our informal copy. This exhibit --
5          Q. 12?
6      A. -- 12 is our formal version.
7          Q. If you look down under Area 13 East Plant
8  Triangle -- it is under the entry pipe. There is --
9  next to that there is an entry that reads, "75 percent
10 complete." Do you have an understanding of what that
11 means?
12     A. That means he has removed 75 percent of the
13 pipe.
14         Q. There are various other percentage entries
15 going down to Area No. 14, Dehy Road?
16     A. Uh-huh, Dehy Road.
17         Q. Under pipe it says, "75 percent complete"?
18     A. Yes. That means he has removed, you know,
19 25 percent of the pipe in Dehy Road, 25 percent of
20 construction materials.
21         Q. Do all of the percentage entries reflect that
22 in those particular areas Mr. Syracuse was complete to
23 whatever that percentage entry is?
24     A. Yes.
25         Q. If you flip back to about the fourth page in

Page 36

1  Collins.
2          Q. Would Orion, either through Walter Landry,
3  Leslie Collins, or someone else, inspect the areas that
4  Mr. Syracuse had cleaned?
5      A. Leslie Collins was responsible for doing
6  that.
7          Q. So Mr. Collins would then confirm that the
8  progress that Mr. Syracuse had made --
9      A. Right, yes.
10         Q. Were the updates based on information
11 provided by Mr. Syracuse?
12     A. I was under the impression, yes.
13         Q. Now, did there come a point in time when --
14 well, actually, let me back up.
15         Let me hand you what has been previously
16 marked as Orion Exhibit 12. If you want to, take a
17 moment to look at that document and tell me what it is.
18     A. Actually, this is what I used to. It is
19 what I was looking for. This is a formal copy.
20         Q. If you look down -- my copy begins so that
21 Area No. 10, North 40 West, so I think it is a little
22 bit out of order.
23     A. Yeah, let me see here. This was our
24 informal -- this was supposed to be our informal
25 version. This was --

Page 35

1  that exhibit, upper, right-hand column there is an entry
2  that reads, "As of 7-5-01."
3      A. Yes.
4          Q. Do you know, does this -- do you know what
5  this document reflects?
6      A. His work progress.
7          Q. Okay. So between 6-18 --
8      A. And 7-5.
9          Q. So this reflects Mr. Syracuse's work progress
10 between June 18, 2001 and July 5, 2001?
11     A. Yes.
12         Q. If you look at the top, under West Plant Tank
13 Field, which, I believe, should be Area No. 1, it reads,
14 "100 percent complete." Does that mean Mr. Syracuse was
15 done with that area?
16     A. Done, yes.
17         Q. And the same with areas 2 and 3?
18     A. He is 100 percent complete.
19         Q. In Area 3A, there is an entry that reads,
20 "75 percent complete." Is Mr. Syracuse 75 percent
21 complete with that area?
22     A. That's correct.
23         Q. Do all of these percentage entries on here
24 reflect the -- Mr. Syracuse's progress as of 7-5-01?
25     A. Yes, they did.

Page 37

9E0551B
## WARREN SQUIRES  JULY 9, 2004

1    Q. If you turn to the next page, it reads -- at
2 the very top right reads, "As of 7-26-01"?
3    A. Uh-huh (affirmative response).
4    Q. Does this reflect the progress, or do you
5 know if this reflects the progress of Mr. Syracuse
6 between 7-5-01 and 7-26-01?
7    A. It does reflect his progress.
8    Q. If you look down to Section 3 Tank Field
9 entry, which is about a third of the way down the left,
10 turning back to the previous page, which is 7-5-01,
11 there is an entry next to it that reads, "Scrap," but
12 there is no percentage entry in there.
13    A. Uh-huh (affirmative response).
14    Q. Do you know why that is?
15    A. That means that there's -- no work has been
16 performed.
17    Q. If you turn back to the document 7-26-01 --
18    A. Uh-huh (affirmative response).
19    Q. -- under what appears to be the same area,
20 Section 3 Tank Field, the second one down is, "Open
21 29 vessels" --
22    A. Uh-huh (affirmative response).
23    Q. -- and it reads, "100 percent complete"?
24    A. Uh-huh (affirmative response).
25    Q. Do you know what that refers to?

Page 38

1 then released them.
2    Q. Who decided that the tanks should be opened
3 and tested and cleaned, if necessary?
4    A. Well, it was a combination of myself and the
5 Environmental Department and the Safety Department.
6 Syracuse was involved in those conversations also and a
7 person who contracts folks. It was a group of people.
8    Q. Did there come a point in time when Orion
9 realized that some of the tanks needed to be cleaned?
10    A. Well, we knew that we had tanks that needed
11 to be cleaned, yes.
12    Q. And --
13    A. It wasn't like we just -- you know, a light
14 shined on us, and we just thought that there was -- you
15 know, "Oh, my god, there are tanks out there that need
16 to be cleaned." It wasn't that way. We knew we had
17 tanks that had to be cleaned.
18    Q. Do you know had Orion known this at the time
19 that the contract was entered into with Mr. Syracuse?
20    A. I wasn't in that contract negotiation, but my
21 understanding is, yes, they knew that.
22    Q. And --
23    A. We just didn't know the magnitude.
24    Q. Was there a process that Orion had for
25 inspecting and cleaning tanks?

Page 40

1    A. That means that we have completed opening up
2 all of the tanks that -- stored vessels that were in
3 Section 13 Tank Field.
4    Q. Who was opening those tanks?
5    A. Those were being opened by PSC.
6    Q. Do you know why PSC was opening various
7 tanks?
8    A. Because we were inspecting them because of
9 the -- making sure that they were environmentally safe
10 so we could release those to Syracuse.
11    Q. Did there come a point in time, prior to
12 7-26-01, when Orion began opening tanks to inspect?
13    A. Yes.
14    Q. When, approximately, was that?
15    A. Shortly after I got involved.
16    Q. So --
17    A. So in June, early June.
18    Q. Why did Orion begin opening tanks to inspect?
19    A. Because we were -- we could not release the
20 tanks to Syracuse because of our environmental
21 obligation to ensure that the materials that he was
22 removing off the site were in a condition that would be
23 safe for himself, us, the public, you know.
24    So we took -- Orion opened the tanks, tested
25 them, cleaned them, if they needed to be cleaned, and

Page 39

1    A. Yes, yes, there was.
2    Q. What was that process?
3    A. The process was -- is that we, Environmental
4 Department, Durell Morris, went out, sniffed the tanks
5 first, determined that there was an environmental
6 exposure. Once that environmental exposure was
7 determined, then the contractor that we had hired to
8 open the vessel, would wear the appropriate EPA. We
9 would take all of the safety, environmental precautions,
10 and then we would open the vessels.
11    Then, based on the type of readings and the
12 type of proposed contaminants that were in the vessel,
13 Glytech was contracted to clean those for us so that
14 information was provided to Glytech so that way Glytech
15 knew what kind of equipment they needed to bring out,
16 what kind of disposal requirements they would need, and
17 so forth.
18    Q. What were some of the environmental concerns
19 that Orion had with respect to the tanks?
20    A. Well, it is like any other -- any other
21 vessel that we have in our operating units. When you've
22 got a vessel that has H2S exposure or some kind of
23 gaseous issue, you know, you don't want people being
24 exposed to that, so that was one -- that was the
25 immediate concern.

Page 41

11 (Pages 38 to 41)

A000111

9E0551B
## WARREN SQUIRES   JULY 9, 2004

1 entry to the vessel to test – to further test it.
2      Q. I will note that some of these, on the first
3 page under Analysis Required, have an entry that reads
4 "no." Does that mean no testing was required?
5      A. No testing was required.
6      Q. As of 7-26-01, on the vessels where no
7 testing was required, do you know had those vessels been
8 released to Mr. Syracuse?
9      A. They should have been.
0      Q. On the second page it appears to be a
1 continuation of the first page. There is a third column
2 that is not on the first page which is Results. What
3 does that reflect or refer to?
4      A. The analysis that was – that were taken,
5 that's the results of that analysis.
6      Q. Okay. So just taking one entry as an
7 example, the first one under Results reads, "Gaskets
8 positive, 50 percent asbestos," and it is next to vessel
9 No. S3-01. What does the 50 percent asbestos mean?
0      A. That means that we have to have an asbestos
1 contractor either – that needs to remove that gasket.
2 Not just anybody can deal with asbestos. You've got to
3 be a certified contractor to do that.
4      Q. I'm going to hand you what has been
5 previously marked as Orion Exhibit 29. Can you tell me

Page 54

1      A. What is that? NS, that is – let me think
2 about this a minute. .
3      Okay. I'm trying to remember exactly
4 what – for example, the "Test East Plant, 11," that's
5 the number of vessels that we deemed that we want to
6 look at.
7      Now, you asked me about the 42, but I think
8 42 is not in direct relation to East Plant because there
9 is, "Clean East Plant." The 34 that I'm bringing out in
10 this exhibit, that is the number of vessels that we've
11 deemed needs to be cleaned in the East Plant. Okay?
12      The same thing with, "Schedule East Plant,"
13 there is a number of vessels to be cut. There are 77
14 total. So, in other words, there are some vessels that
15 we have in the East Plant that either do not need to be
16 cleaned or do not need to be tested.
17      Q. As of that date – whatever date this
18 document was prepared – the vessels in the East Plant
19 that did not need to be tested or cleaned, had those
20 been released to Mr. Syracuse to remove?
21      A. I would assume they should have been. I mean
22 there was nothing that we felt that would prevent him
23 from going and getting those vessels and doing whatever
24 he wants to do with them.
25      Q. Do you know did Mr. Syracuse ever have any

Page 56

1 what that document is?
2      A. Yeah. This is just a – this is just a
3 summary of the vessels that we have in these locations,
4 and – yeah, some duration of testing, cleaning, and
5 when we are going to hand it over, how many vessels.
6      MR. RAPIER: What exhibit are you looking at?
7 I'm sorry.
8      MR. BRIGGS: It is 29.
9      Q. (BY MR. BRIGGS) Just taking one of these
0 entries as an example, about halfway down the page there
1 is an entry that reads – under the Date column
2 January 7th –
3      A. Uh-huh (affirmative response).
4      Q. – next to that is, "Test East Plant." The
5 third column reads, "Number of Vessels to Be Tested,"
6 and there is an entry under that column which is 11.
7 What does that mean?
8      A. That means that there is 11 vessels there
9 that we need to test or do some kind of test.
20      Q. The fifth column over reads, "Number of
21 vessels to be cleaned," and there is an entry that reads
22 42. Does that mean there were 42 vessels to be cleaned?
23      A. No. I interpret that as there is – see
24 where it has got, "cleaned fin fans" –
25      Q. Yes.

Page 55

1 discussions with you concerning – did Mr. Syracuse ever
2 have any discussions with you concerning his ability to
3 remove any of these vessels?
4      A. I had numerous discussions with him about
5 removing these.
6      Q. And –
7      A. A lot of them was – a lot of them were him
8 asking the status, and there were some conversations
9 with us asking him when he was going to get started.
10      Q. When you asked him when are you going to get
11 started, what did he – what was his response?
12      A. He needed to get his scrap metal contractor
13 into the plant, which he was having problems with, and
14 he was complaining about some of our requirements, and
15 his ability to get the people that he needs to take the
16 vessels that he wanted to sell – there was always
17 something. He always had some kind of reason for not
18 moving them. It was either, "I don't have enough people
19 right now, I don't have a cutting contractor," or either
20 I got – you know, "I'm looking for a buyer."
21      Q. Did you ask Mr. Syracuse to remove some of
22 the vessels that had been released to him?
23      A. I asked him to remove all of them that were
24 released to him. Is there any one in particular that
25 you are –

Page 57

15 (Pages 54 to 57)

A000112

9E0551B

WARREN SQUIRES   JULY 9, 2004

1  Q. No, no.
2      A. Yes, yeah.  When we released a vessel to him,
3  the intent was for him to remove them.
4      Q. You mentioned that Mr. Syracuse expressed to
5  you that he was having difficulties with one of his --
6  well, you had mentioned that he had brought in a
7  contractor to cut up the vessels and that there were
8  some problems with --
9      A. Yes.
10     Q. -- concerning that?
11     A. Would you like for me to elaborate on that?
12     Q. If you could.
13     A. Yeah.  J&W had a specific approach that they
14  wanted to use on cutting up these vessels, okay, and we
15  went through -- we had several meetings with J&W prior
16  to him coming in onsite, discussing that approach, and
17  what we could do to make sure that the way that he was
18  going about cutting up these vessels would be
19  acceptable.
20     We did come to an agreement with him and
21  understood exactly what he was going to do, and we were
22  going to put some precautionary things in place and all
23  of that, but we had done, on our part -- I guess what
24  I'm getting at is Orion had worked with J&W on our part
25  to ensure that we were prepared for him.

Page 58

1  equipment in the unit, which is a little different
2  animal, but through a lot of internal discussions as to
3  what we -- I guess what I'm getting at with that is that
4  we wanted to -- we wanted Mike to succeed, Syracuse to
5  succeed in this.  That was the intent.
6      We wanted the stuff to get out of there, so
7  we went through a lot of communications internally to
8  try to decide whether it was feasible for us to even --
9  I brought the question out, "Well, let's let them take
10  the Spanish version.  You know, if they pass it, then we
11  can get this thing going.  You know, do we necessarily
12  need the English version?"
13     Well, the problem that we had discovered,
14  talking with our Safety Department and so forth, is that
15  the areas that these guys would be in and moving through
16  in some cases were operating units, a lot of the
17  locations in the yard and stuff, you will see -- they
18  have to pass through live equipment to get to it.  So
19  due to that, we couldn't -- we determined that we
20  couldn't release them from that obligation, because that
21  same approach we use for another company -- we can't do
22  it for one and not do it for another.  Orion had taken
23  the position that a safety card -- everybody would have
24  to have an English version.
25     Q. Was there a reason that in these areas that

Page 60

1      The problem that J&W encountered is -- and
2  one of the really significant problems -- was that he
3  brought -- his cutting people were Spanish -- they were
4  Spanish descent.  Well, we require -- every contractor
5  onsite Orion required that they pass an English version
6  of the GNOIEC.
7      Q. Okay.  And what is the --
8      A. That's the Greater New Orleans Business
9  Council.  It is where they get their safety card, Safety
10  Council.  Business Council, I meant Safety Council.  It
11  is where they get their safety cards.  Those safety
12  cards are transferable.  Even here we bring people --
13  with the company I'm working for now, we accept safety
14  cards out of Houston.  Okay?  So it is a pretty
15  nationwide card in some cases.
16     Orion required that the contractors that come
17  in, every contractor have a safety card, has to pass the
18  English version.  Okay?  J&W's employees did not pass
19  that English version, so we had discussions with Mike,
20  and we had discussions internally with Orion, Mike
21  Syracuse.  We had discussions internally with Orion
22  about do we need -- do we necessarily hold J&W
23  and Mike Syracuse to the same standards that we held
24  some of the other contractors since he was dealing with
25  scrap and wasn't actually dealing with a live piece of

Page 59

1  you've described as operational that the contractors had
2  to have passed the English Safety Exam as opposed to any
3  other language?
4      A. Well, yes.  The reason is is because our
5  postings, safety precautionary postings, our barricades,
6  danger barricades, any of the signs and stuff that we
7  post in the unit to let people know that there is work
8  going on in this area, you can't access this area of the
9  facility, is done in English.
10     Q. So the --
11     A. So the people that work there need to be able
12  to read English, know English, and the GNOIEC Safety
13  Council Exam, they couldn't understand, they couldn't
14  pass it.
15     Q. Did J&W ever show up at the refinery to begin
16  work?
17     A. No.
18     Q. Did they ever move any equipment onto the
19  refinery?
20     A. No.
21     Q. I'm going to hand you what has been marked as
22  Orion Exhibit 20, and I think we might be jumping back
23  just a little bit, but can you take a look at that
24  document and tell me if you are familiar with it?
25     A. Yes, yes, I am.

Page 61

6 (Pages 58 to 61)

A000113

9E0551B
## WARREN SQUIRES   JULY 9, 2004

1  Q. Can you tell me what that document is?
2  A. Yes. This is our -- this is our -- actually
3  this is our release document to -- this is what I called
4  our release document -- to Syracuse, Mike.
5  Q. What do you mean by "release"?
6  A. Well, this is the status of our testing,
7  whether we had a sample taken, the number of the vessel,
8  location of the vessel, and whether it had a plate or
9  not, and, you know -- and then released to Texas ICO.
10  Q. Was this document updated periodically?
11  A. Yes, it was.
12  Q. Going back to Exhibit 15 --
13  A. That's this one, yeah.
14  Q. Is Exhibit 15 an update of Exhibit 20, or is
15  it a different document, or do you know?
16  A. Walter, he created so much stuff -- it should
17  be the same document, it should be the same information,
18  should be equivalent. I've seen them both --
19  Q. Okay.
20  A. -- in my management of this project, but
21  Walter was controlling the documents.
22  Q. I'm going to hand you now --
23  A. Okay.
24  Q. I'm going to hand you now what has been
25  premarked or marked, rather, as Orion Exhibit 18. If

Page 62

1  scrap capabilities, and they told me that they did -- he
2  told me that they did have that -- the ability to
3  perform that function or that scope of work. I
4  personally called him.
5  I called Walter and conveyed that to Walter.
6  Walter might, if he wants to -- you know, PSC could
7  possibly do this; you know, why don't you talk to Mike
8  and see if he is willing to work with PSC instead of
9  J&W. That was it. That was all of my -- all of my
10  communications with respect to this document.
11  But I do know that communications with Walter
12  and Syracuse, the feedback that I got, is that Syracuse
13  was pursuing PSC.
14  Q. Did there come a point in time where PSC
15  actually made an offer or a bid to Mr. Syracuse to
16  contract for scrapping material?
17  A. Yes, yes, they did.
18  Q. And is this document that bid?
19  MR. RAPIER: I'm going to -- never mind.
20  Q. (BY MR. BRIGGS) Do you know if this document
21  is that bid?
22  A. This is the first time I've seen this
23  particular document.
24  Q. Okay.
25  A. I didn't see this document, because it wasn't

Page 64

1  you could take a moment and just look over this
2  document, and I will ask you some questions about it.
3  A. Uh-huh (affirmative response).
4  Q. Do you know what this document is?
5  A. .I sure do.
6  Q. What is this document?
7  A. When we discovered that -- well, when J&W
8  was -- were not able to gain access to the facility
9  because of their GNOIEC issues, Syracuse -- in fact, I
10  had some conversations with PSC personally for Mike, and
11  through Walter Landry, PSC has a scrap division. We
12  have done a lot of business with PSC. So we gave Mike
13  PSC's name and contact information and said, "Mike, here
14  is someone that can do the scrap for you." They can
15  take the place of J&W.
16  Q. Did Mr. Syracuse approach you or someone else
17  at Orion? And I note that this document is dated
18  July 19, 2001. Did Mr. Syracuse approach you or anyone
19  else at Orion, to your knowledge, in about the July 2001
20  timeframe, seeking recommendations or any other
21  information concerning a contractor with scrapping
22  capabilities?
23  A. I'm not sure whether he pursued us or whether
24  we pursued him. I know that I had personal
25  communications with the site manager for PSC about their

Page 63

1  sent to me.
2  Q. Okay.
3  A. But I knew that they provided him with
4  pricing.
5  Q. Did there come a point in time, to your
6  knowledge, when Mr. Syracuse did, in fact, contract with
7  PSC or any contractor other than J&W to scrap material?
8  A. To my knowledge, he never contracted with
9  anyone other than J&W.
10  Q. Okay.
11  A. He never -- I don't even know if he ever
12  actually even contracted with J&W, because J&W never was
13  able to get onto the job site so I don't know if he even
14  fulfilled that contract, but I know there was no one
15  else that showed up.
16  Q. I'm going to hand you what has been marked as
17  Exhibits 21 through 24. Just take a moment just to look
18  over those documents. I have a few questions concerning
19  them.
20  A. Okay. This is just more status updates from
21  the previous schedule that you gave me. That's what
22  this is, yes. One is dated --
23  Q. If it helps, the first one is dated --
24  A. 6 --
25  Q. -- August 16, 2001, and the last one is dated

Page 65

17 (Pages 62 to 65)

9E0551B
WARREN SQUIRES   JULY 9, 2004

1   October 5, 2001.
2       A. Right, but there is one exhibit that you gave
3   me that's prior to this. Maybe this is it. Yeah, right
4   here, I guess. Yeah, 7-26, 6-16, okay. Yes. This is
5   just more of this.
6       Q. More of the progress reports?
7       A. Progress reports.
8       Q. From CY 2001 Plant Clean-up Plan, correct?
9       A. Yes.
10      Q. The last one, which is Orion Exhibit 24, is
11  dated 10-5-01. Do you know if there are any that would
12  have been generated subsequent to that date, any
13  progress reports?
14      A. Okay. Can you rephrase that question again,
15  please.
16      Q. Yes, sorry. Looking at Orion Exhibit 24 --
17      A. Okay. Hang on. Okay.
18      Q. -- in the upper, right hand -- this document
19  has in the upper, right-hand corner a date that reads
20  10-5-01.
21      A. Right.
22      Q. Do you know if there were any documents,
23  status reports, generated after 10-5-01?
24      A. I don't know that.
25      Q. Okay.

Page 66

1       Q. You had mentioned that at some point
2   Mr. Syracuse went on vacation. Do you know when,
3   approximately, that was?
4       A. That was sometime around the end of the year.
5       Q. End of 2001?
6       A. End of 2001, yes.
7       Q. Was there at that point in time -- in Orion's
8   or in your opinion, was there still substantial work to
9   be completed?
10      A. A lot.
11      Q. Is it correct that, at that point in time,
12  none of the vessels that had been released to
13  Mr. Syracuse had been removed?
14      A. He completely shut down.
15      Q. For approximately how long was he completely
16  shut down?
17      A. I don't remember.
18      Q. Did Mr. Syracuse return, at some point, to
19  continue work?
20      A. He returned, but I think it was just he and
21  his son. I don't think his wife ever come back.
22      Q. Do you recall, approximately, when this was?
23      A. I don't remember. I want to say it was after
24  the first of the year. That's what I remember.
25      Q. After the first of 2002?

Page 68

1       A. If he had any progress, we should have
2   provided an update, but this is getting to the part
3   where he took a leave from the plant for vacation, and I
4   mean, I guess, I don't know if that's pertinent or not.
5       Q. In, approximately, late summer, August 2001,
6   what was the progress that Mr. Syracuse had made in
7   terms of cleaning up the various areas of the refinery?
8       A. Well, he had made some progress. He had made
9   some. It was slow. He still -- we were beginning to
10  realize that -- or having some conversations about his
11  ability to complete before the contract ended because he
12  still had a lot to do. It was slow.
13      Q. As of, you know, late summer 2001, had you
14  had discussions with Mr. Syracuse about extending the
15  contract to allow him to finish his cleaning?
16      A. No, I didn't.
17      Q. Do you know if anyone at Orion did?
18      A. I don't know.
19      Q. Did you have any discussions internally at
20  Orion about extending Mr. Syracuse's contract?
21      A. We had discussions internally about he not
22  being able to finish by March and what were we going to
23  do because our contract was going to be done. Do we
24  write another one, do we extend it, we were talking
25  about it internally, yes.

Page 67

1       A. 2002.
2       MR. BRIGGS: This document, I don't believe
3   has been previously marked, so I'm going to hand it to
4   the court reporter to mark as Squires' Exhibit 1 -- or,
5   actually, do you know what we left off at yesterday?
6       MR. RAPIER: I think 34.
7       MR. BRIGGS: So the next one would be 35?
8       MR. RAPIER: Yeah. We only marked 2. Yes,
9   we used 34 so it would be 35.
10      (Orion Deposition Exhibit 35 was mark'd for
11  identification.)
12      MR. BRIGGS: It should be the last document
13  in your packet.
14      Q. (BY MR. BRIGGS) Take a moment to look over
15  that document. Do you recognize that document,
16  Mr. Squires?
17      A. Yes, I do.
18      Q. Can you tell me what that document is?
19      A. Walter sent me -- what I requested from
20  Walter with respect to this document is I wanted a list
21  of all of the vessels that we had removed plates, and
22  this is what -- this document is indication of that.
23      Q. It is dated June 12, 2002, from Walter Landry
24  to Warren Squires?
25      A. Uh-huh (affirmative response).

Page 69

8 (Pages 66 to 69)

A000115

9E0551B
## WARREN SQUIRES   JULY 9, 2004

1 or whether he just denied, but at the end of the day, he
2 kept the plates. We couldn't put them on without them,
3 and he never returned them to us so we couldn't put them
4 on.
5      My understanding is that he heard us, you
6 know, the fact that we were going to put them on. Did
7 he agree with us doing that, I don't know.
8      Q. Were plates removed from all of the vessels
9 that Mr. Syracuse was to remove from the refinery?
10      A. No, they were not.
11      Q. With respect to the vessels from which plates
12 had been removed, could Mr. Syracuse have removed those
13 vessels from the refinery?
14      A. Yes, he could have.
15      Q. I'm going to hand you what has been
16 previously marked as Orion Exhibit 26. You can just
17 take a moment to look at that document and tell me if
18 you know what that is.
19      A. Yes.
20      Q. Let me ask you, do you know who River Parish
21 Contractors, Inc. is?
22      A. Yes, I do.
23      Q. Who are they?
24      A. They are a – one of our general contractors
25 that we have onsite that does business with us all of

Page 74

1 you would, just take a moment and look at this document.
2 You can tell me, if you know, what it is?
3      A. Yes. This is a – it is a document that was
4 created to wrap up what we had left to do, what Texas
5 ICO had left to do.
6      Q. Who generated this document?
7      A. I'm not sure. I don't remember who created
8 this document.
9      Q. Now, in, approximately, February of 2002, was
10 there still work to be done with respect to cleaning up
11 the refinery?
12      A. Yes.
13      Q. Do you have a general sense of the progress
14 that Syracuse had made up to that point in its work?
15      A. Yes.
16      Q. What is that sense?
17      A. Up to this point, he was just about – he was
18 just about shut down. He wasn't doing anything, no
19 clean-up. So whatever progress that he had, you know,
20 when he left on vacation, when he came back from
21 vacation, it was almost very minimal that he was doing.
22 So it was even worse in the first part of – first
23 quarter of 2002, it was – progress was worse then than
24 it was, you know, the fourth quarter of 2001.
25      Q. In the first quarter of 2002, was

Page 76

1 the time.
2      Q. This document is dated February 4, 2002. It
3 is a letter from River Parish Contractors to Texas ICO,
4 Attention Michael Syracuse. Were you involved at all in
5 communications between River Parish Contractors and
6 Syracuse?
7      A. No, I was not.
8      Q. Do you have any knowledge concerning why
9 River Parish Contractors contacted Texas ICO in February
10 of 2002?
11      A. Yes. They were supposedly going to assist
12 them with another – provide Mike with another
13 alternative to removing materials and helping him in
14 fulfilling his contract.
15      Q. Did you have any conversations with anyone at
16 River Parish concerning them assisting Syracuse in his
17 work?
18      A. No, I did not.
19      Q. Do you know, did Syracuse ever contract with
20 River Parish Contractors?
21      A. Not that I know of.
22      Q. Okay.
23      MR. BRIGGS: Getting there.
24      Q. (BY MR. BRIGGS) I'm going to hand you what
25 has previously been marked as Orion Exhibit 27, and if

Page 75

1 Mr. Syracuse showing up to work on a daily basis --
2      A. No.
3      Q. -- at the refinery?
4      A. No.
5      Q. Do you know whether he was showing up on a
6 weekly basis?
7      A. I don't know how often. I know that it
8 wasn't every day, no. Once a week, once every couple of
9 weeks. I didn't see him every day. I wasn't working
10 every day with him, but I knew he wasn't there every
11 day.
12      Q. When he did show up to work, do you know
13 whether he brought a crew with him or other individuals?
14      A. The feedback that I was getting is that he
15 was – he was – wasn't even hardly there. Presence was
16 really kind of unknown, and he didn't have any – there
17 was no staff, you know, a large amount of staffing,
18 either. So all I know is it was he and his son. That's
19 about the extent of feedback that I was getting.
20      Q. Did there come a point in time, winter of
21 2002, when Mr. Syracuse proposed returning to work and
22 cleaning up, continuing his work at the refinery?
23      A. I don't remember exactly.
24      Q. Do you know whether there were discussions
25 internally at Orion in which you were involved

Page 77

0 (Pages 74 to 77)

A000116

9E0551B
## WARREN SQUIRES   JULY 9, 2004

1  concerning extending the contract with Mr. Syracuse?
2      A. Yes, yes.
3      Q. What was the general substance of those
4  discussions?
5      A. Well, we knew that the contract was coming to
6  an end, and we knew that he had not fulfilled it, and we
7  were looking for alternatives to -- allowing him the
8  ability to extend that contract so we could get -- you
9  know, get the work finished.
10     Q. Did Orion ever have discussions with
11  Mr. Syracuse concerning extending his contract?
12     A. Tony Landry did.
13     Q. Were you involved in any of those?
14     A. I was not involved in those direct
15  discussions.
16     Q. Did there come a point in time when
17  Mr. Syracuse was no longer allowed at the refinery?
18     A. I don't know if it was no longer allowed, but
19  there -- there did come a point in time where our
20  relationship seemed to have severed.
21     Q. Do you know, approximately, when that was?
22     A. I don't remember. I don't remember if it was
23  shortly before or shortly after our contract end date of
24  March.
25     Q. I'm going to hand you what has previously

Page 78

1  lock areas in which other Orion personnel or contractors
2  were working?
3      A. He intended to lock areas that, yes, we had
4  to gain access -- other Orion personnel had to gain
5  access.
6      Q. When he put these locks on the gates, what
7  did Orion do in order to gain access, if anything, to
8  those areas?
9      A. I don't remember. I think we went and cut
10  them off.
11     Q. Did you have any discussions with
12  Mr. Syracuse concerning his attempt to secure those
13  areas?
14     A. No. I got to the point where I didn't talk
15  with Mike much. I let Walter deal -- I talked with
16  Walter about it, so I knew about it, so, no, I didn't
17  have any direct communication with Mike Syracuse about
18  this particular incident.
19     Q. Was this a one-time thing, or did
20  Mr. Syracuse attempt, on numerous occasions, to lock out
21  various areas?
22     A. He attempted on numerous occasions to try to
23  lock these areas.
24     Q. Were all of those occasions in,
25  approximately, March of 2002?

Page 80

1  been marked as Orion Exhibit 28, and can you tell me if
2  you've ever seen this document before?
3      A. Yes, I do remember seeing it.
4      Q. It is dated March 8, 2002. It is from
5  Michael Syracuse To Whom It May Concern at Orion
6  Refining Corporation. It reads, "Due to various
7  problems, Texas ICO, Inc. has had with Orion Refining,
8  effectively immediately, all of Texas ICO's areas will
9  be secured as contract provides. No entry will be
10  allowed without Texas ICO's permission."
11     Did Mr. Syracuse, in fact, ever secure or try
12  to secure any of the areas --
13     A. He tried to.
14     Q. -- of the refinery?
15     A. He tried to.
16     Q. Was that, approximately, March of 2002?
17     A. Yes, it was.
18     Q. What did he attempt to do to secure those
19  areas?
20     A. Put locks on the gates, chains, locks on the
21  gates.
22     Q. Were these areas of the Orion refinery that
23  were operating areas?
24     A. Yes. He couldn't do that.
25     Q. Did he -- just to clarify, did he attempt to

Page 79

1      A. Yes.
2      Q. Did there come a point in time when he
3  stopped trying to lock up those areas?
4      A. I don't remember.
5      MR. BRIGGS: Let me take just a five-minute
6  break. I just want to look over my notes.
7      MR. RAPIER: That's fine.
8      MR. BRIGGS: I think I'm just about done
9  anyway.
10     (A recess was held off the record.)
11     Q. (BY MR. BRIGGS) Just a couple of more
12  questions, Mr. Squires.
13     A. Sure.
14     Q. Did Syracuse ever ask to see documentation
15  that tanks had been properly cleaned?
16     A. Yes.
17     Q. Did Orion give those documents to
18  Mr. Syracuse?
19     A. Yes, we did.
20     Q. If you will turn back to Orion Exhibit 2,
21  which is the map --
22     A. Okay.
23     Q. -- and if you look at the upper, left-hand
24  corner, the list of the areas to be cleaned, by the time
25  that Mr. Syracuse was no longer working at Orion, do you

Page 81

21 (Pages 78 to 81)

**J**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .    Chapter 11

ORION REFINING CORPORATION,               .    Case No. 03-11483 (CGC)

          Debtor.                         .    Sept. 14, 2004 (9:40 a.m.)
                                          .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHARLES G. CASE, II
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



2

1    THE CLERK:  All rise.  United States Bankruptcy

2    Court for the District of Delaware is now in session.  The

3    Honorable Charles G. Case presiding.

4    THE COURT:  Good morning, please be seated.

5    MR. WERKHEISER:  Good morning, Your Honor.  For the

6    ORC Distribution Trust representative, Gregory Werkheiser,

7    Morris, Nichols, Arsht & Tunnell.  I'm joined at counsel

8    table by my colleague, William Sudell and Gregory Donilon.

9    Your Honor, we do have a very, very full agenda today.  A

10   number of matters are up for argument as well as final fee

11   applications, so we'll try to move along as expeditiously as

12   we can.  Your Honor, we did file a third amended agenda

13   yesterday, which I understand the Court has received.  And as

14   we arrived in court this morning, we did receive some

15   requests from parties that come in the Louisiana area to

16   rearrange some matters on the calendar, if that's acceptable

17   to the Court, because we understand that it may soon become

18   very difficult if not impossible to get back to that region

19   because of the hurricane that is bearing down on it.  So, if

20   it's acceptable to the Court, Your Honor, what we would

21   propose to do is take matters related to the Fluor vs. Orion

22   adversary . . . (break in taping) first.  There are a number

23   of -- There are summary judgment motions and related motions

24   there to be presented today, and then following that matter,

25   Your Honor, we would propose to deal with the matters

1    involving Michael Syracuse which appear on the agenda at item

2    numbers 5 and 6 as well as under the adversary proceeding

3    (C), if that's acceptable to the Court.

4         THE COURT:  Of course.  Let's proceed with whatever

5    is convenient to the parties.

