## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ORION REFINING CORPORATION, | ) |
| | ) Case No. 03-11483 (MFW) |
| Debtor. | ) |
| | ) |
| _____ | ) |
| MICHAEL G. SYRACUSE d/b/a | ) |
| INTERSTATE SUPPLY COMPANY, | ) Adv. Pro. No. 03-53939 |
| and TEXAS ICO, INC., | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 06-cv-536 (***) |
| v. | ) |
| | ) Re: Adv. D.I. 77, 78, 1522 |
| ORION REFINING CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## REPLY BRIEF ON BEHALF OF APPELLANTS/PLAINTIFFS,
## MICHAEL G. SYRACUSE d/b/a INTERSTATE SUPPLY COMPANY,
## and TEXAS ICO, INC., ON APPEAL FROM CHAPTER 11,
## CA NO. 03-11483 (MFW), AP NO. 06-00051, ADV. PROC. NO. 03-53939

Andrew C. Wilson (#01162)          Michael R. Lastowski, Esq.
Thomas R. Blum (#03170)            Christopher M. Winter, Esq
Susan M. Caruso (#27195)           Duane Morris LLP
Simon, Peragine, Smith & Redfearn, LLP  1100 N. Market Street
New Orleans, Louisiana 70163-3000  Wilimington, DE 19801-1246
Telephone: (504) 569-2030          (302)657-4951

Edward S. Rapier, Jr. (#17896)
2160 8th Street, Suite A
Mandeville, LA 70471
(504) 831-3393

*Counsel for Michael G. Syracuse d/b/a Interstate Supply Company, and Texas ICO, Inc.*

April 17, 2007

## TABLE OF CONTENTS

PAGE

SUMMARY OF THE ARGUMENT ................................................................................ 1

ARGUMENT....................................................................................................................4

    1.   Without realizing it, the Bankruptcy Court essentially recognized a
        conditional sale, not a sale subject to a suspensive condition....................4

    2.   By choosing the wrong codal article for its analysis, the
        Bankruptcy Court reached the wrong result.......................................8

    3.   The retroactive transfer of title is not an issue.....................................10

CONCLUSION .............................................................................................................. 14

i

TABLE OF AUTHORITIES

Page

## CASES

*Christina Investment Corp. v. Gulf Ice Company*, 55 So.2d 685 (La.App. 1Cir. 1951) .......4

*Electric Neon Clock Company v. Cooper*, 83 So.2d 678 (La. App. 1Cir. 1955)...................4

*Givens v. Southern Farm Bureau Casualty Insurance Company*, 197 So.2d 380 La.App. 2Cir. 1967), writ refused, 250 La. 902, 199 So.2d 1916 (La. 1967) ......................................4

*In re: Evangeline Refining Company, Inc.*, 37 BR. 415 (Bankr. W.D. La. 1984) ............9

*Jefferson Parish School Board v. Rowley Co.*, 350 So.2d. 187 (La.App. 4Cir. 1977)..........6, 7, 8

*Mobile Machinery and Supply Company, Inc. v. York Oilfield Salvage, Company, Inc.*, 171 So. 872 (La.App. 1Cir. 1937) ........................................................................................9

*Morelock v. Morgan & Bird Gravel Company*, 141 So. 378 (La. 1931) ..............................4

*Ober v. Williams*, 35 So.2d 219 (La. 1948) ..........................................................................6

*Remington Rand v. Boliew*, 131 So.2d 835 (La. App. 2Cir. 1961) ........................................4

*Roy O. Martin Lumber Company v. Sinclair*, 56 So.2d 240 (La. 1951)................................4

*Standard Chevrolet Company v. Federal Hardware Implement Mutuals*, 178 So. 642 (La. App. 2Cir. 1937) ...........................................................................................................4

*Standard Oil Company of Louisiana v. Allison*, 200 So. 273 (La. 1941)..............................14

*Thomas v. Phillip Werlein, Ltd.*, 158 So. 635 (La. 1935).....................................................4

*Ventre v. Pacific Indemnity*, 419 So.2d 969 (La.App. 3Cir. 1982) ......................................4

*Wampler v. Wampler*, 118 So.2d 423 (La. 1960)................................................................12, 13

## STATUTES

La. Civ. C. art. 1772 ...........................................................................................................11

