IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ORION REFINING CORP., | ) | Bank. No. 03-11483 (MFW) |
| | ) | Adv. No. 03-53939 (MFW) |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| MICHAEL G. SYRACUSE, d/b/a | ) | |
| Interstate Supply Company d/b/a | ) | |
| Texas ICO Inc., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-536-SLR |
| | ) | |
| ORION REFINING CORPORATION, | ) | |
| et al., | ) | |
| | ) | |
| Appellees. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 9th day of April, 2008, having reviewed the papers submitted in connection with the above captioned appeal;

IT IS ORDERED that the appeal is granted and the matter is remanded to the bankruptcy court for further proceedings consistent with this order, based on the following reasoning:

1. **Standard of review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999). With

mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991) (citing Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. In re Hechinger, 298 F.3d 219, 224 (3d Cir. 2002); In re Telegroup, 281 F.3d 133, 136 (3d Cir. 2002).

2. **Background.** Debtor/appellee Orion Refining Corporation ("Orion") operated a crude oil refinery in Norco, Louisiana. On April 24, 2001, appellant Michael G. Syracuse ("Syracuse") and Orion entered into an agreement ("the Agreement") whereby Syracuse, identified in the Agreement as being in the business of "providing surplus material reclamation and clean-up services," agreed to remove surplus materials from certain designated areas of the Norco facility, so that the areas could be graded and maintained without obstruction. The Agreement was governed by Louisiana law. Section II of the Agreement, entitled "Scope of Work," provided that Syracuse

> shall furnish all required insurance, supervision, equipment, materials, and qualified personnel to remove surplus materials as identified by Orion . . . and clean all designated areas . . . . Completion of areas is defined as: graded and able to cut grass without obstruction . . . . All Work or services rendered or performed by [Syracuse] shall be done with due diligence, in a good, workmanlike manner, using skilled, competent and experienced workmen and supervisors.

2

(D.I. 14 at A000058-59) In terms of remuneration, Syracuse was required to pay Orion $100,000; there is no indication of record that this sum was not paid in full. It was contemplated by the parties that the "Work under th[e] Agreement" would be completed no later than March 31, 2002 and that all areas would be "cleaned and turned back over to [Orion] before [the] project [would be] considered complete." Exhibit E to the Agreement (not included in the appellate record) was "Orion Drawing # 004-003-1-272 for use to identify areas of work."

    3. As I understand the parties' course of conduct from the appellate record (D.I. 14), Syracuse was required to get a work permit on a daily basis and could only work in those areas identified by Orion personnel. There were 17 designated work areas in total, containing different types of materials ranging from large vessels to small fittings. Some of the materials were so large that they could not be removed without use of a crane or the need to cut them into smaller pieces; Syracuse did not have a crane, but did have the equipment to cut up some of the materials. There were occasions when the purchaser of the materials was responsible for physically removing the materials because of their size. During the period April 2001 through March 2002, Syracuse completed about 40% of the total project, selling the removed materials for some $800,000. There was a concern on the part of Orion that Syracuse was selling "the big stuff" first and not performing all of his obligations to remove nonvalue materials so that the areas could be graded and mowed. He was locked out of the Norco facility after March 31, 2002. The estimated value of the remaining materials is $1.5 million.

    4. Orion filed for bankruptcy protection on March 13, 2003 and, shortly thereafter, sold all the assets of the Norco facility to Valero Energy Corporation and

Valero Refining-New Orleans, LLC (collectively "Valero").  Syracuse objected to the sale, based on his claim that he had obtained title by virtue of the Agreement to the $1.5 million worth of surplus materials still located at the Norco facility.  The parties agreed to allow the sale of the facility to go forward, subject to Orion's placing in escrow $1.5 million of the sale proceeds pending a determination of title to the surplus materials.

5.  Through a motion practice, the bankruptcy court concluded that title had not passed to Syracuse before Orion filed for bankruptcy.  The bankruptcy court assumed for purposes of its analysis that the Agreement was a contract for sale, as Syracuse argued, rather than a contract for services, as argued by Orion.  However, the bankruptcy court disagreed with Syracuse's contention that title passed to him upon execution of the Agreement, instead finding that Syracuse's performance of his clean-up services was a "suspensive condition" to his obtaining title to the surplus materials in the designated areas.  In other words, until Syracuse completed the clean-up services in an area, title to the surplus materials in that area did not pass from Orion to Syracuse.  Consequently, title to the surplus materials remaining at the Norco facility had not passed to Syracuse when Orion filed its bankruptcy case; Orion's bankruptcy estate instead obtained an interest in the surplus materials (i.e., the $1.5 million in escrow).