6         MR. WERKHEISER:  All right, thank you, Your Honor.

7         MR. SUDELL:  Good morning, Your Honor, may it

8    please the Court.  William Sudell on behalf of Orion.  We are

9    dealing, Your Honor, with the matters listed under adversary

10   proceedings at (B).  There is a motion for partial summary

11   judgment by Orion, cross-motion for partial summary judgment

12   by Fluor, and also a motion by Fluor, which I take it is

13   still being argued, to strike certain affidavits that have

14   been filed by Orion.  I will be dealing with the -- initially

15   with Orion's motion for partial summary judgment.  I may slip

16   into a response to Fluor's motion for partial summary

17   judgment at stages, but I will try to keep my comments

18   limited at first to our motion.  As an overview, Your Honor,

19   Fluor sued Orion seeking to collect some $26 million that it

20   is owed or there's some dispute as to the exact amount, but

21   roughly that amount for pre-petition construction work done

22   at the Orion Refinery as a result of a very serious fire in

23   January of 2003.  So the work that was done that is the

24   subject of the suit was done thereafter and prior to the

25   petition date of May 13th, 2003.  Fluor seeks to recover on

4

1    the basis of a mechanics lien that they contend they have

2    under Louisiana law.  They seek to recover as a result of

3    what they consider to be fraudulent statements made by Orion

4    representatives, and they seek to impose a constructive trust

5    over -- at times, they talk about insurance proceeds and

6    other times they talk about the proceeds of the sale of the

7    property.  We have moved for partial summary judgment arguing

8    that the mechanics lien claim should be dismissed because

9    Fluor waived its right to lien the job under the contract at

10   issue.  In addition, we argue that in any event a mechanics

11   lien would be invalid under Louisiana law because of failure

12   by Fluor to file the necessary papers as a general contractor

13   to impose such a lien.  In any event, we argue that even if

14   they had a mechanics lien claim it would be subject to and

15   with lesser priority than hundreds of millions if not a

16   billion one in prior secured liens that would come in advance

17   of it under Louisiana law.  And finally, we argue that a

18   constructive trust is not, as a matter of law, appropriate in

19   this case.  First, Your Honor, with respect to the lien

20   waiver argument.  That arises out of §5.6 of the contract at

21   issue here, the MSA, as it's referred to.  That paragraph 5.6

22   states in relevant part, "In connection with the performance

23   of all services, contractor waives and releases all lien

24   rights and shall pay all legal claims of its personnel and

25   subcontractors and will not permit any liens of any kind to

5

1    be affixed against the property of company or any third party

2    as a result of claims by any person or entity who furnishes

3    labor, service, or materials to contractor." By that

4    language, Your Honor, we think it's clear that Fluor agreed

5    to three things: First -- all in connection with the

6    performance of services. (1) Contractor waives and releases

7    all lien rights. (2) It shall pay all legal claims of its

8    personnel and contractors, and (3) will not permit any liens

9    of any kind to be affixed against the property of Orion.

10   Fluor argues that that paragraph was only intended to release

11   lien rights that its personnel and subcontractors might have,

12   and in so arguing, it refers to the title of that provision

13   which is entitled "Payments to Personnel and Some

14   Contractors" but ignores the plain language of the paragraph

15   itself. In addition, they argue that because their personnel

16   and subcontractors were not in privity with Orion, that

17   somehow supports the proposition that Fluor did not intend to

18   release its own lien rights. I'm not sure I fully understand

19   that argument, but under Louisiana law and I would expect in

20   most jurisdictions, a clearer showing that rights of third

21   parties have been waived is required then a showing that the

22   party in privity has waived its lien rights, which as we say,

23   the plain language of that paragraph states. They also argue

24   that that paragraph presupposes --

25             THE COURT: Let me ask you this: Do you think it's

6

1  possible for Fluor to waive the rights of its subcontractors,

2  suppliers, employees, whoever, personnel?

3       MR. SUDELL:  Your Honor, I don't think so although

4  it's possible that under Louisiana law there may be a way,

5  but I don't -- It strikes me as I don't know how a

6  subcontractor, unless that subcontractor had agreed with

7  Fluor that that was the case, would be bound by a statement

8  that Fluor was waiving those rights.  I agree, Your Honor.

9  In my experience, a subcontract may incorporate the prime

10  contract, if you will, and by that method the subcontractor

11  may ultimately be bound, but I don't think that language, in

12  my experience at least, would bind a subcontractor or an

13  employee of Fluor without something more.  I agree.  The

14  paragraph, it is argued, also presupposes that Fluor will

15  have been paid before its liens are waived, but not only is

16  that inconsistent with that language itself, but services is

17  a defined term.  It does not include payment by Orion if

18  their services are to be performed by Fluor, and there are

19  other provisions of the contract by which it appears clear

20  that a lien waiver rule is required before payment would be

21  forthcoming.  That's paragraph 6.3, and the paragraph 5.6

22  later on itself states that Orion could withhold payment to

23  Fluor if a lien were filed.

24       THE COURT:  Well, is it your interpretation then of

25  these payment provisions that Fluor has the obligation in

1  effect to fund payments to its subcontractors prior to

2  receiving payment from Orion?

3  MR. SUDELL:  Your Honor, that's certainly one --

4  THE COURT:  Or at least contemporaneously with.

5  MR. SUDELL:  Yes, Your Honor.  I interpret this to

6  be a clear statement by the owner to the contractor that I

7  don't want my property liened.  And Fluor had ways to protect

8  itself against not being paid, which they, unfortunately for

9  them, didn't avail themselves of, but that would be one

10  result that they would be required to pay their subs and

11  personnel prior to receiving payment.  For example, if they

12  were not prompt in invoicing, as was the case here, they

13  would run that risk if their subs and personnel were not

14  willing to wait.

15  THE COURT:  Well, what Fluor would argue is that

16  it's fundamentally unfair here that Fluor would have the

17  obligation to pay all of these downstream obligations that it

18  has when in fact it hasn't received penny one from Orion.

19  Now, just as a gut level argument, that's what I think they

20  would say.  Now normally, these kind of circumstances are

21  dealt with either through joint checks and simultaneous lien

22  releases and that sort of thing so that the money changes

23  hands.  Here we have the situation where there was no payment

24  for whatever reason by Orion for which a joint check, for

25  example, could have been made payable to both the contractor

1  and its sub.  So, if I understand your interpretation of the

2  contract is that Fluor has the obligation to make sure that

3  there are no liens on the property arising out of unpaid

4  obligations whether they get paid or not.

5       MR. SUDELL:  Yes, Your Honor.  When they entered

6  into this contract, they entered into a contract that said,

7  You will not be able to lien this job.  You don't have to

8  take this work, but if you take this work, one of the

9  conditions is that this property will not be liened.  And

10  they were on notice of that and on notice of needing to,

11  perhaps, protect themselves to a greater extent then if that

12  lien waiver had not been agreed to.  The joint check

13  situation is another way typically that the owner gets

14  protected, that is, the owner's assured that the subs and

15  personnel will be paid and that the job won't be liened from

16  that position.

17       THE COURT:  All right.  Anything else on that

18  argument?

19       MR. SUDELL:  Excuse me?

20       THE COURT:  Anything else on that argument?

21       MR. SUDELL:  I don't think so, Your Honor, no.

22  Even, Your Honor, if Fluor was found not to have waived its

23  rights, we believe that they do not have a valid secured

24  lien.  Now let me state right up front, I believe that there

25  are factual issues involved and in dispute with respect to

9

1   these arguments.  The first is our argument --

2          THE COURT:  With respect to this particular level.

3   This really goes to their motion for summary judgment.

4          MR. SUDELL:  I think it does -- Yes, Your Honor.

5   It certainly --

6          THE COURT:  Because they're the ones who are

7   seeking summary judgment that they have a valid lien, and

8   that they've fulfilled all the obligations under applicable

9   Louisiana law.

10         MR. SUDELL:  That's right, Your Honor, and in our

11   answer we raise the defense that they had not properly

12   complied with Louisiana law because as a general contractor,

13   they needed to file additional papers.  They say in their

14   motion they were not a general contractor.  I can save my

15   comments on that, but basically, I believe at this point the

16   record is not sufficient to determine whether the work they

17   were performing would have -- was a general contract

18   assignment as we contend under Louisiana law or not.  But

19   while -- Since I've gotten into it, my points, Your Honor,

20   would be that we have submitted affidavits from Orion

21   executives who state that Orion was hired -- I'm sorry, Fluor

22   was hired to be the general contractor on this job or at

23   least succeeded through PFC who had been hired to be the

24   general contractor.  In their own papers, in the motion to --

25   fairly recently filed concerning the critical vendor motion,

10

1  Fluor itself states that they performed ninety percent of the
2  work with respect to the fire rebuild.  We believe that to is
3  an indicia, certainly, of being the general contractor.  On
4  the other hand, they've submitted affidavits and documents
5  which they contend show they were only a quote, "contractor"
6  not a general contractor.  I believe that those issues will
7  have to be resolved at a later time.  Secondly, we have
8  pointed out that even if they had a mechanics lien they were
9  right behind hundreds of millions of dollars which will not
10  be paid and that, therefore, this is more an academic
11  exercise than anything.  By having said that to determine
12  precisely where Fluor would lie in the priority, if they had
13  a mechanics lien, we would have to have a fuller record to
14  show precisely how far out of the money they will be.  In
15  order --

16          THE COURT:  So that's really a 506 argument, I take
17  it.

18          MR. SUDELL:  I think it is, Your Honor.

19          THE COURT:  That they're simply -- to the extent
20  there's not value to support their claim, they're an
21  unsecured claim whether they have a security position or not.

22          MR. SUDELL:  Yes, Your Honor, and I think if that
23  were all we were talking about here today, we would be able
24  to work that out pretty quickly between the parties, because
25  I don't think there's any doubt that they will be out of the

1  money if all they have is a mechanics lien.   In order to

2  avoid that result, Fluor has argued and has alleged in the

3  complaint that they should be granted a constructive trust

4  over insurance proceeds and/or the proceeds of the sale of

5  the refinery, and if Your Honor will recall, at the time of

6  the sale, money was set aside with respect to the lien that

7  had been asserted in order to permit the sale to go forward.

8  More recently, we have said that to the extent a constructive

9  trust can be proven in all its elements, that money could be

10 used to satisfy that.   So in a sense, the money's there.   If

11 they can prove all they have to prove to get to that money.

12 But, Your Honor, back to the basic question of whether a

13 constructive trust may be imposed here.   We contend that as a

14 matter of law it cannot.   In an amended answering brief,

15 Fluor amended to assert that state law shouldn't be applied

16 to determine whether there's a constructive trust but federal

17 common law.   In so doing, they argue that in the Third

18 Circuit, in the Columbia Gas case, and in this Court, in

19 Judge Walrath's decision in Edison Brothers, that the courts

20 have determined that a federal common law applies in

21 bankruptcy cases to determining whether a constructive trust

22 will be imposed or not.   To the extent they are arguing that

23 or to the extent those cases could be read to say that, we

24 think that is incorrect.   Each of those cases, Your Honor,

25 involved assertions of a constructive trust with respect to

1  funds that were intimately connected with and subject to

2  federal statutes. That's not applicable in this case.

3  We're dealing here solely with issues of state law other than

4  the fact that we're in a federal court under the Bankruptcy

5  Code.  In Columbia Gas the funds at issue were required to be

6  paid by Columbia Gas -- two of the three categories of

7  payments were funds that the National Gas Act and the FERC

8  required that the middle party, Columbia Gas in that case,

9  distribute to its customers or to a marketing or a research

10 institute that had been set up under the National Gas Act

11 funds received up from the upstream suppliers be distributed

12 to customers.  If Your Honor reads Columbia Gas, you will

13 that it's totally intertwined with orders -- and I take it

14 you have.

15         THE COURT:  Just a second, Mr. Sudell.  Somebody on

16 the telephone who has an open speaker phone that is causing

17 squeaking noises, shuffling noises, and other distracting

18 noises in the courtroom.  So I ask that person, whoever he or

19 she may be, to put on the mute button so that does not occur.

20 If that continues and it becomes too disruptive, I'll have to

21 terminate the call which would be unfortunate for those

22 parties who are on the telephone.  So please take it upon

23 yourself to make sure that you don't make disturbing noises

24 and that any speaker phones are on mute.  Thank you.  Mr.

25 Sudell, sorry that I interrupted you.  You were talking about

13

1    Columbia Gas.

2        MR. SUDELL:  Yes.  Your Honor, Columbia Gas as you

3    will see, ultimately involved orders and provisions of the

4    National -- orders of FERC and provisions of the National Gas

5    Act that required payments to be distributed and of course

6    Columbia Gas was a large interstate pipeline.  It involved

7    many states and, therefore, it was only natural that the

8    federal law and federal common law be applied there.

9    Similarly, in Edison Brothers, Judge Walrath was dealing with

10   a case involving overpayments in pension funds and how they

11   should be and as I recall withholding of certain funds until

12   it was determined how much of that overpayment could be

13   distributed, that is how much tax would be due on it, and

14   therefore, it involved interpretations of ERISA and federal

15   tax provisions, not again, state law.  Now, having said that,

16   there is language in both of those decisions that can be read

17   as indicating that a broader rule should apply.  As I said

18   earlier, to the extent they can be read that way, we think

19   they're incorrect.  Both before and after Columbia Gas, the

20   Third Circuit had clearly stated that in order to determine

21   whether constructive trusts should be imposed on property,

22   the Bankruptcy Court must look (1) to state law to determine

23   whether the claimant has shown the existence of a trust

24   relationship, and (2) to federal law to determine whether the

25   claimant has traced and identified the trust funds.  In

14

1   <u>Goldberg vs. New Jersey Lawyers Fund</u>, 932 F.2d 273 in 1991,

2   prior to <u>Columbia Gas</u>, the Court so held.  And in <u>City of</u>

3   <u>Farrell (phonetical) vs. Sharon Steel Corporation</u>, 41 F.3d 92

4   in 1994, after <u>Columbia Gas</u>, the Court also repeated that

5   language.  In each instance, the Court was relying on

6   <u>Butner (phonetical) vs. The United States</u>, at 440 U.S. 48, a

7   1979 case in which the Court said, "Congress has generally

8   left the determination of property rights in the assets of a

9   bankruptcy estate to state law."  Interestingly, by the way,

10  in <u>Butner</u>, the Court was resolving a dispute or different

11  rulings by a number of Circuit Courts in a bankruptcy

12  context.  It was -- the issue was whether a party with an

13  interest in rents of a landlord had to take some additional

14  action in order to have a right to those rents.  Any way,

15  there was a dispute between the Circuits as to whether state

16  law should be applied or whether some equitable federal

17  common law in the bankruptcy context.  Interestingly, the

18  Third Circuit was in the minority in <u>Butner</u> on that issue,

19  and the Supreme Court sided with the majority and said as

20  subsequent Third Circuit cases recite that you look to state

21  law to determine whether the claimant has shown the existence

22  of a trust relationship.  In <u>The City of Farrell vs. Sharon</u>

23  <u>Steel</u> which came after <u>Columbia Gas</u>, the Court cites <u>Columbia</u>

24  <u>Gas</u>, cites <u>Butner</u>, but applies the rule that you look first

25  to state law.  In that case, the question did not involve a

1    federal statute other than the Bankruptcy Code.  The issue

2    was whether municipal income taxes withheld from debtor's

3    employees' wages and not paid to the City of Farrell were

4    debtor's property or were held in constructive trust for the

5    City.  Again, a case involving only local law, and the Court

6    looked to state law first.  Interestingly, in Columbia Gas,

7    the Third Circuit -- that was a two to one decision, by the

8    way, but the Third Circuit said that you only look to a

9    federal rule in the unusual circumstance.  So, we think, Your

10   Honor, based on those cases and others we've cited in our

11   brief that you do not look to federal common law to determine

12   the existence of constructive trust in every bankruptcy

13   situation.  You look to see whether federal law is intimately

14   involved.  If it is, as in Columbia Gas, then you go to that,

15   but if state law is the primary underlying law, that's what

16   you look to first.  If state law is to be applied, Your

17   Honor, it's clear that that should be the law of Louisiana,

18   not Texas, as Fluor argues.  Both the parties agree that in

19   determining which state law would apply, you look to the most

20   significant relationship test set forth in the Restatement of

21   Conflicts.  Here it's undisputed that the refinery was

22   located in Louisiana, that the work was performed by Fluor in

23   Louisiana, that Fluor and Orion both have places of business

24   in Louisiana, that the MSA the contract at issue here has a

25   provision that says it should be interpreted in accordance

1    with Louisiana law, and all of the alleged pre-petition

2    misrepresentations by Orion to Fluor were made or apparently

3    received -- and apparently received by Fluor in Texas -- I'm

4    sorry, in Louisiana.  Fluor points in an affidavit or two to

5    a couple of their executives being in Texas when on the

6    petition date, May 13th, there was a conference call in which

7    apparently Orion representatives informed Fluor we have filed

8    today, and it's alleged that assurances of payment were made

9    at that point, but that might -- and that's the only Texas

10   connection that Fluor points to for the proposition that

11   Texas is the state with the most significant relationships

12   here.  Again, it was -- as I read the record, it was just

13   that one phone call on May 13th, the petition date on which

14   they seem to rely.  But whether state or federal common law

15   were to be applied here to determine whether constructive

16   trusts should be imposed, we believe, Your Honor, as a matter

17   of law that the Court should conclude that no constructive

18   trust would be imposed.  Under Louisiana law, the law that we

19   believe should be applied here, it's unequivocal that

20   constructive trusts are not recognized.  We asserted that in

21   our opening brief, and I don't believe Fluor takes exception

22   with it.  Under Texas law, even if somehow the Court were to

23   conclude that it should apply here, Fluor cannot prove the

24   actual fraud, the unjust enrichment, and the identifiable

25   race that would be required under Texas law to impose a

constructive trust.  To prove actual fraud under Texas law,

Fluor would have to show that Orion made material

representations that were false, that Orion knew when it made

those representations that they were false, that they

intended to induce Fluor to act on those misrepresentations

known to be false, and that Fluor relied and suffered injury

as a result of that reliance.  With respect to the alleged

misrepresentations, Fluor has not alleged that any were known

to be untrue when made or were intended to mislead Fluor.

The most they can say is they were told, We will do -- We

will get you paid.  We will use insurance proceeds to get you

paid.  They're the assertions, but it's not asserted that

those statements were known to be false when made.  Rather

then were made, if made at all, understanding that that would

be the case.  The situation changed here as a result of the

bankruptcy, of course.  Nor can Fluor allege that relied to

its detriment, was injured by any of the statements made

post-petition.  There are a number of assertions that things

were said and done directly with them or to the Court post-

petition, which should cause the Court to impose a

constructive trust.  But nothing that was said or could have

been said post-petition would have injured Fluor because they

were paid for all of their post-petition work.  We're only

talking about the work they had performed pre-petition.

THE COURT:  What does the record disclose, if

18

1    anything, about why it was that Fluor was not paid?

2         MR. SUDELL:  Your Honor, I'm trying to distinguish

3    my understanding of the situation from what the record

4    discloses, but basically, Your Honor, a problem was that

5    Fluor was very -- The work was performed in a relatively

6    short period of time between February and May, we're talking

7    about here.  As of the petition date or slightly before it,

8    Orion had not been billed by Fluor for the large majority of

9    the work or the cost now at issue.  As the petition date

10   approached and in the critical vendor motion or critical fire

11   vendor motion, that Your Honor has heard about, Fluor was --

12   and this is in the record, included Fluor and its predecessor

13   were included in that motion to be paid a maximum of $3.6

14   million, which was the amount for which Fluor had been billed

15   at least -- I'm sorry, that Orion had been billed by Fluor at

16   least up to the very day or two before the filing,

17   apparently.  So, one of the reasons that they weren't paid

18   was that they were not current in their billing.  They did

19   not take any other steps to protect themselves, and, Your

20   Honor, you deal with these kinds of situations every day.

21   We're not talking in the next element under Texas law that

22   would have to be proven is an unjust enrichment, and we're

23   not talking here about Orion being unjustly enriched.  This

24   is, of course, not a case where the owner of the property is

25   saying I should be permitted to keep the money and not pay it

1    to the contractor that did this work.  The question here is
2    which of Orion's creditors is entitled to receive the funds
3    that are available to Orion to pay its creditors.  And as I
4    say, as a result of that, we believe it would be impossible
5    for Fluor, even if Texas law were to be applied, to show the
6    necessary element of unjust enrichment to Orion.  Now, let me
7    move, Your Honor, to the possibility that federal common law
8    would be applied here.  Again, we don't think it should be,
9    but if it were, we think it's a matter of law, the Court
10   would conclude that even under quote, "federal common law" no
11   constructive trust should be created.  The ultimate question
12   to be determined under the cases that have applied federal
13   common law, such as Columbia Gas is whether the Orion/Fluor
14   relationship was one of a debtor/creditor or a constructive
15   trustee/beneficiary.  The courts say that you look to the
16   language of the parties and, of course, in most cases that's
17   not particularly helpful, and I don't think it is here, the
18   conduct of the party, parties or other circumstances
19   surrounding the transaction that is probative of their intent
20   such as was the party receiving the monies at issue a mere
21   conduit between the payor and the alleged trust beneficiary,
22   whether it was expected that interest would be paid on the
23   money due.  If it was, that's indicative of a debtor/creditor
24   relationship rather than a trust/beneficiary relationship,
25   and whether the funds were commingled with the recipients

that is here Orion's general reserves or held separately for
the benefit of the claimant.  We think all of these indicia
indicate that there's a debtor/creditor relationship here
rather than anything in the nature of a trust relationship.
First, the entire dispute arises out of a construction
contract.  The MSA, a purely commercial relationship between
the provider of services and the acquirer of those services.
A breach of that contract creates a debtor/creditor
relationship, not a trust relationship.  Secondly, Orion was
not a mere conduit of the monies at issue if we focus on the
insurance proceeds, and they're the only monies that were
received that Fluor is contending should be subject to a
trust.  Orion is the insured under its several policies.
Neither Fluor nor any other of Orion's creditors is a named
beneficiary of the policies.  This isn't like Columbia Gas
where Columbia Gas was collecting money from one party and
passing it on to another pursuant to agency orders and other
federal statutes and regulations.  It's not like the Penn
Central case, which we cite in our brief, where a
constructive trust was imposed, but where Penn Central was
collecting and disbursing pursuant to industry-wide interline
agreements that are common among rail carriers and where
again by federal regulation the monies had to be kept and
accounted for separately and distributed to the appropriate
carrier.  Or nor is it like the Sharon Steel case where the

1   employer was the conduit for its employees' tax payments to

2   the city to whom those employees' wages and the portion that

3   was the tax were to be paid.  Thirdly, Fluor expected and

4   continues to expect to be paid interest on what it is owed.

5   They've alleged that in their complaint and in the affidavits

6   that have been submitted.  Finally, the insurance proceeds

7   were not held separately for the benefit of Fluor.  Of the

8   $18 million paid to date to Orion, eight or nine of that pre-

9   petition and approximately an equal amount of post-petition,

10  all but 2.6 million were paid directly to General Electric

11  Capital, one of Orion's primary creditor by the insurers,

12  were used to pay various creditors, and were, to the extent

13  not used in that way, commingled with Orion's funds

14  generally.  That, of course, would lead to a question of

15  whether there's any possibility under any state or federal

16  whether those trust monies if the Court were to impose a

17  trust could be traced.  But that's really not an issue for

18  today.  In conclusion, then, Your Honor, whether Louisiana

19  law, Texas law, or federal common law were applied we believe

20  that Fluor's constructive trust plan must fail as a matter of

21  law.

22          THE COURT:  All right, thank you, Mr. Sudell.

23          MR. SUDELL:  Thank you.

24          MR. MONACO:  Good morning, Your Honor.  Frank

25  Monaco for Fluor Enterprises.  Your Honor, I'd like to

22

1    introduce my co-counsel, John Person from the New Orleans law

2    firm of Middleberg Riddle & Gianna.  He's previously been

3    admitted pro hac vice, and we do appreciate the Court

4    accommodating Mr. Person's schedule, given the weather in the

5    Gulf, thank you.

6            THE COURT:  My question is, why do you want to go

7    back, Mr. Person.

8            MR. PERSON:  I need to get back so I can evacuate,

9    Your Honor.  No, fortunately, my brother has already got my

10    parents and an aunt on the way out, and my wife is trying to

11    decide whether I'm supposed to meet her in New Orleans to

12    leave or meet her in Houston after she's already left.

13            THE COURT:  All right, well best of luck to you.

14            MR. PERSON:  Thank you.  Your Honor, may it please

15    the Court.  I'm going to start with Orion's partial motion

16    for summary judgment, and I'll try to be as brief as I can.

17    Let me address first the waiver argument, the argument that

18    Fluor has waived and released its lien rights.  Paragraph 5.6

19    of the Master Service Agreement is the clause that's in

20    question as opposing counsel has already brought up, and our

21    position, I think is aptly set forth in our briefs.  It's

22    succinctly, Judge, the plain English reading of this

23    paragraph, along with its title, suggests that what is being

24    waived or attempted to be waived in this clause is not the

25    lien rights of contractor, Fluor, the signatory, but the lien

1    rights, as that paragraph is entitled payments to personnel

2    and subcontractors.  In looking at this article, I was taken

3    back to my grade school grammar -- grammar school days of

4    English graphing of sentences, and there's no punctuation in

5    that sentence.  There's no commas.  And if you simply take

6    that sentence and diagram it, break it into its two basic

7    component parts, what is it doing?  It, quote "waives and

8    releases all lien rights of its personnel and subcontractors,

9    and it shall pay all legal claims of its personnel and

10   subcontractors".  The author of this clause was not Fluor.

11   The author of this clause is Orion, that's undisputed.  This

12   was a clause that was not changed from the form contract that

13   was submitted by Orion for signature.  It was not something

14   that was debated and negotiated.  And it does not --

15          THE COURT:  If it was to say that, wouldn't you

16   want there to be commas in there?  For example, wouldn't you

17   want it to say, Contractor waives and releases all lien

18   rights, comma, and shall pay all legal claims of, comma, it's

19   personnel and subcontractors.  That would clarify that issue.

20          MR. PERSON:  Two commas would certainly clarify it

21   in that respect, Your Honor, and it might be a better reading

22   for us in that respect.  The sentence in question, though,

23   reads, In connection with the performance of all of its

24   services, comma, contractor waives and releases all lien

25   rights and shall pay all legal claims of its personnel and

24

1    subcontractors.  It's two things that it's doing of its

2    personnel and subcontractors.  I suggest that that's the

3    better reading.  At the very least, it is a very plausible

4    reading, and if there is ambiguity in this clause, under

5    Louisiana law, as in most jurisdictions, that ambiguity is

6    construed against the author, and it's undisputed here that

7    the author is Orion.  What it does not say is it does not say

8    that the contractor -- that the claims and liens -- that the

9    liens that are being waived are all the claims and liens

10    associated with the work.  It says that its waiving the liens

11    of the personnel and subcontractors and will not permit any

12    liens of any kind to be affixed against the property of the

13    company or any third party as a result of claims by any

14    person or entity who furnishes labor, service, or materials

15    to the contractor.  It does not suggest that the contractor

16    -- does not explicitly say that the contractor's lien rights

17    itself are being given up.

18        THE COURT:  Well, how do you answer my previous

19    question of Mr. Sudell which is, How is it possible for the

20    contractor to waive the rights of third parties who

21    themselves are not parties to this contract?

22        MR. PERSON:  If you're talking about can Fluor on

23    its own with doing nothing else with any other subcontract,

24    can it unilaterally waive the rights of somebody else, and

25    the answer is no, it can't.

25

1    THE COURT:  So what you would suggest is that this

2    puts Fluor under an obligation to make sure that its

3    subcontracts contains such a waiver.

4    MR. PERSON:  That it have a rundown clause, a

5    similar clause, or a more direct clause where the

6    subcontractors waive their lien rights in their subcontract

7    to Fluor.  Some contracts have a more explicit statement

8    requiring a contractor to have its subcontractors waive their

9    lien rights, and I'd suggest that that's what this clause is

10   doing although maybe not as artfully as some others.

11   THE COURT:  Well, the second half would certainly

12   apply to that which says, Would not permit any liens of any

13   kinds to be affixed against the property.  I mean that would

14   suggest that Fluor has affirmative obligation to make sure

15   that when it deals with its subcontractors that they do not

16   lien it.

17   MR. PERSON:  Or its personnel.

18   THE COURT:  Or its personnel.  But the first

19   clause, before we get to the "and will not permit" is an

20   affirmative waiver.  It's not an undertaking by Fluor that it

21   will guarantee that it will not permit the fixing of liens.

22   That's the second clause.  Rather, this is an affirmative

23   waiver of something, and so that's what caught my eye when I

24   read this, and I wanted to get explication from counsel, is

25   your reading, necessarily, is that the contractor here is

26

1    waiving something, waiving and releasing all lien rights that

2    it really can't waive and release effectively as of the time

3    of this contract.

4              MR. PERSON:  I think that's true, Your Honor.  But

5    what it does not say.  It doesn't have the word "its" in the

6    middle of that phrase.  It does not say that contractor

7    waives and releases all its lien rights.  And I think it's

8    significant that following that phrase "contractor waives and

9    releases all lien rights" that there is no single comma

10   there.

11             THE COURT:  Let me ask you this:  I think that I

12   understand fully the parties' positions with regard to the

13   waiver issue.

14             MR. PERSON:  Okay.

15             THE COURT:  Do you think that this is subject to

16   summary judgment?  That is to say, you must, because you are

17   moving for partial summary judgment do you have a valid lien

18   claim.  Which would subsume, I guess, the notion that you did

19   not waive the right to the valid lien claim, and they have

20   moved for summary judgment that you have waived your right to

21   a lien.  Do you -- and I'll ask Mr. Sudell the same question:

22   Do you think that there needs to be any further record

23   developed on this or is this a matter that is subject to an

24   evidentiary hearing or do you think it is subject to being

25   decided by me on summary judgment at this point basically

1   applying the standards that each of you has argued?

2          MR. PERSON:  I think that it is -- I think it is,

3   Your Honor, and for this reason:  The only affidavits that we

4   submitted on this particular issue were that the clause in

5   question was not negotiated.  It was not discussed.  It was

6   not amended.  What we did not receive from Orion was any

7   affidavit suggesting that that was not the case or suggesting

8   through an affidavit that some action or statement by a party

9   during the course of the contract suggests that that clause

10  should be interpreted in a certain way because of their

11  actions or statements.  I think that there simply is no parol

12  evidence to be accepted on the issue.  The clause is what it

13  is, and either it's clear or it's ambiguous.

14         THE COURT:  All right, thank you.

15         MR. PERSON:  Your Honor, I think we've covered the

16  waiver issue in terms of two of our arguments, whether or not

17  my interpretation is correct and even if it's not maybe the

18  best understanding, whether it's a least an ambiguous clause.

19  The alternative argument that the waiver clause does not

20  apply, and I shouldn't even call it a waiver clause, the

21  personnel and subcontractor's clause, that this clause should

22  not have any effect is our fraud argument.  That if there is

23  fraud or error then there is no contract in the first place.

24  And with respect to that argument --

25         THE COURT:  No.  Does there have to be fraud --

28

1    isn't that really a fraud in the inducement kind of argument

2    as opposed to subsequent fraud.  As I understand your fraud

3    argument, it's not that there was fraud in the inducement at

4    the formation stage of the contract.  This was originally a

5    contract negotiated with another party, it was assigned to

6    you.  You basically took over the work subject to this

7    contract.

8             MR. PERSON:  Right.

9             THE COURT:  And at that point in time, I don't -- I

10   haven't read anything that suggests to me that there was

11   fraud involved in that stage of the proceeding.  As I

12   understand your fraud argument, it is that they continually

13   induced you to -- that they induced you to continue to work

14   with promises of payment that were not true and that they

15   didn't intend to be true.

16            MR. PERSON:  Correct, Your Honor, but --

17            THE COURT:  How does that vitiate the formation of

18   the contract itself.

19            MR. PERSON:  In this way, Your Honor:  The Master

20   Service Agreement is a framework providing terms and

21   conditions under which the work is to be performed if the

22   work is given and if the work is accepted.  That goes to the

23   very core of what a Master Service Agreement is versus a

24   construction contract.  And so what we have here is a MSA

25   that says if Orion decides to give Fluor certain work to do,

1   these are the terms and conditions under which it will be

2   done, but there is no requirement in the MSA, and it says

3   this explicitly at paragraph 2.1 of the contract, "This

4   agreement does not obligate company to request services from

5   the contractor nor does it obligate contractor to accept any

6   such request for services from company." Because remember,

7   the purpose of this MSA was originally to do maintenance

8   work.  And sometimes Orion would decide to have PSC do

9   maintenance work, Fluor do maintenance work, and other times

10  decide to give it to somebody else, or they could decide to

11  do it themselves.  And under the circumstances, if a work

12  assignment was received, under the terms of this MSA, Fluor

13  was not obligated to accept that work assignment.  So what we

14  really have here is not just a single contract, the MSA, but

15  we have upwards of 580 little contracts that all incorporate

16  the MSA, all 580 of those work assignments that deal with

17  reconstructing the coker unit after the fire, and those are,

18  I believe, the bulk of what the exhibits to our reply

19  memorandum that's Exhibit C attached to the affidavit of

20  Valerie Kramier (phonetical), 580 work assignments to give

21  the Court an idea of -- that's all work that makes up the

22  rebuilding of the coker unit.  So, at a point in time, in

23  April of 2003, if Orion knows that it's going to file

24  bankruptcy, is expecting to file bankruptcy, and at that

25  point knows that insurance proceeds may not necessarily be

1   available and is promising Fluor, You're going to be made

2   whole. You're going to be paid in full, continue to do the

3   work, continue to accept new work assignments to get this

4   coker unit finished for the benefit of Orion, for the benefit

5   of the creditors, for the benefit of the eventual purchaser

6   out of the bankruptcy proceeding. So, it's inducing the

7   acceptance of additional work assignments which are in

8   themselves essentially new little contracts that incorporate

9   the MSA.

10   THE COURT: So, if I were to accept that, would you

11   agree that that would require an investigation of each one of

12   those little work assignment contracts to determine at which

13   point that predicate that you're talking about arose. In

14   other words, at which point did Orion know that it was filing

15   bankruptcy, know that it maybe couldn't use the insurance

16   proceeds for this purpose but would have to use it for

17   something else, and maybe if the work started in February,

18   that didn't happen until April or March or May.

19   MR. PERSON: If we were talking about getting down

20   to deciding whether or not the waiver of lien clause is

21   valid, solely on the issue of whether or not fraud was

22   committed, it certainly starts getting into a fact intensive

23   discussion.

24   THE COURT: Or the same with constructive trust if

25   we got to that point.