La. Civ. C. art. 1775 ...........................................................................................................11

ii

La. Civ. C. art. 2456 (1998)......................................................................................................11, 12

La. Civ. C. art. 2458 .............................................................................................................8, 10

La. Civ. C. art. 2948 ..................................................................................................................8

## **MISCELLANEOUS**

James E. Archibald, *Pledges of voluntary contributions to the United
Nations by member states; establishing and enforcing legal obligations,
36 Geo. Wash. Int.'l L. Rev. 317, 332 (2004)(internal quotations omitted)* ..........................8

## SUMMARY OF ARGUMENT

The Debtor's Answering Brief serves only to confirm what is obvious from the record: that this is a situation of "seller's remorse" which the Debtor attempts to justify through unsupportable theories created long after the factual events of this matter had occurred. Indeed, the theories the Debtor presents to this Court were created out of non-existent contractual terms and facts by the Bankruptcy Court below, and were only adopted by the Debtor in the post-judgment phase of these proceedings based upon the two opinions issued by the Bankruptcy Court.

As to the specifics, the major premise of the Debtor's post-judgment theory of the case as presented in its answering brief is that title to the "surplus materials" could not pass until such time as the seventeen subject areas of the refinery referred to in the Debtor's agreement had been cleaned and all surplus materials had been removed from those areas. The Bankruptcy Court and now the Debtor, simply echoing the Bankruptcy Court's theories, have relied upon a series of isolated, inapposite cases wherein the courts have found that until such time as a particular suspensive condition to a contract has been fulfilled, title to certain objects associated with the contract might not pass.

None of these cases cited by the Bankruptcy Court, and now the Debtor, address a situation, as here, where an obligor has partially fulfilled, or is in the process of fulfilling, its obligation, or in common-law terms, partial "consideration" has occurred. Here, neither the Bankruptcy Court nor the Debtor, adopting the Bankruptcy Court's theories, have been able to adequately explain how Plaintiffs/Appellants, Michael G. Syracuse, d/b/a Interstate Supply Company, and Texas Ico, Inc. (collectively, "Syracuse"), could be readily reselling the surplus materials to third parties, as well as back to the Debtor, both *in situ* and off-site if Syracuse didn't have title.

1

Indeed, the conduct of the parties makes it abundantly clear that there never was a "suspensive condition," which is consistent with the content of the agreement between the parties drafted by the Debtor, as there was no language to that effect. Nor was there any "waiver" of a suspensive condition, an issue inherent in the suspensive condition theory. In this regard, in yet another attempt to avoid the obviously correct result, the Debtor now attempts to assert that Syracuse waived the waiver issue which is not correct since this issue is inherent in the suspensive condition issue, and is not a new issue for appeal as the Debtor now attempts to incorrectly assert.

More importantly, what the Debtor's answering brief confirms is that all of its arguments were created only after litigation started, or, based upon the Bankruptcy Court's opinions. Significantly, the Debtor's answering brief fails to address the following major factual and legal issues raised by Syracuse:

1. The fact that the Debtor's employees and representatives developed a bad case of "seller's remorse" when they belatedly realized that they had struck a bad bargain due to the wording of the Debtor's own agreement, which contained no provisions indicating when title to the surplus materials passed or when Syracuse was required to clean areas of the refinery;

2. The fact that upon this realization, the Debtor's representatives then interfered with Syracuse, and utilized "self-help" remedies not allowed under Louisiana law, by preventing Syracuse's access to the surplus materials so as to prevent his "cherry-picking" items for additional resales and to force him to clean up certain areas ahead of time, or even areas not part of the agreement;

3.  The fact that at no time during the negotiations between the Debtor and Syracuse were the contractual terms which the Bankruptcy Court supplied for its Opinions ever included or even discussed or in the Debtor's chosen language for its agreement, including the following:

    a.  A suspensive condition;

    b.  The actual cash value of the surplus materials;

    c.  The actual cost of removing the surplus materials or the cost of cleaning up the 17 individual areas of the refinery which were the subject of the agreement;

    d.  Which surplus materials could be removed, and when; and

    e.  When title to the surplus materials would pass, if other than under Louisiana law, particularly the correct provisions of the Louisiana Civil Code;

4.  The fact that Louisiana courts interpret situations such as this as a confected contract of sale, although under the common law this situation would, at worst, be defined as a "conditional sale" with only a partial tender of consideration; and

5.  The fact that the Bankruptcy Court simply applied the wrong codal provisions of the Louisiana code, which inevitably led to the wrong result.