6.  **Analysis.**  The bankruptcy court relied on the analysis found in Jefferson Parish School Bd. v. Rowley Co, Inc., 350 So. 2d 187 (La. Ct. App. 4th Cir. 1977) for its conclusion that title had not passed to Syracuse.  In Jefferson Parish, a fire had destroyed laboratory tables, cabinets, and other property intended to be installed in a

newly renovated science laboratory. The Louisiana court had to determine who bore the risk of the loss, the school board (because the property had already been paid for) or the contractor (because the property had not yet been installed). The Louisiana court concluded, based on its assumption that

> sale is the correct legal categorization of a one-price contract to outfit a school science laboratory with wall cabinets and laboratory tables with troughs, gas, water, distilled water and drain lines, all to be permanently affixed and precisely fitted to the floor and walls . . . , that the "sale" is subject to a suspensive condition of installation which was not fulfilled and the property and risk of loss therefore remained with the "seller". . . . Accordingly the school board suffered no loss of its property and its insurer is not liable.

Id. at 192-193. In other words, the sale was deemed "suspended" (not perfected) until installation was completed.

7. Syracuse argues that the Agreement, upon execution, constituted a perfected contract of sale of the surplus materials, consistent with Articles 2439 and 2459[1] of the Louisiana Civil Code: (a) the surplus materials were "sold in a lump" as identified by "Orion Drawing # 004-003-1-272"; (b) the price was $100,000; and (c) the parties consented to the sale. See In re Evangeline Refining Co., Inc., 37 B.R. 450, 453 (Bankr. W.D. La. 1984); Moblie Machinery & Supply Co., Inc. v. York Oilfield Salvage Co., Inc., 171 So. 872, 874 (La. Ct. App. 1st Cir. 1937).

8. **Conclusion.** The facts of record do not fit neatly into either of the above analytical frameworks. Moreover, neither result is a completely fair one: (a) If Orion prevails, it ends up with a windfall (both Syracuse's $100,000 and $1.5 million from

---

[1]"If . . . goods, produce or other objects have been sold in a lump, the sale is perfect, though these objects may not have been weighed, counted or measured."

5

materials it apparently had not valued before executing the Agreement); (b) If Syracuse prevails, he gets $1.5 million without completing the clean-up work contemplated under the Agreement. Nevertheless, given the Agreement and the parties' course of conduct, I conclude that the better fit is that offered by Syracuse. Syracuse paid Orion $100,000 for the materials; Orion paid nothing for the clean-up services.[2] There is no dispute that removal of the materials was part of the clean-up process and that Syracuse was entitled to remove and sell (or, in some instances, sell and then remove) the materials before the clean-up services were deemed complete. To embrace the "suspensive condition" of sale theory means that title was bestowed on Syracuse on a rolling basis, actually **after** the materials were removed and sold (since clean-up could not be completed until after the materials were removed). Based on the principle that one cannot sell what one does not own, I find that Syracuse had title to the materials he sold prior to March 31, 2002, even if the areas from which the materials were removed were not graded and capable of being mown. Based on the further principle that the Agreement should be enforced consistently with the parties' course of conduct[3] during the term of the Agreement, I conclude that title passed to Syracuse at the time the Agreement was executed and, therefore, that he is entitled to the $1.5 million in escrow. However, the matter will be remanded to the bankruptcy court to ensure that the facts

---

[2]One could argue that Orion's consideration was giving up the right to realize the value of the surplus materials; however, the materials had not been valued at the time of the Agreement and this consideration was nowhere recognized in the Agreement, a document drafted by Orion.

[3]The language of the Agreement is vague and, therefore, not particularly helpful in resolving this dispute. Since the Agreement was drafted by Orion, I find the parties' course of conduct to be dispositive.

taken from the appellate record (to which I could not discern a dispute) are truly not in dispute for purposes of the motion practice.

_____
United States District Judge