MR. PERSON: Yes, sir.

THE COURT: Only to the extent that there were such representations made at a particular time based upon the facts at that point could they have induced Fluor to have undertaken the work.

MR. PERSON: Yes, Your Honor. And with respect to the fraud argument, I've provided Mr. Sudell before Court convened this morning with what I can best describe as my feeble attempt at a demonstrative aide to assist myself and maybe assist the Court, I would hope, in considering the affidavits as they bear upon the fraud issue. May I submit this to the Court?

THE COURT: Please.

MR. PERSON: What I've attempted to do in this time --

MR. SUDELL: Your Honor, I certainly don't have an objection to the document being handed up. I did just receive it at 9:30 or so. I haven't had a chance to review it.

THE COURT: Well, I assume that this is like counsel standing up at a white board and during the course of an argument writing down these same things in a demonstrative way. So I'm not accepting this as evidence. I'm accepting this merely as a demonstrative outline of what it is he wants to say.

32

1    MR. SUDELL:  (Microphone not recording.)

2    MR. PERSON:  I understand, Your Honor, and I'm

3    certainly not trying to put anything over on anybody.  I'm

4    simply trying -- I was struggling with trying to juggle these

5    five affidavits on the one side and three counter affidavits

6    on the other, and trying to mesh them into an understanding,

7    at least on my part, in terms of what took place or how do we

8    view oral argument, Fluor's argument that fraud was

9    committed.  And it gets down to, you know, I guess the old

10   Nixonian question that we looked at in Watergate, What did

11   they know and when did they know it?  And I guess the third

12   question to be added is, What did they tell Fluor at the same

13   time.  And what I've attempted to do here is, Your Honor, is

14   show the dates that certain statements were made by Orion

15   personnel, and what I think is most significant is if you

16   turn to May 13th --

17   THE COURT:  First, let me understand the structure

18   of what you've done here.

19   MR. PERSON:  Certainly, Your Honor.

20   THE COURT:  Somebody who's identified in red is an

21   Orion person.

22   MR. PERSON:  Yes, Your Honor.

23   THE COURT:  If the statement that follows that is

24   in blue, that means that's what a Fluor person says that

25   Orion person said.

33

1      MR. PERSON:  Correct.

2      THE COURT:  If it's red and red, that's what the

3  Orion affidavit says that the Orion person said, and if it's

4  blue and blue that's what the Fluor affidavit says the Fluor

5  person said; is that basically --

6      MR. PERSON:  That's the basic outline, Your Honor,

7  yes.

8      THE COURT:  Okay.

9      MR. SUDELL:  Your Honor, I don't read anything into

10  the red state blue state . . .

11      THE COURT:  Yeah, well --

12      MR. SUDELL:  I haven't tried to interpret that.

13      THE COURT:  Yeah, I do, I just won't tell you what

14  I do.

15      MR. PERSON:  And, Your Honor, I think the crux of

16  things here is the suggestion that Orion was somehow

17  surprised at May 13 that Fluor was claiming that it had some

18  upwards of $21 or $26 million in expenses.  And their

19  statements that are made preceding that May 13 date where

20  Orion is telling Fluor we will make you whole.  We've got

21  insurance proceeds.  You're going to be paid, stay on the

22  job.  At that point, Orion, artificially in my view, puts

23  great emphasis on the fact that only $3.6 million had been

24  invoiced by Fluor at that point.  I think the most

25  significant uncontradicted statement that's reflected in this

34

1   time line, that's also reflected in the affidavits is the one

2   on May 13 where Dave Constable (phonetical), who's the COO of

3   Fluor, says Eric Bluth told him on that day that Orion has

4   been putting in approvals for Fluor that now totaled $21

5   million.  I think it's important for the Court to understand

6   what that means.  Orion is a sophisticated purchaser of these

7   kinds of services.  They don't sign the time and materials

8   contract with a contractor like Fluor and then not monitor

9   what things are going on and costs are  being approved.  They

10  don't ignore that until an actual invoice is received.  They

11  monitor the activities that are going on.  In fact the

12  reason, and we can submit affidavits to this effect if it

13  were necessary, the reason more invoices hadn't been

14  submitted by that date had to do with the process under the

15  contract where Orion required that Orion approve time sheets

16  of Fluor and its subs before an invoice could be submitted.

17  So, Orion, according to Mr. Constable, saying to me by Mr.

18  Bluth to him had been monitoring approvals on this project

19  and had accrued over $21 million with respect to Fluor's

20  work.  At the same time, they have to know that of that $21

21  million approval, they are telling Fluor in earlier in May,

22  you're going to be made whole from the insurance proceeds.

23  We're going to take care of you in a critical vendor motion.

24  They start preparing that critical vendor motion in April

25  according to the Orion affidavits themselves.  So, Orion

35

1   would have to be sticking their head in the sand to suggest

2   that in April and early May they honestly thought that Fluor

3   had only done $3 million worth of work because only $3

4   million worth of invoices had been received, and yet they are

5   telling Fluor, stay on the job, you're going to get paid,

6   we're going to make you whole.  That is the crux of the

7   fraudulent misrepresentation that we feel has been made here.

8   And I won't belabor the Court with going through the entire

9   document.  What I've attempted to do is take actual

10  statements and not color them, no pun intended, one way or

11  the other in terms of the time line to reflect exactly what

12  was said by one affidavit or another on a particular issue.

13  The other thing that I  think is important is what is not

14  found in the Orion affidavits as they impact on the fraud

15  issue.  They do not contradict the critical statements made

16  by the Fluor people in their affidavits about what Orion

17  people told them.  Their affidavits, if you read them

18  carefully are artfully worded and talk around the issue of

19  the promises that were made.  For example, this only $3.6

20  million was invoiced to that point.  But they don't directly

21  say that Orion had no knowledge of additional accruals nor is

22  Mr. Constable's affidavit directly contracted by Mr. Bluth or

23  anyone else as the result relates to the accrual issue.  In

24  summary on the fraud issue, Your Honor, it's fraud if Mr.

25  Rayzor or Mr. Bluth, Mr. Anderson or Mr. Victor knew when

36

1    they were making these assurances that insurance money would

2    be going elsewhere. If on one hand are telling Fluor you're

3    going to be paid, and they know that they've earmarked that

4    insurance money to go elsewhere, I suggest that that's fraud.

5           THE COURT: Now what evidence do you have that they

6    actually knew that or do you need to have evidence of that

7    point in order to sustain your argument?

8           MR. PERSON: I think that the fact that -- The

9    evidence that I think we do have is the uncontradicted

10    statement by Mr. Constable that Mr. Bluth told him that  they

11    had accruals of $21 million. So they knew that the cost

12    incurred by Fluor were substantially higher than 3.6 million.

13    So that when Orion is saying you're going to be made whole,

14    they're not really saying you're going to be paid 3.6, they

15    know that Fluor's understanding or should know that Fluor's

16    understanding that to mean that you're going to be paid

17    upwards of 21 million.

18           THE COURT: Well, I guess my question was, you said

19    it is fraud if the Orion personnel knew at the time they made

20    these statements that the insurance proceeds were going

21    elsewhere and, therefore, would not be available to pay

22    Fluor.

23           MR. PERSON: Right.

24           THE COURT: And my specific question was, What

25    evidence do you have that they knew that, number one? And

1    number two, at the summary judgment stage, do you need that

2    evidence now?

3            MR. PERSON:  I think in terms of this issue of

4    fraud really being one to defeat the partial summary judgment

5    on the Orion side, I don't think I need it yet --

6            THE COURT:  Although Orion argues that you do.

7    Orion argues in its reply papers, I think if I remember

8    correctly, somewhere, that when you scrape everything away

9    there is no evidence here that anybody on Orion's side was

10   actually acting in bad faith or with knowledge that what they

11   were saying was not true, and, therefore, you can't overcome

12   that hurdle even if the rest of what your affidavits say is

13   true.

14           MR. PERSON:  I think it's rather incredulous to

15   suggest that the Orion personnel did not know that if they've

16   hired a chief restructuring officer in April.  That person is

17   gathering together what they're calling a critical vendor

18   list used for a motion.  It suggests that their defense is

19   that they were incompetent and didn't look at accruals to see

20   how much Fluor was going to be -- it was actually accruing to

21   suggest that they knew when they were saying that Fluor was

22   going to be paid out of insurance proceeds that they would be

23   paid only 3.6 when they knew that Fluor -- they had to know

24   that Fluor's real accruals were in the neighborhood of $20

25   million.  It a matter of the date of the financial

1    information that was available in Orion's own systems to them

2    that I think is suggested in the affidavits.  It is not

3    contradicted by the Orion affidavits.  That is the factual

4    information that overcomes that problem for me on summary

5    judgment.  And understand, Your Honor, as well, that that's

6    in respect to the fraud argument.  If the Orion defense is,

7    Oh, well, you know, that person didn't really have that

8    malice.  This person didn't really know that the insurance

9    wasn't going to be available.  They were ignorant of that

10   aspect of the bankruptcy process and proceedings, et cetera,

11   then under Louisiana law we have error.  Maybe mutual error

12   on Orion and Fluor's part with respect to those work

13   assignments that are issued from that point forward.  An

14   error vitiates the contract as well, you know, separately, as

15   a separate basis, separate from a fraud.  And certainly we

16   have at least unilateral error on Fluor's part, and I think,

17   frankly, the defense that Orion suggests is mutual error on

18   both the parties parts in terms of, you know, a key part of

19   Fluor accepting these work assignments is the promise and

20   knowledge that they're going to be paid, and that they're

21   going to be paid out of the insurance proceeds.  Your Honor,

22   let me move -- I'll skip over the lien is defective

23   contractor, general contractor issue until I get to our

24   summary judgment, partial summary judgment motion at the end.

25   Dealing briefly with the issue of the ranking argument that

1    it doesn't matter, Orion's position that it doesn't matter

2    whether Fluor's lien is good or not.    That it's so far

3    behind everybody else that it's irrelevant.    Your Honor, I

4    suggest that that argument might be true.    It's their

5    obligation on summary judgment to make a record that it is

6    true, and that record has not been made to this point.    If

7    they wanted to do a rule to rank all of the liens, all of the

8    creditors that stand in front, they could have brought such a

9    motion and brought evidence to establish that.    Instead of

10   really litigating before this Court, putting on evidence,

11   showing what the validity and amount of all of the secured

12   creditors allegedly in front of Fluor are, they offer you a

13   conclusory affidavit from Mr. Rayzor.    That at first, the

14   first time it's submitted, is not even submitted as his own

15   personal knowledge and then they slap on that talismatic

16   language which still failed to have him address the details

17   of what are -- not just what are the traunches of debt and

18   the amounts, but who are the creditors, how much was loaned,

19   how much has been paid down, what are the details -- What's

20   the validity of that particular secured creditor.    I'm not

21   saying that they can't do it.    I don't know.    The

22   obligation's on them to put on that evidence, and they chose

23   for whatever reason to not put on that type of detailed

24   evidence of what secured creditors really exist and the

25   validity of their liens.    We've got a lot of argument, a lot

40

1   of evidence that's been submitted to Your Honor discussing

2   the validity of the Fluor lien, but there is not one iota of

3   statement in the affidavits submitted by Orion that discuss

4   the validity of the liens that supposedly rank ahead of

5   Fluor's.  It is in that respect that I think that the motion

6   is defective, and that the argument or the discussion of the

7   ranking is simply premature.  Moving to constructive trust

8   argument, Your Honor.  We'll concede that under Louisiana law

9   there's not a constructive trust, but we've shown you, I

10  think, why the critical decision, while many of the

11  representations made by Orion personnel originated in

12  Louisiana and many of those representations were received by

13  Fluor personnel in Louisiana, the critical receipt by Fluor,

14  the person who made the call, Do we take this job?  The

15  person who makes the call, Do we stay on this job?  Do we

16  continue to do the work?  Was the COO back in Texas, Mr.

17  Constable?  And the May 13 representation to him, Stay on the

18  job; don't leave; you're going to be made whole, that

19  critical representation is certainly received in Texas.

20  That's where the decision was made.

21          THE COURT:  Well, what about the argument of Mr.

22  Sudell that even if that's true, that doesn't create a record

23  as to all of the pre-petition work relating to the $25

24  million that you're asserting, but rather is we filed

25  bankruptcy, please stay on and we will pay you on a post-

1   petition basis and in fact you were paid on a post-petition

2   basis.

3       MR. PERSON:  Why did --

4       THE COURT:  His argument is, the record is devoid

5   of that kind of affidavit evidence going back to these

6   critical time periods when the work assignments were being

7   made and accepted.

8       MR. PERSON:  And those are the facts.  You know,

9   the critical -- What I would suggest, Your Honor, is that the

10  representations made on May 13, indeed even the

11  representations made on the critical fire vendor motion, you

12  know, when they're in Court in June of '03, are not limited

13  to -- how can I put it.  It is stay on the job and do the

14  post-petition work because you're going to be taken care of

15  here on the critical vendor motion.

16      THE COURT:  But even if that's true, let's assume

17  that that's the way Fluor received it.

18      MR. PERSON:  Uh-huh.

19      THE COURT:  The reality is Fluor was not harmed

20  because they stayed on the job and they did the post-petition

21  work and they were paid for the post-petition work.  They

22  were already unpaid for the pre-petition work.  You could

23  say, Well, we could have decided not to have done the post-

24  petition work based upon the fact that we had not been paid

25  for the pre-petition work, but isn't it a no harm, no foul

1    situation since you did the work and were paid.

2        MR. PERSON:  Well, you end up with an unjust

3    enrichment situation that Orion, and certainly the secured

4    creditors and Valero, end up with a completed refinery unit

5    because of these representations made to Fluor to induce them

6    to stay on the job and continue to accept additional work

7    assignments to complete the job.

8        THE COURT:  Well, what of the argument that if

9    anybody -- that there is no unjust enrichment of Orion.  It's

10   simply a question of where the value goes, which creditor

11   does the value go to?  I mean it's not as if they were

12   unjustly enriched with regard to that additional work that

13   you did post-petition at the expense of Fluor since Fluor was

14   paid for that.  If Fluor had not done the work and perhaps

15   the refinery had not been restored and, therefore, had

16   brought less money then that really doesn't come out of

17   Fluor's hide one way or the other.  In fact, it's better for

18   Fluor to have the increased value to the extent that it's

19   trying to recover its pre-petition amount just like any other

20   creditor.  I'm having a hard time seeing the nexus on the --

21       MR. PERSON:  Well, there may not be any direct

22   harm, Your Honor, but there certainly is unjust enrichment in

23   terms of -- to again benefit -- There's certainly a benefit

24   to Orion.

25       THE COURT:  But that has to be an unjust enrichment

43

1  at the expense of Fluor, and I don't see where the expense

2  was to Fluor.  I would agree with you if in fact Fluor had

3  not been paid for the post-petition amounts.

4         MR. PERSON:  Uh-huh.

5         THE COURT:  Since Fluor was paid on a post-petition

6  basis, what was the expense to Fluor?

7         MR. PERSON:  In terms of the Texas nexus, you're

8  correct, Your Honor.  The other fraudulent

9  misrepresentations, if you will, date back to pre-petition

10  time frame and earlier work assignments, and that really

11  relates to the federal constructive trust argument.

12         THE COURT:  Right.  There really is no record that

13  we have currently in front of us that indicates that that

14  same Texas nexus, so to speak, exists for those pre-petition

15  amounts.

16         MR. PERSON:  Only to the extent that the people for

17  Fluor in Louisiana who received them funneled them back to

18  Mr. Constable and the decision can you stay on the job was

19  really a decision made in Texas, and that's admittedly more

20  tenuous.

21         THE COURT:  And does the -- Remind if the affidavit

22  actually says that.

23         MR. PERSON:  I don't believe they do, Your Honor.

24         THE COURT:  Right.  That's a conclusion I should

25  draw or inference I should draw from the fact that Mr.

44

Constable's a COO who has the ultimate responsibility to make
these decisions.

      MR. PERSON:  Right.

      THE COURT:  Okay.  So let's talk about federal
constructive trusts.

      MR. PERSON:  Okay.  Your Honor, frankly, I thought
Mr. Sudell did a good job of summarizing, you know, the case
law that we're relying upon in terms of the Columbia Gas case
and others.  I think the question that Your Honor asked is
one that has puzzled us and maybe relates to this issue
somewhat, and that is, does the record reflect why exactly
Fluor was never paid?  And the record doesn't really reflect
why Fluor was never paid except that we've got these repeated
representations that we've been talking about of you'll be
paid, you'll be paid out of the insurance proceeds, stay on
the job.  And here I guess the real -- the benefit to Orion
and secured creditors, and I've alluded to it already, I
guess, in talking about the Texas argument, is that the
secured creditors benefitted from the sale.  In that respect
Orion benefitted from the sale.  Fluor throughout the month
of April and early May is continuing to accept work
assignments for form work on a pre-petition basis.  Work for
which it doesn't get paid.  And so that's the harm or the
detriment to Fluor.  The federal law issue, if you will, is
really -- is bankruptcy law and the whole idea of inducing

1  someone like Fluor to stay on the job or inducing someone

2  like Fluor to come to a bankrupt situation and perform work

3  for a potential bankrupt situation where there's rumors that

4  someone's going to, you know, going to go into bankruptcy,

5  and perform work, rebuilding something, creating, you know,

6  this rebuilt coker unit for the benefit not only of Orion but

7  its creditors in the future, and it's the nature of the core

8  of the fire critical vendor motion that Orion, you know,

9  files later on in '03 in June where they want the Court to

10  authorize the payment to these critical vendors.  And

11  basically what Fluor's position is, you induced us to stay.

12  You induced us to continue work so that benefit is gained by

13  you and the other creditors, and then Fluor doesn't get paid.

14  And it's a discouragement of other contractors in Fluor's

15  position from coming around or sticking around again in the

16  future.  Now, finally, I'd like to turn to the contractor,

17  general contractor issue in Fluor's partial motion for

18  summary judgment.  There seemed to be no dispute that the

19  proper paperwork for a small c contractor's lien was

20  certainly timely filed.  That's never been disputed by Orion.

21  Their suggestion is that Fluor failed to properly file and

22  record the Master Service Agreement, I presume, the contract

23  as the general contractor with Orion filed in St. Charles

24  Parish in the Clerk's office, to preserve its status,

25  preserve its lien as a general contractor.  We come back to

1    the argument, Your Honor, that I suggested earlier that in

2    order to be a general contractor you have to impliedly, from

3    the contract, be in charge of the entire project or a large

4    portion of it.  The very core nature of that Master Service

5    Agreement by itself prevents Fluor from being classified when

6    they signed the Master Service Agreement as a general

7    contractor.  When they signed the MSA, this is over a year

8    and a half, two years before the fire happened, much less

9    Fluor being or PSC being asked to do their fire rebuild work.

10   The fact that this MSA does not require any work be assigned

11   by Orion nor does it require any work be accepted by PSC or

12   Fluor, I think prevents it from creating a general contractor

13   relationship between Fluor and Orion.  Because it took 580

14   work assignments issued by Orion to assign all of the little

15   tasks, all of the big tasks, all of the purchase of certain

16   equipment, all of the -- It's virtually a micro-management of

17   and direction of the rebuilding of the coker unit by Orion on

18   a daily or weekly basis in terms of the issuance of all of

19   these work assignments.  And the small minute nature of, you

20   know, authorizing sixteen laborers to go out and put up

21   scaffolding at a cost of $12,000 or $20,000, and those are

22   paraphrases of actual work assignments that are submitted as

23   part of the affidavits and were quoted, I think, verbatim in

24   our memoranda.  The nature of the work -- The way in which

25   Orion parceled out the work on a piecemeal basis, and the

1   fact that no work had to be issued at all, I think creates a

2   small c contractor relationship between the companies, not a

3   general contractor relationship between the companies.  And

4   the fact that Orion did parcel out the work in this piecemeal

5   fashion and directed the use of certain subcontractors and

6   only -- you know, authorized things as minute as so many

7   laborers at a cost of so many dollars to do certain work

8   demonstrates the way that Orion was controlling the work, and

9   that information, that affidavit testimony remains totally

10  uncontradicted by anything Orion has submitted.  What they

11  submit in reply is the characterization of Fluor as general

12  contractor by their CFO, Mr. Rayzor, by their COO, Mr. Bluth.

13  I suggest they're not experts in Louisiana law.  Their

14  characterization of them as general contractor is certainly

15  not controlling under Louisiana law, and the underlying

16  facts, the way the actions of those people at Orion, their

17  actions in controlling the work and parceling it out on a

18  piecemeal basis, those actions speak much louder than the

19  words in their affidavit, which is frankly self-serving and

20  after the fact in terms of the characterization of general

21  contractor.  I'll concede, Your Honor, that even some of the

22  documents that Fluor signed, one of those work assignments

23  authorizes $5 million worth of work and calls Fluor a general

24  contractor.  It only authorized $5 million worth of work, and

25  Orion continued to have to issue additional work assignments

1   detailing the $5 million and more than that $5 million and

2   Orion under the terms of the contract could have chosen to

3   stop issuing those work assignments and go in a different

4   direction if they had wanted to and have someone else

5   complete things.  And Fluor would have had no legal basis to

6   require them to give them the total amount of the work.

7          THE COURT:  Do you think that creates an issue with

8   regard to those -- to that portion of the $23 million.  In

9   other words, to the extent that there is an authorization

10  that is issued specifically that calls them the general

11  contractor or do you think that the fact that they're called

12  a general contractor is really not that relevant?

13         MR. PERSON:  I think the fact that they're called a

14  general contractor is irrelevant, Your Honor.  You know, if

15  you call a horse a duck, it's still a horse.  Even if the

16  paperwork selling it and exchanging it between the parties

17  calls it something else.  It is what it is by its actions.

18  Your Honor, I probably have forgotten something, but given

19  the hour, if Your Honor doesn't have any other questions,

20  I'll rest and again I want to appreciate the Court in giving

21  me the time in letting us go first that I can maybe catch a

22  plane.

23         THE COURT:  All right.  Mr. Sudell, do you have

24  anything briefly in reply?

25         MR. SUDELL:  I'm certainly available to answer any

49

1   questions you have.  I don't know how tight the plane

2   connections are, so I wouldn't want to cause you to miss by

3   --

4          MR. PERSON:  I've got a shuttle at 11:45.

5          MR. SUDELL:  Okay.  Again, Your Honor, if you have

6   any questions I'm certainly happy to answer them.  I had

7   jotted down a few notes.  Back to the waiver argument, the

8   interpretation that Fluor gives to that provision, I think as

9   Your Honor has pointed out, would make the language "waives

10  and releases all lien rights".  Contractor waives and

11  releases all lien rights, parens (of its personnel and

12  subcontractors).  Superfluous or meaningless.  They couldn't

13  do it, and therefore, I don't think that interpretation is

14  plausible, and I think as a result the plain meaning of the

15  contract does permit us to be given summary judgment on that.

16  I don't think it could be granted the other way, however,

17  Your Honor.  It doesn't say that contractors shall cause its

18  subs and personnel to waive and release all their rights,

19  which would have a different meaning, but that's not what it

20  said.

21          THE COURT:  What about this notion raised -- I want

22  to note for the people on the telephone again, we're starting

23  to get chatter.  We cannot have chatter on the telephone or

24  I'll have to cut off the line since it's disruptive to the

25  proceedings in the courtroom.  What about the argument made

50

by counsel that each one of these that -- you have to look at

what the facts and circumstances were at the time each one of

these work assignments was issued because there was no

obligation by Orion to hire Fluor or Fluor to accept the

assignment until such time as each individual work assignment

arose.

MR. SUDELL:  And that comes up, I guess, Your

Honor, with respect to their argument that there may not be a

contract because of fraud or error.

THE COURT:  Right.  In other words that if there

was at the time a request for a work assignment was issued

and it was accepted by Fluor, if there was at that point --

If that acceptance was induced by fraud at that point that

would vitiate the lien waiver portion of the contract.  I

think I'm restating that correctly.

MR. SUDELL:  Well, again, Your Honor, candidly, in

my view virtually wherever the issue of fraud comes up in

these discussions, it's a question of fact.  If we have to go

there, I think summary judgment can't be granted either way.

There's just too much out there about that.  Our arguments as

to the waiver, except for this sub-argument now, didn't have

a fraud component to it.  The constructive trust position

really doesn't have a fraud component unless you get into

Texas law, and I think we've sort of gotten almost by that

based on Your Honor's questions and the record.  So, under

1    Louisiana law and the constructive trust there is no such

2    animal, and I don't think under federal common law, if that

3    were to be applied, that the fraud component would come in.

4    Your Honor, they may very well -- I don't in any way concede

5    this, but the allegations of fraud at best in our mind lead

6    to another basis for an unsecured claim.  You were defrauded.

7    You know, that's not an unusual claim in a bankruptcy

8    situation, but it doesn't lead to anything more than an

9    unsecured claim.  That's really the point, Your Honor.  And

10   again, one of my notes is that with respect to the

11   constructive trust argument, of course counsel argues that

12   Fluor was never paid, that as a result secured creditors

13   benefitted, Orion in some way benefitted.  Again, that leads

14   to -- and that they were induced to do that post-petition,

15   that leads to a fraud claim, maybe a breach of contract claim

16   even for the pre-petition work, of course, but not a

17   constructive trust.  Some of the cases, some of the

18   commentators would never have the Court consider constructive

19   trust in a bankruptcy situation because by definition it

20   takes money from one deserving party and gives it to another.

21   That's the whole situation here is determining who among

22   people who are entitled outside of bankruptcy to payment,

23   should get the available funds.

24         THE COURT:  All right.

25         MR. SUDELL:  Thank you, Your Honor.  Unless you

52

1   have any further questions.

2           THE COURT:  Thank you.  The matter will be

3   submitted.

4           MR. PERSON:  Thank you, Your Honor.

5           THE COURT:  And I will rule also on the motion to

6   strike the affidavits as part of that overall matter.  I

7   assume that that's still being prosecuted by Orion?  Excuse

8   me, by Fluor?

9           MR. PERSON:  Your Honor, for all practical purposes

10  since the -- technically yes, Your Honor, and I'll let Your

11  Honor, you know, take it on the briefs.

12          THE COURT:  But the supplemental affidavits did put

13  in the personal knowledge statements.

14          MR. PERSON:  And I think the substance --

15          THE COURT:  The question is more -- from your

16  standpoint a question of sufficiency.

17          MR. PERSON:  Yes, Your Honor.  I think even as

18  they've been supplemented they're still insufficient, and

19  we'll just leave it at that.

20          THE COURT:  All right, thank you.  Okay, what's

21  next?

22          MR. WERKHEISER:  Your Honor, for the record again,

23  Gregory Werkheiser of Morris, Nichols, Arsht & Tunnell.  Your

24  Honor, we --

25          MR. COTLAR (TELEPHONIC):  Excuse me.  Can the Court

53

1    hear me?

2            THE COURT:  Yes, who is this?

3            MR. COTLAR (TELEPHONIC):  Your Honor, my name is

4    Sidney Cotlar, Herman, Herman, Katz & Cotlar in New Orleans.

5    I apologize for the interruption.  I'm on a call for a fee

6    application. I am in New Orleans.  My office is going to

7    close in two hours because of the hurricane, and I would

8    appreciate whatever the Court can do to facilitate the

9    hearing on that.  I believe -- I don't know if the second

10   matter that was announced earlier involves Louisiana counsel.

11   I know the first one did.

12           THE COURT:  Yeah, the second one does also.

13           MR. COTLAR (TELEPHONIC):  Oh, so, I just have to

14   wait.

15           MR. LANDWEHR (TELEPHONIC):  Your Honor, also, my

16   name is Darryl Landwehr.  I'm also in New Orleans.  My client

17   is St. Charles Parish School Board.  My plans were to have my

18   matter heard this morning, pick up my wife and load my

19   vehicle.  We packed last night and evacuate.  I heard counsel

20   for the debtor at the outset say certain matters had been

21   continued for New Orleans attorneys.  If I could, Your Honor,

22   I would like to get out of town as soon as I can.  I'm

23   concerned that if it goes into the afternoon, I won't be able

24   to leave town.

25           THE COURT:  All right, let me find out what the

54

1   status is of the St. Charles Parish matter.

2        MR. WERKHEISER:  Your Honor, the St. Charles Parish

3   matter is a contested matter, and there's been briefing

4   submitted on that, and I think Mr. Landwehr had previously

5   indicated he wanted an opportunity for argument today.

6        THE COURT:  Well, let me ask the question of Mr.

7   Landwehr.  I'm familiar with the St. Charles Parish matter.

8   I've reviewed the briefs.  Would there be any objection to

9   that matter being submitted and my issuing a written order?

10        MR. LANDWEHR (TELEPHONIC):  Your Honor, I would

11   like to just have five minutes of the Court's time.  If it's

12   not convenient today, I will be glad to come back whenever

13   the Court tells me.

14        THE COURT:  All right, let me ask the question with

15   regard to the other matter we have, the Syracuse matter,

16   what's the status with counsel on the Syracuse matter?  With

17   regard to getting out of town and so on.

18        MR. WILSON:  Your Honor, I have a flight out of

19   Baltimore at 2:45.

20        THE COURT:  Okay.  All right, so when do you have

21   to leave here to get to Baltimore?

22        MR. WILSON:  Well, with regard to law enforcement

23   officials, I would say probably about 12:15.

24        THE COURT:  Okay, let's do this.  Let's take up the

25   St. Charles Parish matter very briefly and do that and then

55

1  we'll do Syracuse immediately after that.

2       MR. LANDWEHR (TELEPHONIC):  Thank you, Your Honor.

3  Your Honor, my name is Darryl Landwehr and I am co-counsel

4  for St. Charles Parish School Board.  We're here today solely

5  because a box wasn't checked on a proof of claim form.

6  There's no question that the St. Charles Parish School Board

7  was listed as an unsecured priority creditor on the schedules

8  filed by the debtor.  Accordingly there was nothing required

9  of it to be recognized as such by the school.  However, there

10  is disputed the amount of the scheduled priority claim.  It

11  filed a proof of claim setting forth what is believed to be

12  the correct amount due.  There was no dispute as to the

13  priority status or nature of the claim.  To suggest that by

14  filing such form without checking a box it intended to reduce

15  its position in this proceeding from a priority creditor to

16  an unsecured general creditor is nonsensical.  We're dealing

17  with a publicly elected party whose financial officer

18  prepared a proof of claim form.  He attached to such claim

19  form an itemized statement of all the sales tax deficiencies

20  due the school board by the debtor from December 15, 1998

21  through December 31, 2002 together with all related

22  schedules, clearly identifying such claim as a priority claim

23  for taxes.  Additionally, far in advance of the bar date or

24  some two weeks subsequent to the filing of the debtor's

25  petition, a copy of an outside tax audit reflecting the

56

1    amount of the school board's tax claim was remitted directly

2    to Orion.  After the bar date, it became apparent to this

3    office that the amount on such filed claim form included . .

4    . (microphone not recording) filed an amended claim form so

5    as to reduce the amount by removing the amounts for the

6    penalties so as to be in compliance with the mandate of

7    §507(a). . . of the Bankruptcy Code.  Section 11, 11(a) of

8    the Bankruptcy Code provides:  Claims listed in the schedules

9    filed by the debtor or any filed under §501.  A proof of

10   claim for a debt listed on the schedule filed by the debtor

11   should only be filed when some purpose would be served, and,

12   in this case, the purpose that was served was to put the

13   debtor on notice that a dispute existed as to the amount . .

14   . initially filing a proof of claim for this proceeding that

15   St. Charles Parish School Board removed its claim from a

16   priority status to an unsecured general status makes no

17   sense.  The sole purpose of such filing was to put the debtor

18   and other parties in interest on notice that a dispute

19   existed as to the amount of such claim.  It was scheduled as

20   a priority tax claim.  Each of the proof of claim forms filed

21   clearly indicated that it would be a sales tax priority

22   claim, and it still remains a priority tax claim.  The

23   Bankruptcy Court is, has been, and still remains a court of

24   equity, equity by allowing the priority tax claim of the

25   school board.  Thank you, Your Honor.

57

1        THE COURT:  All right, thank you, Mr. Landwehr.

2   Mr. Werkheiser, are you going to respond?

3        MR. WERKHEISER:  Yes, Your Honor.  Your Honor,

4   Gregory Werkheiser for the ORC Distribution Trust

5   representative.  Your Honor, there is a preliminary matter

6   related to this dispute.  Your Honor may recall that prior to

7   the August hearing there was a flurry of submissions

8   including I think an attempt to apply a -- what would in

9   effect be a sur-sur-reply and an amended sur-sur-reply by the

10  Parish.  On the Trust representative's objection, Your Honor,

11  entered an order denying the amended motion for relief of the

12  Parish and in doing so denied them the opportunity to file

13  this sur-sur-reply, if you will, and a proposed affidavit

14  that they asked to have introduced at that time.

15  Notwithstanding that order, Your Honor, yesterday, at

16  approximately 5 p.m., I received an electronic notice and a

17  fax copy of the very same affidavit that they refiled and

18  asked to be considered for this hearing, and so I would

19  orally move now that that be stricken again.

20       THE COURT:  All right, that will be granted.  I

21  think that matter has already been resolved.  So, go ahead

22  with the substance.

23       MR. WERKHEISER:  All right, thank you, Your Honor.

24  Your Honor, I think the parties are in agreement in what the

25  issue is here and the simple issue is is whether the parish

58

1    in attempting to amend its claim, well after the bar date,

2    was asserting a new claim or whether that can somehow be

3    attributed to the original non-priority claim that they filed

4    some six months before that. There is no issue of excusable

5    neglect. That issue has not been raised or argued or other

6    equitable considerations and, therefore, is waived. And I

7    think Third Circuit precedent is clear on that issue. Your

8    Honor, the premise that I hear Mr. Landwehr pressing for his

9    client is that in essence there was no obligation to file an

10   amended claim because the debtor supposedly scheduled these

11   obligations as priority. While it is true that when the

12   schedules were initially filed at the outset of the case,

13   there was a priority claim scheduled for the parish. They

14   said an amended schedule was filed on August 4, 2003 which

15   eliminated that claim. If I may, I can hand up a

16   reproduction of those schedules from the --

17        THE COURT: Okay, thank you.

18        MR. WERKHEISER: And, Your Honor, referencing

19   Schedule E priority claims, that claim was eliminated at that

20   time from the Schedule E of the schedule. So to say that

21   there was no obligation simply isn't an accurate statement.

22   From that point forward, under the Bankruptcy Rules, the

23   parish was obligated to --

24        THE COURT: Why were they amended?

25        MR. WERKHEISER: The debtor conducted an ongoing

1    review of its schedules and determined in fact that it did

2    not believe there was a priority claim.