3

## ARGUMENT

### 1. Without realizing it, the Bankruptcy Court essentially recognized a conditional sale, not a sale subject to a suspensive condition.

In its answering brief, the Debtor presents the same confusion regarding suspensive conditions under the civil law and conditional sales under common law as the Bankruptcy Court experienced. More specifically, in its answering brief, the Debtor incorrectly states:

> "Syracuse is simply wrong as a matter of Louisiana law when he argues that a contract to sell movables subject to a suspensive condition cannot exist under Louisiana law and then characterizes the Agreement as a conditional sale under which title could not be retained by Orion."[1]

Syracuse does not contend that there can be no contract to sell "movables subject to a suspensive condition" under Louisiana law. To the contrary, these contracts can exist, but often times they are, as here, actually attempts to confect common law "conditional sales," which, in contrast, are not allowed under Louisiana law. In those situations, as Syracuse has pointed out in its Opening Brief, Louisiana courts recognize that the seller has attempted to retain title until such time as all "consideration" has been tendered, but the courts do not recognize such an arrangement. Instead, the courts recognize that while the seller has attempted a common law conditional sale, a true sale under the Louisiana Civil Code has been confected and title has passed.[2]

---

[1] Debtor's Answering Brief at p. 15.

[2] See, e.g., *Ventre v. Pacific Indemnity*, 419 So.2d 969 (La.App. 3Cir. 1982); *Givens v. Southern Farm Bureau Casualty Insurance Company*, 197 So.2d 380 La.App. 2Cir. 1967), writ refused, 250 La. 902, 199 So.2d 1916 (La. 1967); *See, e.g., Givens, surpa*; *Remington Rand v. Boliew*, 131 So.2d 835 (La. App. 2Cir. 1961); *Electric Neon Clock Company v. Cooper*, 83 So.2d 678 (La. App. 1Cir. 1955); *Roy O. Martin Lumber Company v. Sinclair*, 56 So.2d 240 (La. 1951); *Christina Investment Corp. v. Gulf Ice Company*, 55 So.2d 685 (La.App. 1Cir. 1951); *Standard Chevrolet Company v. Federal Hardware Implement Mutuals*, 178 So. 642 (La. App. 2Cir. 1937); *Thomas v. Phillip Werlein, Ltd.*, 158 So. 635 (La. 1935); *Christina Investment Corp., supra.*; *Morelock v. Morgan & Bird Gravel Company*, 141 So. 378 (La. 1931).

Compounding this confusion, the Debtor then overstates its case by simply reiterating the Bankruptcy Court's theories without analyzing the inherent inconsistencies in same.   For instance, in its contentions, the Debtor quotes the Louisiana Supreme Court as follows:

> "(I)t is no more possible to sell without transferring ownership than it is possible to sell without selling, or to transfer ownership without transferring ownership, or to do anything without doing it."[3]

The Debtor has plainly forgotten that Syracuse resold numerous items to third-parties and back to the Debtor, both *in situ* and offsite, and was also transporting items away for storage in anticipation of later resales.  All of this was done without objection by the Debtor and with no evidence any of any type of formal approval, waiver, modification of the original Agreement or any other evidence that this was anything but the normal fulfillment of the contractual terms. Consequently, either there was a sale of the surplus materials or there was no sale of the surplus materials.   There were no selective sales of surplus materials and there was no evidence to support such a theory contrary to the contentions of the Debtor, echoing the Bankruptcy Court's new facts.  There had to have been a sale as is evidenced by the resales since it is impossible "to sell without transferring ownership" and certainly it was impossible for Syracuse to resell without having ownership.  This is the "elephant in the living room" of the Debtor's argument which the Debtor is unable to effectively ignore.