3            THE COURT:  Is that based upon any filing that was

4    made by St. Charles Parish or independently?

5            MR. WERKHEISER:  Independently, Your Honor.

6            THE COURT:  And what was the basis of that?  Is

7    there something in the record that tells me what that is?

8            MR. WERKHEISER:  No, I don't believe there is

9    something in the record.  The only thing in the record, Your

10   Honor, is the fact of the amendments, and, Your Honor, the

11   amendments were made on August 4th, 2003, well before the

12   September 22nd general bar date in these cases and well

13   before they filed their initial claim which is Claim 302

14   which I believe is undisputed, asserts no priority whatsoever

15   for these purported tax obligations.  And if Your Honor would

16   like, I can also hand up to Your Honor a copy of Claim 302,

17   and I think review of the claim will reflect in no way does

18   it assert a priority.

19           THE COURT:  No, I've seen that, thank you.

20           MR. WERKHEISER:  And on that same vein, Your Honor,

21   although there's been much said about this supposed audit

22   attached to the claim, there is nothing on the face of the

23   audit that would put the Court, the debtor, or our creditors

24   on notice that the parish was asserting a priority obligation

25   as a part of this plan.  So we find ourselves at the

60

1    September 22nd general bar date in these cases with no

2    indication on the face of the claim that the parish is

3    pursuing a priority claim.  Some three months later in

4    December of 2003, the parish again, without leave of court,

5    files a claim in the same amount again asserting no priority.

6    And for reasons of its own that I don't think it's adequately

7    explained in any of its submissions to this court, submits

8    this proof of claim.  So twice now, the parish has availed

9    itself of an opportunity that it believed it had to file a

10   claim, and twice has failed to assert a priority.  It's only

11   in March of this year, without seeking leave of the court,

12   that the parish raises the priority issue on its submission

13   for the first time.  And at that time files a proof of claim

14   which asserts a priority claim under 507(a) for the first

15   time in excess of a million dollars.  And it is that claim as

16   well as claim 677 which we objected to because it was

17   identical to the prior filed claim and filed after the bar

18   date, that is the subject of this objection.  And, Your

19   Honor, we have argued in length in our papers citing

20   primarily the Walls and All (phonetical) case out of the

21   Western District of Pennsylvania and Metro Transportation out

22   of the Eastern District of PA, that they have in fact

23   asserted a claim that is fundamentally different in character

24   from the unsecured non-priority claim that they asserted

25   prior to the bar date, and that does in a very meaningful way

61

1    change the landscape for creditors in this case.

2           THE COURT:  Were the amended schedules -- the fact

3    that they were removed from the amended schedules, was that

4    served upon St. Charles Parish?

5           MR. WERKHEISER:  Your Honor, that I can tell you

6    there is a filing in the record that reflects service on

7    counsel for the parish.  I neglected to bring that with me

8    today, but I'm happy to submit that to Your Honor, but I do

9    make that representation that there was a notice of service

10   filed that indicates service of the amended schedules on the

11   parish.

12          THE COURT:  Okay.

13          MR. WERKHEISER:  So, Your Honor, in the interest of

14   brevity and opposing counsel's need to vacate Louisiana, I'll

15   cut this short and stand ready to answer any questions that

16   Your Honor has.

17          THE COURT:  Thank you.  Other than the ones I've

18   asked I have no other questions.

19          MR. WERKHEISER:  Thank you.

20          MR. LANDWEHR (TELEPHONIC):  Your Honor --

21          THE COURT:  Hold on a second.  Yes, counsel?

22          MR. PHILLIPS:  I'm just Darryl Landwehr's local

23   counsel.

24          MR. LANDWEHR (TELEPHONIC):  (Microphone not

25   recording.)

A000178

1      THE COURT:  Just hold on, Mr. Landwehr.

2      MR. LANDWEHR (TELEPHONIC):  I'm sorry.

3      MR. PHILLIPS:  It's Jack Phillips, Your Honor.  I'm

4  Darryl Landwehr's local counsel.

5      THE COURT:  All right, thank you, okay.

6      MR. LANDWEHR (TELEPHONIC):  The reason for the

7  second filing on December 5, 2003 was in response to the

8  supplemental bar date.  We noticed that the . . . (microphone

9  not recording) claim had been filed because a duplicate was

10  submitted, identical to the one that had been initially

11  filed.  Secondly, we received no notice of any amended

12  schedules, and thirdly, the authorities that have been cited

13  by counsel for Orion in none of those instances had the claim

14  been scheduled as a priority claim.  And that distinguishes

15  all those cases from this situation.  Thank you.

16      MR. PHILLIPS:  Your Honor, may I just make one

17  comment for the record?  I would note that all of this

18  information was forwarded to Orion with the backup material

19  on May 27, 2003.  So they were well-aware of the assertion

20  that St. Charles Parish had a tax lien.  Of course they've

21  been getting the tax notices all along anyhow, so it's

22  somewhat disingenuous for them to come in here and tell you

23  that this should not be a priority claim because it wasn't

24  filed as such when they knew they had a tax obligation to

25  this parish school board where they were in existence, and,

63

1    you know, to try to avoid this at this point in time is truly

2    inequitable.

3    THE COURT: Here's the question I'm trying to

4    understand. If I were to allow this claim to be filed as a

5    priority tax claim, the debtor has objected to it on the

6    ground that it's not timely or was a new claim that was filed

7    after the bar date. If I were to say no, it's a timely claim

8    -- Now, Mr. Werkheiser, are we going to have a battle about

9    the allow-ability of the claim because apparently the debtor

10   has made some determination that the claim is not truly a

11   priority claim for reasons I guess are not clear at this

12   point?

13   MR. WERKHEISER: Your Honor, we most certainly

14   would have a battle quote/unquote "on the merits" of the

15   claim both in the amount and to the extent if any that it's

16   entitled a priority status. Your Honor, just responding to

17   Mr. Phillips' comment --

18   THE COURT: Make this quick. I cut into Mr.

19   Syracuse's time, and I don't want to cut in any longer.

20   MR. WERKHEISER: Certainly, certainly. Your Honor,

21   I would only note that the only record basis for this letter

22   having been delivered to the debtor on May 27th is in the

23   affidavit that Your Honor has stricken from the record, and

24   secondly, Your Honor, in response to the statement that Mr.

25   Landwehr made in justification for filing claim 677, that is

1    in conflict with the statements that they made in their

2    memorandum filed, I believe it was on June 21st of this year.

3    At that time, they contended that the reason they filed that

4    claim was in response to the supplemental bar date notice

5    filed on February 19th or excuse me, served on February 19th,

6    2004.  So the contention in their brief was, well, we filed a

7    claim in December 2003, but the bar date notice wasn't

8    actually served until 2004.  So, I note that only because it

9    does strain some credibility to hear that now.  Thank you,

10    Your Honor.

11          THE COURT:  All right, thank you.  That matter will

12    be submitted.  I'll issue an order very promptly.  Let me ask

13    this question:  Is there any objection to the Herman, Herman,

14    Katz and Cotlar fee application?  Has there been?  I'm not

15    aware that there was any objection filed by any interested

16    party.

17          MR. WERKHEISER:  None that we're aware of, Your

18    Honor, and nothing on the record.

19          THE COURT:  All right, based upon that I'll allow

20    the fees on a final basis, and everybody can go home in New

21    Orleans.

22          MR. LANDWEHR (TELEPHONIC):  Your Honor, thank you

23    very much.

24          THE COURT:  All right, thank you.  All right, let's

25    move onto the Syracuse matter.

65

1          MR. WERKHEISER:  Thank you, Your Honor.  Gregory

2    Werkheiser, Morris, Nichols, Arsht & Tunnell, again for the

3    ORC Distribution Trust.  Your Honor, there are two distinct

4    pieces to the Syracuse matter.  There is items 5 and 6 on our

5    agenda which are the debtor's motion to either compel

6    execution of an escrow agreement or authority to pay funds in

7    the escrow agreement and their responsive cross-motion, if

8    you will, seeking sanctions and other relief against the

9    estate.  And then there are the motions related to the

10   adversary proceeding.  I rise to deal only with those first

11   two discrete items, and then Mr. Richard Allen from our firm

12   will address the motions relative to the adversary

13   proceeding.  Your Honor, what we have here on these items is

14   I guess charitably described as essentially a dispute over

15   what was required of the parties under the refinery sale

16   order that quickly evolved into hostility between the parties

17   and then simply an inability of the parties to reach an

18   agreement on the terms of an escrow agreement.  Once it

19   became apparent to the representative that there was no

20   ability to reach an agreement on the escrow agreement and

21   that threats were being repeatedly made to hold the estate in

22   contempt and to pursue sanctions, we filed our motion seeking

23   leave to pay the funds in the court register.  To the best of

24   my understanding of the responses that Syracuse has made to

25   that motion, there is no objection per se to paying the funds

A000182

1   into the court registry other than the articulated concern

2   that they may not earn interest there, and I believe that's

3   probably without basis, Your Honor.  Based on my experience

4   in the past when we've had a situation where we put funds

5   into the registry of the Court, the Court has in turn placed

6   those in certificates of deposit with financial institutions

7   where they've earned interest, certainly not an excessive

8   amount of interest but interest in at least the money has

9   worked while the dispute has been resolved before the Court.

10  So, we would continue to press that as a satisfactory

11  resolution to the escrow issue, if you will.  In terms of the

12  contention that has been made that the ORC Distribution Trust

13  and/or the debtor has violated the sale order, we do not

14  believe there's any substantial basis to that.  That seems to

15  be based principally on the assertion that one, there was a

16  formal requirement to establish an escrow, which is something

17  the parties certainly are capable of disputing and getting

18  paid and certainly articulated the bases for a position that

19  that is something that reasonable minds can differ on, and

20  then secondly, there is the contention made by Syracuse that

21  there was an obligation which does not appear on the face of

22  the order in any way to accrue interest for Syracuse's

23  benefit on those funds, and, Your Honor, we'd simply refer

24  the Court to the language that was reproduced in our

25  submission to the Court from the order that is devoid of any

1  reference or obligation to accrue interest for Syracuse's

2  benefit.  And, Your Honor, again, I think we've articulated

3  in our papers that in fact the inability to reach an escrow

4  agreement, you know, suffice it to say was just the result of

5  the parties to reach an agreement.  I don't know that that

6  warrants going into great detail, but from the estate's

7  perspective and the representative's perspective we believe

8  that we've behaved in good faith, made all reasonable efforts

9  necessary to reach an escrow agreement, and that there is

10  simply no basis for pursuing any sanctions claim or other

11  remedy against the estate.  So with that, Your Honor, I'll

12  rest and just reserve the opportunity to reply to statements

13  by Syracuse.  Thank you.

14       MR. LASTOWSKI:  Good morning, Your Honor, Michael

15  Lastowski of Duane Morris here today for Michael Syracuse

16  doing business as Interstate Supply Company and Texas ICO.

17  Your Honor, Mr. and Mrs. Syracuse are present here today in

18  the back of the courtroom.  I'm here today as well with my

19  co-counsel Andy Wilson who spoke briefly just before.  He's

20  with the law firm of Burke & Meyer in Louisiana, and Your

21  Honor signed an order admitting him pro hac vice earlier in

22  the case.  With the Court's permission, I'll turn the podium

23  over to him.

24       THE COURT:  All right, thank you.

25       MR. WILSON:  Thank you for the opportunity to argue

1  on an accelerated basis, Your Honor.  I'm not sure if I do

2  want to back, but I guess the dogs and kids are going in

3  different directions, and I've got to rescue them.  To give a

4  brief background for this matter.  Essentially our clients

5  here are people involved in the salvage business.  They

6  purchased these items, these surplus materials from the

7  refinery, and then they stated moving them out.  They sold

8  $800,000 worth of this stuff, and they paid the purchase

9  price in full.  They were allowed credits because the debtor

10  actually bought back some of these items.  It was clearly a

11  contract of sale.  They then had a situation where the

12  debtor's representatives tried to impede them from removing

13  things of high value because they wanted them to clean up the

14  place first.  The deal was to remove the stuff and then clean

15  up afterwards.  That's the backdrop that forms the basis for

16  the whole case.  It's really rather simplistic.  What

17  permeates this entire dispute insofar as the claim brought by

18  the Syracuses against the debtor is that all these documents

19  that the debtor drafts don't mean what they say they mean.

20  So that this goes from the simple contract which spawned this

21  litigation, then the orders which the debtor's attorneys

22  draft for the Court to sign, and the motions with the

23  debtor's attorneys draft and submit to the Court.  None of

24  these things mean what they say, and that's the entire

25  premise of the debtor's entire case vis-a-vis the Syracuses.

69

1    In this particular case, we have a situation where when it

2    became apparent that the entire refinery was going to be sold

3    to Valero, with all of the surplus materials that were still

4    there at the site, Syracuse objected to it so as to protect

5    his rights, because if it all went, then that would be the

6    end of his rights, and he'd be an unsecured claimant.  In

7    this situation he was the actual owner of those items.  He

8    objected to the sale properly and timely, and the response

9    was that they worked out an arrangement, a settlement, with

10    the debtor whereby under that settlement agreement, the

11    debtor would post and establish and fund a cash escrow

12    account, and the concept of a reserve, which is what the

13    debtor eventually did, was specifically rejected in Exhibit 3

14    to the memorandum that was presented and filed on behalf of

15    the Syracuses.  There's an e-mail exchange with our local

16    counsel to local counsel here for the debtor, and in that Mr.

17    Lastowski specifically rejects the concept of a reserve.  He

18    says, "It is unclear to me what you mean when you state the

19    monies will be reserved.  Does this suggest that the monies

20    will be placed in some type of operating account to which

21    multiple parties may assert claims.  We still require the

22    money be escrowed."  So it's a specific requirement.

23           THE COURT:  What about the court registry idea?

24           MR. WILSON:  I think that that would be fine.  I

25    think that would be a quick resolution assuming that the

1    Syracuses did not lose their right to interest from June 26,

2    2003 when the order should have gone into effect and the

3    escrow account should have been established.  We also were

4    aware that there would be some type of interest earned in the

5    registry of the court.  We felt that it would not be the

6    equivalent of what an escrow account would earn.  The whole

7    idea -- Because we always knew the funds could be deposited

8    into the registry of the court.  The idea was to put them in

9    an escrow account where they would earn greater interest.

10   I'm not sure what the interest differential is though.  So --

11        THE COURT:  I'm not either.  It seems to me that

12   this is a dispute that needs to be resolved sooner rather

13   than later, and if it can be resolved by the submission of

14   the money into the court registry, and that the Clerk can be

15   directed then to purchase or put it into appropriate CDs or

16   certificates of deposit, with financial institutions then

17   that at least will stop the bleeding.  And to the extent that

18   there's an argument over whether the Syracuses are entitled

19   to interest from June of last year until now, we're not going

20   to solve that problem by not doing something today.  In other

21   words, if that problem exists it will still exist but at

22   least we can alleviate the problem on an ongoing basis and

23   actually talk about the merits of this case as opposed to the

24   escrow issue.

25        MR. WILSON:  We had anticipated that particular

1    solution, but what I was suggesting it was that an accounting

2    could be provided by the debtor as to what had been going on

3    with these funds, the 1.5 million since June 26, 2003.  If

4    they presented an accounting as to where those funds have

5    been allotted or what type of interest they've been earning,

6    if that particular amount of interest could be at least

7    determined or calculated or actually shown through their own

8    records, that could be added to the corpus of the funds and

9    then that whole amount be deposited into the registry of this

10   court.

11             THE COURT:  What's the story on that, Mr.

12   Werkheiser, do you know?

13             MR. WERKHEISER:  Well, Your Honor, in just

14   referring to paragraph 21 of our response to Syracuse's

15   sanctions motion where we do quote the order, and the order

16   simply indicates that the debtor shall establish an escrow

17   account funded with $1.5 million in cash from the proceeds of

18   the sale.  There is no reference of an obligation to accrue

19   interest.

20             THE COURT:  That was not the question.

21             MR. WERKHEISER:  And --

22             THE COURT:  The question is, where have the funds

23   been and what's happened to them.  It's a factual question.

24   It's not an argument over what the order required or didn't

25   require.

1    MR. WERKHEISER: Certainly, Your Honor. Your
2  Honor, the funds were held in a segregated account from the
3  debtors' operating funds for the duration of the bankruptcy
4  case. They were never in jeopardy. They were maintained
5  there --

6    THE COURT: And were they in an interest bearing or
7  non-interest bearing account?

8    MR. WERKHEISER: They were in an interest bearing
9  bank account. When our plan was confirmed, what we did at
10 that time was transfer the 1.5 million which we believed was
11 our only obligation to Syracuse to an account with the ORC
12 Distribution Trust. Again segregated from any operating
13 funds of the Trust to preserve those funds in the event
14 Syracuse is ultimately determined to be owed anything.

15   THE COURT: So there was -- It was in an interest
16 bearing account but what you transferred was the 1.5 million,
17 and you left behind the interest; is that correct?

18   MR. WERKHEISER: That's correct, Your Honor, and --

19   THE COURT: So can you give an accounting of what
20 that is so that at least the parties will know what they're
21 arguing about?

22   MR. WERKHEISER: As a factual matter here today,
23 Your Honor, I can't tell you precisely what that interest
24 was. Our position has always been and continues to be that
25 it just simply wasn't --

73

1       THE COURT:  I'm not interested right now in your

2    position --

3       MR. WERKHEISER:  I understand.

4       THE COURT:  -- I'm interested in the facts.

5       MR. WERKHEISER:  And I don't know the answer to

6    that, Your Honor.  I suspect it was simply a savings account

7    so the interest would have been relatively de minimis, but I

8    can't tell you precisely what it was.

9       THE COURT:  All right.  Well, it seems to me that

10   ought to be easily found out if it was a segregated account

11   that was funded on day X -- on day A and was -- a million

12   five was taken out on day B, then there was a certain amount

13   left behind that was interest.  There ought to be a record of

14   that somewhere.  We can at least know what that amount is.

15      MR. WERKHEISER:  Your Honor, we can certainly

16   determine that amount, obviously, without prejudice to any

17   arguments and obligations.

18      THE COURT:  So what you ought to do is transfer the

19   1.5 million into the court registry, into an interest bearing

20   account in the court registry, provide that accounting to the

21   Syracuse's counsel with regard to how much interest was left

22   behind.  And if the parties can't work that out then you can

23   submit to me whether or not who's entitled to that interest,

24   and if they're entitled to that interest, then that money

25   will come out of wherever it is and go into the court

1    registry.  But first, let's get the money into the court

2    registry.  Let's get it into an interest bearing account in

3    the court registry or interest bearing instruments in the

4    court registry, and let's figure out how much interest is in

5    play from the other period of time for the whatever it would

6    be, a year plus, and then let's figure out if the parties

7    have a continuing argument about that.  If they do, we don't

8    need to have another hearing about it.  You just need to give

9    me a certification -- a certificate of counsel, I'll review

10   the documents, and I'll decide whether they're entitled to

11   the interest.  If I give you a chance to see if once you

12   figure out what that is whether that matter can be resolved,

13   and if it can't then just let me know, and I'll resolve it

14   one way or the other.

15            MR. WERKHEISER:  Very well, Your Honor.  I do have

16   a form of order.  I do expect, given after the entry of the

17   Court's ruling it wouldn't be acceptable to the Court or

18   Syracuse's counsel so we'll settle on --

19            THE COURT:  Settle an order with counsel and then

20   submit it.  Then we'll at least have that part of this

21   resolved, and we can get onto the merits of whether Mr.

22   Syracuse is or is not entitled to anything with regard to

23   this property.

24            MR. WERKHEISER:  And if I understand Your Honor's

25   ruling on that aspect, you're not asking for further

75

1    submissions from the parties, simply to indicate --

2        THE COURT:  I don't think we need further

3    submissions from the parties.  I think it's been probably

4    briefed to death.  I just -- I'm not prepared right here

5    today, this moment, to issue an order.  I'll issue an order

6    promptly upon receiving a certificate of counsel if in fact

7    the matter cannot be resolved consensually --

8        MR. WERKHEISER:  Very well, Your Honor.

9        THE COURT:  -- with regard to the missing interest.

10    Okay?

11        MR. WERKHEISER:  Thank you, Your Honor, very well.

12        THE COURT:  Okay, so let's move on now to the

13    adversary proceeding.

14        MR. WERKHEISER:  Thank you, Your Honor.

15        THE COURT:  Okay, who's up first?

16        MR. ALLEN:  Your Honor, Richard Allen for Orion.  I

17    think it depends a little on which motions we're actually

18    going to argue given Mr. Wilson's time constraints.

19        THE COURT:  Well, we have the expert testimony

20    motion.  I received that -- I've got a binder of completion

21    of briefing, so my assumption on that was that you didn't

22    want to argue that, you just wanted me to decide it.

23        MR. ALLEN:  Well, I actually would like to argue

24    that, if I may, Your Honor, but I can be very brief on that.

25        THE COURT:  As a result, I have not looked at that,

1  and I'm not really prepared to think about it today because I

2  thought it was going to be submitted without argument.  But,

3  if you want to give me brief argument on that, I can take

4  that back when I'm reviewing the briefing binder.

5      MR. ALLEN:  There are also cross-motions for

6  summary judgment on the issue of title.  They went first on

7  that in the briefing, and I think they're entitled to go

8  first on it now, and then they have filed a variety of what

9  I'll characterize as lesser motions that we would at least be

10  happy to submit on the briefs, but --

11      THE COURT:  So, counsel, what do you say?  How

12  should we proceed?

13      MR. WILSON:  My thought, Your Honor, was that we

14  would do the motion on the completing of the expert if it's

15  very brief.  We'll get that out of the way.

16      THE COURT:  Okay.

17      MR. WILSON:  Because ultimately --

18      THE COURT:  As long as everybody understands that I

19  did not prepare for that thinking that it was going to be

20  submitted without argument.  So, why don't you go ahead then,

21  Mr. Allen.

22      MR. ALLEN:  May it please the Court.  Your Honor,

23  we have moved to preclude them from offering an expert report

24  which they now say they want to offer, which is an appraisal

25  that was done about fifteen months before the complaint was

1  filed.  It's attached to our papers.  It is an appraisal that

2  essentially has 221 line items covering multiple pieces of

3  this surplus material where it describes the material and

4  then just puts a dollar value on it.  We assert three

5  grounds, but there's really one I want to focus on.  We don't

6  think this individual was fairly identified as an expert.  We

7  don't think they have complied with their discovery

8  obligations as to an expert, although they have belatedly

9  given us some of the material.  The real problem here is this

10  expert report gives us none of the information to which we're

11  entitled under Rule 26, and the expert at his deposition has

12  admitted he can't give us that information today.  Here's the

13  problem.  The report is attached to our submission, and

14  there's all these line items and this fan is worth a hundred

15  dollars and coincidentally everything's a nice round number.

16  There is a brief textual introduction that say the expert

17  used the cost approach and the sales comparison approach with

18  which I know Your Honor is very familiar from days and days

19  of testimony on those in another matter.  Well, it turns out

20  he really didn't use either of those approaches, and that's

21  what he said in his deposition.  His basic approach was he

22  went to the refinery.  He eye-balled the equipment.  He sort

23  of dictated a description of the equipment and what he called

24  a gut value.  He went back, he had those notes transcribed.

25  He then refined the values in ways he can't recall.  He got

1    information from others, but the specifics of which he can't

2    recall, and if you look at their report, there is nothing in

3    that report that tells anybody how any single value was

4    actually derived.  When I deposed him, I was expecting to

5    hear all about the sales comparison approach, and what he

6    looked at and the cost approach, and what he looked at.  He

7    did none of that.  He admitted it.  He called that part of

8    his report boiler plate.  Rule 26 requires some very critical

9    disclosures, the basis and reasons for the opinions and the

10   facts and circumstances underlying the opinions.  The real

11   problem here is the report gave us none of that, and when I

12   asked him at his deposition because they had said, Oh, well,

13   this can all be curable, you deposed him once, and you can

14   depose him again, and all I would direct Your Honor to read

15   in our reply brief is his testimony which we cite, in which I

16   said to him, at the end of the day, after what was a somewhat

17   frustrating three or four hours, As you sit here today, can

18   you tell me as to any line item here, how you actually

19   derived that value?  And the answer was, No.  Now this is

20   not, in fairness to Mr. Israel, his fault because he

21   testified that he had no idea he was doing an appraisal for

22   litigation purposes.  The report itself says it's for

23   financing purposes.  He understandably valued 8,600 pieces of

24   equipment, and one can understand why today he doesn't have

25   any idea how he came to those values three years ago.  But if

1  the plaintiffs intended to offer that as an expert report, it

2  was their obligation both to tell Mr. Israel what he had to

3  do, and it was their obligation to give us that information,

4  and this report is woefully deficient.  So it doesn't have

5  what we're entitled to, and he has now admitted he can't give

6  us what we're entitled to.  And in fairness, there's no way

7  we can test these nice round numbers as to why something is

8  worth $5,000 and something else is worth $6,000.  So

9  fundamentally, Your Honor, because they haven't complied with

10  Rule 26, and it's really the important substantive parts of

11  Rule 26, that we would be greatly prejudiced if they can just

12  put this guy on the stand, talk about these numbers when we

13  have no way to test as to any of these items how he really

14  derived that.  Thank you.

15       MR. WILSON:  Your Honor, we would submit that this

16  motion is being filed entirely for taxable reasons.  There's

17  no prejudice involved.  What we have here is a situation

18  where they have no expert of their own, and no one bothered

19  to get an appraisal of all of these surplus materials while

20  the debtor had possession of them.  So, the only way that

21  they can come back against the Syracuses is to eliminate the

22  expert from the proceedings.  If anything, if you listen to

23  the argument that's being presented orally, which is

24  different from what is in the pleadings, they're basically

25  presenting a dauber, as we would say, or a dauber up here, I

1    guess, a motion as to the weight or the quality or the

2    substance of the motion or the expert's report, which would

3    go to the weight of the expert report and what the trier of

4    fact would determine is the value of the report. I think

5    that they do resent the fact that this individual has been

6    selling these types of equipment for decades, and so what he

7    did was he relied on his own personal experience as to what

8    these things are generally worth, and that's how he valuated

9    them. He didn't use some sort of book, and he didn't use any

10   type of manual. He has been buying and selling this stuff as

11   his own personal business and then he went into the appraisal

12   business after that. So he knows this stuff because he's

13   selling it all the time and evaluating it for banks, for

14   would- be purchasers and would-be sellers. So, he just

15   relied on his own experience, and the debtor doesn't like

16   that because they can't refute it. So the only way to

17   respond is to eliminate him, and that's what this motion is

18   all about. In terms of the basis for the motion, there's

19   three faulty premises. The first, the debtor said that, we,

20   that is the Syracuses had to identify an expert by April 1st,

21   2004. That's completely wrong. The deadline was April 30th,

22   2004. Prior to April 30th, 2004, in two letters, a letter

23   exchange, one from the plaintiffs and one to the debtor's

24   counsel -- from the debtor's counsel. This individual is

25   specifically identified as an expert. So, the first premise

1   that the plaintiffs never identified him as an expert is

2   completely false.  So it's confirmed there were attachments

3   in our motion showing that the letters were exchanged and

4   identify him as an expert.  Then they said that we never

5   provided the report.  The report was provided to their prior

6   counsel in Louisiana, and it was always understood it was an

7   expert report.  If there are any problems with it or if Orion

8   needed to get an expert on this issue, they knew that value

9   was going to be a major issue in the case, and they could

10  have gotten him at any time.  So in terms of not providing a

11  report, they've been provided shortly after the report was

12  generated to Orion's prior counsel in Louisiana and then was

13  provided and attached to our complaint in the bankruptcy

14  proceeding, then it was provided in an attachment to request

15  for admission.  So for the debtor to now argue that they had

16  no idea that value was an issue, is totally disingenuous at

17  best.  The third thing is that we didn't comply with the

18  discovery obligations.  In terms of the content of the

19  report, normally you attach any drafts or whatever that the

20  individual had.  We contacted the individual.  He didn't have

21  any drafts.  We contacted his prior employer.  He said he

22  didn't have anything.  And then once the deposition was

23  taken, we went back -- because of the complaints to the

24  debtor's counsel, we went back to his prior employer and

25  said, Surely, you must have something.  They went way back in

1  their closed files and found some drafts.  We sent everything

2  to them, provided them everything.  If they really had any

3  prejudice, they just take a follow-up deposition of him.  The

4  problem is, they don't like his report, and the only solution

5  they have is to knock out his report, not deal with the

6  substance or real prejudice or real arguments.  They just

7  want him out of the game because they have no testimony on

8  this.  So, I think if we look at the merits of this thing,

9  the three faulty premises are laid out in our brief.  There's

10 no way that they have experienced any prejudice that they

11 couldn't correct, if they experienced any prejudice from the

12 get-go.

13        MR. ALLEN:  Well, Your Honor, of course our motion

14 is tactical in a sense.  Everything you do in litigation is

15 tactical.  The question is whether we're entitled to have

16 this report barred where they haven't complied with the

17 rules.  Now, one thing when Your Honor reads the briefs,

18 you'll see, nowhere in the briefs do they ever dispute that

19 the report gave no information on the things Rule 26

20 requires, the basis and reasons for the opinions and the

21 facts and circumstances relied on by the expert.  They don't

22 dispute that anywhere, Your Honor.  You can search the

23 briefs.  They just ignore that point.  They say that they

24 always understood this would be an expert report.  Well, that

25 highlights why it was their obligation to comply with Rule

1   26.  And in terms of this notion that we don't have an

2   expert, Mr. Wilson knows that I tried the beginning of last

3   February to get the deposition of Mr. Israel.  I said to him

4   in letters which are not before the Court, but I could put

5   before the Court, that I can't make a decision on an expert

6   until I understand what this guy has done.  And I finally got

7   the deposition on July 7 and the two things that came out of

8   that were (1) he hadn't even used the methodologies he had

9   said in his report he had used, and he couldn't today tell me

10  how he derived at any of these values.  And if Rule 26 means

11  anything, it means we are entitled to that information, which

12  they did not give us and which the expert admits he simply

13  cannot give us today.

14          THE COURT:  All right, thank you.  Okay.  Let's

15  move onto the next one.

16          MR. WILSON:  Your Honor, this would be the motion

17  for partial summary judgment on behalf of the plaintiffs.

18  There's a cross-motion on the same issue.  This is in regards

19  to title.  In terms of backdrop for this particular situation

20  as part of the settlement in June of 2003, it was agreed that

21  the cash escrow account would be established in the amount of

22  1.5 million, and then the plaintiffs would be able to recover

23  whatever amount was in the escrow account with interest or

24  whatever, that issue to be determined later, I guess at this

25  point.  But, the recovery could be had by the plaintiffs upon

84

proof of three different elements.  The first was that title

passed to the plaintiffs pursuant to the contract between the

parties, and that's the contract of May 2002 -- I'm sorry,

2001.  And then the second item was that the surplus

materials were still at the refinery site on July 1st, 2002

when title passed to Valero and the third item was that the

value of the surplus materials at the site met or exceeded

1.5 million.  And those are the three elements of proof that

we needed to establish for the plaintiffs to recover the

amount in the escrow account.  With that backdrop, we had

done the --

THE COURT:  So, presumably if I were to exclude the

expert report, would that make you incapable of meeting the

requirement under number three?

MR. WILSON:  No, Your Honor.  Mr. Syracuse has also

been involved in this business his entire life, and so he

basically has sales, all kinds of records of sales that go

back throughout his history of his company.  Sales of similar

items and they -- basically it's the same thing.  They just

say we sell this and this is what we sell it for.  And that's

basically what all these people in this business do.  Mr.

Israel is typical about the business.  They don't have these

books that they look at.  It's all based on their own

knowledge as to what these items will go for in the market.

In terms of the issue of title, this is basically an issue of

1   Louisiana law.  I think we all agree that Louisiana law would

2   apply to the interpretation of the contract.  Louisiana law

3   is stated as the choice of law in the contract, and the situs

4   of the refinery is in Louisiana, the transactions took place

5   in Louisiana.  So I think it's pretty straightforward.  I

6   don't think it's been contested that Louisiana law would

7   apply here.  As the only problem we have here, and why I

8   think we're before the Court, is that just as was the case

9   with the escrow account, where they said that a cash escrow

10  account doesn't mean that, here they said that the contract

11  is not a contract of sale.  It's a contract for services.

12  And the premise for this concept is that somehow Mr. Syracuse

13  paid $100,000 to perform services for Orion.  Which doesn't

14  make any sense.  Nobody -- If someone doesn't come to your

15  house and pay you for the right to fix your sink, it doesn't

16  make any sense at all.  And what this was is a contract for a

17  sale, and in the contract it says "buyer" and "seller", and

18  that's not a contract for services.  It says "buyer" and

19  "seller" and identifies them as such in two separate

20  paragraphs.  So this is not a contract for services, and I

21  can understand where in desperation they're making this

22  argument, because that's the only argument they have to

23  refute the contract, but it is strictly a contract of sale

24  whereby Mr. Syracuse paid $100,000 for the surplus materials.

25  One of the issues that they bring up is that these items were

1   not specifically identified or appropriated to the contract,

2   which is totally wrong.  We have the testimony of Orion's

3   former employees who said, All of these items were

4   specifically set aside in said areas, in seventeen areas of

5   the refinery.  There's no question which ones they were

6   because Stanley Cavalara (phonetical) whose testimony is

7   attached to our motion had gone around and labeled these

8   items, photographed these items, talked to management about

9   which items were for sale and which items were not, and the

10  contract says that everything was sold except for what was

11  fixed assets, things that were actually fixed to the ground.