For reasons that remain unclear, presumably confusion with the unique aspects of the civil law, the Debtor has created a legal "fruit salad," mixing the "apples and oranges" of conditional sales with suspensive conditions, movables with immovables, and, common law codes with civil law codes.  Indeed, as mentioned above, the Debtor wrongfully misrepresents that several pages of Syracuse's opening brief suggest that a sale subject to a suspensive condition does not exist,

---

[3] Debtor's Answering Brief at p. 21.

when in fact Syracuse simply pointed out that common law conditional sales do not exist under Louisiana civil law. The Debtor also equates decisions dealing with immovables to those governing movables much as the bankruptcy court did, citing *Ober v. Williams*.[4] Oddly, the Debtor includes a quote from the *Ober* matter, indicating that the holding of that case relates not to movables, as here, but only to cases involving "contracts to sell and purchase immovable property," i.e., real property under the civil law, more importantly, written deeds, and titles, mineral leases, and specific contractual terms as in that matter. The Debtor fails to note, or simply ignores this basic distinction of the civil law between movable and immovables. Finally, the Debtor suggests that Syracuse must yield to the Bankruptcy Court's expertise in the civil law and the Louisiana Civil Code because it deals with the U.S. Bankruptcy Code. This makes no sense as neither the Bankruptcy Code, the U.S. Code nor even the California Civil Code are true civil codes; they are compilations or codifications of common law, or statutory law, not civilian codes or sources such as the Napoleonic Code, the Louisiana Civil Code or Roman law.

Perhaps most significantly, in its answering brief, the Debtor has been unable to cite any cases recognizing a sale subject to a suspensive condition where, as here, the "condition" at issue is no long suspended: the obligor has commenced performance and the execution of the contract or agreement is well underway with both parties to the agreement fulfilling their respective obligations. Instead, the Debtor attempts to recycle the inapposite holding in *Jefferson Parish School Board v. Rowley Co.*[5] This case stands alone, and in isolation, and consequently if distinguished the Debtor's argument as well as the Bankruptcy Court's opinions fall.

In *Rowley*, a school board had purchased cabinets which were to be installed and thus the court referred to the contract as a particular, specialized type of contract known as a "furnish and

---

[4] 35 So.2d 219 (La. 1948) cited at p. 24 of the Debtor's Answering Brief pp. 24-25.
[5] 350 So.2d 187 (La.App. 4Cir. 1977).

6

install" contract. There is no evidence that any of the cabinets were ever installed before they were eventually destroyed by a fortuitous event in this fact situation. This is in complete contrast to the instant matter in which there is no question that the surplus materials were sold to Syracuse, that Syracuse took title and was reselling them to third-parties and back to the Debtor, and was transporting still others offsite until the Debtor prevented him from doing so.

Thus, while *Rowley* may have stood for the proposition that a suspensive condition to a contract of sale may exist for an installation contract, for *Rowley* to apply, the condition must remain suspended. That was not the case in this matter where $700,000.00 worth of equipment had been sold offsite by Syracuse before the Debtor shut down Syracuse's operation. In addition, the terms and conditions of the contract at issue in *Rowley* clearly indicated that whichever contractor's bid was accepted by the school board had to comply with certain conditions, many of which, particularly the insurance terms, indicated that risk of loss had to remain with the seller.

Although the Debtor attempts to put these terms aside, these terms were compelling that the Court held that the contractor had to bear the loss.[6] In fact, one term stated that the contractor had an obligation to "protect one's" work and replace damaged work and to provide builder's risk insurance.[7]

In addition, the conduct of the parties clearly indicated that the school board had no intention of taking title or even possession of the cabinets until they were installed. As the Court described the arrangement from the school board's perspective, "if you do not install, I do not want and will not buy."[8] In complete contrast, Syracuse indicated every intention of taking

---

[6] Id. at 191.
[7] Id. at 189.
[8] Id. at 192.

7

possession on an immediate basis of all the surplus materials which had been sold to him as he was immediately reselling them to third-parties and back to the Debtor and, readily taking other items offsite.  Consequently, while perhaps interesting as an example of a "furnish and install" contract, a species of construction contract, *Rowley* has no bearing, and certainly no precedential value insofar as this matter is concerned.