12  And what's important here is that the debtor is unable to

13  conceptualize the Louisiana law issue here and that is

14  there's a bright line distinction between things as defined

15  in the Louisiana law.  That distinction being movables and

16  immovables.  Immovables are things that are like land and

17  structures attached to land.  Those are the things that were

18  not sold.  The things that were sold were the movables,

19  things that could be moved around, and we pointed out that in

20  our memorandum the debtor thinks that trees are movables, and

21  that's a major concept.  Ducks are movables.  Trees are fixed

22  to the property.  We showed that trees are not ducks, and we

23  thought that was a pretty bright lined distinction.  Couches

24  are movables.  Typewriters are movables.  Houses are

25  immovables.  The key is, you have different types of law,

87

1  different types of requirements that apply to the two

2  different categories of things under Louisiana law.  And

3  that's pretty much set out in our reply memorandum where we

4  basically run through the Louisiana law related to the sales

5  of immovables and movables.  There's a specific code article

6  that deals with sales of this type and that deals with what

7  they call sales of movables in a lump.  And that's where a

8  seller wants to sell objects that they don't want to bother

9  to count or to go through and inventory because it costs too

10  much to inventory them.  So they say, You can buy all this

11  stuff that's in this area and that's yours, and you have to

12  take it, but as soon as that agreement is reached, title

13  passes to the purchaser, and it's theirs.  There's no

14  question about that.  The debtor has been unable to cite

15  anything but tree cases which have nothing to do with

16  movables.  This is governed strictly by Article 2548 of the

17  Louisiana Civil Code which deals with sales in a lump and

18  where it says specifically and again, the civil law is

19  different from the common law in that the principle is set

20  out there in the Code.  It doesn't have to be deduced from

21  the case law, it's right there.  Timber sales are governed by

22  entirely different areas of the Code.  Article 2458 says when

23  things such as goods or produce are sold in a lump, ownership

24  is transferred between the parties upon their consent even

25  though the things are not yet weighed, counted, or measured.

88

1    This is exactly what we have here.  That's on page 14 of our

2    brief.  But what's important is the courts interpret it

3    exactly that way.  There's the <u>Mobile Machinery</u> case, which

4    is 171 Sub. and 874 and in the <u>Mobile Machinery</u> case an

5    individual man in the salvage business, similar to Mr.

6    Syracuse, went to a defunct lumber company and he and his

7    representatives were trying to buy all the pipe that was in

8    these kilns, you know, on the location of the lumber company,

9    and all this pipe was used equipment, it was obsolete but he

10   could so something with it.  So the purchaser agreed to pay a

11   thousand dollars for all that pipe.  And this is without

12   counting it.  They estimated how much was there, but they

13   didn't know how much.  And the seller said you can have the

14   pipe in that kiln, that kiln, and that kiln.  And it's not

15   counted.  It's set aside in an area.  It's all just in there.

16   And all they have to do is agree that the amount of the sale

17   of the -- on the sale of the -- they agree on the sale that

18   is an amount, the purchase price, a thousand dollars, and a

19   pipe that titles the pipe passes back to the buyer.  There's

20   no question about that.  So what happens in that case is, the

21   salvor pays the money and then he comes back to get his pipe,

22   and he finds out a bunch of the pipe is missing, and the

23   Court holds that title passed upon their agreement and the

24   payment of the purchase price.  But the payment was not even

25   necessary.  It was just the consent that they identified the

89

1   pipe and they agreed, and that's it.  That's how Louisiana

2   law works with movables.  So, when the pipe disappeared, the

3   Court ruled the loss of the pipe was at the risk of the buyer

4   at that point in time because title had passed, and they

5   decided against the buyer in that case.  Now in this case, in

6   our case, title passed but then Mr. Syracuse was not allowed

7   to take his stuff.  They locked him out of the refinery.  So

8   we have a different situation.  It's uncontested he's locked

9   out of the refinery.  So, under the case law, the clear case

10  law of the Louisiana Civil Code is the sale in a lump is not

11  a contract for services, it's not a building contract.  For

12  some reason the debtor tried to make this into a building

13  contract and cited Code articles that have nothing to do with

14  building contracts, and that is, they cited Code articles

15  that had only to do with building contracts and nothing to do

16  with sales.  So, you can't, as I guess my prior Louisiana

17  counsel said, You can't just call it a duck when it's not.

18  It's a contract of sales, and there's no question about that.

19  And this is another situation where Orion ignores the plain

20  language of the contract which calls the buyer and the seller

21  specifically by name, those terms, and then says this is for

22  services.  All Mr. Syracuse had to do is he was to buy the

23  stuff, take it out of there, and then clean up afterwards.

24  He did agree to clean up afterwards but that's not the meat

25  of the contract.  What he's trying to is buy the stuff and

1   sell it.  He sold $800,000 worth of this stuff to third

2   parties and some of it he even sold back to Orion, and that's

3   without leaving the premises.  Because the debtor also tries

4   to argue that because these surplus material never -- they

5   did not -- Title didn't pass unless it left the site and a

6   lot of this stuff was sold back to Orion with it still on the

7   site and to third parties on the site.  So it's clearly a

8   contract of sale, and I don't see how you can possibly

9   consider it otherwise.

10          THE COURT:  So that's an amount that was sold

11  that's not in dispute here.

12          MR. WILSON:  Correct.

13          THE COURT:  So, he was able to sell part of this.

14          MR. WILSON:  A very small part.

15          THE COURT:  $800,000?

16          MR. WILSON:  Yes.  There's considerably more.  And

17  in fact it's probably 2.3 million there of what he purchased,

18  still there.

19          THE COURT:  But we only have a million and a half

20  escrow set aside.

21          MR. WILSON:  That's all we could set aside.  That's

22  the only amount that we have.  We had an appraisal for 1.5

23  but we didn't have an evaluation as to the rest of it because

24  he couldn't get to it.  And also, Mark Israel didn't have

25  expertise in salvage pipe and Mr. Syracuse knows how much

91

1    it's worth and there are other people who would testify as to

2    the value of the salvaged pipe which brings the claim up to

3    2.3.

4         THE COURT:  But you have to remind me about the

5    agreement that was made previously.  Is the limit of your

6    recovery 1.5 or is that just the limit of what's set aside?

7         MR. WILSON:  That's the limit of what's set aside,

8    because that's all -- in terms of the settlement that we

9    reached?  All we could show was 1.5 was the amount in the

10   appraisal.  That was the extent of it.  In fact it's a little

11   bit more than 1.5, but we had to exercise the settlement

12   immediately in order to let the sale go through.  So, that

13   was the most we could come up with in terms of any type of

14   proof.  It was a compromise.  And then we felt we would have

15   a claim for the residual against the estate at the

16   conclusion.

17        THE COURT:  Is that an unsecured claim against the

18   estate?

19        MR. WILSON:  Co-counsel --

20        MR. LASTOWSKI:  Your Honor, we filed an

21   administrative claim for the remaining amount.

22        MR. WILSON:  So anyway, in terms of the overall

23   situation, it's clearly a contract of sales.  The Louisiana

24   Civil Code governs the whole thing.  It's clearly a sale in a

25   lump under Article 2458.  All the building code articles that

1  the debtor cites have nothing to do with this, and it's not a

2  sale of timber, which involves immovables which is clearly an

3  entirely different concept.

4         THE COURT:  Okay.  Thank you.  Mr. Allen?

5         MR. ALLEN:  Your Honor, before I address the issue

6  Mr. Wilson just addressed, the legal title, let me answer

7  Your Honor's question as to what's the effect of excluding

8  the valuation they have tendered.  I think the effect is they

9  don't have any evidence unless Your Honor then gives them

10 leave to reopen discovery, and we'll probably be back

11 fighting over that because this notion that Mr. Syracuse can

12 now offer this kind of testimony is something that was never

13 disclosed in discovery.  We don't have any information on

14 what he would say or how he would go about valuing this.  So,

15 my belief is the only thing they've ever tendered is Israel's

16 report, and if that's not admitted, unless Your Honor gives

17 them leave to reopen discovery, they really have no evidence

18 of the value of this material which incidentally Orion

19 thought wasn't worth very much.  Now, on the cross-motions

20 for summary judgment, the fundamental issue is who held title

21 to this as of July 1, 2003 or whenever the refinery was sold

22 to Orion, because we agreed --

23        THE COURT:  To Valero.

24        MR. ALLEN:  To Valero, I'm sorry, thank you.  We

25 agree the material was still sitting there.  We've now

1    learned in discovery it was largely sitting where it was when
2    Mr. Syracuse left the plant and quit working.  We think we
3    are entitled to summary judgment on that issue really for
4    three separate reasons.  One is, and it's the one I will
5    principally address, this was not a contract for sale.  It's
6    a contract for services.  Secondly, even if it was a contract
7    for sale under Louisiana law it would be deemed an executory
8    contract as to which title would pass only when the services
9    were actually performed, and there's no dispute they weren't
10   performed.  The material at issue wasn't removed.  Had it
11   been removed we wouldn't be here.  And finally, even if the
12   Court would find it was a contract of sale and title had at
13   one point passed to Mr. Syracuse, under Louisiana law it
14   would have reverted to Orion when Mr. Syracuse left without
15   meeting the scheduled deadline for taking the material off
16   the property.  It's the latter two issues that involve these
17   thorny questions of Louisiana law as the differences between
18   ducks and trees.  The first issue, which is the issue on
19   which the Court ought to focus, does not.  It is simply, Was
20   this contract essentially a services contract or was it a
21   sale contract?  They agree that's an issue for the Court.  It
22   is interpretation of the contract.  They agree or haven't
23   said that Louisiana imposes some unique contract construction
24   principles and in fact the contract principles they cite in
25   their brief are the typical ones one sees about looking at

1  the contract as a whole and looking at the language and

2  assuming people said what they meant.  They also agree that

3  the definition of a contract for sale under Louisiana law is

4  that it is a contract whereby a person transfers ownership of

5  a thing to another for a price in dollars.  That makes some

6  sense.  Somebody is -- If there is an agreement for somebody

7  to acquire ownership for dollars and dollars only, sounds

8  like a sales contract.  Conversely, if the Court finds this

9  was a services contract, they do not dispute, have never

10  disputed that title would not have passed to them until they

11  performed the specific services relating to the specific

12  materials, and consequently, as to the materials that are in

13  dispute, the ones that were still sitting at the refinery,

14  it's undisputed they didn't perform the services.  The

15  services were to remove the material, and they didn't do it.

16  Now, the contract is really not that long.  It is attached to

17  their motion, and I suggest to Your Honor it cannot sensibly

18  be read as anything other than a services contract, and I

19  just want to focus on a few provisions because time and

20  again, and Mr. Wilson did it again, he says, Oh, it's a sales

21  contract.  We paid some dollars.  And yes, here and there it

22  uses the term buyer and seller.  But they ignore, they never

23  addressed in their briefs all of the language in the contract

24  to which we've pointed.  All Your Honor has to do is look at

25  the first substantive paragraph.  After the contract says,

1    This is an agreement, it says, The contractor, Mr. Syracuse,

2    is in the business of providing surplus material reclamation

3    and cleanup services, and contractor agrees to furnish such

4    services to owner.  You then go down to the scope of work,

5    and the scope of work refers solely to the providing of

6    services which consist of removing the material and cleaning

7    the designated areas.  That section talks about all work and

8    services being rendered or performed with due diligence and

9    in a good workmanlike manner.  There's a term of the

10   agreement which requires that all the work be done no later

11   than March 31, 2002, and then interestingly, and I happened

12   to notice it when I was sitting in the back and really not

13   paying much attention to my partner's argument, that if you

14   look at Exhibit A to the contract, which are the general

15   contract provisions, virtually every paragraph talks about

16   restrictions on the work being performed.  Paragraph (1)

17   talks about it is intended the work hereunder will be as an

18   independent contractor.  Paragraph (2) talks about complying

19   with state laws in performing the work.  Item (4) talks about

20   the performance of the work to be done, performance of the

21   work is used in item (5), item (6), item (8).  Those

22   provisions make absolutely no sense if one says, Oh this is a

23   contract for sale.  You cannot read this contract, and they

24   have offered to the Court no way in which one can read this

25   contract as something other than a contract for the provision

1    of services.  Now, they did agree, as part of the overall

2    consideration to pay a hundred thousand dollars, and they did

3    pay it.  The contract doesn't say what that's for.  The

4    contract doesn't say that's the purchase price for the

5    material.  Clearly, under this contract, what Syracuse agreed

6    to do was to provide extensive services and to make a payment

7    in exchange for which he would get the material.  The

8    contract cannot be read as other than principally a services

9    contract.  It makes no sense for Orion -- and intent would be

10   an issue here if the Court found the language was somehow

11   ambiguous.  It would make no sense for Orion to have agreed

12   to immediately convey title when all it was interested in was

13   getting the material off site.  That was the principal

14   service for which it contracted.  But finally, Your Honor, at

15   most, this could be viewed as sort of a mixed consideration

16   contract where Mr. Syracuse agreed to provide services and

17   make a payment.  Under Louisiana law, no one has disputed at

18   least this statement of Louisiana law bias or the cases we've

19   cited.  The Court looks to what is it really.  What is it

20   principally even if you can look at a mixed consideration

21   kind of analysis.  And here, if you think about what he's

22   claiming he got, he's claiming he got equipment that's worth

23   2.4 million and still sitting there, and equipment he's

24   already sold for $800,000, and he got all that for $100,000.

25   That's a great deal if it were right.  But it isn't.  Because

1  what he also agreed to do was perform services that were

2  expected to take a year. And he's testified that he had his

3  full crew there for a year performing these services. So,

4  under this contract, it simply is indisputable that the

5  principal obligations of Mr. Syracuse involved the providing

6  of services. They agree, never disputed in the briefs, that

7  if this was a services contract title did not pass. In

8  resolving this issue of who held title as of the sale to

9  Valero, the only issue the Court really needs to address --

10 the Court's analysis begin and end with reading the contract

11 because I think Your Honor will conclude it is a services

12 contract. If you don't, then you have to deal with our

13 alternative argument and whether or not we've somehow

14 committed a Louisiana law heresy in describing what we think

15 Louisiana law is, but there's nothing special under Louisiana

16 law about interpreting this contract, and we believe, Your

17 Honor, the only sensible reading is it was a contract for

18 services and, therefore, we're entitled to summary judgment

19 on the issue of title.

20      MR. WILSON: Your Honor, we respectfully disagree

21 completely that there's nothing under the Louisiana Civil

22 Code that addresses this situation. Where you have an issue

23 of title, you look to the actions of the parties, and here,

24 the debtor said, Go ahead and sell all this stuff to these

25 people. They just let them go with it. So they gave it to

1    them.  But then what happened --

2    THE COURT:  Sorry, I don't understand.  The debtors

3    said to which people to sell it?

4    MR. WILSON:  To the Syracuses.  The Syracuses

5    bought the stuff, and they started selling it.  And they were

6    selling the big ticket items.  And there was an individual at

7    the company who didn't like this, Walter Landree (phonetical)

8    and Warren Squires (phonetical), and these two individuals

9    didn't like the idea of him selling all the stuff and getting

10   big bucks for it.  So they just said, No, you're not going to

11   remove all the big stuff any more, you're going to go pick up

12   papers.  We want you to go pick up trash and papers and get

13   all your little people to go over there and do that, and

14   we're not going to issue any work permits to go in the areas

15   you want to go in to remove the big stuff.  Now, he should

16   have had a right.  There's nothing in the contract that says,

17   You can't go where you want to do and remove your stuff.  He

18   had a right to do that.  And so instead of letting him do

19   that, they interfered with it, and there's a specific codal

20   article that deals with a situation where you have a

21   obligor's or an obligee's interference with the rights of the

22   other party, that's Article 1712 of the Civil Code, and we

23   briefed that in there.  Because it's obvious that they

24   interfered with him, all of the testimony and the affidavits

25   from the Orion people said they interfered with him.  The

99

1   testimony of the guy who did it, Warren Squires who's a

2   former Orion employee, he said he wasn't going to allow them

3   to cherry-pick this stuff, and then he passed on instructions

4   from  Walter Landree to that same effect, They're not going

5   to allow him to cherry-pick this stuff.  So then they stopped

6   issuing permits.  They wouldn't let them go to the places he

7   needed to go to.  So they basically put him in a situation

8   where he couldn't do anything.  He could show up every day,

9   and he could either go pick up papers, like they wanted him

10  to, or he could not work, and so after awhile it just dragged

11  on.  Eventually, he took advantage of a contractual provision

12  in the contract that said that he could cordon off areas and

13  lock it off with fence and then start to work on it.  And he

14  tried to do that so they kicked him out of the refinery and

15  locked him out.  And that was in the contract that he had the

16  right to do that.  So the debtor basically ignores the plain

17  language of its contract that says, Mr. Syracuse and his

18  companies are the buyers.  It says the debtor's the seller,

19  and that's not a sale.  He pays $100,000 and gets stuff that

20  he's selling to third parties.  He's even selling it back to

21  the debtor, and the debtor's own checks show that they're

22  actually paying for this stuff and sometimes they allowed him

23  credits against his payments.  So it was clearly understood

24  the title --

25          THE COURT:  Against his $100,000 payment?

100

MR. WILSON:  Correct.

THE COURT:  But he had already made the $100,000 payment.

MR. WILSON:  He paid it in increments.  So he paid the $25,000 then the next one came up and said well, If you want to buy these back, then you can buy them back but I'm going to offset that against my next payment.  So then the next payment comes up and he offsets some more and then he made the final $25,000 payment, and they locked him out.  So, basically, you have the fault of the obligee, here the debtor, that has literally locked him out and the head of security has filed an affidavit here.  Security at the refinery saying that he was locked out.  There's no question about it.  All of the Orion people say they locked him out.  They had interfered with his performance.  When you have interference with performance, then the performance is deemed fulfilled on the part of the obligor, and that's the case here under the Louisiana Civil Code in terms of Mr. Syracuse.  So, all the actions of the parties say the title passed to Mr. Syracuse.  He's selling $800,000 worth of stuff.  Now, there's no question that Orion had no clue what the stuff was worth, and they weren't doing anything with it, but that's his business.  That's what he does.  He goes and finds buyers.  He has a network of people.  Orion could never do that.  That stuff was sitting out there for decades, and we

1    have testimony to that effect.  Some of it was new, and they

2    didn't know what to do with it.  But he did.  So he shouldn't

3    be punished for having the knowledge, the same knowledge that

4    Mr. Israel has.  That's what happened here.  There's no case

5    law or code articles to deal with mixed consideration as has

6    been implied by the debtor.  That's not the case here.  This

7    is a contract of sale.  This deals specifically -- they cite

8    a building code articles which have nothing to do with that,

9    and this is just a sale.

10        THE COURT:  Well, the sale, am I correct, that a

11    contract for sale is where you sell something for the payment

12    of dollars; is that correct?

13        MR. WILSON:  Correct.

14        THE COURT:  Well, here, wouldn't you agree that

15    there was, even under your construction of the contract, it

16    was sold for the payment of dollars plus the removal and

17    cleanup.

18        MR. WILSON:  The removal wasn't an issue.  The

19    cleanup afterwards is really what they were looking for

20    because they wanted to be able to cut the grass on it is what

21    they said.  I guess they were getting ready to sell the

22    refinery at that time.  But the -- he would arrange to have

23    the new purchaser come in and pick the stuff up.  So there

24    was no expense for that either for Orion or for him.

25        THE COURT:  Well, but if there was an expense, it

1    --

2        MR. WILSON:  It would be toward his account.

3        THE COURT:  -- fell on him.

4        MR. WILSON:  Right.  But there wasn't --

5        THE COURT:  In other words he had the obligation to

6    do that, and he could sell it to somebody presumably for a

7    price that they were willing to pay that included whatever

8    incremental costs they would have to come and pick it up

9    also.

10        MR. WILSON:  Right, but again, it wasn't part of

11   the consideration because whatever that was he just -- it was

12   passed on to the new purchaser.  Orion could have done that

13   too, so the net value was 100,000.

14        THE COURT:  But there was cleanup.

15        MR. WILSON:  That's the going around and picking up

16   papers and whatnot.  One of the biggest things that the

17   seller did to interfere, the debtor did to interfere with his

18   progress was they also had to decontaminate all the stuff

19   before it was sold, and the debtor didn't tell Mr. Syracuse

20   that a lot of the stuff was all contaminated, and he couldn't

21   take it off site until it was decontaminated, and that was

22   another major hindrance that throughout this, even after they

23   left and they were locked out, they still hadn't

24   decontaminated stuff.  So these huge tanks, he couldn't take

25   them out of there because they hadn't done the

1    decontamination.  So that's another element of seller fault,

2    but the big point is, in terms of what Mr. Syracuse was going

3    to do, he paid the 100,000 and it would not cost him much,

4    there wasn't big add-on consideration to what he was going to

5    pay to Orion for what he considered was his investment.  The

6    big thing was that he would just sell it.  He boxed it up and

7    then the new third party purchaser would come in and take it

8    off.  Or he would sell it back to Orion.  So clearly title

9    passed from my understanding from all the parties.  There's

10   no question about that, and the only reason why they couldn't

11   get it off the property is because they locked him out.

12            THE COURT:  I understand.  Anything else on the

13   summary judgment on title?  I'm always glad when the answer

14   is so clear to everybody, which in this case it is obviously

15   clear to both sides.

16            MR. ALLEN:  If Your Honor would indulge me for

17   thirty seconds.

18            THE COURT:  I'll indulge you for thirty seconds and

19   that's it.

20            MR. ALLEN:  Just two quick points.  One, Your

21   Honor, I take it is correctly noted that the contract itself

22   provides among the services for the removal of surplus

23   material.  Mr. Syracuse didn't have the right to let that

24   material sit there until he found a buyer and incidentally

25   his expert said, sometimes it takes seven or eight years to

104

1   sell this kind of stuff. He had to remove it. That was the

2   service Orion wanted and that's what the contact covers. On

3   this whole point of interference, that is hotly disputed.

4   There is a provision in the contract which we've now cited

5   twice in our briefs that allowed designation of work areas.

6   They've yet to address it. Clearly, Orion had the right to

7   limit access to particular work areas, but that has nothing

8   to do with the title issue. The title issue turns on whether

9   it was a contract for services or a contract for sale.

10       THE COURT: All right. That matter will also be

11  submitted. Sounds like I'll be busy for the next -- Do you

12  want me to do this before or after the tank farm, Mr. Allen,

13  is that -- That's a joke.

14       MR. ALLEN: It makes no difference to me, Your

15  Honor.

16       THE COURT: All right, we have other Syracuse

17  matters, but we also have counsel who has to get on an

18  airplane. What do you want to do, counsel?

19       MR. WILSON: There's two I can address very

20  quickly, I think. First, and I think they'll probably

21  concede this one, there's a motion for partial summary

22  judgment on the second element of our burden of proof, which

23  is that the surplus materials were present at the site on

24  July 1st, 2003. We had filed this motion because they

25  wouldn't agree to that. We had to do two inspections. We

1    did request for admissions in our interrogatory, request for

2    production, and they finally conceded once we filed a motion

3    for sanctions.  So, now I believe they've agreed to this,

4    that the materials were all there.  If not, then we need to

5    proceed with the motion.  If they can concede that, that we

6    have met our second element of proof, then that gets rid of

7    that motion.

8            MR. ALLEN:  Your Honor, I agree to the end result.

9    I strongly disagree with everything that preceded that.  The

10   testimony now is from witnesses we submitted and were only

11   ·deposed a month ago, that yes, this material as far as anyone

12   knows laid where it was --

13           THE COURT:  I guess the question is is that still

14   an open issue.

15           MR. ALLEN:  It is not an open issue, we agree with

16   that, Your Honor . . . (microphone not recording).

17           THE COURT:  All right, so, counsel can submit

18   basically an order for partial summary judgment on that

19   issue.

20           MR. ALLEN:  We can, Your Honor.

21           THE COURT:  All right, thank you.

22           MR. WILSON:  Your Honor, I'll skip down.  There's a

23   motion to compel or to exclude evidence, and I'll be very

24   brief with it.  Basically, we've had a very difficult time --

25   particularly with that one issue, in trying to get them to

1    admit the stuff is all there.  The testimony came from their

2    own employees.  They just never talked to them.  We asked in

3    the deposition whether they even interviewed them.  They

4    didn't even talk to these guys.  So for two years we've had

5    them doing inspections, all these discovery requests,

6    deposing these guys, and they finally admit it because we

7    filed the motion for sanctions.  In addition to this, they

8    had interfered with the original inspection when we tried to

9    do it on July 2nd, and we had to get a TRO in Louisiana to

10   allow us to complete it in December.  So, we had to go

11   through all that.  Then they denied the request for admission

12   which prompted additional depositions, then we also had

13   problems with -- We were supposed to get continued discovery

14   through the end of the summer.  The debtor filed a motion

15   representing the actual agreement of the parties that we

16   would continue discovery to the end of the summer.  That's

17   what we understood because both sides wanted to take

18   depositions or whatnot.  I had served a simple interrogatory

19   and request production asking what their current plan was,

20   and they objected to it saying discovery's over, you don't

21   get to see that.  So, that was in July, and I think the stop

22   entirely is inappropriate, on the one hand to represent to

23   the Court that discovery is going to continue throughout the

24   summer and then tell me, no, discovery ended in May and then

25   shortly after that, I had just taken the depositions of the

1    Valero people.  So, the discovery's okay if it's unilateral.

2    We also asked them to update the discovery responses in

3    March, and they refused to do that.  We asked them who their

4    trial witnesses were, they refused to do that.  We asked them

5    what their witnesses and exhibits would be for trial, they

6    refused to do that.  We asked them to update the discovery

7    response to give a privilege log to all the stuff they've

8    withheld.  They refused to do that.  Then they took the

9    corporate deposition of Valero, they subpoenaed Valero's

10   documents, a series of documents related to the value of the

11   surplus materials.  The deposition was canceled.  They still

12   received the documents by a subpoena from Valero.  Then they

13   withheld them.  They didn't tell us they had them, and they

14   started springing them in the middle of the Valero

15   deposition.  I asked to get a copy of them.  They refused to.

16   They said discovery is over, you can't see that.  And these

17   are documents that were produced during the discovery period

18   as it originally occurred even before the agreed extension.

19   And so this is -- They're hiding Valero's stuff.  They won't

20   give me a privilege log.  They're withholding all their

21   discovery responses.  They won't tell me who their trial

22   witnesses are.  They won't tell me what the trial exhibits

23   are, and we're supposed to have a trial in October.  So then

24   they send me a letter saying we'll furnish updated discovery

25   responses by October 1st because I filed another motion for

108

1    sanctions. So every time I file a motion for sanctions, I

2    finally get some result. So, I filed -- I had to file a

3    motion for sanctions to get an inspection. I had to file a

4    motion for sanctions to get them to answer the request for

5    admissions. I had to file a motion for sanctions to get them

6    to respond to discovery. It goes on and on. And my clients

7    don't have time to pay -- time or funds to pay for all of

8    this, you know. We appreciate the Court putting us on the

9    docket because we'd have to make two trips just for all these

10   sanctions. But it's the only thing that gets them to

11   respond. So, we move to exclude all their exhibits. They

12   won't tell us what they are, so we want to exclude all the

13   Valero stuff, all the trial exhibits, and all the witnesses

14   because they won't tell us anything. And if they give it to

15   us on October 1st, after discovery is over and just before

16   the  trial, that's useless, and they know that. And we asked

17   for the privilege log and keep asking for it and they won't

18   give it us. So I think this and we also had a related motion

19   to test the sufficiency of a request for admissions. In that

20   request for admissions we asked them to say that the value

21   was 1.5. They said, No, but we don't know what the value is,

22   which is denying it. So they just denied the value. They

23   denied the stuff was there, and they -- I mean, it goes on

24   and on. So that basically, you know, to try to put it into a

25   nutshell, we've tried to simplify the case through the

109

1   request for admissions, they just deny it unless we bring a

2   motion for sanctions, and even on the payments under the

3   contract, saying that the guy paid $100,000 and received some

4   credits, they denied that.  They said --

5          THE COURT:  All right.  Mr. Allen?

6          MR. ALLEN:  Your Honor, I'm mindful of Mr. Wilson's

7   schedule but this may take a few minutes.

8          THE COURT:  Well, here's what I'm going to do.  I

9   want to handle this separately, and I want to do it by

10  telephone at some time in the near future when -- maybe early

11  next week, we can do that or maybe later on this week there's

12  a possibility too.  But remind me what the proposed trial

13  schedule is in this?

14         MR. ALLEN:  Your Honor, I'm unaware of a trial

15  date.  I was a little surprised by Mr. Wilson's statement.

16         MR. WILSON:  At the last hearing when we had

17  extended the discovery through the summer, it was agreed that

18  the trial date would be in early October.  It probably would

19  be in Phoenix was what we're told.

20         THE COURT:  Well --

21         MR. WILSON:  We think it would be one or two days

22  at the most.

23         MR. ALLEN:  I was not here --

24         THE COURT:  That's one of the things we're going to

25  have to talk about because I don't think I have anything on

1   my calendar in Phoenix, and if I was supposed to have
2   something on my calendar in Phoenix, that hasn't happened.
3   But I want to get to the bottom of where we are in the
4   pretrial stuff, and I want do it in a telephone call with
5   counsel.  After counsel have had an opportunity between now
6   and when we have the telephone call to confer and make sure
7   that they know exactly what they disagree about and see if
8   there's anything that they currently disagree about that they
9   can agree about.  And if not, that's fine.  But I'm going to
10  direct counsel to lock themselves in a padded room for as
11  long as it takes to come to a conclusion of what is in good
12  faith dispute here about the trial preparation for this case.
13  Then I'm going to have a telephone conference on the
14  discovery and the sanction matters for as long as it takes to
15  kind of work through each one of these, so that we're all on
16  the same page about what is happening here.  That includes
17  things from Mr. Allen's standpoint, which is, for example,
18  that he says Mr. Syracuse has never been identified as a
19  witness who would testify about value.  That's a surprise to
20  the other side.  If that's going to be a contested matter we
21  need to bring that up too.  Anything that has to do with
22  who's going to testify, what the documents are, what the
23  status of discovery is, is there a privilege log that's due
24  that hasn't been provided, has there been a mechanism for
25  contesting issues of privilege, all the things that counsel

1   just went through plus any problems you have on your side,

2   you need to sit down and lock yourself in a padded room, see

3   if you can resolve as many as possible.  Those you can't

4   resolve, we're going to have a call, and we'll probably do it

5   early next week.  Is that clear enough?

6           MR. ALLEN:  Thank you, Your Honor.

7           MR. WILSON:  Thank you, Your Honor.

8           THE COURT:  Okay.  Is there anything else we need

9   to do then in Syracuse?

10          MR. LASTOWSKI:  Your Honor, how will we know when

11  the call's scheduled?  Through debtor's counsel?

12          THE COURT:  How would we know when that's scheduled

13  for?  Well, let me ask when counsel thinks they'll have their

14  opportunity to confer before we do that, otherwise I can find

15  the time.  I can do it later on this week here in Delaware by

16  telephone, again, Thursday afternoon is a time I can think

17  of, but if that's too soon, particularly given the problems

18  back in New Orleans, what I'd like you to do is to have the

19  two of you talk and then contact Ms. Ballek and tell her when

20  a time that you would like to have it done.  I want to do it

21  Monday, Tuesday, or Wednesday morning of next week because

22  after that I'm gone for about ten days, and if we're going to

23  get the thing on the road here we need to do it between now

24  and next Wednesday morning.  Okay?  Wednesday morning

25  probably being the worst choice because I think I've really

112

1    crammed stuff up, and I've got a plane that afternoon, so I

2    would be -- like counsel here, I would not be paying

3    attention.  I'd be thinking about the law enforcement

4    officers.  So Monday or Tuesday would be better.  Okay?

5            MR. WILSON:  Thank you, Your Honor.

6            THE COURT:  All right, thank you.

7            MR. WERKHEISER:  Your Honor, again for the record,

8    Gregory Werkheiser for the Trust representative.  Your Honor,

9    it might be helpful just to review where are on the agenda

10   because there --

11           THE COURT:  Tell me how much we have left.

12           MR. WERKHEISER:  There are a number of what I would

13   call uncontested or lightly contested claims matters where

14   either there's been no response filed or there's been a

15   resolution or somebody's filed a response but to my knowledge

16   they're not here and they're not appearing today in any way

17   or form.  There is a claims objection to a claim filed by

18   National Union Insurance Company that the parties have

19   briefed and are here and prepared to argue today if Your

20   Honor wants to receive argument on that.  And then we have,

21   Your Honor, we have just a status conference on the Shaw

22   matter which is simply advising the Court that we've reached

23   a settlement in principal and the parties are documenting it

24   as we speak.  And then I believe that leaves us with a status

25   conference on what we call the interpleader action and fee

113

1   applications.

2          THE COURT:  All right.  Well, we've obviously had a

3   very full calendar today.

4          MR. WERKHEISER:  Yes, Your Honor.

5          THE COURT:  I've got omnibus hearings at 2 and 3

6   this afternoon, both in fairly active cases.  So, it's now

7   12:37.  So what do you suggest here, Mr Werkheiser, in terms

8   of how we can get from here to there or what can be continued

9   to another date or whether they can be continued to later on

10  this week or something else.  Because we're running into a

11  position where we don't have enough time to do everything we

12  have to do.

13         MR. WERKHEISER:  Well, Your Honor, there are a

14  number of --

15         THE COURT:  Should we maybe take a five-minute

16  break and have counsel confer with regard to those issues and

17  see if everybody can -- Rather than my hearing seriatim from

18  everybody why don't -- literally five minutes.  We'll take

19  five minutes and you can talk about it and let us know.

20         MR. WERKHEISER:  Certainly, Your Honor, thank you.

21         (Whereupon at 12:38 p.m. a recess was taken in the

22  hearing in this matter.)

23         (Whereupon at 12:47 p.m. the hearing in this matter

24  reconvened and the following proceedings were had:)

25         THE CLERK:  All rise.

114

1    THE COURT:  Please be seated.

2    MR. WERKHEISER:  Your Honor, again, Gregory

3  Werkheiser for the record.  Your Honor, during the break I

4  think the parties all agreed that they could dispense with

5  having the status conference on the interpleader action.  The

6  apparent purpose of that was just simply to confirm a

7  stipulation that the parties had and their satisfied that the

8  signatures they have on that stipulation are sufficient.  So

9  that matter we propose to continue to the next hearing in

10 this case.  That appears, Your Honor, is the last item before

11 the fees on the agenda.  Then, Your Honor, I think at least

12 among the professionals in the case there was universal

13 agreement that if there are no issues or objections with

14 respect to the fee applications, and we're not aware of any

15 that are of record, that if Your Honor did not have questions

16 or concerns we could take that up first and dispense with

17 that and a number of people will leave and drop off the

18 phone.

19    THE COURT:  That's fine with me.

20    MR. WERKHEISER:  Very well, Your Honor.  We're

21 happy to proceed however you want.  A number of people are

22 here in the courtroom, others are on the phone and can answer

23 questions as appropriate, and we have a proposed form of

24 omnibus order to hand up to Your Honor that we can mark up

25 with the appropriate numbers.

115

1        THE COURT:  Is the -- General Security, that's the

2    interpleader action?

3        MR. WERKHEISER:  That is the interpleader action,

4    Your Honor, yes.

5        THE COURT:  Okay, let's proceed.

6        MR. WERKHEISER:  Thank you, Your Honor.  So, Your

7    Honor, that would then bring us to the fee applications which

8    are all identified on Exhibit A to our agenda, and they've

9    been broken down on there by debtor professionals and

10   Committee professionals.  And we can take matters up in

11   whatever order you'd like, simply working through them as

12   they appear on the agenda?