### 2.    By choosing the wrong codal article for its analysis, the Bankruptcy Court reached the wrong result.

The most critical aspect of a legal analysis under the deductive reasoning process of the civil law involves the application of "general code provisions to the facts of the case to reach a specific solution."[9]  Consequently, the choice of the correct "code provisions" is critical to a correct analysis.  The codal provisions serve as the gateways through which the Court enters its analysis.  Thus, much like the airplane passenger who enters the wrong gate and boards the wrong plane, the court, much like the passenger, will end up at the wrong destination if the wrong code articles are chosen at the outset.  This is what happened here.

Both the Bankruptcy Court, and the Debtor in adopting the Bankruptcy Court's analysis whole heartedly, never explain why they failed to apply Article 2458 of Louisiana Civil Code dealing with sales in a lump.  Syracuse provided two separate cases involving analogous fact situations which showed that Article 2948 was obviously the correct codal article to apply.  The application of this article obviates any consistencies of the value of the surplus materials, or the value of the clean-up which might be associated with "innominate" contracts by the Debtor.  In

---

[9] James E. Archibald, *Pledges of voluntary contributions to the United Nations by member states; establishing and enforcing legal obligations*, 36 Geo. Wash. Int.'l L. Rev. 317, 332 (2004)(internal quotations omitted).

those situations, the value of the services and items at issue is considered by the parties and set out in the terms of the agreement at issue.

Here, the parties never discussed the actual cash value of the surplus materials or the costs involved in transporting them offsite or even the minimal cost of cleaning up the property, i.e., removing paper and small trash items so as to be able to cut grass.  In addition, Syracuse paid a specific purchase price of $100,000.00, for the surplus materials as they lay at the refinery.  This specific purchase price and actual payment of the price distinguishes this situation from such "innominate" contracts, under the cases cited by the Debtor.  Moreover, the Bankruptcy Court, nor the Debtor could explain why they should not reply upon cases including sales "in a lump" with removal costs included, which is exactly what this was.  In fact, no explanation was ever given for why the would not, or could not, address *Mobile Machinery and Supply Company, Inc. v. York Oilfield Salvage, Company, Inc.*,[10] which involved exactly the same scenario in which a salvage company purchased surplus materials, i.e., pipe, "in a lump" from a financially stressed company for later re-sale, bearing all costs of removal, just as here.  Further, in that case neither side knew how much pipe was actually there nor was the value for resale ever discussed, just here.[11]  Yet, the Bankruptcy Court failed to not only distinguish, but to even address that matter which involved a purchase and remove scenario just as here, not a "furnish and install" contract as in *Rowley*.

Likewise, the Bankruptcy Court also failed to address a similar matter involving yet another soon to be bankrupt refinery, *In re: Evangeline Refining Company, Inc.*[12]  That matter is particularly relevant for yet another reason since the actions of both the Debtor and the Purchaser

---

[10] 171 So. 872 (La.App. 1Cir. 1937).
[11] Id. at 873.
[12] 37 BR. 415 Bankr. (W.D. La. 1984).

9

show that they both considered the fuel at issue to belong to the Purchaser much like the surplus materials, which was evidenced here by the fact that Syracuse was reselling the surplus materials to third-parties and back to the Debtor and also readily removing them offsite. Both the Bankruptcy Court and the Debtor in its answering brief have no explanation for why these cases and Article 2458 of the Louisiana Civil Code should not control the outcome of this matter. This is obviously an error of law, which provides this Court ample reason to overturn the decision below.

### 3.   The retroactive transfer of title is not an issue.

Both the Bankruptcy Court, and the Debtor in adopting the Bankruptcy Court's new theories as they evolved, harped upon the need for Syracuse to somehow establish the retroactive transfer of title in order to prevail. That analysis presents multiple flaws.

First, both the Bankruptcy Court and the Debtor have overlooked the original purpose of the escrow account which was specifically intended to eliminate all the issues which both the Bankruptcy Court raised in its opinions and which the Debtor now reiterates. As its reads, Paragraph 57(a) of the Bankruptcy Court's sale order allowed for Syracuse's claim to attach to the escrow proceeds. Consequently, the existence of the escrow account obviated any concerns about specific performance or claims for damages except for amounts in excess of the escrow account. It also eliminated the concerns associated with the third-parties. This was the purpose of the escrow account and without which, the sale would not have proceeded.