13       THE COURT:  Just work through them.

14       MR. WERKHEISER:  Okay.  Your Honor, first item then

15   is Turner Mason & Company, final fee application.

16       THE COURT:  All right, is there anybody who wishes

17   to be heard in connection with the Turner Mason & Company

18   final fee application?  I'm not aware of any objections.  I

19   don't have any questions.  I'll sign the order.

20       MR. WERKHEISER:  Thank you, Your Honor.  Item

21   number 2 then would be Andrews & Kurth LLP final fee

22   application.  I believe that Mr. Joe Holzer is appearing by

23   telephone for that, Your Honor.

24       THE COURT:  Is there anybody who wishes to be heard

25   in connection with Andrews & Kurth?  The record does not

1   reflect any objections, and I'm not aware of any. Are you

2   aware of any objections, Mr. Werkheiser?

3           MR. WERKHEISER:  No, Your Honor.

4           THE COURT:  I don't have any questions, I'll sign

5   the order.

6           MR. WERKHEISER:  Thank you, Your Honor.  Item

7   number 3, Your Honor, is Huron Consulting Group, LLC,

8   financial advisor to the debtor.

9           THE COURT:  Anybody wish to be heard in connection

10  with Huron Financial -- Excuse me, Huron Consulting Group?

11  Again, I'm not aware of any objections.  Are you aware of any

12  objections, Mr. Werkheiser?

13          MR. WERKHEISER:  I'm not aware of any and to my

14  knowledge none appear of record.

15          THE COURT:  I have no questions, I'll sign the

16  order.

17          MR. WERKHEISER:  Item number 4, Your Honor, Landis

18  Rath & Cobb, LLP, special counsel to the debtor.

19          MS. EDMONSON:  Good afternoon, Your Honor, Jamie

20  Edmonson of Landis Rath & Cobb, special counsel to the debtor

21  and debtor in possession.

22          THE COURT:  All right.  I'm not aware of any

23  objections, are you counsel?

24          MS. EDMONSON:  No, Your Honor, I'm not.

25          THE COURT:  Remind me again exactly what you were

1    special counsel for?

2        MS. EDMONSON:  Your Honor, we're special counsel

3    for the debtor as part of the interpleader action.

4        THE COURT:  I am aware of  no -- So these are all

5    final applications because of the confirmation of the plan

6    and so that further fee awards will not be subject to the

7    same procedures; is that correct?

8        MR. WERKHEISER:  That's correct, Your Honor.

9        THE COURT:  It's not that they're not going to do

10    any more work because that matter, I think, is still

11    proceeding; correct?

12        MR. WERKHEISER:  That's correct although we hope

13    not have to have them do any more work at it, but that's

14    correct.  The plan contemplates that these fees will be

15    submitted directly to the Trust.

16        THE COURT:  All right.  I'm aware of no objections,

17    I have no questions, I'll approve the fees.

18        MS. EDMONSON:  Thank you, Your Honor.

19        THE COURT:  We've already dealt with the Herman,

20    Herman, Katz & Cotlar matter.

21        MR. WERKHEISER:  Yes, Your Honor.  Item 6, Your

22    Honor, is the twelfth and final application of Morris,

23    Nichols, Arsht & Tunnell.  I can represent that we're not

24    aware of any objections and that none appear of record, and

25    I'm ready to answer any questions Your Honor has.

118

1        THE COURT: So what remains to be paid here is a

2   twenty percent holdback on the last group; is that right?  Or

3   are we past that?  Just roughly speaking.  I mean what's gone

4   along here is that there have been interim awards which have

5   provided for the payment of the holdback?

6        MR. WERKHEISER: That's correct.  That's correct.

7   There's a holdback and I believe -- if I can consult with my

8   colleague for just one second.

9        THE COURT: It's basically true with all of these

10  is that the most that's remaining to be paid is the holdback

11  for the last group, for the last interim application that may

12  not yet have been heard.

13       MR. WERKHEISER: And there may in some cases, I

14  believe, be a month or two -- monthly at the end; is that

15  correct?  There may be a month or two at the end that has not

16  been officially applied for.

17       THE COURT: Beyond the previous interim.

18       MR. WERKHEISER: That's correct, Your Honor.

19       THE COURT: All right, I'm not aware of any

20  objections.  I have no questions.  I'll sign the order.

21       MR. WERKHEISER: Thank you, Your Honor.  Your

22  Honor, then that brings us to item number 7, tenth and final

23  application of Vinson & Elkins LLP.  I believe D. Bobbitt

24  Noel is appearing by telephone on their behalf, and I can

25  represent that we're not aware of any objections to that

1  application either.

2  THE COURT:  All right, and remind me what Vinson &

3  Elkins did as special counsel.

4  MR. NOEL (TELEPHONIC):  Your Honor, we were

5  transaction counsel responsible for taking the lead on

6  selling the refinery.  We were corporate counsel going into

7  the bankruptcy case so we handled a variety of miscellaneous

8  corporate matters throughout the course of the bankruptcy

9  case.

10  THE COURT:  All right, thank you.  I don't have any

11  other questions.  I'm prepared to sign the order.

12  MR. WERKHEISER:  Thank you, Your Honor.  Your

13  Honor, that brings us to item number 8, twelfth interim and

14  final fee application of Jones Walker, special Louisiana and

15  business law counsel for the debtor.  Again, I can represent

16  that I'm not aware of any objections for that application.

17  THE COURT:  So did the firm of Jones Walker, et

18  cetera, have any point of view about ducks and trees under

19  applicable Louisiana law.

20  MR. KERTH (TELEPHONIC):  Your Honor, this is David

21  Kerth of Jones Walker . . . (microphone not recording)

22  everything seems fairly accurate.

23  THE COURT:  Well, that's encouraging since we had a

24  rather diverse point of view.

25  MR. KERTH (TELEPHONIC):  Well I will say that at

120

1    least . . . (microphone not recording).

2        THE COURT:  That there are ducks and there are

3    trees is what you're saying, okay.

4        MR. WERKHEISER:  I guess we can discuss another

5    time about what that says about the state of Louisiana law.

6        THE COURT:  All right, I'm aware of no objections,

7    and I don't have any questions.  I'll sign the order.

8        MR. WERKHEISER:  Thank you, Your Honor.  Your

9    Honor, then that brings us to the final application, the

10   Development Specialists, Inc., as a chief restructuring

11   officer and Mr. Victor is present in the courtroom.  They

12   were retained under § 363 of the Bankruptcy Code to provide

13   chief restructuring officer services to the debtor.  I can

14   again represent I'm not aware of any objections and none

15   appear of record with respect to that application.

16       THE COURT:  I'm aware of not objection.  I have no

17   questions.  I'll sign the order.

18       MR. WERKHEISER:  Thank you, Your Honor.  Your

19   Honor, that brings us forward to the Committee's

20   professionals fee applications.  I would just note for the

21   record that as to these applications it's contemplated under

22   the plan and the order so provides that they will be paid not

23   from the ORC Distribution Trust but from the Liquidation

24   Trust, which is a separate trust established to fund this and

25   some other unsecured creditor obligations.  That brings us to

1    item 10, Your Honor.  It's the tenth and final application of

2    KPMG LLP, financial advisors to the Committee.  And, Your

3    Honor, from the ORC Distribution Trust respectfully if I can

4    represent, we're not aware of any formal objections to this

5    application.  One clarification that was made at our request.

6    The application did seek payment from debtor, and they have

7    since clarified to us that in fact payment from the

8    Liquidation Trust is what was intended and is what they seek.

9           MR. WARNER:  Your Honor, for the record, Michael

10   Warner, Warner Stevens, on behalf of the Creditors Committee

11   and the Liquidation Trust and Trustee, and we know of no

12   objections to the KPMG application.

13          THE COURT:  I have no questions, I'll sign the

14   order.

15          MR. WARNER:  Thank you, Your Honor.  Your Honor,

16   that brings us to number 11, which is the application of Saul

17   Ewing which was local counsel for the Committee and their

18   final application.  We know of no objections to that either.

19          THE COURT:  I'm aware of no objections.  I have no

20   questions.  I'll sign the order.

21          MR. WARNER:  Thank you, Your Honor.  Item 12 is the

22   firm of Warner Stevens, my firm, Your Honor, as counsel to

23   the Creditors Committee, and we know of no objections to that

24   final.

25          THE COURT:  When did you lose Doby?

122

1     MR. WARNER:  Doby retired in July of this year.

2     THE COURT:  So that's when the name changed.

3     MR. WARNER:  Right and I told Stevens to watch out.

4     THE COURT:  All right.  Anybody wish to be heard in

5 connection with this application.  I'm not aware of any

6 objections.  I have no questions.  I'll sign the order.

7     MR. WARNER:  Thank you, Your Honor. I believe that

8 is the end of the fee applications.

9     THE COURT:  Okay.

10     MR. WARNER:  Thank you, Your Honor.

11     THE COURT:  Thank you.

12     MR. WERKHEISER:  Thank you, Your Honor.  Your

13 Honor, my colleague is finishing interlineating the order

14 with the final amounts with the final amounts.  We did not

15 want to presume they would be allowed as proposed, so we'll

16 hand it up momentarily if that works for the Court.

17     THE COURT:  All right, let's see what else we have

18 to resolve.

19     MR. WERKHEISER:  Your Honor, then, we would propose

20 to take up what appears under -- I'm sorry, if I can

21 interrupt for a second.  May we excuse the various

22 professionals whose --

23     THE COURT:  Whoever's on the telephone who was only

24 there for the fee applications, may ring off now.

25     MR. WERKHEISER:  Thank you, Your Honor.  That would

123

1    bring us to item number 2 on the agenda and in the interest

2    of accommodating travel schedules and such, we've agreed with

3    counsel for American Home Assurance Company to take up

4    argument on the debtor's objection to what is referenced on

5    the agenda as response b) informal response National Union

6    Fire Insurance Company, Pittsburgh, PA, which has listed

7    under the number of briefs that the parties have filed with

8    respect to that claim.  And the parties have made written

9    submissions on that and stand ready to present brief argument

10   I think in the neighborhood of probably ten to fifteen

11   minutes apiece.

12          THE COURT:  Okay.

13          MR. WERKHEISER:  If that's acceptable to Your

14   Honor.  Your Honor, on behalf --

15          THE COURT:  Is there anything else other than that?

16          MR. WERKHEISER:  Your Honor, what remains after

17   that is essentially uncontested resolutions to claims

18   objections, which I think can be submitted by certification

19   to Your Honor following the hearing.  And then there are a

20   couple of instances where we have pending claims objections

21   where responses have been filed and to my knowledge no one is

22   here today advocating the position stated in the responses,

23   but we do have --

24          THE COURT:  Well, we're going to end it no later

25   than 1:30.

124

1    MR. WERKHEISER:  Understood, Your Honor.

2    THE COURT:  So you need to figure out how best to

3 use your time.

4    MR. WERKHEISER:  Well, I've made a commitment that

5 we would go forward with this, Your Honor, so --

6    THE COURT:  Fine.  Let's make it closer to ten

7 minutes or seven minutes apiece.

8    MR. WERKHEISER:  We'll do our best, Your Honor.

9 Your Honor, this objection seeks the disallowance of Claim

10 No. 648 filed by National Union Fire Insurance Company and

11 various affiliates including American Home Insurance Company

12 which was the provider of Worker's Compensation insurance

13 policy to Orion in particular for the period from

14 approximately March 2002 to March 2003.  And we've objected

15 to that particular claim on the basis that the claim is not

16 entitled to the asserted statutory priority under 507(a)(4)

17 of the Bankruptcy Code.  Subsequent to objecting, the parties

18 had discussions, and I think that there's general agreement

19 that there's not a dispute in the amount of the claim that

20 they are asserting as additional Worker's Compensation

21 insurance premiums which is in the neighborhood of $344,000.

22 The dispute is whether and to what extent that obligation

23 enjoys a priority under the Bankruptcy Code.  Each party's

24 filed an opening and an answering brief.  In the interest of

25 keeping things short, they have exhaustively addressed the

1  issue of whether a Worker's Compensation insurer can claim a

2  statutory priority as a party providing -- making a

3  contribution to an employee benefits program under §507(a)(4)

4  of the Bankruptcy Code.  They rely extensively on Judge

5  Walrath's decision in Integrated Health, and we certainly

6  acknowledge this is a clear issue of law.  Integrated Health

7  has positioned itself on one side of the issue with the

8  minority of courts led by the Ninth Circuit in the Plaid

9  Pantry (phonetical) case.  We have advocated what we

10  characterize as a majority position which has been embraced

11  by at least three Circuit Courts, various District Courts and

12  Bankruptcy Courts that are cited in our papers.  We would

13  especially direct the Court's attention to the relatively

14  recent decision of In Re:  Edward W. Mintie & Company

15  (phonetical), 286 BR 1 Bankruptcy District of Columbia

16  (2002).  I think we would essentially agree with just about

17  everything that's stated in that decision other than the

18  Court's indication that a Worker's Compensation insurance

19  obligation may not be considered necessarily a contribution.

20  They appear to limit statements by the Birmingham National

21  Court on that, and obviously we would follow that Court.  But

22  I'm not going to belabor the position on that issue.  As I

23  said, I think it's been fully briefed, and we're prepared to

24  rely on our papers subject to reserving the ability to

25  respond to American Home Insurance Company's arguments on

126

1    those issues.  I did want to address some discrete issues

2    that are raised by their papers that do not necessarily write

3    directly to the issues that's pure interpretation.  And the

4    first of those is they have argued in their answering brief

5    that the ORC Distribution Trust and the debtor waived the

6    ability to make the services rendered argument.  They cite to

7    some e-mail discussions of what the parties intended to brief

8    in advance of making these submissions and contended those

9    should be read to exclude any argument that would exclude a

10   priority based on the insurer's inability to demonstrate that

11   its claim is for services rendered within the meaning of

12   507(a)(4).  And, you know, we would respectfully submit that

13   the discussion was intended only to demonstrate the emphasis

14   that the parties were focusing on statutory interpretation,

15   and it's somewhat disingenuous for them to now make this

16   argument especially given the fact that they themselves made

17   the argument in their opening brief appearing at page 10,

18   carrying over to page 11, that what they had provided under

19   the policy did in fact constitute services rendered within

20   the meaning of the statute.  So, notwithstanding whatever

21   discussions there had been, parties have joined issue on that

22   and I think fully presented it to the Court so there would be

23   no reason to exclude it from consideration.  I would also

24   note that despite the e-mail that they attached, the parties

25   have not, shall we say, lived by the terms of that for the

1    reason I just noted, and also for the fact that that

2    contemplated a briefing an additional issue having to do with

3    whether they had properly calculated the claim which they

4    since insisted not be put forward at this time. So I don't

5    think that is a definitive statement of where the parties

6    are. And finally, I would note, there is just simply no

7    prejudice to American Home Assurance Company from having this

8    issue addressed today given that both parties have fully

9    addressed it. A further argument that they made and that

10   they put greater emphasis on in their answering brief is this

11   concept that the debtor and the trust is somehow judicially

12   estopped today from taking the position that they're not

13   entitled to a priority, and they essentially come to make a

14   mountain out of a mole-hole. They point to a first day

15   motion the debtor filed, a typical employee wages and

16   benefits motions which contains a passing reference to the

17   fact that the debtor had a Worker's Compensation program, but

18   does not discuss that at length or seek specific relief

19   directed to that program within the motion and suggest that

20   we've taken an inconsistent position in our first day papers

21   from that that we now advocate in our briefs, and as I'm sure

22   Your Honor's aware, you know, that is the first prong of

23   establishing any defense of judicial estoppel is establishing

24   an inconsistent position. And that's just simply not the

25   case. It is certainly true that the existence of Worker's

128

Compensation does at least in a tangential way provide
benefits to employees.  They are relieved of various employer
defenses such as contributory negligence, and they are
insured the benefit of insurance that is in place for their
recovery purposes.   So there is no disputing that.  The
question is is whether they, the insurance company, can
insert itself as an intermediary and piggy-back on the
priority that would be established and afforded to a
traditional employee benefits plan.  So, from that
standpoint, Your Honor, there simply was no inconsistent
representation.  Secondly, we wouldn't be here today had we
obtained an advantage or gotten the Court to act on that
representation in a way that was to our advantage from making
that representation, because in fact we did not pay the
premium obligations for the pre-petition insurance premium
under this policy, notwithstanding whatever relief they think
was sought under that motion, and therefore, there is no
connection between the statement and actions that were
approved by this Court.  And then, thirdly, Your Honor,
emphasizing the point that this was nothing more than a
passing reference.  The debtor separately filed a motion
specifically directed to Worker's Compensation programs.  It
sought authority to pay certain Worker's Compensation claims,
particularly those claims that arose under previous Worker's
Compensation arrangement where the debtor had some direct

129

obligation to pay the claims itself and premised that not on

the status of these claims as supposedly employee benefits,

but on the necessity of payments doctrine and that we have

cited authority in our answering brief for that very notion

and emphasizing that very distinction.  Your Honor, the final

point that I would make which is addressing some of the

statements and arguments made in American Home Assurance

Company's answering brief with respect to our argument that

the additional premium obligation needs to, in fact, be

allocated over the entire length of the policy is that they

consistently argue that the premiums were earned within 180

days, that they became due within 180 days, and they applied

our payments in such a way that the amounts that remained due

at that time were amounts that accrued within 180 days.  But

that's simply not what the statute says, Your Honor.  The

statute says for services rendered.  And if Congress had

meant earned, they would have said earned.  They certainly

said earned in 507(a)(3) when they were talking about

employee wages, and they didn't say it here.  They said

services rendered just as they've done in 503(b) in

discussing entitlement to an administrative claim, and so we

submit that that argument is simply off base.  The final

thing I would note for Your Honor is that during the course

of discussions about these claims and preparing to brief this

before Your Honor, the issue was raised of setoff with

1    respect to some additional premium obligations that debtor

2    and now the Trust is due back from the insurance company on

3    related policies that were issued by American Home Assurance

4    Company and its affiliates.  The parties had agreed to

5    reserve on that issue, either try to reach an agreement on it

6    or to submit that for consideration to the Court at a later

7    me, but I didn't want to be silent on that today and waive

8    any rights.  The debtors believes they do not have the right

9    to setoff under applicable law or under the terms of the plan

10   and confirmation order, but regardless of that, we've agreed

11   to defer consideration of that today.  Thank you, Your Honor.

12   I just reserve a short opportunity to reply.

13           THE COURT:  Thank you.

14           MR. PALACIO:  Good afternoon, Your Honor, may it

15   please the Court, Ricardo Palacio of Ashby & Geddes on behalf

16   of the American Home Assurance Company and certain other AIG

17   related entities.  Your Honor, with me today is Eric Brunstad

18   of Bingham McCutchen.  We yesterday filed a pro hac motion.

19   Excuse me, a motion for pro hac vice admission for Mr.

20   Brunstad, and I ask that the Court allow Mr. Brunstad to

21   present argument.  Thank you, Your Honor.

22           THE COURT:  The motion will be granted.

23           MR. BRUNSTAD:  Thank you, Your Honor.  Eric

24   Brunstad on behalf of American Home.  I think that my

25   argument can be divided readily into basically four points

and with a couple of facts, I think that bear emphasis.  The

first is that the total amount of the premium obligation for

the workers, the year-long Worker's Compensation policy was

$1,126,000 roughly.  Of that, Orion paid $781,522.  So,

American Home has a claim for the balance owed of $344,000

approximately.  Now the statute requires, in order to have

the priority, that the creditor has to have a claim for a

contribution to an employee benefit plan for services

rendered within the 180 day period.  And each of those

points, I think, particularly the concept of what is an

employee benefit plan, Judge Walrath's recent opinion in the

Integrated Health case, I think, persuasively points out

Worker's Compensation policies are a classic form of employee

benefit plan.  If the injured worker is injured, he through

Worker's is entitled to benefits in the form of lost wages,

health, disability, et cetera, and that this clearly

qualifies for a kind of employee benefit plan.  Now, here,

American Home's claim is for the debtor's obligation to pay

for this plan by paying premiums, and that constitutes a

contribution.  The services rendered were the insurance

services that American Home rendered within the 180 day

period, and additionally, obviously that also arose from the

services rendered by the employees who were employed giving

rise to debtor's obligation to have Worker's Compensation

insurance.  So within the plain meaning, the plain text of

132

1   the statute, we have a claim for contributions, debtor's

2   obligation to pay for this plan for an employee benefit plan

3   a provision of Worker's Compensation benefits to the

4   employees under this plan for services rendered during the

5   statutory period.  Now the debtor argues that well, this

6   can't be an employee benefit plan within the meaning of the

7   statute because it wasn't voluntary.  Well that can't be

8   right, Your Honor, because the statute first of all draws no

9   distinction between voluntary employee benefit plans and

10  involuntary employee benefit plans.  If Your Honor would

11  think about it, it makes no sense because if that same

12  analysis were applied to the wage priority under § 507(a)(3),

13  then you'd have no wage priority there either even though

14  most states, for example, make it a crime if you do not pay

15  the wages to employees who actually work.  The concept is not

16  part of the statute.  It's not a qualification you can

17  engraft onto the statute, plus we know, for example, in the

18  Ron Pare (phonetical) case when the Supreme Court said, Look,

19  506(b) does not draw a distinction between voluntary liens

20  and involuntary liens so we're not going to create one there.

21  That same sort of thing can't happen here, Your Honor.  The

22  statute doesn't require it be voluntary, involuntary.  It

23  simply says it has to be an employee benefit plan.  The

24  legislative history is of no aid to the Trust here.  The

25  legislative history does not say that it has to be voluntary

1    or involuntary.  The legislative history does not say that

2    Worker's Compensation policies are excluded.  The legislative

3    history simply provides some examples and some discussion

4    that is not grounds for saying, Aha, therefore, there must be

5    an implicit qualification on the plain statutory text.  It

6    doesn't work that way.  The statute doesn't say services

7    rendered by the employees or something else.  It says for

8    services rendered.  Here the insurance carrier rendered the

9    services during the statutory period, the 180-day period, and

10   asserts a claim accordingly for the priority.  So we have a

11   situation in which all of the statutory criteria in

12   accordance with their plain meaning has been met and

13   fulfilled and accordingly the priority applies.  With respect

14   to the allocation issue, again, the argument is that, well,

15   this $344,000 claim has to be allocated over the year life of

16   the policy and, therefore, falls outside the 180-day window.

17   That's not how these things work, and that's not what

18   American Home's rights are.  Again, American Home received an

19   initial payment of premiums of $781,000 when it first

20   initiated the policy.  That left $344,000 owed.  Under

21   applicable state law, there really is no dispute as to this,

22   American Home was entitled to apply what it received, the

23   $781,000 to the front end of the policy.  The Cornell case

24   that we cite is on point on that point in bankruptcy, where

25   Judge Shoole (phonetical) said, The union got payments and it

1    was entitled where the debtor never directed how the payments

2    would be applied when the payments were made to the older

3    amounts owing.  State law is also on point, whether you look

4    at Louisiana law or Texas law the standard is exactly the

5    same.  When you receive payments on a debt, if the debtor

6    doesn't direct how they're to be made, the creditor has the

7    right to apply it to how it sees fit and here that's what

8    happened.  The $781,000 that was received was applied to the

9    front end of the policy, and the $344,000 that's owed goes to

10   the back end of the policy and clearly falls within the 180-

11   day window.  This is also consistent with how insurance

12   polices work in the market at large.  When you have a

13   situation in which, for example, you have financing of the

14   insurance premium.  The claim or premium arises when the

15   services are rendered.  And when the services are rendered

16   then the debtor's obligated to pay the premium -- that pays

17   the premium, someone financed it.  If the policy is then

18   canceled, then the debtor gets a refund for premium that was

19   paid for the days that there was actual coverage not for

20   payments that stretch out into the future beyond the

21   termination or something like that.  That's not how it works.

22   Same concept here.  When American Home received the 781,000

23   it applied it to the front end of the premium obligations

24   leaving the back end unpaid.  So, on the petition date it

25   held a claim for $344,000 for services rendered, insurance

135

1  provision, Worker's Compensation insurance coverage that it

2  provided for the period of time within 180 days prior to the

3  filing of the petition date.  So, this is a straightforward

4  application of state law as to rights of allocation.  State

5  law is undisputed.  There is no general federal common law of

6  allocation of payments.  It is purely a question of state

7  law.  So, the allocation issue, I think, is petty clear.

8  Again, we have a contribution.  The debtor's obligation was

9  to make a contribution to an employee benefit plan.  We have

10  an employee benefit plan, and I would note, Your Honor, that

11  then Judge Bryer of the First Circuit in the Sako

12  (phonetical) Development case, a case which we discuss

13  dealing with an employee benefit plan for general life and

14  disability and health, there then Judge Bryer explained very

15  clearly, Look, the reason why we have this priority is

16  basically to protect these kinds of plans, that by giving the

17  plan the priority the insurers are more likely to provide the

18  benefits which helps employees.  You help the insurer to help

19  the employees.  If the insurer doesn't have this priority,

20  it's less likely to be willing to provide the coverage if the

21  debtor goes into financial distress and you hurt the

22  employees.  And since the policy of this section was to

23  provide for payment of priority for these kinds of plans, it

24  fits together perfectly.  Accordingly, we think the priority

25  applies.

136

1    THE COURT:  All right, thank you.

2    MR. BRUNSTAD:  Thank you, Your Honor.

3    MR. WERKHEISER:  Very, very briefly, Your Honor.

4  Just to address a couple quick points.  Counsel's reference

5  to Integrated Health's statement about employee Worker's

6  Compensation benefits being classic employee benefits.  Your

7  Honor, that statement appears on page 613 in the opinion,

8  unsupported by any citation to any other precedent or

9  authority.  And I would also note that the reason courts have

10  clearly embraced the legislative history and been willing to

11  look at that is that none of the terms are defined in the

12  statute that are at issue here.  What is an employee benefit

13  plan?  What are services rendered?  Those are all left to be

14  filled in by the courts in necessitating resort to the

15  legislative history.  Your Honor, the argument was also made

16  presenting our position on what is an employee benefit plan

17  as solely whether or not it's voluntary.  That's not the

18  case.  Whether it's an employee benefit plan, that is

19  certainly one argument that has been made in support of

20  whether it's an employee benefit plan, but I think as the

21  Mintie Court said, it is not a direct benefit to employees.

22  It is an arrangement between the debtor and the insurance

23  company, and, Your Honor, I just direct your attention to

24  pages 15 and 16 of the Mintie opinion on that point.  Your

25  Honor, also I would just simply note that reliance on Cornell

A000253

1    is misplaced here.  That was a case where there were in fact

2    payments made by the debtor within 180 days of the bankruptcy

3    case, and the issue was how to apply those payments that were

4    made by the debtor during that time period.  That is not what

5    we have here.  We have a question of when the services were

6    rendered and it's distinct.  Finally, as to Sako Development

7    it is very much a red herring to suggest that the insurers

8    are going to be fleeing from the field if they do not get a

9    priority here.  They certainly have the ability to protect

10   themselves through various security devices, letters of

11   credit and such.  And also, would just emphasize the point

12   that at no time in this case were the ability of the debtor's

13   former employees to get their claims honored under the policy

14   were ever at risk by virtue of the non-payment of this

15   premium obligation.  So, to suggest that there is any

16   jeopardy to the benefits that employees might otherwise

17   receive from having insurance in place is simply not the

18   case.  Thank you, Your Honor.

19           THE COURT:  All right, thank you.  The matter will

20   be submitted.

21           MR. BRUNSTAD:  Thank you, Your Honor.

22           THE COURT:  Thank  you.

23           MR. WERKHEISER:  All right, Your Honor, I'll try to

24   make what progress we can in the last five minutes and then

25   if we can just deem what remains continue it to our next

1    hearing.

2         THE COURT:  Well, why don't we deal with the ones

3    where responses have been filed but nobody is here to

4    prosecute them.

5         MR. WERKHEISER:  That's my plan, Your Honor.  Your

6    Honor, that would take us to item number 2, the first omnibus

7    objection.  Your Honor, there were a couple of claims subject

8    to that objection that we objected to on the basis that there

9    was no liability for the debtor.  They included claims filed

10   by Richard Hein, No. 102, and -- or 20, and claims filed by

11   Richard Cheramie, C-h-e-r-a-m-i-e, Claim No. 419.  They are

12   virtually identical claims, Your Honor.  They both argue an

13   entitlement to pension obligations for the 2003 plan year.

14   You may recall from a few hearings ago we addressed this on

15   our uncontested objection to various other parties in this

16   case, which was raised as part of the third omnibus

17   objection.  We did ask for leave and filed a reply which

18   essentially to attach and incorporated our third omnibus

19   objection and the argument that we made in there as to why

20   there was no funding obligation with respect to the pension

21   for the 2003 plan year.  We'd rely on that and submit it for

22   Your Honor's consideration on that basis.

23        THE COURT:  Based upon that previous ruling, it's

24   ordered sustaining the objection.

25        MR. WERKHEISER:  Thank you, Your Honor.  I have a

1    proposed form order, if I may hand it up?

2         THE COURT:  I've signed the order.

3         MR. WERKHEISER:  Thank you, Your Honor.  Your

4    Honor, I'm going to skip past a number of what I would call

5    resolved or uncontested items on the second omnibus

6    objection.  That will be submitted by certification of

7    counsel to Your Honor.  The contested item that remains is

8    the claim of Michael Walton Woods, Claim No. 1097, and the

9    clam of Steven D'Ingianni, Claim No. 1023.  They are similar

10   claims for pension benefits, again, although slightly

11   different in their arguments as to why they're entitled to

12   it.  And these claims are both subject to the second omnibus

13   objection and to the debtor's third omnibus objection.  The

14   second omnibus objection objects to them as having been late

15   filed and as lacking any supporting documentation.  The third

16   omnibus objection raises the objection that Your Honor just

17   ruled upon that there is no liability to the claims to the

18   extent that it relates to the 2003 plan year.  As to Michael

19   Walton Woods, he asserts a claim of $39,308.11.  The proof of

20   claim identifies this as for pension in covering the period

21   1/1/03 to 6/31/03.  However, in Mr. Woods' response, he

22   appears to contend that he was required to be paid in March

23   2003 based on services rendered during a prior plan year

24   under the pension plan but was not paid.  And, Your Honor, I

25   believe we can dispose of this contention if Your Honor will

1    accept a brief proffer on what occurred with respect to the

2    2002 plan year obligations.  And, for this purpose, I would

3    offer the testimony of Steven L. Victor.  If called to

4    testify, Mr. Victor could and would testify that he was the

5    debtor's chief restructuring officer through and including

6    the effective date of the debtor's plan of liquidation.  Mr.

7    Victor would further testify that he's familiar with the

8    debtor's books and records and that to the best of his

9    knowledge, information, and belief formulated based on the

10   debtor's books and records, the debtor fully satisfied its

11   obligations to fund the pension plan for the 2002 plan year

12   by means of a wire transfer dated March 31st, 2003 in the

13   amount of $2,847,539.92, payable to Diversified Investment

14   Advisers the entity then responsible for administering the

15   pension plan.  Mr. Victor would further testify that the

16   debtor's books and records, evidence and allocation of the

17   debtor's plan contributions for the 2002 plan year in the

18   amount of $5,468.09 in accordance with the terms of the

19   pension plan.  And finally, Mr. Victor would testify that he

20   believes that the debtor, based on that allocation and that

21   payment fully satisfies the 2002 plan year obligations.

22   Based on the foregoing, Your Honor, we would ask that Mr.

23   Woods' claim be disallowed on its merits.  We also note that

24   Mr. Woods' claim was late, was not filed until March 16th,

25   2004, and no justification is given in his response for the

late filing.  So, we have proposed form of orders to address that.  They also address the Steven D'Ingianni, Claim No. 1023, again objected to as a late filed claim and lack of supporting documentation for omnibus objection two, and a no liability pension plan for omnibus objection three.  Mr. D'Ingianni argues in his response that his response was not untimely because he contends that he did not receive notification of the claims objection until the date the responses were due.  I can represent to the Court and there is a notice of service on file to this effect, that Mr. D'Ingianni was served with the bar date notice at the address specified in the debtor's schedules for him which equates to the address that appears in his proof of claim.  Moreover, he was served with the supplemental bar date notice in February of this year and in more than adequate time to allow him to respond to that notice and yet did not file his claim until March 16th, 2004, one day after the supplemental bar date and several months beyond the original bar date.  Mr. D'Ingianni makes not response in support of his position that the pension obligation is entitled to a priority or is otherwise valid.  Simply states that he would like that paid and for the reasons already stated, Your Honor, we believe you can rightfully disallow the claim.  With that, Your Honor, I do have proposed form of orders if Your Honor would grant the relief requested that would disallow the claims both to Mr.

142

1    D'Ingianni and Mr. Woods, I can hand those up for Your

2    Honor's consideration.

3          THE COURT:  Is there anybody in the courtroom or on

4    the telephone who wishes to be heard on behalf of either Mr.

5    Woods or Mr. D'Ingianni?  Apparently not.  I take it with

6    regard to Mr. D'Ingianni, is the relief you're seeking

7    primarily based upon the lateness of the claim or based upon

8    the lack of documentation?

9          MR. WERKHEISER:  Both, Your Honor.  Due to the way

10    our local rules are set up, the debtor's forced to segregate

11    substantive from non-substantive objections.  So as a non-

12    substantive objection because the second omnibus we raised

13    the lateness objection and the lack of supporting

14    documentation objection.  As part of the third omnibus

15    objection, which was a substantive objection, we raised the

16    issue that there was no liability substantively on the

17    pension obligation to either of these parties, and that's why

18    they've been split up process to two claims objections.

19          THE COURT:  I've signed the two orders.

20          MR. WERKHEISER:  Thank you, Your Honor.  All right,

21    Your Honor, I believe that covers everything that was even in

22    the lightly contested category.  I very much appreciate Your

23    Honor's indulgence today.  I do have the completed proposed

24    form of omnibus fee order I can hand up to Your Honor.

25          THE COURT:  I've signed the order.

143

1  MR. WERKHEISER: Once again, thank you very much

2  for your indulgence and all the Court's time today. And

3  we've had pleasure working with you. Thank you, Your Honor.

4  THE COURT: Thank you. We're adjourned.

5  (Whereupon at 1:32 p.m. the hearing in this matter

6  was concluded for this date.)