Thus, all of the concerns which the Bankruptcy Court and the Debtor referenced under articles 1772 and 1775 of the Louisiana Civil Code are not at issue. These include whether the remedy of specific performance is not available such that a claim must be limited to damages. Here, the escrow account took the place of approximately $1,500,000.00 worth of surplus materials and to the extent of that sum, damages and specific performance are no longer at issue. Nor is there an the issue as to whether third-parties would be adversely effected. Not surprisingly, not even the Bankruptcy Court could keep the latter contention straight as the Bankruptcy Court in its original opinion was concerned as to the adverse effect that "retroactive title" would have on Valero's title to the surplus materials purchased by Valero at the refinery's sale out of bankruptcy. But then the Bankruptcy Court abruptly switched its concern to the possible adverse effect on the Bankruptcy estate that "retroactive" title would have. The Bankruptcy Court gave no explanation as to how its concerns shifted from Valero to the bankruptcy estate; yet either finding, served to defeat Syracuse's claims to title. Combined with the other insupportable holdings, i.e., use of the wrong codal article, the revelation of a non-existent suspensive condition, the discovery of a selective waiver of the non-suspensive condition, and ignoring the significance of Syracuse's resales, the overall result was to deny Syracuse his rightful claim to title to the surplus materials. The complete absence of any factual basis or legal authority for these conclusions should require a reversal of all of these holdings.

A second reason that retroactive effect is not relevant, besides the original purpose of the escrow agreement is that title to the surplus materials had already passed to Syracuse as soon as the contract of sale had been confected. The Bankruptcy Court lost sight of this fundamental precept of Louisiana law as set forth under Article 2456 of the Louisiana Civil Code that

11

"ownership is transferred between the parties as soon as there is an agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid."[13]

There is no question that Syracuse paid his portion of the bargain to take title to the surplus materials in the form of $100,000.00, although the Debtor allowed him to tender some of his surplus materials back to the Debtor to satisfy some of the purchase price. This was at the Debtor's own request. Additionally, there is no question that an agreement was reached as to the surplus materials in the seventeen different areas sufficient to identify them as "objects" for the sale agreement. Accordingly, there is no question that there was an agreement as to the "objects" and the "price" and thus the sale was confected under Article 2456. As an aside, it should be pointed out that although the Debtor in its answering brief at one point states that Syracuse "alleges" he paid the purchase price,[14] the Debtor initially acknowledges the truth on this issue that Syracuse did indeed pay the purchase price in another area of its answering brief.[15] Accordingly, since title has already passed with the confection of the sale there is no reason to deal with the issues associated with reversion of its title or any retroactive effect.

Finally, both the Bankruptcy Court and hence the Debtor place great emphasis on two decisions related to real property transactions, which should be addressed. The first of the two, *Wampler v. Wampler*,[16] is a case involving the assignment of a mineral lease on immovable property. The issue is when the assignment of the mineral lease on the immovable property became effective, as the assignee's ex-wife claimed she had an interest in the assignment if it had become effected prior to the date of the divorce decree at issue.

---

[13] La. Civ. C. art. 2456 (1998).
[14] Debtor's Answering Brief at p. 15.
[15] Debtor's Answering Brief at p. 4.
[16] 118 So.2d 423 (La. 1960).

Significantly, and where the instant matter differs, because of the specific terms and conditions of the assignment, the mineral lease in *Wampler* could not be assigned until all interested landowners had signed off on the mineral lease and a title examination had been completed. Further, the payment of the assignment was not to be made until those specific terms and conditions had been met. As the title examination had not been completed prior to the entry of the divorce decree, the payment of the assignment had also not been made. Thus by the specific terms and conditions of the agreement between the parties, the assignment was not effective until after the divorce decree and thus the ex-wife had no interest in the mineral lease. This was an obvious conclusion for the court to reach, and thus there was simply no basis for reversion of title.

The instant matter bears absolutely no resemblance to *Wampler* for two major reasons. First, *Wampler* has no precedential value as it involves immovables governed by an entirely different area of the Louisiana Civil Code and an entirely different body of law. This fundamental distinction in basic civil law concepts repeatedly evades the reasoning of both the Bankruptcy Court and derivatively, the Debtor. The second distinguishing aspect of *Wampler* is that there were specific terms and conditions within the agreement between the parties that made it abundantly clear the assignment would not be effective until those specific terms and conditions were fulfilled.   In complete contrast, the Debtor failed to include such specific terms and conditions in its contractual language within the agreement in this matter. Further, the conduct of the parties and other parole evidence in *Wampler* clearly evidenced the fact that title should not pass until some suspensive conditions were fulfilled. Here, the conduct of the parties showed title *had* passed through resales of Syracuse's surplus materials to third-parties and the Debtor.