7

8

9

10

11

12  I, Elaine M. Ryan, approved transcriber for the

13  United States Courts, certify that the foregoing is a correct

14  transcript from the electronic sound recording of the

15  proceedings in the above-entitled matter.

16

17  *Elaine M. Ryan*                                    9-24-04

18  Elaine M. Ryan
   2801 Faulkland Road
   Wilmington, DE 19808
19  (302) 683-0221

20

21

22

23

24

25

**K**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 03-11483(MFW)
                                . Chapter 11
                                .
  ORION REFINING CORPORATION,   .
                                . 824 Market Street
                                . Wilmington, Delaware  19801
                    Debtor.     .
                                .
. . . . . . . . . . . . . . . .
MICHAEL G. SYRACUSE d/b/a        . Adv. Pro. No. 03-53939
INTERSTATE SUPPLY COMPANY,       .
and TEXAS ICO, INC.,             .
                                .
                    Plaintiffs, .
                                .
          v.                    .
                                .
ORION REFINING CORPORATION,     .
                                .
                    Defendant.  . June 28, 2006
. . . . . . . . . . . . . . . . . 9:32 a.m.

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Morris, Nichols, Arsht & Tunnel
                             By:  RICHARD D. ALLEN, ESQ.
                                  GREGORY W. WERKHEISER, ESQ.
                                  THOMAS W. BRIGGS, ESQ.
                             1201 North Market Street
                             Wilmington, DE  19899

Audio Operator:              Brandon J. McCarthy


Proceedings recorded by electronic sound recording, transcript
          produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

A000261

2

APPEARANCES (Cont'd.):

For Texas ICO:                    Duane Morris LLP
                                  By:  MICHAEL R. LASTOWSKI, ESQ.
                                  1100 North Market Street
                                  Suite 1200
                                  Wilmington, DE 19801

For Texas ICO:                    Simon, Peragine, Smith &
                                    Redfearn, L.L.P.
                                  By:  ANDREW C. WILSON, ESQ.
                                  30th Floor - Energy Centre
                                  1100 Poydras Street
                                  New Orleans, LA  70163

For Texas ICO:                    Law Office of Edward S. Rapier,
                                    Jr.
                                  By:  EDWARD S. RAPIER, JR., ESQ.
                                  2160 Eighth Street, Suite A
                                  Mandeville, LA 70471

A000262

3

1          THE CLERK:  All rise.  You may be seated.

2          THE COURT:  Good morning.

3          MR. LASTOWSKI:  Good morning, Your Honor.  Michael

4   Lastowski of the law firm Duane Morris, LLP, here today for the

5   plaintiffs in the adversary proceeding, Michael G. Syracuse v.

6   Orion Refining Corporation.  With me today is my co-counsel

7   Andrew Wilson, who will be presenting our argument.  Also

8   present is my other co-counsel, Edward Rapier.  And finally, at

9   counsel table are Mr. and Mrs. Michael Syracuse.

10         Your Honor, we have prepared a PowerPoint, and I'm

11  hopeful that you're able to see it --

12         THE COURT:  I can.

13         MR. LASTOWSKI:  -- from the bench.

14         THE COURT:  Yes.

15         MR. LASTOWSKI:  And unless debtor's counsel has

16  something to say, I would suggest we just proceed.

17         THE COURT:  All right, you may proceed.

18         MR. WILSON:  Good morning, Your Honor.

19         THE COURT:  Good morning.

20         MR. WILSON:  Essentially what we've tried to do is to

21  outline our basic case insofar as the motion to reconsider is

22  concerned.  Much of it has been brought in from the other

23  motions for summary judgment that have be floating beforehand.

24         Essentially, as -- the crux of the issue is that

25  basically our contention is that title passed to Mr. Syracuse

**J&J COURT TRANSCRIBERS, INC.**

A000263

4

1  and his company and the principles of his company when the

2  agreement was reached.  Essentially our main contention is that

3  this was a sale and the -- I think that all the parties are

4  pretty much in agreement that this is a sale.  The Court has

5  treated it as a sale in the sense that all of the concepts --

6  it was a sale subject to a suspensive condition, as I

7  understand the Court's ruling.  So, I think in terms of the

8  first hurdle, what the nature of the transaction was, certainly

9  it had other elements to it such an a requirement to clean up

10 after the sale.  I think that the first hurdle is there, that

11 we are in a sale situation.

12          THE COURT:  Well, I think that your opponents

13 asserted it was a services contract.

14          MR. WILSON:  As I understand it, though, as far as

15 the Court's ruling, the ruling was that it was a sale, so now

16 we're in a --

17          THE COURT:  Okay.

18          MR. WILSON:  -- a really another step as to whether

19 it's a sale subject to a suspensive condition.

20          THE COURT:  All right.

21          MR. WILSON:  And we would contend that there was no

22 suspensive condition.  So consequently if we take out -- we

23 have the sale, we have no suspensive condition, then we -- we

24 then get to the point where the parties' conduct confirms that

25 title has passed.  We contend that title did pass just by the

5

1  nature of the agreement because there was consent as to the

2  object and the price.  I don't think there's any question as to

3  what the objects were.  They were objects set aside in the 17

4  different areas of the refinery and that the price was $100,000

5  that he would pay.  He would begin to sell everything

6  immediately, and then they would have to clean up after they

7  removed the objects.

8          It's our contention that this is a sale not only from

9  the -- just the general overview of the facts and

10 circumstances, but certainly contractually that it was also a

11 sale factually, and it was a sale legally.  From those three

12 standpoints, we confirm that all aspects of the sale took

13 place, and if that occurs, then the title should have passed.

14 And this is not an agreement to sell.  It's not an agreement

15 for the sale subject to a suspensive condition, but a sale that

16 actually took place, as is evidenced by the parties and the

17 terms of the Syracuses selling the products both back to the

18 debtor and to third parties.

19         To look at the first element we go to the contract,

20 and I think if we look at the plain wording of the contract --

21 and, again, I point out that the contract was drafted by Orion,

22 the debtor, and Syracuse had very little input, if any, on the

23 terms and conditions of the contract.  It appears just from the

24 nature of the language of the contract that it was -- I'm

25 reminded of the phrase that "A camel is a horse designed by

**J&J COURT TRANSCRIBERS, INC.**

A000265

6

1  committee." This is -- basically this contract has all kinds

2  of elements just thrown in, and it appears that they just took

3  terms and conditions from other contracts and then grafted them

4  together to make somewhat of an alphabet soup of a contract.

5  But that is the contract, and, as ambiguous as it is, it would

6  be construed against the debtor and not against Syracuse.

7        If you look at the plain terms of the contract, the

8  basic gist of the contract is that they would have a

9  requirement to remove the surplus materials, and these are huge

10  items.  These are not shovels and pitchforks or whatever.

11  These are enormous items, some as big as this room, and you

12  cannot clean up until those items are removed.  It's simply

13  impossible.  So, the contemplation from the get-go, just from

14  the understanding of the parties, is that the object was to

15  remove the surplus materials and then clean all the designated

16  areas thereafter.  In other words, in -- within the contract

17  itself it says, cleaning is defined as cutting -- being able to

18  cut grass.  You could not cut grass with these objects there.

19  So, just from the plain language of the contract, you had to

20  have all these items removed before you could go from there.

21        What the contract does not say is that all these

22  areas must be cleaned first and then remove the surplus

23  materials, so that cleaning the areas could not be suspensive

24  condition.  In addition, you could not do the level of cleaning

25  necessary to cut grass until all these items were removed.  So

**J&J COURT TRANSCRIBERS, INC.**

7

1    cleaning these areas --

2            THE COURT:  Well, but there were 17 areas.  You could

3    remove some and clean some.

4            MR. WILSON:  Right, it is possible to clean some, but

5    what they wanted to do was get all the big stuff out right away

6    and then they can start moving the little stuff.  There were

7    bits of scrap metal here and there.  At some points, they

8    picked up papers.  But the idea is he was buying the big items.

9    That's what he was paying $100,000 for.

10           THE COURT:  Although looking at the contract, the

11   second paragraph, does that not -- the "Whereas" clause, does

12   that not tell us what this contract was all about, contract --

13   "Owner operates a crude oil refinery facility, and contractor

14   is in the business of providing surplus material, reclamation,

15   and cleanup services, and contractor agrees to furnish such

16   services to owner."

17           MR. WILSON:  The reclamation services encompasses

18   actual sales of these materials to third parties.  That is the

19   business of reclamation.  If they were just removing it, it

20   would be called disposal, as opposed to reclamation.

21   Reclamation means that they're bringing it back in, they're

22   going to do something with it afterwards.  It's a description

23   of his business.  It's not describing exactly what he's going

24   to do.  And the rest of the contract, clearly, if there's an

25   ambiguous term or an inconsistent term, should be construed

**J&J COURT TRANSCRIBERS, INC.**

8

1  against the debtor --

2        THE COURT:  Well, how is it ambiguous or inconsistent

3  with the rest of the contract?

4        MR. WILSON:  To the extent the "Whereas" clause has

5  some sort of narrow definition as to what the intent of the

6  contract is, where it indicates further inside that there is a

7  sale and constantly references the term "seller," "buyer," that

8  they're selling these materials, if that's inconsistent with or

9  ambiguous or if it does not flow with the "Whereas" clause,

10  since there's only one it doesn't really set out what the terms

11  and conditions of the contract are.

12        THE COURT:  Well, why is it inconsistent?  There

13  can't be a contract for both sales and services?

14        MR. WILSON:  There can be, but the important thing is

15  whether there is a hybrid contract at work is not the issue.

16  The issue is whether insofar as the sale is concerned whether

17  the title passed on the items that were sold and then the

18  services were to be provided later on.

19        THE COURT:  Well, the <u>Jefferson Parish</u> case that I

20  cited did have a similar contract where it provided a sale and

21  services, the installation of the cabinets, and that was the

22  contract that the court, Louisiana court, found was a, you

23  know, subject -- a sale subject to a suspensive condition.

24        MR. WILSON:  And I cover that later in the

25  presentation, but in terms of -- to address that directly right

**J&J COURT TRANSCRIBERS, INC.**

A000268

9

1 now, under Louisiana law there are different types of

2 contracts.  There's a sale, and there are construction

3 contracts.  A furnish and install contract under Jefferson

4 Parish, under that Raleigh case, is considered a construction

5 contract.  It's a furnish and install.  That individual

6 purchaser does not want the services unless he actually gets

7 the stuff on-site and it's installed.  It's not complete until

8 it's installed.  In contrast, Syracuse is buying the stuff and

9 he wants it -- he's going to move it himself.

10          THE COURT:  But it's not complete until he's

11 completed the reclamation and cleanup services, is it?

12          MR. WILSON:  The title is complete.

13          THE COURT:  Well --

14          MR. WILSON:  The title passes, because you have --

15 there's --

16          THE COURT:  Why is it different from the Jefferson

17 Parish?  Why does title pass in this case but not in the

18 Jefferson Parish?

19          MR. WILSON:  They're completely different.  One is

20 taking materials that are being purchased and installed into an

21 object that the actual purchaser will eventually own.  The

22 other is in complete contrast.  It's taking things out that the

23 purchaser is buying.  The case that is on point --

24          THE COURT:  It's not only taking them out ,that

25 you're buying.  It's taking them out and putting the property

10

1  in a condition that the owner wants.

2          MR. WILSON:  After everything is removed.

3          THE COURT:  Well --

4          MR. WILSON:  But that doesn't benefit Syracuse.  He's

5  trying to buy the stuff, and once he gets it off-site he has

6  also agreed to clean up afterwards.  That's the essence of the

7  agreement.  There is nothing that shows that there was anything

8  but that was the agreement.

9          THE COURT:  It doesn't say he's going to clean up

10 afterwards.

11         MR. WILSON:  It does, and if we look at the contract,

12 if -- on the first page it says, "Remove surplus materials and

13 clean all designated areas."

14         THE COURT:  Okay.

15         MR. WILSON:  It is in that order.  One is to remove.

16 When he removes he's selling them immediately.  And the second

17 part is to clean the designated areas.  If you go to the

18 remainder of the contract, it doesn't say to remove the surplus

19 materials and clean all designated areas.  It doesn't say clean

20 the areas and then remove the surplus materials.

21         THE COURT:  Well, I believe in your material, it's

22 clear that Mr. Syracuse did, in fact, clean some of the areas.

23 He did provide clean --

24         MR. WILSON:  After he moved the materials.

25         THE COURT:  Well --

11

1        MR. WILSON:  He would remove the materials, sell

2   them, and then move on to another area.  That was the process.

3   That's what they agreed to do, and that's what he did, in fact.

4   To try to read into this a completely different situation where

5   he cleaned up the whole areas and then he was entitled to take

6   those large items and sell them is inconsistent with what we

7   have.

8        If we look at the remainder of the contract the --

9   basically there's a contract price of $100,000 that is set out

10  in specific terms.  That is his consideration.  That's what

11  he's getting to take care of the sales portion of the contract.

12        THE COURT:  No, that's what he was giving.

13        MR. WILSON:  That's what he was paying.  He was

14  paying $100,000.  He's not paying $100,000 to go have the right

15  or the pleasure of cleaning up this refinery.  He's going and

16  he's paying $100,000.  He paid the money.  He's taking the

17  stuff.  He's selling the stuff, and in the middle of his

18  efforts to sell the stuff, the refinery shuts him down for two

19  reasons.

20        THE COURT:  I know all that.  But let's focus on your

21  statement that he paid $100,000 for these goods.  He sold some

22  of them for $800,000, correct?

23        MR. WILSON:  Correct.

24        THE COURT:  And he asserts that the remaining

25  property is worth $1.5 million.

**J&J COURT TRANSCRIBERS, INC.**

12

1          MR. WILSON:  Correct.  Well, actually it's worth

2     more.  There's other scrap on there.  Those are the big items

3     that he could actually put a value on.

4          THE COURT:  So the value of what he bought was at a

5     minimum $2.3 million?

6          MR. WILSON:  Correct, Your Honor.

7          THE COURT:  For which he paid $100,000?

8          MR. WILSON:  Plus he had the obligation to remove it

9     --

10         THE COURT:  And to clean --

11         MR. WILSON:  -- and all the costs attendant to that.

12         THE COURT:  And to clean --

13         MR. WILSON:  Right.  The cleaning is minor.  That's

14    cutting grass and picking up papers.  To remove the stuff,

15    that's the expenditure, and that's just like the Mobile

16    Machinery case that we cite later in there, which is a sale in

17    a lump, where the individual bought all this pipe and kilns.

18    He said, I want all the pipe you have in these kilns as it is,

19    and I pick up the cost of shipping that.  That's directly on

20    point.  It's the exact same situation.  It's a direct codal

21    reference.  It's a direct codal parallel.  It's a direct

22    indication from the jurisprudence.  It lines up directly with

23    our case.  So, he goes into these kilns and he says I want all

24    your pipe, all your disposed pipe, your useless pipe, it's good

25    to me, I'm going to buy it for this sum.  I think it was

**J&J COURT TRANSCRIBERS, INC.**

13

1  $50,000.

2      THE COURT:  But there were no services in that

3  contract.

4      MR. WILSON:  There were no -- in addition, no.  But

5  he -- if he --

6      THE COURT:  Well, there are services in this

7  contract.

8      MR. WILSON:  Well, the services are cutting grass,

9  and that's what it says in there.  It says cutting grass after

10  that.  If you want to attach 2.3 million to cutting grass, I

11  think that's inconsistent with the contract.

12      THE COURT:  Well, I don't think that cutting grass

13  was all because in --

14      MR. WILSON:  You're trying to --

15      THE COURT:  -- Paragraph 2A, the last sentence, "All

16  work or services rendered or performed by contractor shall be

17  done with due diligence and a good workmanlike manner, using

18  skilled, competent and experienced workman and supervisors."

19  That doesn't refer only to cutting grass.

20      MR. WILSON:  No, it refers to cutting up these

21  materials.  If we show what these materials look like -- I

22  think there's a fundamental gap here in terms of what the

23  materials were.  These were not like lawn mowers and picks and

24  shovels.  Pictures.  And throughout the contract you see the

25  constant references to selling and buyer, and there's the price

**J&J COURT TRANSCRIBERS, INC.**

A000273

14

1  of $100,000.  So, our contention is that Syracuse, as you said,

2  could not -- as we said, it could not clean until all these

3  materials were removed.  If you look at these different items

4  -- stop -- if you look at these different items, they're huge.

5  Go back one.  They're enormous.  Part of the work -- you can't

6  just bring in a wheelbarrow and put that in a wheelbarrow.  You

7  have to have skilled workman come in, and a lot of times they

8  cut these things up and actually remove them from the refinery.

9  They didn't just go in there and put it in a truck.  They had

10  to have cranes.  They had to have all kinds of stuff to remove

11  these things.  These are huge items.

12        Now, some of these were actually capable of being

13  reused in terms of actual reinstallation in some other

14  location.  So they picked these things up and they would

15  package them as-is on-site, and the person who bought it, the

16  third party, would come in and just pick it up and remove it.

17  So, Syracuse was responsible for making sure that where he sold

18  this stuff to third parties that they did it in a proper way,

19  that they didn't just come in and have, you know, for want of a

20  better term, a bunch of knuckleheads come in and just drop the

21  stuff all over the place, or cause a fire or whatever.  They

22  had to do it correctly, so to the extent they had to cut things

23  loose, if they had to weld something to -- in order to put

24  padeyes on these to lift them.  They're huge.  These tanks are

25  enormous, and so you can't cut grass unless all these are gone,

**J&J COURT TRANSCRIBERS, INC.**

15

1  and when they removed them, they sold them.  And there's no

2  question that you have title transfer because he's selling them

3  back to Orion.  He's selling them to third parties.  Either

4  title transferred or it didn't, and it didn't transfer just

5  because they removed them.  They were selling them on-site in

6  place.  They weren't just selling them once they got off-site.

7  And Orion was buying things in place as they lay in the

8  refinery.  So, either title transferred or it didn't.  Orion

9  acknowledges titled transferred.  The problem was they didn't

10  want him just selling everything and cherry picking the best

11  stuff and then disappearing.  So, this is when they tried to

12  force terms and conditions into the contract that weren't

13  there.

14        So our point is, if you look at the facts, certainly

15  the contract doesn't indicate that they had to clean all these

16  areas before they could remove anything, and certainly -- and

17  factually they didn't remove everything -- I'm sorry -- they

18  didn't clean everything until they -- and then remove all these

19  items.  It was simply impossible, because if you look at the

20  size of them, they're huge.  And these are the ones that were

21  left over.  He removed a bunch of the other ones already, and

22  those are the 800,000 that he sold to date.

23        So, one of the important things, though, is if you

24  look into the overall fact situation, there are certain

25  questions that arise, and if title didn't pass to Syracuse,

**J&J COURT TRANSCRIBERS, INC.**

A000275

16

1   then why did Orion buy the surplus materials back from

2   Syracuse?  That makes no sense.  They bought them back from

3   Syracuse.  Title had to pass to him under the understanding of

4   the parties, under the contract, factually, legally, however

5   you look at it.

6          Then also if title didn't pass to Syracuse, why

7   didn't Orion give Syracuse his money back?  If they said,

8   that's not your stuff, you can't -- can have your money back.

9   They didn't give him his money back.  They just kept it.  So

10  the title passes.  The purchase price is paid and they kept the

11  money.

12          The third thing is if title didn't pass --

13          THE COURT:  To the extent the debtor kept the money,

14  you have a claim against the debtor.

15          MR. WILSON:  If that's what we are seeking, but we --

16          THE COURT:  If you're asserting the debtor breached

17  the contract, you do have a claim for that.

18          MR. WILSON:  Right.  There's no question about that.

19          THE COURT:  So --

20          MR. WILSON:  But we're not looking for -- we're

21  looking to acknowledge that we have the title.. That's the

22  essence of this motion here.  There's no question that that

23  contract lies in the background.  The third thing is if title

24  didn't pass, why did Orion ask Syracuse to return the -- why

25  didn't Orion ask Syracuse to return the surplus materials he

**J&J COURT TRANSCRIBERS, INC.**

17

1  sold to third parties.  If the title didn't pass, how could he

2  possibly be doing that?

3          THE COURT:  Well, it's clear that those items were

4  removed.

5          MR. WILSON:  If it went as some, it went as to

6  others.  There's nothing in the contract that says unless you

7  remove this title hasn't passed, because with ones that were

8  actually on-site, with him not even removing them, third

9  parties came and picked them up.  It's uncontested.  And Orion

10 was buying them back as they lay in the refinery.  So removal

11 is not in there.  Removal is not in the contract.  Removal is

12 not an issue factually.  It's not an issue legally.  The Mobile

13 Machinery case --

14         THE COURT:  There is an obligation to remove them.

15         MR. WILSON:  To remove them.

16         THE COURT:  It's in 2A.

17         MR. WILSON:  Right.  He has an obligation to remove

18 them, but in terms of title passing, removal was not a

19 condition precedent to sale.

20         THE COURT:  Well, because you assert there is no such

21 thing as a condition precedent in the sale contract, but there

22 is a sale subject to a suspensive condition.

23         MR. WILSON:  Yes, that's correct, under these terms

24 and conditions.  To the extent -- I've generalized and I may

25 have overspoke on that, but there is sale subject to a

**J&J COURT TRANSCRIBERS, INC.**

A000277

18

1  suspensive condition, but there is no such thing as the vendor

2  keeping title to goods and then taking the purchase price and

3  just awaiting compensation.  That's what has been tried for

4  years with cars and whatnot in Louisiana, and they haven't been

5  able to do that until they actually came up with a statutory

6  exception, if they had a lease purchase agreement, because that

7  was foreign to the Civil Code.

8          THE COURT:  But the whole point of a sale subject to

9  a suspensive condition is title does not pass --

10         MR. WILSON:  Right.

11         THE COURT:  -- until the suspensive condition is met.

12         MR. WILSON:  Right, but the suspensive condition

13 doesn't exist in this case because he was selling stuff before

14 he actually cleaned up.  So cleaning up could not be a

15 suspensive condition.  It's impossible under the facts.  It's

16 not in the contract, and legally it's not possible, because he

17 -- they're trying to keep title, but yet he's selling these

18 things.  Either he had title or he didn't, and there was no

19 requirement of removal first before title would pass because he

20 was selling things as they lay in the yard.  So basically, the

21 answer to those questions is that both parties understood that

22 title had passed, and the issue was really how soon after he

23 removed the surplus materials would he clean up.  There's no

24 question he had the obligation to clean up and he was supposed

25 to do that.  So, the problem was they were concerned that he

19

1  would cherry pick, and that's all in the testimony, and take

2  all the best stuff and then sell it and then disappear.  So

3  they tried to start forcing him to clean up before he actually

4  started taking his stuff out.

5          THE COURT:  Well, that's a disputed fact.

6          MR. WILSON:  Not really.  None of the witnesses --

7  all -- we deposed all the --

8          THE COURT:  It is a disputed fact.  They assert that

9  he was incapable of doing the job, that he had four people on

10 the job, one of whom was Mrs. Syracuse, and he was incapable of

11 doing the job.

12         MR. WILSON:  If -- we're going to take that position,

13 but I'm talking about the other Orion witnesses who are not our

14 witnesses.  They all testified --

15         THE COURT:  But I'm just pointing out --

16         MR. WILSON:  Right.

17         THE COURT:  -- that it's a disputed fact, as to --

18         MR. WILSON:  I think the Court's already ruled that

19 that would be a contested issue of fact --

20         THE COURT:  Yes.

21         MR. WILSON:  So, anyway, the extent of -- to which

22 Orion interfered with his operations that would prevent him

23 from actually completing it, that would be another issue.  So,

24 I think contractually there's nothing in the contract that

25 deals with a suspensive condition.  There's nothing in the

**J&J COURT TRANSCRIBERS, INC.**

20

1  contract related to passage of title, and there's nothing in

2  the contract except the order of the activities that reflects

3  what the understanding was, and that was that the removal of

4  the products, which would all him to sell them, would take

5  place before the cleanup.  So then if you look at the facts,

6  that's --

7           THE COURT:  Well, let's look at the contract again.

8  If the contract is simply a contract of sale, but there was the

9  obligation for Syracuse to clean up --

10          MR. WILSON:  Afterwards.

11          THE COURT:  -- where was -- what was he being paid

12  for that?  Wasn't he being paid two and a half million dollars

13  for that?

14          MR. WILSON:  For the cleanup?  No, these people were

15  trying to sell this refinery.  They eventually sell it in

16  bankruptcy.  They're in financial trouble.  The place is a

17  mess.  It's covered with all this junk that's been sitting

18  there for three decades.  They --

19          THE COURT:  That's worth two and a half million

20  dollars?

21          MR. WILSON:  Right, and they don't know that.

22          THE COURT:  Well -- they don't know that?

23          MR. WILSON:  No.  And that's why they're in

24  bankruptcy.

25          THE COURT:  Well --

**J&J COURT TRANSCRIBERS, INC.**

21

1          MR. WILSON:  So they had four people that have come

2     out to bid on the stuff and none of them will do it.  They want

3     to be paid to clean up.  So, Mike comes out and he says he's

4     going to actually pay them the $100,000 to get the job because

5     he knows what the stuff is worth, and he's hooked up to all the

6     salvage markets, all the scrap markets.  He's in the

7     reclamation business.  So, he can get on the phone and say I've

8     got a turbine fan unit here, and then they come and pick it up,

9     and he's made $100,000 there.  Then he calls somebody else --

10     I've got a whole bunch of valves here, do you guys want them,

11     yeah, they come pick it up.

12          THE COURT:  Well, whether or not the debtor knew it

13     or not, the value to the debtor of removal was two and a half

14     million dollars --

15          MR. WILSON:  No, I --

16          THE COURT:  -- which is what he got under this.

17          MR. WILSON:  No, that's what he was eventually able

18     -- through his own efforts -- now, that's a net, too -- that's

19     not a net.

20          THE COURT:  Through his efforts, and his efforts were

21     to perform the contract -- to cut up the stuff, to remove it --

22          MR. WILSON:  Right.

23          THE COURT:  -- and to clean.

24          MR. WILSON:  Right.

25          THE COURT:  All of that was part of his obligation

**J&J COURT TRANSCRIBERS, INC.**

22

1    under the contract.

2              MR. WILSON:  Right.  Well, to get it off there,

3    however he did it it was up to him.  If he wanted to pay -- if

4    he had people lined up as purchasers, he wouldn't have to do

5    anything to the extent --

6              THE COURT:  Yes, but --

7              MR. WILSON:  -- whatever he wanted to do.

8              THE COURT:  -- that was his obligation and the value

9    of that was two and a half million dollars.

10             MR. WILSON:  I disagree with that.  I don't think it

11   was worth two and a half million dollars, otherwise he doesn't

12   make a profit.  That's the whole point.  It's worth less than

13   that.  It's worth far less than that.  That's how he makes his

14   money.  Because these people -- it's -- one man's treasure is

15   another man's trash, or vice versa, however you want to look at

16   it, and these people didn't know that they had all this stuff.

17   When they finally realized how much he was making, that's when

18   they -- that's when they got upset.  There's no question about

19   that, and that's uncontested in the facts.  They didn't want

20   him cherry picking the good stuff when they realized how much

21   it was worth.

22             THE COURT:  Well, the contract did permit the debtor

23   to designate where he would work.

24             MR. WILSON:  To some extent, and then it also says

25   that he could cordon off areas and keep the refinery people

23

1    out.  He did that, and that's when they locked him out.  So he

2    had rights and they had rights, but the contract's a mess.

3    There's no question about it, and it's clearly ambiguous in

4    that it has inconsistent terms all which should be construed

5    against the debtor.

6            THE COURT:  Well, I'm not sure they're inconsistent.

7            MR. WILSON:  Well, to the extent that it's implied

8    that he has to clean up before he's removing this stuff, the

9    order of them is remove and then clean up.  So, if that seems

10   -- is ambiguous, I think it's clear cut that's what he's

11   supposed to do, but he's also supposed to pay them, and he paid

12   them.  It's not your basic contract.  There's no question about

13   that, and it's typical in Louisiana.  We usually see these in

14   the context of charter parties for vessels where they get a

15   whole bunch of forms together and they come up with some

16   Frankenstein contract.

17           THE COURT:  All right.

18           MR. WILSON:  So in terms of the legal analysis, then,

19   I found a Law Review article that goes right to the point of

20   the distinction between a suspensive condition or a sale

21   subject to a suspensive condition or a conditional sale, and

22   they're certainly distinct terms, and to the extent that that

23   would help -- this is not cited in my original briefs or

24   whatever.  I have copies of the article for the Court and for

25   counsel if they want it.  But this article I think is helpful

**J&J COURT TRANSCRIBERS, INC.**

A000283

24

1  because it shows how the courts in Louisiana do treat these two

2  very different concepts.  And in terms of -- first off, there's

3  a definition of the suspensive condition, "A sale under a

4  suspensive condition is not enforceable until the happening of

5  an uncertain event that the contracting parties contemplate."

6  Here there is no specific event.  He's selling from the get-go.

7  As soon as he arrives on the site, he starts selling.  So there

8  cannot be a suspensive condition.

9                              (Pause)

10         MR. WILSON:  He could not complete the cleanup until

11  the surplus materials were removed.  By necessity the removal

12  had to proceed the cleanup and the sales did proceed the

13  cleanup.  The parties never contemplated that the cleanup would

14  suspend the transfer of title, and the debtor never even raised

15  this theory.  This was not ever a defense raised in the

16  memoranda.  It was only -- it appears that it came from a Law

17  Review article, and that's where we ended up.  So, this was not

18  even the debtor's theory.  The fact that the debtor has grafted

19  this onto their case at this point in time doesn't give it any

20  greater credence.  I think that they had all these other

21  theories, but all of it is rationalization after the fact

22  because the real truth of it is he's supposed to remove it, he

23  could sell the stuff and then he could clean up.

24         In terms of what really has been found here, it's

25  actually a conditional sale.  In a conditional sale, the seller

**J&J COURT TRANSCRIBERS, INC.**

25

1  is obligated to deliver the thing, and the buyer incurs the

2  obligation to pay the price prior to the fulfillment of the

3  condition.  So what happens here is, this is a typical

4  situation where the buyer has some other -- that you can pay

5  over time and by the time you finished paying then you can

6  receive the item.  You get the title to it.  This is

7  essentially what they're saying.  And a conditional sale is

8  interesting and it's certainly -- as the debtor is now

9  construing it, it would be a conditional sale, but there's only

10  one problem with that.  Louisiana courts don't recognize

11  conditional sales of movables.  You can't have that.  And the

12  debtor has cited those cases that say there's no such thing as

13  a conditional sale of a movable.

14         So, what we have here is instead when they do -- when

15  they are confronted by a conditional sale, which often happens,

16  oftentimes the seller will try to say this is what we were

17  doing, the courts don't recognize that.  They just say that

18  there is an agreement as to the thing and the price which

19  perfects the sale.  The sale is perfected at that point in time

20  and title passes, and then the issue of payment becomes

21  something that's left to be resolved for another day.

22         To the extent that that's the case here, I mean, the

23  debtor was expecting as part of the payment that Syracuse would

24  clean up.  So he hasn't finished paying for the stuff, is what

25  the issue is.  But the problem was they wouldn't let him finish

26

1  paying for the stuff, and he was going to pay both in currency

2  and in credits, and also he was going to pay with his services.

3  So by keeping him from doing his services, they basically kept

4  him from actually fulfilling his obligations under the

5  contract.  So he paid cash.  He was supposed to clean up

6  afterwards, but the debtor wouldn't let him perform, and the

7  debtor didn't want him to cherry pick.

8          So then you get into the issue or the importance of

9  Article 1772 of the Louisiana Civil Code, which deals with the

10 fault of the party, and basically this says that a condition is

11 regarded as fulfilled when it is not fulfilled because of the

12 fault of a party with an interest contrary to the fulfillment,

13 and fault encompasses also intentional acts and deliberate act

14 on the part of the obligee.  And there is a case that we cited

15 earlier in our motion for summary judgment, Cox v. Department

16 of Highways.  This is a Louisiana Supreme Court case, and this

17 is still viable.  It says -- as the Louisiana Supreme Court has

18 said, "It is unimaginable that any civilized system of law

19 would allow the promisee to recover damages for the promisor's

20 failure to perform under the contract.  It is a long

21 established principle of law that he who prevents a thing may

22 not avail himself of the non-performance he has occasioned."

23         So, it only makes sense, and if they're going to

24 prevent somebody from performing and then getting the benefit

25 of whatever's occurred to date, it certainly would not weigh in

**J&J COURT TRANSCRIBERS, INC.**

27

1  favor of any equities, and Louisiana is different from the
2  common law system in that equity is generally not even
3  considered as a separate remedy, because they consider that a
4  failure of the legal system if you have to have equitable
5  remedies come in to correct the wrongs of the existing system.
6  So equitable principles are built into the Code itself, and by
7  deduction those principles precipitate out into the case law.
8           So, under this same _Cox_ decision, the Louisiana
9  Supreme Court summarized the rule of law that one should not be
10 able to take advantage of his own wrongful act, and that's
11 basically what we have here.  So, to the extent that they
12 prevented Syracuse's performance, that fulfills his obligation.
13 And in this regard, and I realize the Court considers it a
14 contested issue of fact because there's indication from some of
15 the Orion people, I think just one, Mrs. Squires, that they
16 didn't have the proper equipment, but in reality this is what
17 the other Orion employees who are still there, the ones who
18 were not let go, like Mrs. Squires, they indicated that Orion
19 had deliberately interfered with Syracuse's operations, that
20 they had impeded Syracuse's acts as to the surplus materials,
21 and eventually, by March 31st, 2002, Syracuse was locked out of
22 the refinery, which meant he clearly could not perform on the
23 obligation.  And in the cases we cited within the memorandum --
24 within the earlier motion for summary judgment, as well as the
25 motion for reconsideration, we point out that there are several

**J&J COURT TRANSCRIBERS, INC.**

A000287

28

1  cases that deal with situations where somebody was prevented

2  from performing or locked out and the court considers their

3  obligation fulfilled.  So, under Article 1772, we feel that

4  when he was locked out title passed under any theory.

5           THE COURT:  Well, isn't it true that in order for

6  title to pass under that theory there has to be a judicial

7  determination of your rights?  It would be retroactive to the

8  lockout date.

9           MR. WILSON:  No, Your Honor, I believe that the way

10 the cases read, they say that title passed at that time.  There

11 is a later judicial recognition of that, but it's not

12 retroactive.

13          THE COURT:  But the cases -- 1775, doesn't it say --

14 isn't that the section that provides if title is passed to a

15 third party in the interim, title doesn't pass retroactively,

16 that all you're left with is a claim for damages?