13

In the second case they cite, *Ober v. Williams*,[17] both the Bankruptcy Court and the Debtor failed to recognize the same distinguishing elements as in *Wampler*. Again, *Ober* involves immovables, and, once again, the outcome was dependent upon the specific terms and conditions of a deed for real property. A specific effective date was set forth in that deed which controlled the outcome of the case. Consequently, *Ober* is as equally inapplicable as was *Wampler*.

In sum, to the extent that this Court need delve so far, neither the Bankruptcy Court not the Debtor have produced any legal or logical rationale for preventing a retroactive recognition of Syracuse's title to the surplus material due to the interference of the Debtor, under Articles 1772 and 1775 of the Louisiana Civil Code. Again this inquiry is only necessary, should the Court choose to reach the retroactive title issue. The unequivocable testimony and related evidence from the Debtor's own employees show that the Debtor deliberately interfered with Syracuse's performance, thus allowing for retroactive title to occur under Articles 1771 and 1775 of the Louisiana Civil Code. These articles allow for title to be "crystallized" in favor of Syracuse, when performance was no longer possible i.e. when he was locked out. This is all set out previously in the opening brief of Syracuse.[18] The Debtor fails to address this aspect of the jurisprudence.

## CONCLUSION

In sum, the Debtor's answering brief has only served to highlight the flaws in the Bankruptcy Court's opinion and rationale. The opinions below had ignored facts and inserted or relied upon non-existent facts as well as contractual terms that did not exist. The result was pushed further off track by the application of the wrong civil law and codal articles as well as by

---

[17] 35 So.2d 219 (La. 1948).
[18] See, p. 35 citing, *Standard Oil Company of Louisiana v. Allison*, 200 So. 273 (La. 1941).

a failure to recognize the purpose of the escrow account. For all of these reasons, the opinions

below should be reversed, and summary judgment should be granted in favor of Syracuse.

DUANE MORRIS LLP

Michael R. Lastowski (DE I.D. 3892)
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail: mlastowski@duanemorris.com

Andrew C. Wilson (#01162)
Thomas R. Blum (#03170)
Susan M. Caruso (#27195)
Simon, Peragine, Smith & Redfearn, L.L.P.
1100 Poydras Street, 30th Floor
New Orleans, Louisiana 70163-3000
Telephone: (504) 569-2030
E-mail: andreww@spsr-law.com

Edward S. Rapier, Jr. (#17896)
2160 8th Street, Suite A
Mandeville, LA 70471
Telephone: (985)626-1011
Facsimile: (905)674-9082
E-mail: erapier@charter.net

COUNSEL FOR:
MICHAEL G. SYRACUSE D/B/A
INTERSTATE SUPPLY COMPANY, AND
TEXAS ICO, INC.

April 17, 2007

15

IN THE UNITED STATES BANKRUPCTY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| ORION REFINING CORPORATION, | ) | Case No. 03-11483 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| IN RE: | ) | |
| | ) | |
| MICHAEL G. SYRACUSE d/b/a | ) | |
| INTERSTATE SUPPLY COMPANY, | ) | Adv. Pro. No. 03-53939 |
| and TEXAS ICO, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Re: Adv. D.I. 77, 78, 1522 |
| ORION REFINING CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Michael R. Lastowski, certify that I am not less than 18 years of age, and that service

of a copy of the attached OPENING BRIEF ON BEHALF OF APPELLANTS/PLAINTIFFS,

MICHAEL G. SYRACUSE d/b/a INTERSTATE SUPPLY COMPANY, and TEXAS ICO,

INC. was made on April 17, 2007 by hand-delivery upon the following attorney:

Thomas W. Briggs, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19801

David L. Buchbinder, Esquire
Office of the U.S. Trustee
 J. Caleb Boggs Federal Building, Suite 2207
 Wilmington, DE 19801

Dated: April 17, 2007

_____
Michael R. Lastowski (DE I.D. 3892)