17          MR. WILSON:  But title wouldn't have passed in the

18 interim.  When he was locked out on March 31st, 2002, that was

19 before the eventual sale, and the agreement, the stipulation

20 that was entered into by the parties took place as of I think

21 it's May of 2003.

22          THE COURT:  But what you're missing is the filing of

23 the bankruptcy passed title.  Title passed when bankruptcy was

24 filed.

25          MR. WILSON:  The bankruptcy was passed after March

**J&J COURT TRANSCRIBERS, INC.**

A000288

29

1  31st, 2002.

2          THE COURT:  But there was no judicial determination

3  that title passed in March of 2002.

4          MR. WILSON:  But judicial determination isn't the

5  standard.

6          THE COURT:  Well, yes, it is, because if you get a

7  judicial determination that -- there would have been a lockout,

8  but before the judicial determination the property was sold to

9  a third party.  The Court cannot determine that title rests in

10 the buyer.

11         MR. WILSON:  The courts -- I assume we're applying

12 Louisiana law --

13         THE COURT:  Yes.

14         MR. WILSON:  -- to determine this case.

15         THE COURT:  Yes.

16         MR. WILSON:  And if that's the case, it's not the

17 date of judicial -- the judicial determination.  If you look at

18 the cases, they go back into the facts and when that act

19 occurred was when -- that's when title passes.

20         THE COURT:  However, they have held that if between

21 the time of that act and the time of the judicial determination

22 the property has been sold to a third party or pledged as a

23 security to a third party, the third party's rights will not be

24 affected.

25         MR. WILSON:  I haven't seen any cases to that effect.

**J&J COURT TRANSCRIBERS, INC.**

30

1 There's one case that was cited in the opinion, but that deals

2 with a mineral lease, and that's where there was a retroactive

3 application where they said it had been sold to a third party,

4 but that had nothing to do with a situation like we have here.

5 That was a case where you're dealing with specific immovables,

6 and they had a separate agreement where there was a title

7 passing at a later time.  You had separate items that occurred,

8 and they said that the title could not be retroactively issued

9 at an earlier date in order to knock out the holder of the

10 mineral lease.

11        THE COURT:  Well, the <u>Orion Refining Corporation</u>

12 case, is that what you're referring to?

13        MR. WILSON:  No, I was referring to -- Your Honor, I

14 was referring to the <u>Ober v. Williams</u> case.

15        THE COURT:  Well, the <u>Orion Refining Corporation</u> case

16 found that Article 1775 of the Civil Code protects the rights

17 of third persons against retroactive effects of the fulfillment

18 of a condition.

19        MR. WILSON:  But it wouldn't be retroactive effects

20 because when we reached the stipulation, the stipulation was

21 that we would allow the sale to go through.  The sale wasn't

22 going to go through.  We locked the status quo in.  Whether it

23 transferred to Valero is irrelevant because the whole point --

24        THE COURT:  Not to Valero, I'm talking about the

25 transfer to the debtor when bankruptcy was filed.

J&J COURT TRANSCRIBERS, INC.

31

1          MR. WILSON:  In terms of the items, there's no way

2   that these would transfer back to the -- the title had already

3   transferred with the sale.

4          THE COURT:  But without a judicial determination of

5   that --

6          MR. WILSON:  I --

7          THE COURT:  1775 says that this retroactive effect,

8   or this retroactive deeming fulfillment of a condition, cannot

9   apply to a third party, correct?

10         MR. WILSON:  I don't read it that way.  I think,

11  number one, title passed when they reached their agreement, so

12  we're not looking for retroactive effect in that situation.  To

13  the extent that we're relying upon Article 1772 and attempting

14  to say that it was actually occurring as of the date that he

15  was locked out --

16         THE COURT:  Right.

17         MR. WILSON:  -- that's March 31st, 2002 --

18         THE COURT:  Right.

19         MR. WILSON:  I don't think we're looking for

20  retroactive effect.  The cases that I saw --

21         THE COURT:  Well, there has to be a retroactive

22  effect with the court determining that the condition is deemed

23  fulfilled because of your bad acts --

24         MR. WILSON:  It would --

25         THE COURT:  -- is a dispute.  The parties don't agree

**J&J COURT TRANSCRIBERS, INC.**

32

1   title passed, and a court has to make that determination and

2   determine the date that the title was deemed to have passed

3   because of the bad acts of the seller, correct?

4           MR. WILSON:  I would just --

5           THE COURT:  That's the effect of 1772.

6           MR. WILSON:  That's not how 1772 would work.  As I

7   understood it from the case law, they don't look to the date

8   that the judicial determination is made, and it's not looking

9   for retroactive effect.  It's looking for spontaneous --

10  contemporaneous effect that's recognized that it occurred back

11  then, but it's not --

12          THE COURT:  But it -- okay, all right.  It's

13  recognized by a court, but 1775 says that court cannot

14  recognize title passed if there's an intervening transfer to a

15  third party.  Otherwise, what's the effect of 1775?

16          MR. WILSON:  I guess I'm missing something.  If the

17  Court would allow, we'd be willing to -- or we would request

18  the opportunity to brief that issue because I think there's a

19  disconnect between those two articles, 1772 and 1775.  If we

20  could brief that issue, I'd appreciate it, Your Honor.

21          THE COURT:  All right.  All right.  Sorry to

22  interrupt.

23          MR. WILSON:  See if I can -- so that basically I had

24  focused more on these two cases.  I thought that was crux of

25  the decision, and these are the two cases, one of which was the

33

1  construction.  I felt that the -- or we feel that in terms of

2  the construction of the contracts involved in those cases,

3  they're apples and oranges because Raleigh and the Syracuse

4  situations differ.  One is a furnish and install contract,

5  which is essentially construction, and Syracuse has an entirely

6  different setup where he's actually removing items.

7          THE COURT:  Isn't it the reverse?  It's the take out

8  and sell.  It's de-install and sell.

9          MR. WILSON:  Well, sometimes it's just sitting there

10  and sell, too.  I mean they -- it's just a transaction or --

11          THE COURT:  Yes, it's removal and sell.

12          MR. WILSON:  Right, but that's -- the important

13  distinction is not removal and sell.  They're sold, and because

14  they're sold he can remove them.  So, he's selling them back to

15  Orion without them doing anything.  They're actually being sold

16  as they sit there.  There's no removal involved.  Orion has to

17  remove them, or Orion has to --

18          THE COURT:  Orion doesn't remove them.  The --

19  Syracuse does.

20          MR. WILSON:  No.  I'm saying on some of these items

21  they were sitting there on the refinery --

22          THE COURT:  Yes.

23          MR. WILSON:  -- and Orion would approach Syracuse and

24  say, we want to buy this back from you.  So, he says, okay,

25  well, I'll give you a price, and so he invoices him.  They pay

J&J COURT TRANSCRIBERS, INC.

34

1  him.  They take that time.  They remove it from where it is,

2  and they install it into their refinery and they use it.  So

3  they're actually doing some of the removal.  So he didn't -- it

4  wasn't -- there was no requirement of removal, as is the case

5  with a furnish and install --

6           THE COURT:  Well, his buyer was doing the removal

7  rather than him, but does it matter whether it was Orion or

8  some third party that did the removal?  It was all part of

9  Syracuse's obligation.

10          MR. WILSON:  But sometimes Orion didn't remove them.

11 They just left them there.  They just bought them back.

12          THE COURT:  Okay.

13          MR. WILSON:  So, what I'm saying is that where the

14 installation is integral to the contract, the removal is not.

15          THE COURT:  But the contract says it is.

16          MR. WILSON:  It says that -- yes, he --

17          THE COURT:  It says removal is integral to the

18 services --

19          MR. WILSON:  But --

20          THE COURT:  -- Syracuse is providing.

21          MR. WILSON:  But it doesn't say title doesn't pass

22 unless you remove it.  In these cases, they say title doesn't

23 pass because the customer does not want a big roll of carpet

24 stuck in their livingroom they want it installed.

25          THE COURT:  But the contracts in those cases didn't

**J&J COURT TRANSCRIBERS, INC.**

A000294

35

1  say title doesn't pass until you've installed.  The court made

2  that determination --

3          MR. WILSON:  Well, in --

4          THE COURT:  -- by finding it a sale subject to a

5  suspensive condition.

6          MR. WILSON:  In Raleigh they specifically did find

7  that there was a separate element of the contract that said

8  that everything was for the risk of loss of the seller, because

9  they had separate insurance requirements, they had separate

10 risk of loss, they had duties to take care of the equipment.

11 And if you look at the terms and conditions of that contract,

12 it was totally different than anything Syracuse had.  So there

13 were separate requirements within Raleigh.

14         THE COURT:  Syracuse wasn't required to provide

15 insurance?

16         MR. WILSON:  Not for the equipment.  See, they had to

17 take care of all -- they had to have a builder's risk policy in

18 place in Raleigh.

19         THE COURT:  Well, "Contractor shall furnish all

20 required insurance, supervision, equipment, materials --

21         MR. WILSON:  Right.

22         THE COURT:  -- and qualified personnel to remove the

23 surplus materials."  That's not the same thing?

24         MR. WILSON:  No.  That's liability insurance.  A

25 builder's risk policy insures the actual item that you're

**J&J COURT TRANSCRIBERS, INC.**

36

1  installing.  This is what -- in <u>Jefferson Parish</u> -- in the

2  <u>Raleigh</u> case, Jefferson Parish required them to get a builder's

3  risk policy in place to insure what they were installing.

4  Syracuse is removing stuff.  He doesn't need to get any of

5  that.  The whole idea was that this worker had to be in charge

6  and responsible for installing all of this equipment and had to

7  be responsible legally for it, and that was the issue, and the

8  question was whether title would pass to Jefferson Parish, but

9  it wouldn't until it was installed.  So Jefferson Parish's

10  insurance company was not on the hook because title had not

11  passed.  But the whole concept was that the contractor had to

12  bring the stuff in, install it, and when it was all done then

13  title would pass.  But there's nothing in the contract like

14  that.  That was in that contract.  That's the import of it.

15  There's nothing in the Syracuse contract that says that's when

16  title passes.

17          THE COURT:  Well, those contracts didn't tell you

18  when title passed either.

19          MR. WILSON:  They didn't say title passes at this

20  point, but from it it says that everything is at the risk of

21  loss of the seller to the extent that they construe it as such,

22  but the important thing is they're not even calling that a

23  contract of sale.  They said -- no matter what we call it,

24  because they said this is not a sale, a typical sale.  This is

25  what we call a furnish and install, and it's a whole different

37

1  type of law.  It's construction law, and this is not -- we're

2  not in construction, and we're not in destruction.  He's just

3  buying the stuff and selling it to other people.  He's in

4  reclamation.

5          So, basically in terms of the overall view, I just

6  think that if we look at those contracts, furnish and install

7  are totally different from anything else that we have as far as

8  what Syracuse had.  The school board doesn't even want this

9  equipment unless it's installed.  Syracuse wants it

10  immediately, and he takes it and sells it.  There's no question

11  about it.

12          But more importantly on all this, the -- as far as

13  the provisions in the contract, there's no express provision in

14  this contract that says this is a suspensive condition, and

15  Louisiana courts do not actually read a suspensive condition

16  into a contract.  That's totally anathema to Louisiana courts.

17  This is a case -- but this is not in our memorandum, our

18  original memorandum.  This case shows that Louisiana courts do

19  not read suspensive conditions like this into a contract.

20          THE COURT:  What about the Jefferson Parish?  There

21  was no mention of suspensive condition in that case.  It did

22  read that into the contract.

23          MR. WILSON:  It was there in terms of the import of

24  the contract, because they had all the elements of the --

25  there's a Louisiana Supreme Court case on this that says this,

**J&J COURT TRANSCRIBERS, INC.**

38

1  too.  Unless it's expressed, they don't, but in that case, it

2  is there because they have all these --

3          THE COURT:  It's not expressed there.

4          MR. WILSON:  It doesn't say title, but they have a

5  suspensive condition that they had to install it.  It's common

6  knowledge from any situation where you have say carpet

7  installed or cabinets installed that you have to install them

8  for the title to pass, otherwise people don't want them.  In

9  this situation, he bought them and he could do whatever he

10 wanted with them.  That was the whole concept.  He could --

11         THE COURT:  He had to remove them.

12         MR. WILSON:  Right, but Orion didn't say you can sell

13 it to these people.  They didn't say you can sell it back to

14 us.  You can cut this up.  He made -- it was his to make a

15 decision on.

16         THE COURT:  But he had to remove it.  That was the

17 condition.

18         MR. WILSON:  Right.  There's no question of that,

19 yes.  But -- no, that was not a condition before title passed.

20         THE COURT:  Well --

21         MR. WILSON:  It had to be taken away, but title -- it

22 did not require it to be removed because they had items they

23 sold on-site without being removed.  The title had already

24 passed when they were removed.  So it can't be a suspensive

25 condition because it was occurring afterwards.  And these are

**J&J COURT TRANSCRIBERS, INC.**

39

1   the Supreme Court cases on that issue, so -- in terms of

2   requiring these things. So, we if we look to the actual

3   language of the contract, there's nothing in there that would

4   expressly require the removal or the cleanup before he actually

5   took title to any of these objects. So our position is that

6   the sale to Syracuse was perfected upon the signing of the

7   Orion contract.

8            This is the <u>Ober v. Williams</u> case. That's basically

9   just a mineral lease case, and that can be easily distinguished

10  because they have a separate title. There's two different

11  documents, and the title passes after the original suspensive

12  condition. They have two separate documents. They have their

13  original agreement and then they have a separate title, and the

14  issue is the title, and this related to an immovable, so it's

15  completely different than any other movable case. And because

16  Louisiana is a -- was primarily an agrarian society, all the

17  requirements for immovables is strictly construed, including if

18  you have a separate agreement related to title, and they had a

19  separate title that issued after their original agreement. So

20  that would form a whole separate basis for consideration.

21           Move onto the next one. Finally, I think this is

22  where we believe the case should have gone in terms of normal

23  construction of a codal situation such as this where you have a

24  sale and it's expressly provided for or covered under a

25  specific codal article.

J&J COURT TRANSCRIBERS, INC.

40

1          THE COURT:  But your argument is that all this was
2  was a sale.  The contract was more than a sale.

3          MR. WILSON:  There's no question about that.  There
4  was an attendant requirement that he clean up afterwards, but
5  the essence of it is that he's buying the stuff.

6          THE COURT:  No, not from the debtor's perspective.
7  The essence was they wanted the stuff out of there and the
8  place cleaned up.

9          MR. WILSON:  There's no question that that's what
10  they wanted, but he was buying it.

11          THE COURT:  That's the essence of theirs.

12          MR. WILSON:  Right.

13          THE COURT:  So this was more than just a sale.

14          MR. WILSON:  Well --

15          THE COURT:  They weren't selling stock.  They were
16  hiring him for material reclamation and cleanup services.  From
17  their perspective, this wasn't selling stuff.  As you suggest,
18  they didn't even know it was valuable.  They didn't want to
19  sell it.  They wanted to hire him to remove this stuff.

20          MR. WILSON:  They went to three different contractors
21  and they wouldn't do it.

22          THE COURT:  Well, so what?  They hired Syracuse to do
23  it.

24          MR. WILSON:  No --

25          THE COURT:  He agreed to do it.

**J&J COURT TRANSCRIBERS, INC.**

41

1   MR. WILSON:  He agreed to buy the stuff and he's

2 thinking he could just take it all out of there --

3   THE COURT:  But this contract doesn't just say it's

4 not a bill of sale.

5   MR. WILSON:  But if --

6   THE COURT:  It's a contract for services.  That's the

7 way it's written.

8   MR. WILSON:  But if -- and it should be construed

9 against the debtor.  But if it were just a contract for

10 services, or if it was primarily a contract for services, then

11 they should have paid him and then they should have kept all

12 the stuff, and that didn't happen.  He paid them.

13   THE COURT:  The price he agreed on was I'll pay you

14 $100,000 if I can keep the stuff.

15   MR. WILSON:  Right.  So he gets to keep the stuff.

16 The title should have passed.  It's

17   THE COURT:  But he didn't -- it's more than just a

18 sale.

19   MR. WILSON:  And they stopped him.

20   THE COURT:  It's more than just a sale contract.

21   MR. WILSON:  There's no question it's more than a

22 sale, but the cleanup, cutting the grass afterwards, is

23 separate and apart.

24   THE COURT:  It's not just the cleanup.  It's the

25 removal and cleanup, and as you suggest, these are huge pieces.

**J&J COURT TRANSCRIBERS, INC.**

A000301

42

1  This is a huge piece of junk.

2          MR. WILSON:  Which is exactly what the <u>Mobile</u>

3  <u>Machinery</u> case was.  It's all kinds of pipes stuck in these

4  kilns.

5          THE COURT:  Yes.  But that contract was clearly a

6  sale contract.  It didn't require removal and cleanup.

7          MR. WILSON:  Yes, it did.  He had to take all that

8  stuff out of there.

9          THE COURT:  It didn't require cutting the pieces and

10  removing them and doing reclamation.

11          MR. WILSON:  He -- it didn't require cutting the

12  grass around the kilns, but what it did require is he had to

13  move it.  Part of the contract was express and said he had to

14  take all the costs of shipping and removing the stuff, just

15  like Syracuse did.  It's the exact same situation.  He had to

16  cut up the pipe, and what happened was he didn't come back in

17  time, so all that stuff was left.  It's the exact same

18  situation.  And you have an express -- under Louisiana law and

19  under the Code, if you have an express codal provision that

20  deals exactly with the situation, because of the deductive

21  reasoning process, you have to go to the codal article that

22  addresses that, and this is the exact same situation.  We've

23  got a case right on point.  We have another one, the <u>Evangeline</u>

24  <u>(phonetic) Refinery</u> case that we also cited in there, which the

25  Court recognizes in another bankrupt refinery situation that

**J&J COURT TRANSCRIBERS, INC.**

43

1    they still have title just because -- the transfer takes place

2    once you have an agreement as to the price and the objects.

3    That's -- I think the basic gist of it is this is where it

4    should go.

5          So, in sum, our basic contention is that the parties

6    had reached an agreement on the objects and the price under

7    2458. The surplus materials were sold as-is in a lump pursuant

8    to that article and that title passed to Syracuse. Thank you,

9    Your Honor.

10          THE COURT: Okay. Thank you.

11          MR. ALLEN: Good morning, Your Honor. I'm Richard

12    Allen with Morris Nichols, representing ORC Distribution Trust.

13    I suppose there's a lot I could cover here. I'm going to try

14    and cover the points that seem now to be key to their argument,

15    and obviously if the Court has other questions, I'll be happy

16    to answer them.

17          I want to make a preliminary point about the record,

18    though, and I'm going to address this in more detail later,

19    because they now make a big deal about, oh, the facts show he

20    did this, the facts show he was selling right and left, et

21    cetera. Now, as I'll explain later, even if you accept

22    everything they say about the facts, that conduct is really

23    consistent with the Court's interpretation and with the

24    commonsense notion that once he took the materials off the site

25    we could care less, he had performed a suspensive condition, he

**J&J COURT TRANSCRIBERS, INC.**

44

1  had done part of the work, and he owned them.  But it's also

2  legally irrelevant.

3          However, I'm sure in his zeal to advocate his

4  client's position, he -- I think Mr. Wilson really has

5  overstated what the record shows in terms of the sales.  Now, I

6  haven't gone back and reviewed all the depositions, but I did

7  go back and look at the materials they put before the Court on

8  summary judgment, and these were the materials where they were

9  trying to make this point about conduct based on sales.

10          This morning, Mr. Wilson said Syracuse was selling

11  from the get-go -- I think those were his words -- and he was

12  selling from the day he got in there.  Well, that's not what

13  the record shows.  If you look at the materials they put before

14  the Court, the sales to Orion began in August of 2001 and went

15  through February.  He started work in April 2001.  The sales to

16  third parties, and by the way there's nothing in the record I

17  know of that indicates Orion knew what he was doing with this

18  material or whether he was taking it.  I know he testified he

19  was putting a lot of it in inventory.  But even the sales he

20  points to to third parties, there's a handful in June, two

21  months after he's on-site, there's a handful in July, three

22  months after he's on-site, and most of them are August to --

23  August 2001 until March 2002, which was when he was last

24  on-site.  Those sales are perfectly consistent.  When he came

25  in, no question he started work.  He removed a lot of material,

45

1 and he sold it.  But that's what the record shows that they've

2 put before the Court on all of these sales.

3         Now, in terms of the contract itself, one really

4 cannot reasonably read that as anything other than primarily a

5 contract for services.  The Court has noted the language.

6 Syracuse was defined as the contractor.  What's that mean?  The

7 opening paragraph says he specialized in providing certain

8 services and "agrees to furnish such services."  The scope of

9 work defines the services as removing the materials and

10 cleaning up, and there's also mechanics set out.  If you go

11 over in -- it's on Page 4, the mechanic was when he was

12 removing this material he needed to have what was called a dray

13 ticket and a scale receipt, and then it went off-site.  But

14 once it was gone, it was his as far as we're concerned.

15         The point which Mr. Wilson seems to overlook is

16 removal was part of the cleanup.  It's probably the biggest

17 part of the cleanup.  That's what Orion wanted done.  Orion

18 wanted this material removed.  That's what it contracted to do.

19 No question at some point he came to own it, and once he owned

20 it he was perfectly free to sell it or dispose of it, or, as he

21 testified in his deposition, put it into inventory.

22         Now, the position we urged the Court to adopt on

23 summary judgment was following the Louisiana cases on what are

24 called "mixed consideration contracts," because they disputed

25 that if it's primarily a services contract title didn't pass.

**J&J COURT TRANSCRIBERS, INC.**

A000305

46

1  And the Louisiana law -- and we cited those in our -- I think

2  it was our opening brief, Pages 12 to 14 -- essentially says

3  where you have a mixed consideration case, goods and services,

4  you look at what is the predominate consideration, and here

5  unquestionably the predominate consideration was not a payment

6  in cash.  It was agreeing to work for a year on-site with

7  subcontractors removing tons and tons of, as Mr. Wilson said,

8  very heavy equipment.  Although, by the way, not all of it was

9  these huge tanks.  There were a lot of valves and miscellaneous

10 things that he removed quickly.

11         Now, the Court, and at least I hope I correctly

12 understood the opinion, Mr. Wilson said Your Honor decided it

13 was a sales contract but it had a suspensive condition.  I read

14 the Court's opinion as saying you need not reach the issue of

15 whether it was a services or sales contract because even if it

16 is a sales contract then the Louisiana law would impose what

17 the Court found to be a suspensive condition.

18         It was remarkable to me when I read their motion for

19 re-argument and their brief that they didn't even mention the

20 Jefferson Parish case, which was the heart of the Court's

21 opinion, didn't mention it in their opening papers.  They

22 didn't say that's bad law.  They didn't say it's

23 distinguishable.  They didn't say it's an aberration under

24 Louisiana law or it's been overruled.  They just plain ignored

25 it.

**J&J COURT TRANSCRIBERS, INC.**

47

1       Well, in principle the case clearly is directly on

2  point, and, in fact, there the court actually found the

3  services component was a very small part of the overall

4  consideration being provided, but nonetheless an essential

5  part.  Here, no matter how you read this contract, as to the

6  materials, a key obligation of Syracuse was to remove it.

7  That's what Orion wanted, and, yes, they wanted the ground

8  cleaned up and mowed afterwards, but they wanted to be rid of

9  these things.

10      So, plainly, even though we would say, look, it's a

11 mixed consideration contract, it's plainly a services contract,

12 end of debate because they concede title doesn't pass, clearly

13 it is also correct to analyze that as a suspensive condition

14 under the Jefferson Parish case.  They haven't pointed to

15 anything suggesting that's wrong.  They, in their reply brief,

16 came up with another case about sale of a horse and horse

17 training, but, again, that case -- actually, it's sort of

18 interesting.  The case is distinguishable because the court

19 found, look, there were two different contracts -- one for sale

20 and one for services.  On the other hand the court recognized

21 in principle the notion of a -- there could be a suspensive

22 condition in a contract for the sale of a movable.  At least I

23 assume under Louisiana law a horse is a movable because

24 obviously it can move on its own volition.

25      THE COURT:  Well, what about their argument today

**J&J COURT TRANSCRIBERS, INC.**

48

1  that <u>Jefferson Parish</u> is not applicable because it is a

2  construction law case?

3      MR. ALLEN:  Well, Your Honor, in -- we cited this in

4  -- I think in our summary judgment brief -- as I understand

5  Louisiana law, you have essentially sales contracts and

6  services contracts.  Services contracts come under Article

7  2756, which defines such a contract as (1) it can be to build

8  by a plot, that's one definition, or to work by the job.

9  That's the definition of a services contract.  Clearly, he was

10 working a job here.  That's the nature of the -- of this

11 contract.  It's the essence of it, really.  So, it plainly fits

12 within the services contract definition of Louisiana law.

13     Now, in terms of all these facts about the conduct,

14 et cetera, there could not be a sale until items were removed.

15 The purchaser would take the item.  Now, is it possible the

16 sale and removal could occur simultaneously?  Sure.  But a sale

17 by Syracuse would still have to be accompanied by removal, by

18 having performed the service or having arranged for performance

19 of the service of removing the item, which is what he

20 contracted with Orion to do.  So there's nothing at all

21 inconsistent with him selling things once he removed them.

22 Offhand, I'm not aware of anything in the record that indicates

23 he held fire sales on the site and brought people in, but even

24 if he did, even if that were the case, if someone agreed to

25 purchase this piece of junk and it was removed by Syracuse,

A000308

49

1  well, fine, he can sell it because he's performed the cleanup

2  condition as to that item, which is to get it out of there.

3          I think the other thing to have in mind, though, is

4  this conduct.  In general, if you're going to look at conduct

5  as reflecting interpretation, the conduct needs to be by the

6  people who negotiated the agreement because they're the ones

7  who insofar as they had an intent as to what was happening, are

8  the ones whose intent is relevant.  These were people -- these

9  were workmen on the site who were trying to get the job done

10  who I would venture to say were probably not thinking of legal

11  concepts such as title.  So it really isn't, generally

12  speaking, relevant in terms of contract interpretation, but

13  moreover, the contract itself had a provision that essentially

14  said, look, if either party, not just Orion, if Syracuse or

15  Orion waives a right, doesn't mean they waive anything else.

16  So, worst case, if somebody on the site screwed up and waived

17  some legal right with respect to some tank or some valve or

18  something, it's not relevant to contract interpretation unless

19  it was the person who negotiated the contract, which it wasn't.

20  These were workman on the site trying to get him to do his job,

21  obviously in what became a very contentious atmosphere.

22          The only other point I actually want to touch on is

23  the Court concluded that the issue of interference was

24  irrelevant because even if he is right, that is, even if he

25  were interfered with and even if the legal effect under

50

1  Louisiana law would be that he is then deemed to have performed

2  his contract back as of 2001, all that gives him is a damages

3  claim because Louisiana law says you can't override the

4  intervening title of someone else.

5       Now, I would strongly oppose Mr. Wilson's request

6  that he now be allowed to submit a brief on that, which I

7  understood him to say in talking to the Court.  The Court, in

8  its opinion, specified the Louisiana law on which it was

9  relying for that conclusion.  Louisiana law clearly supports

10 the conclusion.  They've had every opportunity, if they

11 disagreed with that, to argue it or to brief it now, and so I

12 would urge the Court to deny their motion for reconsideration,

13 but not give them yet another opportunity to brief, and then I

14 suppose after that brief we'll go through a decision and then

15 we'll go through another motion for reconsideration.  They

16 haven't come close to meeting the standard for reconsideration

17 here.  They haven't shown any clear error by the Court in any

18 respect.  They made a bunch of arguments in their initial

19 motion and brief, which they now seem to have largely

20 abandoned.  Some of them were just mischaracterizations of the

21 Court's opinion.

22      But on what now seems to be their key argument, look

23 to the conduct of the parties.  The answers really are (1)

24 they've overstated the conduct, (2) even as they characterize

25 it, the conduct is perfectly consistent with the conclusion

**J&J COURT TRANSCRIBERS, INC.**

51

1  that they first had to remove the material before they got

2  title, and (3) it's legally irrelevant.  It's not conduct by

3  somebody who negotiated the contract, and, finally, even if

4  it's legally irrelevant, the anti-waiver provision covers it.

5  So they've pointed to nothing that justifies any deviation from

6  the Court's opinion, and, for these reasons, we would ask the

7  motion be denied.

8          THE COURT:  Thank you.  Reply?

9          MR. WILSON:  Brief reply.  Your Honor, I think

10  basically the major gist of the -- or the major crux of the

11  issue is title passes to all of this equipment or it passes to

12  none of it, and if it passes to some, as it was on-site, then

13  it passed as to all of it.  There's no -- there's nothing in

14  the contract that would allow piecemeal title to pass.

15          THE COURT:  Why?  They can't waive a condition?

16          MR. WILSON:  There's no indication that they waived

17  anything.  It was -- they acted in accordance with the

18  contract.

19          THE COURT:  Well, by their actions.

20          MR. WILSON:  There's no waiver.  They are buying --

21  everyone understood that it was their equipment.

22          THE COURT:  Well, not everybody did understand it.

23  You're suggesting --

24          MR. WILSON:  They don't now.

25          THE COURT:  You're suggesting that the actions show

**J&J COURT TRANSCRIBERS, INC.**

52

1 one thing.  They're suggesting the actions don't show that.

2          MR. WILSON:  Well, under Title -- oh, I'm sorry --

3 under Rule 56 of the Federal Rules of Civil Procedure, any

4 inference along those lines should be construed against the

5 movant, and to the extent that they're trying to say that this

6 should apply --

7          THE COURT:  Well, who's the movant here?

8          MR. LASTOWSKI:  Sorry, if I may, I think Mr. --

9 Michael Lastowski, Mr. Wilson meant to say --

10         MR. WILSON:  My guardian angel.

11         MR. LASTOWSKI:  -- should be construed against the

12 non-moving party.  And with regard to this conduct, it either

13 established (1) that there was no condition, or (2) that there

14 was a waiver of the condition, and our position would be under

15 Rule 56 that the inferences have to be drawn in our favor and

16 not the debtor's favor.

17         THE COURT:  But why?

18         MR. LASTOWSKI:  To the extent you're talking about

19 conduct and what inferences can be drawn from it, the context

20 of a summary judgment motion, under Rule 56 all inferences are

21 to be drawn in favor --

22         THE COURT:  But you are both --

23         MR. LASTOWSKI:  -- of the moving party.

24         THE COURT:  You are both moving parties.

25         MR. LASTOWSKI:  Oh, well --

                    **J&J COURT TRANSCRIBERS, INC.**

A000312

53

1          THE COURT:  That's the problem.

2          MR. WILSON:  But to the extent that we lose --

3          MR. LASTOWSKI:  Oh, but --

4          MR. WILSON:  -- on their motion, which is where we

5    are now, they should be drawn against --

6          THE COURT:  Well, you're losing on your motion, too,

7    though.

8          MR. WILSON:  Right, but in terms of -- that's not the

9    issue in our motion --

10         THE COURT:  Well, I think it -- well --

11         MR. WILSON:  To the extent that that particular

12   inference has carried the day and led us to where we are now,

13   that inference should have been construed against the movant on

14   their motion, is I guess the point that I'm trying to make.

15   But in any event, Syracuse sold the equipment to Orion without

16   removal, so, to the extent that's happened, that shows that

17   it's not a waiver situation.  That was the practice.  The was

18   the understanding of the contract.  And under Louisiana law,

19   the conduct of the parties can be used to construe the

20   contract, and that's what was going on.  Whether it's a waiver

21   or whatever, it's the conduct of the parties pursuant to the

22   terms and conditions of the contract, and that should control.

23         In addition, as far as -- one of the contentions made

24   by the debtor is that they're not -- this is not a sales

25   contract; they're working by the job.  They're not working by

54

1 the job. He's there to buy and sell this stuff. That's why he

2 entered into this contract. So, it's -- for him, cleaning up

3 and cutting the grass is something he has to do, but he's there

4 to buy this stuff, to resell it, and to make a profit, and

5 that's what it's all about.

6      And to the extent that the services are an important

7 element of the contract, Orion certainly would have an action

8 back over against Syracuse if at a later time -- let's say he

9 did cherry pick all the good stuff and then he bolted, they

10 would have an action back against him for the services they

11 feel he didn't perform, an action for either specific

12 performance or what they felt the value of the services might

13 be, perhaps. But the fact remains the issue we're here on is

14 not what the nature of the contract is, it's whether title

15 passed, and there's no question that under the terms and

16 conditions of the contract, under the facts and under the

17 conduct of the parties, or legally if you look to the correct

18 codal article, title passed when they reached their agreement

19 because there was an agreement as to the object and the price,

20 and the conduct of the parties evidenced that that's what

21 occurred.

22      And, Your Honor, we can furnish that supplemental

23 brief within a matter of days, as the Court prefers.

24      THE COURT: Well, I will allow you to file a

25 supplemental brief because I think that is a key issue here.

55

1          MR. WILSON:  Thank you, Your Honor.

2          THE COURT:  I'll give you a week.

3          MR. WILSON:  Thank you, Your Honor.

4          THE COURT:  All right.  I don't know if the debtors

5  wish to reply.

6          MR. ALLEN:  I expect we will, Your Honor.  I think we

7  probably will --

8          THE COURT:  All right, a week for the Syracuse brief

9  and a week for the response.

10         MR. WILSON:  Your Honor, in addition, if the Court

11  would appreciate or would request, we can also provide to

12  opposing counsel and to the Court a copy of the PowerPoint

13  either by hard copy or by electronic --

14         THE COURT:  Yes, a hard copy would be helpful if you

15  have it, or electronic we can use as well.

16         MR. LASTOWSKI:  Your Honor, Mike Lastowski again.  We

17  have the hard copies here.  Would Your Honor also want it in

18  electronic format?

19         THE COURT:  No, hard copy is fine.

20         UNIDENTIFIED ATTORNEY:  May I approach?

21         THE COURT:  You may.

22         THE COURT:  All right.  Thank you for your argument.

23  I think it's been helpful in going through these murky waters.

24  All right, we'll stand adjourned.  Thank you.

25         UNIDENTIFIED ATTORNEYS:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

56

C E R T I F I C A T I O N

       I, DENISE M. O'DONNELL, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, to the best of my ability.


/s/ Denise M. O'Donnell

DENISE M. O'DONNELL

J&J COURT TRANSCRIBERS, INC.      Date: June 30, 2006


**J&J COURT TRANSCRIBERS, INC.**

A000316